

**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

---

Connecticut Financial Center        (203)821-3700
157 Church Street, 25th Floor        Fax (203) 773-5376
New Haven, Connecticut 06510        www.justice.gov/usao/ct

November 19, 2021

Darnell Crosland
The Crosland Law Group LLC
1200 Summer Street, Suite 202
Stamford, Connecticut 06905

United States District Court
District of Connecticut
FILED AT      NEW HAVEN

*November 19* 2021
Roberta D. Tabora, Clerk
By_____
Deputy Clerk

  Re: *United States v. Laheem Jones*
    Case No. 3:20CR126(JBA)

Dear Attorney Crosland:

  This letter confirms the plea agreement between your client, Laheem Jones (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government") in this criminal matter.

**THE PLEA AND OFFENSE**

  In consideration for the benefits offered under this agreement, Laheem Jones agrees to plead guilty to Count One of the Superseding Indictment charging a violation of 18 U.S.C. § 1962(d) (Racketeering Conspiracy) and the divisible portion of Count Two of the Superseding Indictment charging him with VCAR attempted murder and aiding and abetting in the same in violation of 18 U.S.C. § 1959 (a)(5).

**COUNT ONE – RACKETEERING CONSPIRACY**

  The defendant understands that, to be guilty of Racketeering Conspiracy, the following essential elements must be satisfied:

1. That an enterprise existed as alleged in the Superseding Indictment;

2. That the enterprise engaged in, or its activities affected, interstate or foreign commerce;

3. That the defendant was employed by, or associated with, the enterprise; and

*Darnell Crosland, Esq.*
*Page 2*

   4.  That the defendant knowingly agreed to conduct or participate, directly or indirectly, in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity.

## COUNT TWO – VCAR ATTEMPTED MURDER AND AIDING AND ABETTING

The defendant understands that, to be guilty of this offense, the following essential elements must be satisfied:

1. The existence of an "enterprise" as defined in 18 U.S.C. § 1959(b)(2);

2. The charged enterprise engaged in, or its activities affected, interstate or foreign commerce;

3. The charged enterprise engaged in "racketeering activity" as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1); and

4. The defendant attempted to or aided others to commit murder, which crime violated Connecticut state law; and

5. The crime of violence was committed either: (1) as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from the charged enterprise, or (2) for the purpose of gaining entrance to or maintaining or increasing position in the charged enterprise.

## THE PENALTIES

### Imprisonment

Racketeering Conspiracy as charged in this case carries a maximum penalty of 20 years' imprisonment. VCAR Attempted Murder carries a maximum penalty of 10 years' imprisonment. The defendant understands that as a result of his plea to both counts, he faces a maximum sentence of 30 years of imprisonment.

### Supervised Release

In addition, the Court may impose a term of supervised release of not more than three years to begin after any term of imprisonment.

### Fine

Each offense carries a maximum fine of $250,000, for a total of $500,000.

*Darnell Crosland, Esq.*
*Page 3*

<u>Special Assessment</u>

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $200 on each count of conviction.  The defendant agrees to pay the special assessment to the Clerk of the Court on the day of sentencing.

<u>Restitution</u>

In addition to the other penalties provided by law, the Court must also order that the defendant make restitution under 18 U.S.C. § 3663A, and the Government reserves its right to seek restitution on behalf of victims consistent with the provisions of § 3663A.  The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. Restitution is payable immediately unless otherwise ordered by the Court.

<u>Interest, penalties and fines</u>

Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or restitution not paid within 15 days after the judgment date.  18 U.S.C. § 3612(f).  Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572(h), (i) and § 3612(g).

*Darnell Crosland, Esq.*
*Page 4*

## THE SENTENCING GUIDELINES

Applicability

The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case and is not bound by this plea agreement. The defendant agrees that the Sentencing Guideline determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office. The defendant further understands that he has no right to withdraw his guilty plea if his sentence or the Guideline application is other than he anticipated, including if the sentence is outside any of the ranges set forth in this agreement.

Acceptance of Responsibility

At this time, the Government takes no position on whether the Court should reduce by two levels the defendant's adjusted offense level under § 3E1.1(a) of the Sentencing Guidelines. Because the Government has been preparing for trial and had announced that it would not recommend a one-point reduction pursuant to § 3E1.1(b) if defendant did not enter a plea before October 1, 2021, the Government will not recommend that the Court reduce the defendant's Adjusted Offense Level by one additional level.

Stipulation

The parties stipulate that (1) the narcotics quantity for which the defendant is responsible, as a result of his role in the conspiracy, is at least 60 kilograms but less than 80 kilograms of converted drug weight; (2) from approximately 2014 until the present, Laheem Jones was a member and/or associate of the Greene Homes Boys, a.k.a. GHB, a.k.a. G$B; (3) that in furtherance of the GHB enterprise, Mr. Jones conspired to traffic marijuana, heroin, cocaine base and Percocet pills and (4) on or about January 27, 2020, the defendant agreed with other fellow GHB enterprise members and Original North End ("O.N.E.") allies that they would retaliate against opposition gang members, Trevon Wright a.k.a. "Tre," Jaheim Warren a.k.a. "JD," and all persons with them when they left State Superior Court by killing them in order to increase or maintain his standing within GHB.

Guideline Stipulation

The parties agree as follows:

The Guidelines Manual in effect on the date of sentencing is used to determine the applicable Guidelines range. Under U.S.S.G. § 2E1.1(a)(2), each underlying act of racketeering is treated as a separate count of conviction. The parties agree that the five groups—the narcotics crime and the attempted murders of Trevon Wright, Jaheim Warren, Jaffar Ali and Khalil Heard—must be considered in determining the Guidelines.

*Darnell Crosland, Esq.*
*Page 5*

The five predicate acts listed above are not groupable under U.S.S.G. § 3D1.2 and therefore require a multiple count computation under U.S.S.G. § 3D1.4. For the first group, which is the drug conspiracy (the first racketeering act), the base offense level is 19, under U.S.S.G. § 2E1.1, because the parties agree that an offense level of 19 is equal to or higher than the offense level that would be applicable pursuant to U.S.S.G. § 2E1.1.

For the second group, which is the January 27, 2020 attempted murder of Trevon Wright, the base offense level is 33 under U.S.S.G. § 2A2.1(a)(1). A further four levels are added because Mr. Wright sustained permanent or life-threatening bodily injury, pursuant to U.S.S.G. § 2A2.1(b)(1)(A), resulting in an adjusted offense level of 37.

For the third group, which is the attempt to murder Jaheim Warren on January 27, 2020, the base offense level is 33.

For the fourth group, which is the attempt to murder Jaffar Ali on January 27, 2020, the base offense level is 33 and a further two levels are added because Mr. Ali suffered a serious bodily injury under U.S.S.G. § 2A2.1(b)(1)(B), resulting in an adjusted offense level of 35.

For the fifth group, which is the attempt to murder Khalil Heard on January 27, 2020, the base offense level is 33 and a further two levels are added because Mr. Heard suffered a serious bodily injury under U.S.S.G. § 2A2.1(b)(1)(B), resulting in an adjusted offense level of 35.

Under U.S.S.G. § 3D1.4, there are a total of five units on which the parties agree. Because unit one is nine levels less serious than any other unit, it is not counted. However, because the attempted murders of Mr. Wright, Mr. Warren, Mr. Ali and Mr. Heard (units two through five) are within two level of each other, each attempted murder receives one unit for a total of four units. See U.S.S.G. § 3D1.4. Four units result in an increase to the highest offense level (here the 37 from Mr. Wright's attempted murder), resulting in a base offense level of 41.

If the Court grants a two-point reduction for acceptance of responsibility, Mr. Jones' total offense level becomes 39. The defendant understands that due to his decision to enter the plea after jury selection has commenced, the Court may not award him two points for acceptance, a decision to which the Government defers.

Based on an initial assessment, the parties agree that the defendant falls within Criminal History Category V. The parties reserve the right to recalculate the defendant's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate.

A total offense level 39, assuming a Criminal History Category V would result in a range of 360 to life in prison (sentencing table) and a fine range of $50,000 to $500,000, U.S.S.G. § 5E1.2(c)(3). The defendant is also subject to a supervised release term of one year to three years. U.S.S.G. § 5D1.2. In light of the statutory maximum, Mr. Jones' Guidelines range is capped at 360 months.

*Darnell Crosland, Esq.*
*Page 6*

The Government and the defendant reserve their rights to seek a departure or a non-Guidelines sentence, and both sides reserve their right to object to a departure or a non-Guidelines sentence.

The defendant understands that the Court is not bound by this agreement on the Guideline ranges specified above. The defendant further understands that he will not be permitted to withdraw his guilty plea if the Court imposes a sentence outside any of the ranges set forth in this agreement.

In the event the United States Probation Office or the Court contemplates any sentencing calculations different from those stipulated by the parties, the parties reserve the right to respond to any inquiries and make appropriate legal arguments regarding the proposed alternate calculations. Moreover, the parties reserve the right to defend any sentencing determination, even if it differs from that stipulated by the parties, in any post-sentencing proceeding.

Information to the Court

The Government reserves its right to address the Court with respect to an appropriate sentence to be imposed in this case. Moreover, the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material.

**WAIVER OF RIGHTS**

The defendant acknowledges and agrees that he is knowingly, intelligently, and voluntarily waiving the following rights:

Waiver of Trial Rights and Consequences of Guilty Plea

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, the right to testify and present evidence, and the right to compel the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty he waives those rights and that, if the plea of guilty is accepted by the Court, there will not be a further trial of any kind.

The defendant understands that, if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

*Darnell Crosland, Esq.*
*Page 7*

<u>Waiver of Statute of Limitations</u>

The defendant agrees that, should the conviction following defendant's guilty plea be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement (including any indictment or counts the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

<u>Waiver of Right to Challenge Conviction</u>

The defendant acknowledges that under certain circumstances he is entitled to challenge his conviction. By pleading guilty, the defendant waives his right to appeal or collaterally attack his conviction in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241. In addition to any other claims he might raise, the defendant waives his right to challenge his conviction based on (1) any non-jurisdictional defects in the proceedings before entry of this plea, (2) a claim that the statute(s) to which the defendant is pleading guilty is unconstitutional, and (3) a claim that the admitted conduct does not fall within the scope of the statute. This waiver does not preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

<u>Waiver of Right to Appeal or Collaterally Attack Sentence</u>

The defendant acknowledges that under certain circumstances, he is entitled to challenge his sentence. In consideration for the benefits offered under this agreement, the defendant agrees not to appeal or collaterally attack the sentence in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241 if that sentence does not exceed 360 months of imprisonment, a 3-year term of supervised release, restitution, a $ 200 special assessment, even if the Court imposes such a sentence based on an analysis different from that specified above. The Government and the defendant agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with, in whole or in part, the undischarged portion of any other sentence that has been imposed on the defendant at the time of sentencing in this case. Furthermore, the parties agree that any challenge to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. This waiver does not preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

<u>Waiver of Challenge to Plea Based on Immigration Consequences</u>

The defendant understands that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, non-citizens are subject to removal for a broad range of crimes, including the offense(s) to which the

*Darnell Crosland, Esq.*
*Page 8*

defendant is pleading guilty. Likewise, if the defendant is a naturalized citizen of the United States, pleading guilty may result in denaturalization and removal. Removal, denaturalization, and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. The defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is automatic removal from the United States.

The defendant understands that he is bound by his guilty plea regardless of the immigration consequences of the plea.  Accordingly, the defendant waives any and all challenges to his guilty plea and to his sentence based on those consequences, and agrees not to seek to withdraw his guilty plea, or to file a direct appeal or any kind of collateral attack challenging his guilty plea, conviction or sentence, based on the immigration consequences of his guilty plea, conviction or sentence. This waiver does not preclude the defendant from raising a claim of ineffective assistance of counsel in the appropriate forum.

## ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA

The defendant acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because he is guilty.  The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and him (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind.  The defendant further acknowledges his understanding of the nature of the offense to which he is pleading guilty, including the penalties provided by law.  The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorney.  The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

The defendant acknowledges that he is not a "prevailing party" within the meaning of Public Law 105-119, section 617 ("the Hyde Amendment") with respect to the count of conviction or any other count or charge that may be dismissed pursuant to this agreement.  The defendant voluntarily, knowingly, and intelligently waives any rights he may have to seek attorney's fees and other litigation expenses under the Hyde Amendment.

## SCOPE OF THE AGREEMENT

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority.  The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved.  Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

*Darnell Crosland, Esq.*
*Page 9*

## COLLATERAL CONSEQUENCES

The defendant understands that he will be adjudicated guilty of each offense to which he has pleaded guilty and will be deprived of certain rights, such as the right to hold public office, to serve on a jury, to possess firearms and ammunition, and in some states, the right to vote. Further, the defendant understands that if he is not a citizen of the United States, a plea of guilty may result in removal from the United States, denial of citizenship, and denial of admission to the United States in the future. The defendant understands that pursuant to section 203(b) of the Justice For All Act, the Federal Bureau of Prisons or the United States Probation Office will collect a DNA sample from the defendant for analysis and indexing. Finally, the defendant understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty plea, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of his participation in the offense conduct, which forms the basis of the Superseding Indictment in this case. After sentencing, the Government will move to dismiss Count Four of the Superseding Indictment because the conduct underlying the dismissed counts will have been taken into account in determining the appropriate sentence.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, the defendant will not be permitted to withdraw his guilty plea.

\*\*\*The defendant further agrees that all trial exhibits and discovery materials that have been provided to him in preparation for trial will be returned to Government counsel.

*Darnell Crosland, Esq.*
*Page 10*

### NO OTHER PROMISES

      The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

      This letter shall be presented to the Court, in open court, and filed in this case.

            Very truly yours,

            LEONARD C BOYLE
            ACTING UNITED STATES ATTORNEY


            _____
            JOCELYN COURTNEY KAOUTZANIS
            RAHUL KALE
            STEPHANIE T. LEVICK
            ASSISTANT UNITED STATES ATTORNEYS

*Darnell Crosland, Esq.*
*Page 11*

      The defendant certifies that he has read this plea agreement letter and its attachment(s) or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachment(s) with counsel and that he fully understands and accepts its terms.

_____        11 / 19 / 21
LAHEEM JONES                                                    Date
The Defendant

      I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

_____        11 / 19 / 2021
DARNELL CROSLAND, ESQ.                              Date
Attorney for the Defendant

*Darnell Crosland, Esq.*
*Page 12*

## RIDER CONCERNING RESTITUTION

The Court shall order that the defendant make restitution under 18 U.S.C. § 3663A as follows:

1.  If the offense resulted in damage to or loss or destruction of property of a victim of the offense:

    A.  Return the property to the owner of the property or someone designated by the owner; or

    B.  If return of the property is impossible, impracticable, or inadequate, pay an amount equal to:

        The greater of –

        (I)  the value of the property on the date of the damage, loss, or destruction; or

        (II) the value of the property on the date of sentencing, less the value as of the date the property is returned.

2.  In the case of an offense resulting in bodily injury to a victim –

    A.  Pay an amount equal to the costs of necessary medical and related professional services and devices related to physical, psychiatric, and psychological care; including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

    B.  Pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

    C.  Reimburse the victim for income lost by such victim as a result of such offense;

3.  In the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and

4.  In any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

The order of restitution has the effect of a civil judgment against the defendant.  In addition to the Court-ordered restitution, the Court may order that the conditions of its order of restitution be made a condition of probation or supervised release.  Failure to make restitution as ordered may result in a revocation of probation, 18 U.S.C. § 3565, or a modification of the conditions of supervised release, 18 U.S.C. § 3583(e). Failure to pay restitution may also result

*Darnell Crosland, Esq.*
*Page 13*

in the defendant being held in contempt, or the defendant's re-sentencing to any sentence which might originally have been imposed by the Court.  *See* 18 U.S.C. §§ 3613A, 3614.

```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF CONNECTICUT
 2

 3   _____
                                    )
 4   UNITED STATES OF AMERICA,      )
                                    ) No. 3:20-cr-00126-JBA-5
 5                   Plaintiff,     )
                                    ) November 19, 2021
 6                                  )
     v.                             ) 10:43 a.m.
 7                                  )
                                    ) 141 Church Street
 8   LAHEEM JONES,                  ) New Haven, Connecticut
                                    )
 9                   Defendant.     )
10   _____)

11

12

13                   CHANGE OF PLEA HEARING

14

15

16   B E F O R E:

17        THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

18

19

20

21

22

23

24              Official Court Reporter:
                Corinne T. Thomas, RPR
25              (203) 809-0848
```

```
 1   A P P E A R A N C E S:

 2   For the Government:

 3           JOCELYN J. COURTNEY KAOUTZANIS, AUSA
             STEPHANIE TSAY LEVICK, AUSA
 4       U.S. Attorney's Office - NH
         157 Church Street, 25th Floor
 5       New Haven, CT 06510
         (203) 821-3700
 6       E-mail:  jocelyn.kaoutzanis@usdoj.gov
                  stephanie.levick@usdoj.gov
 7
             RAHUL KALE, AUSA
 8       U.S. Attorney's Office - BPT
         1000 Lafayette Boulevard, 10th Floor
 9       Bridgeport, CT 06604
         (203) 696-3029
10       E-mail:  Rahul.Kale@usdoj.gov

11   For the Defendant:

12           DARNELL DEONAS CROSLAND, ESQ.
         L/O DARNELL D. CROSLAND
13       1200 Summer Street, Suite 202
         Stamford, CT 06905
14       203-921-1782
         E-mail:  info@croslandlaw.com
15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Call to Order, 10:43 a.m.)
 2          THE COURT:  Good morning, counsel, ladies and
 3   gentlemen.  Please be seated.
 4          MS. KAOUTZANIS:  Good morning, Your Honor.
 5          THE COURT:  We are here this morning in
 6   Unites States of America v Laheem Jones, 20-cr-126.
 7          May I please have appearances of counsel
 8   starting with the government?
 9          MS. KAOUTZANIS:  Good morning, Your Honor.
10   Jocelyn Courtney Kaoutzanis and with me at counsel
11   table are Assistant United States Attorneys Rahul
12   Kale and Stephanie Levick and special agent with the
13   ATF, Barrett Hyde.
14          THE COURT:  I'm sorry.  Special agent --
15          MS. KAOUTZANIS:  Sorry.  Special Agent
16   Barrett Hyde.
17          THE COURT:  And for Mr. Jones?
18          MR. CROSLAND:  Good morning, Your Honor.
19   Darnell Crosland, I'm here for Mr. Jones.
20          THE COURT:  Good morning, Mr. Jones.
21          THE DEFENDANT:  Good morning.
22          THE COURT:  Are we ready to proceed?
23          MR. CROSLAND:  Yes, Your Honor.
24          THE COURT:  I'm asking Mr. Jones.
25          THE DEFENDANT:  Yes, ma'am.
```

1          THE COURT:  I know that you've been spending

2    some time with your lawyer this morning.  I want to

3    make sure that you're ready to proceed.

4          THE DEFENDANT:  First, I want to apologize

5    for yesterday.  I didn't -- if we could have -- if I

6    talked from the beginning, we never would have sat

7    here and wasted so much time with the jury selection.

8    I can't say I didn't understand because I could have

9    spoke up; however, I can't just blatantly say

10   "Judge."  I don't want to be disrespectful, if that

11   makes sense.

12         THE COURT:  All right.  It's my understanding

13   that instead of picking the jury today continuing,

14   that Mr. Jones would like to plead guilty to Count 1

15   and 2 of the indictment charging him with

16   racketeering conspiracy and VCAR attempted murder and

17   aiding and abetting in violation of 18 United States

18   Code 1962(d) and 1959(a)(5).

19        Mr. Jones, is that your understanding of why we

20   are here?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Before I can accept your guilty

23   plea, I need to ask you a number of questions while

24   you are under oath.  I need to make sure it is a

25   valid plea, it is one that you are doing voluntarily

```
 1   and not under coercion, it is one in which there is a
 2   factual basis for your plea, you are competent to
 3   enter the plea and that -- what have I left out?  So
 4   I want to make sure if you don't understand my
 5   questions, you tell me.  I'll reword the question.
 6   If you need to speak with Mr. Crosland for any
 7   reason, tell me and you should step back from the
 8   microphone so you can't be heard.  All right?
 9            THE DEFENDANT:  Yes, Judge.
10            THE COURT:  Please put Mr. Jones under oath.
11            (Laheem Jones, sworn.)
12            THE CLERK:  You may be seated.
13            THE COURT:  Mr. Jones, you have now been
14   sworn.  This means that your answers to my questions
15   are subject to penalties for perjury or making a
16   false statement if you do not answer truthfully,
17   willfully.  Do you understand?
18            THE DEFENDANT:  Yes.
19            THE COURT:  You have the right to remain
20   silent, that means you are not required to make any
21   statement.  If you make a statement, you need to
22   understand that that statement can and probably will
23   be used against you if this trial to were to resume
24   and we were to continue with our business we started
25   yesterday.  Do you understand?
```

```
1              THE DEFENDANT:  Yes.
2              THE COURT:  If you begin to make a statement,
3    you may still stop at any time.  Do you understand?
4              THE DEFENDANT:  Yes.
5              THE COURT:  You have a right to counsel which
6    means you have a constitutional right to be
7    represented by an attorney at every stage of the
8    criminal proceedings against you.  If you cannot
9    afford counsel, one will be appointed for you by the
10   Court at no cost to you.  Do you understand that
11   right?
12             THE DEFENDANT:  Yes, ma'am.
13             THE COURT:  Would you please give me your
14   full name and tell me any other name that you have
15   used or been known by?
16             THE DEFENDANT:  Laheem Jones, that's my full
17   name.
18             THE COURT:  You don't have a middle name?
19             THE DEFENDANT:  Laheem Tyrone Jones, that's
20   my full name, first, middle and last, and Heemie is
21   the only name that people use me by, Heemie.
22             THE COURT:  All right.  How old are you?
23             THE DEFENDANT:  Twenty-seven.
24             THE COURT:  What is your schooling or
25   education?
```

```
 1            THE DEFENDANT:  Schooling or education, like
 2      the level?
 3            THE COURT:  How far did you go in school?
 4            THE DEFENDANT:  Tenth grade -- ninth grade --
 5      tenth grade.  I don't think I completed tenth grade.
 6            THE COURT:  You started tenth grade?
 7            THE DEFENDANT:  Yeah.  Because I -- I went to
 8      jail, so I didn't get to really complete it.
 9            THE COURT:  Where did you start tenth grade?
10            THE DEFENDANT:  Harding.
11            THE COURT:  What year?
12            MR. CROSLAND:  The last year that I went to
13      school was in 2012.
14            THE COURT:  Have you had any difficulty in
15      communicating with your attorney for any reason?
16            THE DEFENDANT:  For the last -- for today or
17      can you rephrase the question?
18            THE COURT:  In connection with this case.
19            THE DEFENDANT:  Yeah.  For the last month, he
20      was at -- he was doing a trial, so I didn't really
21      get to talk to him.
22            THE COURT:  So you've had no communication
23      with him for the last month?
24            MR. CROSLAND:  Little to -- yeah.  None.
25            THE COURT:  Is that true?
```

```
 1              THE DEFENDANT:  Yeah.  I didn't have no
 2   communication with him while he was on trial, no.
 3              THE COURT:  No calls?
 4              THE DEFENDANT:  No calls.
 5              THE COURT:  No visits?
 6              THE DEFENDANT:  No visits.
 7              THE COURT:  No e-mails?
 8              THE DEFENDANT:  No e-mails.
 9              THE COURT:  No mail?
10              THE DEFENDANT:  No mail.
11              THE COURT:  With respect to communicating
12   with your lawyer for the purpose of discussing and
13   considering the government's plea offer, have you had
14   any difficulty in that communication?
15              THE DEFENDANT:  No.  We just was talking
16   about it downstairs in lockup, so no.  I didn't have
17   no difficulties talking about it with him, right.
18   Can you, like -- maybe I'm not understanding right
19   because I don't want to seem like I'm babbling.  Can
20   you repeat that again?
21              THE COURT:  So what I want to understand is
22   whether you have in your view had adequate
23   communication with your attorney for the purpose of
24   considering, understanding, and deciding what to do
25   about the government's renewed plea offer?
```

1            THE DEFENDANT:  Yes.

2            THE COURT:  Are you now or have you recently

3   been under the care of any physician, any

4   psychiatrist, any social worker, or any counselor?

5            THE DEFENDANT:  No.

6            THE COURT:  In the past 48 hours, have you

7   had any narcotic drugs, any medication, any pills, or

8   any alcoholic beverage?

9            THE DEFENDANT:  Benadryl, Benadryl helps -- I

10  mean, the jail gives that to you at night for your

11  sleep.

12           THE COURT:  Anything else?

13           THE DEFENDANT:  No.

14           THE COURT:  Have you ever been hospitalized

15  or treated on an outpatient basis for narcotic

16  addiction or other substance abuse including alcohol?

17           THE DEFENDANT:  No.  I took -- I've tooken

18  classes for stuff like that, but no, I haven't been

19  treated for anything like that.  I took classes on my

20  own accord.  Like, I just signed up for them.

21           THE COURT:  But you have not been treated for

22  substance abuse?

23           THE DEFENDANT:  No.  Or any abuse.

24           THE COURT:  So as you sit here today, is your

25  mind clear?

1              THE DEFENDANT:  Yes.

2              THE COURT:  Do you understand what is going

3    on?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Now, Mr. Crosland, have you had

6    any difficulty for any reason in communicating with

7    the defendant?

8              MR. CROSLAND:  None whatsoever, none, Your

9    Honor.

10             THE COURT:  Have you had enough time and

11   information to permit meaningful discussion with

12   Mr. Jones about his case and his decision on how

13   it -- what its disposition should be?

14             MR. CROSLAND:  Yes, Your Honor.  Just to make

15   the record clear, before I started the trial which

16   Mr. Jones references, the government, Ms. Kaoutzanis,

17   was kind of enough to give me a plea agreement and I

18   drove up to Wyatt and I took it to him.

19             THE COURT:  What is the date that you did

20   that?

21             MR. CROSLAND:  I have an e-mail that could

22   help me with that.  Let me just look at the e-mail.

23   Here it is.  I have an e-mail from Attorney

24   Kaoutzanis dated October 15th with the new plea

25   agreement.  And so that was a Friday and I drove on

```
 1   Saturday, which should be October 16th, if I'm
 2   correct, and I delivered it.
 3            MR. KALE:  It's the 17th.
 4            MR. CROSLAND:  Your Honor, the government
 5   corrected me.  I went up after church on Sunday which
 6   would be the 17th.
 7            THE COURT:  October 17th?
 8            MR. CROSLAND:  Correct, Your Honor.
 9            THE COURT:  And the plea agreement that you
10   said you delivered, did you discuss that with him?
11            MR. CROSLAND:  No, Your Honor.  I brought the
12   plea agreement to Mr. Jones and left a copy with him
13   for him to go over it and I went back down to
14   Stamford to start my trial and -- but we've had --
15   the plea agreement is substantially the same as to
16   what he's entering a plea to now, just the numbers
17   changed.  And the government was kind enough
18   yesterday after court to sit at our table and we had
19   a full-length discussion and I really thank them for
20   that.
21            THE COURT:  What do you mean substantially
22   the same?
23            MR. CROSLAND:  Meaning that one thing, for
24   instance, that was taken out was a minimum role
25   adjustment, some points, which doesn't bar me from
```

1    arguing that later, which I intend to, but it was

2    taken out of the agreement.  So that's changed.

3            THE COURT:  So had he discussed the plea

4    agreement with you around October 17th, that plea

5    agreement contained a stipulation of a minimal role

6    adjustment?

7            MS. KAOUTZANIS:  No, Your Honor.

8            MR. CROSLAND:  That was out already.

9            MS. KAOUTZANIS:  Sorry.  Just so the record's

10   clear, the plea agreement that Mr. Jones rejected in

11   open court in front of Your Honor with the Frye

12   hearing contained that.  The plea agreement today is

13   the same plea agreement as October 15th with two

14   exceptions:  One, there's an agreement that Mr. Jones

15   is going to turn over all of the discovery and trial

16   exhibits to us; and two, the government is taking no

17   position and deferring to the Court on the two-point

18   adjustment for acceptance of responsibility which is

19   your decision anyway.  So it's pretty much exactly

20   the same as the one on October 15th.

21           MR. CROSLAND:  I accept that, Your Honor.  I

22   was just confused.  So the minimum role adjustment

23   was in the one before it and you did bring us before

24   Your Honor for a Frye hearing.  So I think the -- not

25   -- to give back all the discovery, I think that was

1    changed, but that didn't change the agreement.  So

2    the agreement is substantially the same.

3              THE COURT:  With respect to the two-point

4    acceptance that Ms. Kaoutzanis says is now being left

5    to the Court, was it being left to the Court in the

6    prior agreement?

7              MS. KAOUTZANIS:  Yes, Your Honor.  It's just

8    we put in language that says because of the first day

9    of jury selection, the government -- we basically put

10   in language suggesting that we're in a different

11   stage than the October 15th one, but it is the

12   Court's decision.

13             THE COURT:  Of course, my concern is with

14   respect to lack of communication to discuss the

15   second offer.

16             MS. KAOUTZANIS:  That was our concern as

17   well.  That's why there is no change.  I mean, I

18   would say two things:  One, Mr. Jones' guidelines on

19   the October 15th offer were 360 to life capped at

20   360.

21             THE COURT:  That's still true under this plea

22   agreement?

23             MS. KAOUTZANIS:  That's still true, yeah.

24   And there's no -- we were always deferring to the

25   Court in the two points.  In the October 15th offer,

1   we said we're not moving for the third point for

2   acceptance because we had made clear to all

3   defendants that we weren't going to do that after

4   whatever date, I don't remember right now,

5   October 1st.  So it's exactly the same.  It just has

6   the language about the discovery, which was important

7   to us because of all the disclosures, and we

8   mentioned in the agreement that jury selection has

9   started.

10          THE COURT:  All right.  But it's not quite

11   the same because the issue about whether you get two

12   levels for acceptance once you've already gone into

13   jury selection is different from if he had had

14   consultation with his attorney and been in a position

15   to accept your plea agreement from October; isn't

16   that correct?

17          MS. KAOUTZANIS:  That's correct.  And that's

18   why we are not saying he should not get those two

19   points.  We're just saying we defer to the Court on

20   that for the same reasons.  We had the same concerns

21   that Your Honor is raising.

22          THE COURT:  That certainly puts the Court in

23   a difficult position, doesn't it?  Let's move on.

24          So I had asked you, Mr. Crosland, if you had

25   enough time and information to permit meaningful

1  discussion with Mr. Jones about his case and his

2  decision now on what the case's disposition should

3  be.

4        MR. CROSLAND:  Yes, Your Honor.  And the

5  answer is yes.  I have had quality time to discuss

6  that.  As the government has pointed out, the

7  agreement that I went over with him today is similar

8  to what I dropped off to him before.  He understands

9  it.  He read --

10        THE COURT:  We'll get to that.  In your

11  opinion, does Mr. Jones understand the rights that he

12  will be waiving if he pleads guilty now?

13        MR. CROSLAND:  In my opinion -- excuse me.

14  Hold on a second.

15     Your Honor, Mr. Jones questions what rights,

16  and if I'm correct, he understands the rights that

17  are inside the agreement such as the appeal rights,

18  et cetera, and he understands those.

19        THE COURT:  In your view, does he understand

20  the nature of our proceedings today?

21        MR. CROSLAND:  Yes, Your Honor.  Your deputy

22  clerk sent us a change of plea form that Your

23  Honor --

24        THE COURT:  That's not my question.  Does he

25  understand the nature of our proceedings in your

1   view?

2          MR. CROSLAND:  Your Honor, in my view, he

3   understands the nature of the proceedings.  He's here

4   to change his plea.  He understands that he gives up

5   his right at trial to present evidence, to face

6   witnesses, and he fully understands that that's what

7   we're here to do today, give up those rights in

8   exchange for a plea agreement.

9          THE COURT:  Do you have any doubt as to

10  Mr. Jones' competence to enter a guilty plea at this

11  time?

12         MR. CROSLAND:  None whatsoever.  He's been

13  fully active in these negotiations.  He's taken my

14  highlighter and gone over stuff in the plea

15  agreement.  He's questioned stuff about the minimal

16  role adjustment.  He's been very, very alert.  He's

17  presented case law to me and he fully understands

18  what we're doing and he understands these procedures.

19         THE COURT:  And have you advised Mr. Jones of

20  what the maximum sentence and fine is that can be

21  imposed?

22         MR. CROSLAND:  I have, Your Honor.

23         THE COURT:  Have you discussed with him how

24  the federal sentencing guidelines operate after the

25  *U.S. v Booker* decision?

1              MR. CROSLAND:  The 3553(a) factors I went

2    over with him from the first day we started this

3    because, obviously, that was the important and --

4              THE COURT:  But that's not what I asked you.

5    Have you discussed with him the import of the Booker

6    decision which held that the federal sentencing

7    guidelines are advisory, they are not mandatory?

8              MR. CROSLAND:  Yes, Your Honor.  I was

9    getting to that.

10             THE COURT:  And have you advised Mr. Jones of

11   the collateral consequences to a guilty plea at this

12   time?

13             MR. CROSLAND:  Excuse me.  Yes, I have.

14             THE COURT:  And what are the collateral

15   consequences for Mr. Jones?  I understand he has

16   prior felony convictions.  Is there anything in

17   addition to --

18             MR. CROSLAND:  One of the collateral

19   consequences we looked into is whether he was on

20   probation or parole and if that can affect that and

21   he's not.  And another collateral consequence, when

22   you have a federal court to intervene -- in my

23   opinion, to intervene in this type of situation, the

24   state court very rarely does but can exercise an

25   option to maybe try him on the same charges.  Maybe

1   it's just a theoretical perspective, but I've always

2   looked at that sovereign space and, of course, I

3   explained that with him.

4           THE COURT:  Okay.  So the federal court has

5   not intervened in anything, has not intervened in any

6   state matter.  Is what you are saying is that he

7   would not be -- that he would not have a claim of

8   double jeopardy if the state were to prosecute him

9   for any of the conduct that underlies this

10  superseding indictment?

11          MR. CROSLAND:  What I'm saying is I hope

12  jeopardy attaches and that's my view, but Your

13  Honor's question was have I explained to him the

14  collateral consequences.  I said yes.  And you said

15  give me an example of what you talked about and

16  that's just a discussion.

17          THE COURT:  I want to know what you told him

18  about the consequences of entering a guilty plea

19  here.

20          MR. CROSLAND:  That's what I told him, Judge.

21  That's it.  About probation and parole, I have to

22  check those things, because if you enter a plea

23  somewhere, you make no promises to how that could

24  affect your probation or parole and we don't have

25  that concern and I explained that.

1          THE COURT:  Ms. Kaoutzanis, with respect to

2     this reference that's made to potential for state

3     court charges as a collateral consequence in which if

4     he pled guilty here and he had the potential for

5     facing state court charges, he would have a problem.

6          MS. KAOUTZANIS:  Your Honor, there are no

7     state court charges that we are aware of that the

8     state court intends to pursue and don't anticipate

9     there being any in the future.

10          THE COURT:  Thank you.

11          MS. KAOUTZANIS:  Of course, we don't control

12     the state but just from what I am aware of.

13          THE COURT:  Mr. Jones, have you now had

14     enough opportunity and information to discuss your

15     case with your attorney?

16          THE DEFENDANT:  Like, yes.  You mean the

17     case, like, today, the plea agreement and stuff

18     today?

19          THE COURT:  The case, the case that we were

20     picking the jury for yesterday.

21          THE DEFENDANT:  Had I had enough time to talk

22     about it?

23          THE COURT:  And information to discuss your

24     case with your attorney so that you knew what you

25     were facing, what the government had to show your

```
1   guilt.

2           THE DEFENDANT:  Yes.

3           THE COURT:  Are you satisfied to have

4   Mr. Crosland represent you?

5           THE DEFENDANT:  Yes.

6           THE COURT:  Is there any way in which you are

7   not fully satisfied with his advice and

8   representation?

9           THE DEFENDANT:  Is there -- only the time --

10  only the time when I wasn't able to talk to him, but

11  besides that, he's been a pretty good lawyer, a good

12  lawyer, a really good lawyer.  But besides that, I

13  wasn't able to talk to him for a while.

14          THE COURT:  Have you received a copy of the

15  superseding indictment?

16          THE DEFENDANT:  Do I got one right now, yeah.

17          THE COURT:  Would you put that in front of

18  Mr. Jones, please?

19          Have you consulted with Mr. Crosland about

20  these charges?

21          THE DEFENDANT:  Yes.

22          THE COURT:  And do you understand them?

23          THE DEFENDANT:  Yes.

24          THE COURT:  I want to make sure you

25  understand that you don't have to plead guilty even
```

1  if you're guilty, and I say that because it is our

2  system of law that puts the burden on the government,

3  the burden of proving the guilt of a defendant beyond

4  a reasonable doubt.

5          THE DEFENDANT:  I understand.

6          THE COURT:  If the government can't meet that

7  burden of proof, the jury has the duty to find that

8  defendant not guilty.  Do you understand?

9          THE DEFENDANT:  Yes, ma'am.

10         THE COURT:  And sometimes it happens that a

11  jury will return a verdict of not guilty in a

12  criminal case even though everyone in the courtroom

13  listening to all the evidence thought the defendant

14  was guilty.  But what the jury is saying is not that

15  it found that defendant innocent, what it found was

16  that the government failed to meet the burden of

17  proof of guilt beyond a reasonable doubt.  Do you

18  understand that difference?

19         THE DEFENDANT:  Yes, ma'am.

20         THE COURT:  So that's why I'm saying even if

21  you're guilty, you do have a choice.  You can plead

22  guilty, as you indicated your desire was when we

23  started, or you may change your mind and say to the

24  government prove my guilt beyond a reasonable doubt,

25  meaning we will go to trial and you exercise that

1   option later on when the clerk asks you how do you

2   plead.  If you want to continue with trial, you will

3   say not guilty.  Do you understand?

4           THE DEFENDANT:  Yes, ma'am.

5           THE COURT:  If you plead not guilty, the

6   constitution and federal statutes entitle you to a

7   speedy public trial by a jury with the assistance of

8   your counsel at every stage of the proceedings on the

9   charges contained in the indictment and there are

10  three.  You understand that right?

11          THE DEFENDANT:  Yes, ma'am.

12          THE COURT:  At trial, you're presumed

13  innocent.  The government has to overcome that

14  presumption and prove you guilty by competent

15  evidence and beyond a reasonable doubt.  As you heard

16  me tell the prospective jurors yesterday, you don't

17  have to prove you are innocent.  If the government

18  fails to meet its burden, the jurors have the duty to

19  find you not guilty.  Do you understand?

20          THE DEFENDANT:  Yes, ma'am.

21          THE COURT:  You have further rights in the

22  course of a trial.  Witnesses for the government have

23  to come into court and testify in your presence.

24  That's your right of confrontation.  And you know

25  you've been provided with a copy of the whole witness

1   list from the government.  Your counsel has the right

2   to cross-examine the government's witnesses, to

3   object to evidence that the government offers, to

4   offer evidence on your behalf, and to use a subpoena

5   to get witnesses here in the courtroom to testify at

6   your trial on your behalf.  Do you understand those

7   rights?

8           THE DEFENDANT:  Yes, ma'am.

9           THE COURT:  At trial, you would have the

10  right to testify if you chose to do so.  You could

11  not be required to testify.  Under the Constitution,

12  no defendant in a criminal case can ever be forced to

13  take the witness stand at trial and say anything that

14  can be used to show guilt of the crime the person is

15  charged with and you heard me tell the jurors that

16  also yesterday.

17          THE DEFENDANT:  Yes.

18          THE COURT:  So if you decided that you were

19  going to trial but you did not want to testify for

20  your own reasons, I would instruct the jury that you

21  are exercising that right and it could not hold it

22  against you.  Do you understand?

23          THE DEFENDANT:  Yes, ma'am.

24          THE COURT:  If you proceed to plead guilty,

25  I'm going to have to ask you questions about what it

```
 1    is that you did in order to satisfy myself that, in
 2    fact, you are guilty of the charges that you seek to
 3    plead guilty to.  If you choose to answer my
 4    questions and acknowledge your guilt, you'll be
 5    giving up this right that I've just been describing,
 6    the right not to say anything that shows you are
 7    guilty of the crimes that you're charged with.  Are
 8    you with me?
 9              THE DEFENDANT:  Yes, ma'am.
10              THE COURT:  If you plead guilty, if I accept
11    your plea as valid, meaning voluntary, knowing the
12    rights you're giving up, having a factual basis, and
13    you're being competent, you're going to be giving up
14    your constitutional right to a trial and the other
15    rights I've been discussing with you.  There will be
16    no trial of any kind.  Do you understand?
17              THE DEFENDANT:  Yes, ma'am.
18              THE COURT:  If you're adjudicated guilty,
19    you'll be deprived of certain rights and benefits
20    such as the right to vote, to hold public office, to
21    serve on a jury, or to possess firearms unless and
22    until your civil rights are restored to you which can
23    happen under Connecticut law after you are released
24    from custody.  You will -- assuming you are not on
25    any state parole.  You will not be deemed a
```

Case 22-1390, Document 141-2, 06/29/2023, 3536008, Page38 of 222

**A - 90**

Case 3:20-cr-00126-JBA   Document 512   Filed 04/11/22   Page 25 of 71

25

```
1   prevailing party under the Hyde Amendment which means

2   that you can't seek attorney's fees or other

3   litigation expenses.

4          The Justice for All Act provides that a DNA

5   sample will be collected from you by the Bureau of

6   Prisons or the probation office for analysis and

7   indexing.

8          Where were you born?

9          THE DEFENDANT:  Bridgeport, Connecticut.

10         THE COURT:  If you were not a U.S. citizen,

11  you may be removed from the United States, denied

12  citizenship, and denied admission to the U.S. in the

13  future.  The government reserves the right to notify

14  any state or federal agency that might license you or

15  with whom you might do business of the fact of your

16  conviction.  If the government seeks to notify

17  current or future employers of the fact of your

18  conviction, it must obtain permission from the Court.

19  Do you understand?

20         THE DEFENDANT:  Yes, ma'am.

21         THE COURT:  Further, by pleading guilty, you

22  are waiving your right to have DNA testing performed

23  on physical evidence related to this case that's in

24  the government's possession and to have such physical

25  evidence preserved.  As a result, any physical
```

```
 1   evidence in the government's possession that could be
 2   DNA tested for the purpose of potentially showing
 3   innocence, that physical evidence will likely be
 4   destroyed and otherwise unavailable for DNA testing
 5   in the future.  If you went to trial in this case, if
 6   you continued with the trial and you were convicted,
 7   you could file a motion to require DNA testing of
 8   such physical evidence under 18 United States Code
 9   3600 and 3600(a).
10            Any questions about the rights that you're
11   giving up?
12            THE DEFENDANT:  No, ma'am.
13            THE COURT:  Are you willing to give up your
14   right to a trial and these other rights I've been
15   discussing?
16            THE DEFENDANT:  Yes, ma'am.
17            THE COURT:  All right.  I understand there is
18   a written plea agreement.  Is that in front of you
19   now, Mr. Jones?
20            THE DEFENDANT:  Yes, ma'am.  Let me make
21   sure.  Yup.  Now, it is.
22            THE COURT:  And have you read that agreement?
23            THE DEFENDANT:  Huh?
24            THE COURT:  Have you read the agreement?
25            THE DEFENDANT:  Yes, ma'am.
```

1          THE COURT:  Have you discussed it with your

2    attorney?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Do you understand it?

5          THE DEFENDANT:  Yes, ma'am.

6          THE COURT:  Have you signed it or is it your

7    plan to sign it here in open court?

8          THE DEFENDANT:  It's my plan to sign it in

9    the court.

10          THE COURT:  I'm going to ask the government

11    to please outline the terms of the agreement and I

12    want you to listen carefully because I want to make

13    sure that the outline that is described by the

14    government fully and accurately reflects your

15    understanding of the agreement that you have entered

16    into with the government.  All right?

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  All right.  Ms. Kaoutzanis.

19          MS. KAOUTZANIS:  Thank you, Your Honor.  The

20    plea agreement, which is dated with today's date of

21    November 19, 2021, is 13 pages.  It begins by stating

22    that Mr. Jones is agreeing to plead guilty to

23    racketeering conspiracy, which is Count 1, and the

24    divisible portion of Count 2 of the superseding

25    indictment, which is VCAR attempted murder, and as it

1    states later in the agreement, the government at

2    sentencing would be moving to dismiss Count 4.  And

3    then it lays out the elements for both of those

4    counts.  Should I go through those now, Your Honor,

5    or wait?

6         THE COURT:  I think what we'll do is get

7    through the other and then come back to the elements,

8    please.

9         MS. KAOUTZANIS:  Okay.  After the elements,

10   the plea agreement lays out the penalties.  So

11   racketeering conspiracy, which is Count 1, carries a

12   maximum penalty of 20 years, and the Count 2, the

13   VCAR attempted murder, carries a maximum penalty of

14   10 years.  So the maximum penalty that Mr. Jones

15   faces by pleading to both counts is 30 years.

16   There's a supervised release term of not more than

17   three years, a total fine of 500,000 because each

18   count carries a $250,000 fine, and a special

19   assessment of $200 which Mr. Jones is agreeing to pay

20   on the day of sentencing.  There is an agreement

21   about restitution which is covered in the stipulation

22   at the end.

23        And then the next part of the plea agreement

24   goes into the sentencing guidelines.  So the plea

25   agreement lays out how the Court's required to

1   consider the sentencing guidelines and those

2   determinations will be made by the Court with a -- by

3   a preponderance of evidence and that Mr. Jones cannot

4   withdraw his guilty plea if his sentence or the

5   guideline application was something other than what

6   he anticipated including if it was outside of the

7   range set forth in the agreement.

8          The next paragraph concerns the acceptance of

9   responsibility.  The government is not taking a

10  position as to whether the Court should reduce by two

11  levels Mr. Jones' adjusted offense level.  But as I

12  had referred to earlier, and this was in the

13  October 15th plea agreement, because the government

14  has been preparing for trial and announced it would

15  not recommend a one-point reduction to three --

16  pursuant to 3E1.1(b) if the defendant did not enter a

17  plea before October 1, 2021, the government is not

18  recommending that the Court reduce Mr. Jones'

19  adjusted offense level by that one additional level.

20         The next part of the plea agreement contains

21  the factual stipulation.  So the parties are

22  stipulating that the narcotics quantity for which

23  Mr. Jones is responsible as a result of his role in

24  the conspiracy, so it's foreseeable to him as a

25  result of his agreement, is at least 60 but less than

1    80 kilograms of converted drug weight and the

2    converted drug weight is just an effort to capture

3    the Percocet, marijuana, crack, that various members

4    of the conspiracy were dealing.

5         Mr. Jones is agreeing that from approximately

6    2014 until the present or February of 2021 in the

7    superseding indictment, Mr. Jones was a member and/or

8    associate of the Greene Homes Boyz otherwise known as

9    GHB or G$B, that in furtherance of the GHB

10   enterprise, Mr. Jones conspired to traffic marijuana,

11   heroin, cocaine base, and Percocet pills and, four,

12   that on January 27, 2020, Mr. Jones agreed with other

13   fellow Greene Homes Boyz members and Original North

14   End allies that they would retaliate against

15   opposition gang members Trevon Wright or Tre, Jaheim

16   Warren, JD, and persons with them when they left

17   state superior court by killing them in order to

18   increase or maintain his standing within the Greene

19   Homes Boyz.

20        The next part of the plea agreement contains

21   a lengthy guideline stipulation under 2E1.1(a)(2).

22   There's five groups and each underlying active

23   racketeering is treated as a separate count of

24   conviction.  So the five groups are the narcotics

25   crime and then the four victims or the four attempted

1    murders on January 27, 2020.  So basically, the

2    first -- the drug conspiracy because the base offense

3    level is so much lower than the rest, that's not

4    counted in terms of grouping them.

5           And then for the second group, which is the

6    attempted murder of Trevon Wright, because he was

7    paralyzed, under the guidelines that constitutes

8    permanent or life-threatening injury, so he has an

9    adjusted offense level of 37.  Because Jaheim Warren

10   was grazed in the ribs, there's no additional points,

11   so he has a base offense level of 33 for the

12   attempted murder.  For the attempted murder of Jaffar

13   Ali and Khalil Heard based on their injuries, they

14   start, again, at the base offense level of 33 but

15   only two levels are added unlike with Trevon Wright.

16          So then there's five units in which the

17   parties agree, but like I said, the first unit, the

18   drug conspiracy, isn't counted.  So the four units

19   together result in an increase to the highest offense

20   level, which is 37, for Mr. Wright's attempted

21   murder.  So altogether, there's a base offense level

22   of 41.

23          If the Court grants a two-point reduction for

24   acceptance of responsibility, Mr. Jones' total

25   offense level becomes 39.  And based on an initial

1   assessment, the parties agree that the defendant

2   falls within Criminal History Category V.  So a total

3   offense level of 39, Criminal History Category V

4   would result in a range of 360 to life in prison and

5   a fine range of 50,000 to $500,000.  But in light of

6   the statutory maximum, Mr. Jones' guidelines range is

7   capped at 360 months.  So essentially the guideline

8   range is 360 months.  As we were discussing earlier,

9   even if the Court did not grant that two-point

10  reduction for acceptance of responsibility, the

11  guidelines range is exactly the same.

12       Mr. Jones and the government reserve their

13  rights to seek a departure or nonguideline sentence

14  and both sides reserve their right to object to a

15  departure or a nonguideline sentence.  And then

16  Mr. Jones, again, is just acknowledging that he

17  understands that the Court's not bound by this

18  agreement on the guidelines range.

19       The next part of the agreement goes over the

20  waiver of rights.  Your Honor had gone over the

21  waiver of trial rights and consequences of pleading

22  guilty.  There's a waiver of statute of limitations,

23  which basically says that if the conviction following

24  Mr. Jones' guilty plea were to be vacated for any

25  reason, any prosecution not time barred on this date,

1    the date of the signing of the plea agreement, could

2    be commenced or reinstated against Mr. Jones even if

3    the statute of limitations had expired at that time.

4         The next part of the plea agreement concerns

5    waiver of the right to challenge the conviction.

6    Mr. Jones is -- sorry.  Mr. Jones is acknowledging

7    that under certain circumstances, he can challenge

8    his conviction, but he's waiving his right to appeal

9    or collaterally attack his conviction in any

10   proceeding including but not limited to a motion

11   under 28 United States Code Section 2255 and/or 2241.

12   And he's waiving his right to challenge his

13   conviction based on any nonjurisdictional defects in

14   the proceeding before the entry of the plea, a claim

15   that the statutes to which he's pleading guilty are

16   unconstitutional or a claim that his admitted conduct

17   does not fall within the scope of the statute.  He's

18   not precluded from raising a claim of ineffective

19   assistance of counsel in an appropriate forum.

20        Mr. Jones is further agreeing not to appeal

21   or collaterally attack his sentence if that sentence

22   does not exceed 360 months of imprisonment, a

23   three-year term of supervised release, restitution,

24   and a $200 special assessment, even if the Court were

25   to impose a sentence different than the analysis

1   specified in the plea agreement.  There's a waiver of

2   challenge to plea based on immigration consequences,

3   which is not applicable here.

4        Mr. Jones is acknowledging he's entering into

5   the agreement and pleading guilty freely and

6   voluntarily.  Mr. Jones is further acknowledging that

7   this agreement is limited to the undersigned parties

8   and can't bind any other federal authority or state

9   or local authority.  There is a satisfaction of

10  federal criminal liability or breach which states

11  that Mr. Jones' guilty plea if accepted by the Court

12  will satisfy the federal criminal liability of

13  Mr. Jones as a result of his participation in the

14  offense conduct, which forms the basis of the

15  superseding indictment, and that at sentencing, the

16  government will move to dismiss Count 4 of the

17  superseding indictment.

18       And then there's this last provision

19  where Mr. Jones is agreeing that he's going to return

20  all trial exhibits and discovery materials, which,

21  actually, Mr. Jones himself suggested and has been

22  willing to do.

23       And then finally, after the signature page,

24  there's this rider on restitution.  I forgot to say

25  this in the beginning, Your Honor, but victim

1  notification was made last night.  No one chose to be

2  present today, obviously, but there may be one or

3  more victims who would choose to come to sentencing.

4  There is a rider concerning restitution regarding --

5  because the victims of the courthouse shooting

6  suffered bodily injury and this rider lays out what

7  could be required in terms of restitution.

8          As of this time, the government has no claims

9  from the victims as to restitution, and at least at

10  this point, I don't think we foresee any claims.  But

11  it is there because it is required under law if they

12  do come forward with claims.  Thank you, Your Honor.

13          THE COURT:  All right.  Mr. Jones, does the

14  written agreement that you have in front of you that

15  Ms. Kaoutzanis has outlined fully and accurately

16  represent your understanding of the agreement that

17  you've entered into with the government?

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT:  Has the entire agreement that you

20  reached with the government been put down in writing?

21          THE DEFENDANT:  Yes, ma'am.

22          THE COURT:  Has any government official made

23  any promises to you that have not been put in

24  writing?

25          THE DEFENDANT:  No, ma'am.

1          THE COURT:  Other than the promises that are

2     in that written agreement, has anyone made any other

3     promises that have caused you to decide to plead

4     guilty?

5          THE DEFENDANT:  No, ma'am.

6          THE COURT:  Has anybody threatened you or

7     intimidated you in any way that has caused you to

8     wish to plead guilty?

9          THE DEFENDANT:  No ma'am.

10         THE COURT:  Has anyone made any promises to

11    you what your sentence will be?

12         THE DEFENDANT:  No, ma'am.

13         THE COURT:  Do you understand that no one

14    knows what your sentence will be until it is imposed

15    on the day of sentencing?

16         THE DEFENDANT:  Yes, ma'am.

17         THE COURT:  And you've acknowledged in the

18    plea agreement that Ms. Kaoutzanis just summarized

19    that if your conviction based on your guilty plea

20    pursuant to this agreement is vacated for any reason

21    and the prosecution is commenced or reinstated, you

22    have agreed to waive defenses based on statute of

23    limitations with respect to any prosecution that's

24    not time-barred as of the day you sign this which

25    presumably is today.  Do you understand that?

```
 1              THE DEFENDANT:  Yes, ma'am.

 2              THE COURT:  Do you understand what that

 3    means?

 4              THE DEFENDANT:  Yes, ma'am.

 5              THE COURT:  Do you understand your plea

 6    agreement does not bind any other federal authority

 7    or any state or local authority --

 8              THE DEFENDANT:  Yes, ma'am.

 9              THE COURT:  Any civil or administrative

10    consequences that might result from your plea of

11    guilty are solely within the province and the

12    discretion of that specific administrative or

13    governmental entity.  Your plea agreement also is

14    without regard to any civil tax matters that might be

15    pending or might arise.  And you understand that if

16    before sentencing you violate a term or condition of

17    this agreement or engage in any criminal activity,

18    the government may void the agreement, cancel it.  If

19    the agreement is voided, you cannot withdraw your

20    guilty plea on that basis.  Do you understand that?

21              THE DEFENDANT:  Yes, ma'am.

22              THE COURT:  All right.  Then if you agree to

23    the terms that are set out in the agreement dated

24    November 19th, then you should sign that, your lawyer

25    should sign that, and you are attesting that you have
```

```
 1   read the plea agreement and have had ample time to
 2   discuss this agreement with your attorney and you
 3   fully understand and accept its terms.
 4            MR. CROSLAND:  Thank you, judge.
 5            THE COURT:  Please file it with the clerk.
 6            MR. CROSLAND:  May I approach?
 7            THE COURT:  You may.
 8            All right.  Mr. Jones, I want to discuss the
 9   sentencing scheme that's applicable here.  As to the
10   offense of the racketeering conspiracy and the VCAR
11   attempted murder and aiding and abetting, the
12   criminal statutes together provide a total maximum
13   penalty of 30 years.  Do you understand that?
14            THE DEFENDANT:  Yes, ma'am.
15            THE COURT:  The Court also may impose a term
16   of supervised release of up to three years that
17   begins at the expiration of any term of imprisonment
18   imposed.  If you were to violate a condition of
19   supervised release, the Court could sentence you to
20   up to two more years in prison without giving you any
21   credit for the time that you'd already spent on
22   supervised release.
23            There is an alternative fine statute which
24   provides you could be sentenced to the greater of
25   either twice the gross gain to you from the offense,
```

1   twice the gross loss to others from the offense, the

2   amount or -- or the amount specified in the statutes

3   which would be $500,000.  If a fine is imposed and

4   it's over $2,500, interest begins to run on the

5   unpaid balance after 15 days from the entry of

6   judgment.  If your payments are past due, the

7   government can seek to impose a statutory penalty on

8   the amount that is delinquent or in default.

9        You are also obligated to pay a special

10  assessment of $200, $100 per offense, per count of

11  conviction, which you have agreed, I understand, to

12  pay by the time of sentencing.  While it is not known

13  if there will be a request for restitution from any

14  of the victims, an order of restitution as outlined

15  in the rider would apply and that may also be

16  ordered.

17       Now, the Booker decision that I referred to

18  earlier holds that application of the sentencing

19  guidelines is advisory.  It's not mandatory on the

20  Court, but the Court is required to determine and to

21  consider the applicable sentencing guideline along

22  with other factors that are enumerated in 3553(a) to

23  tailor an appropriate sentence in your case.

24       Evidentiary determinations, if any, that are

25  needed to impose sentence will be made by the Court,

1    they will not be made by a jury, and they will be

2    made by a preponderance of the evidence, not beyond a

3    reasonable doubt.  We will hear from you, the

4    government, your counsel, and the probation officer

5    who prepares the presentence investigation report

6    about you.  You have no right to withdraw your guilty

7    plea if your sentence or if the guideline application

8    that the Court determines is applicable is something

9    other than you anticipated.  Do you understand?

10             THE DEFENDANT:  Yes, ma'am.

11             THE COURT:  Your plea agreement contains a

12    sentencing guideline stipulation under which the

13    government takes no position on whether the Court

14    should reduce your base offense level by two under

15    3E1.1(a), and because the government has prepared for

16    trial and was prepared to proceed to trial and had

17    announced it will not recommend a one-point reduction

18    under 3E1.1(b), if a plea was not entered prior to

19    October 1, 2021, the Court is not going to recommend

20    that the Court -- the government is not going to

21    recommend that the Court reduce the adjusted offense

22    level by that one additional level.

23             As set out in the plea agreement, you and the

24    government have agreed that your base offense level

25    is 41.  If levels are reduced for acceptance of

1    responsibility, it's 39.  But the Court may choose

2    not to award you that two-level reduction for

3    acceptance since your plea has been entered after

4    jury selection commenced.  You and the government

5    agree your criminal history is a five.  While the

6    sentencing -- advisory sentencing guideline directs a

7    sentencing range of 360 months to life imprisonment,

8    the statutory maximum is 360 months and thus that

9    becomes the guideline.

10           Please understand that the Court is not bound

11   by this agreement nor the guideline nor the fine

12   ranges and it won't be until sentencing when we have

13   the presentence report, we hear from you and your

14   lawyer and the government, only then will you know

15   for certain what the guidelines are, whether there's

16   grounds to depart from them, whether they should be

17   found inapplicable and a nonguideline sentence

18   imposed, and the calculation of your criminal history

19   will also be done by the Court even though you and

20   the government have reached an agreement on what you

21   believe it is.

22           If this criminal history or your sentence is

23   different than you and the government agreed, that is

24   not a basis for withdrawing your guilty plea.

25   Similarly, if the Court imposes a sentence different

1  from the guidelines or fine range, that is not a

2  basis for withdrawing your guilty plea.

3       I want to focus on appeal rights.  You may be

4  able to appeal your conviction if you believe that a

5  guilty plea was somehow unlawful or involuntary or

6  there's some other fundamental defect in the

7  proceeding including unconstitutional ineffective

8  assistance of counsel that you did not waive by your

9  guilty plea.  There is also a statutory right to

10  appeal your sentence if you think your sentence is

11  contrary to law.  You specifically agreed that you

12  would not appeal or collaterally attack in a habeas

13  proceeding under 2255 or 2241 the conviction or

14  sentence if it does not exceed 360 months, a

15  three-year term of supervised release, and a $200

16  special assessment; is that right?

17       MS. KAOUTZANIS:  Yes, Your Honor.

18       THE COURT:  Any notice of appeal must be

19  filed within 14 days of judgment being entered in

20  your case -- if you're unable -- which happens after

21  the sentencing hearing.  If you're unable to pay the

22  cost of the appeal, you may apply to proceed in forma

23  pauperis and at your request, the clerk of the court

24  will prepare and file the notice of appeal on your

25  behalf.  If you cannot afford counsel for your

```
 1   appeal, the Court will appoint one for you at no cost

 2   to you.

 3           Do you understand that time line and those

 4   rights?

 5           THE DEFENDANT:  Yes, ma'am.

 6           THE COURT:  Do you understand all the rights

 7   that you are waiving starting with the right to trial

 8   and the other rights I've been discussing?

 9           THE DEFENDANT:  Yes, ma'am.

10           THE COURT:  You've indicated you wish to

11   plead guilty to Count 1 and Count 2 charging you with

12   racketeering conspiracy and VCAR attempted murder and

13   aiding and abetting.  Each offense, each crime, is

14   composed of elements.  Elements are each fact, each

15   fact the government must prove beyond a reasonable

16   doubt to the jury's satisfaction before you could be

17   convicted.

18       I want to ask the government now to identify

19   the elements of these two offenses as those facts

20   that the government would have to prove if this case

21   continued to trial.

22           MS. KAOUTZANIS:  Yes, Your Honor.  For

23   Count 1, which is the racketeering conspiracy, the

24   government would have to prove that an enterprise

25   existed as alleged, which is the Greene Homes Boyz
```

1  enterprise, that it engaged in or its activities

2  affected interstate or foreign commerce through the

3  drug dealing, that Mr. Jones was employed by or

4  associated with the enterprise, and that Mr. Jones

5  knowingly agreed to conduct or participate directly

6  or indirectly in the conduct of the affairs of the

7  enterprise through a pattern of racketeering

8  activity.

9          For the second count, which is violence

10  committed in aid of racketeering, attempted murder,

11  and aiding abetting, the government would have to

12  show, first, the existence of an enterprise; second,

13  that the charged enterprise engaged in or its

14  activities affected interstate or foreign commerce;

15  third, that the charged enterprise engaged in

16  racketeering activity; fourth, that the defendant,

17  Mr. Jones, attempted to or aided others to attempt to

18  commit murder which crime violated Connecticut state

19  law; and five, that that crime of violence was

20  committed either for the consideration or the receipt

21  of money or promise to pay, or as applicable here,

22  for the purpose of gaining entrance to or maintaining

23  or increasing position  in the charged enterprise.

24          THE COURT:  All right.  Mr. Jones, have you

25  read those charges against you?

```
 1              THE DEFENDANT:  Yes, ma'am.
 2              THE COURT:  Do you want me to read them to
 3   you again or do you wish to waive a reading of the
 4   charge?
 5              THE DEFENDANT:  Waive.
 6              THE COURT:  Tell me in your own words what
 7   you understand you're charged with.  And we'll start
 8   with the racketeering charge.  This is just in your
 9   own words what you're charged with, not what you did.
10   What does the government claim that you did for the
11   racketeering charge?
12              THE DEFENDANT:  Just what I'm charged with?
13              THE COURT:  Correct.
14              THE DEFENDANT:  I would say she kind of --
15   she kind of tried to enlighten me on I'm charged with
16   selling drugs.
17              THE COURT:  You understand that for the
18   racketeering charge, it starts with the existence of
19   an enterprise and the enterprise is the Greene Homes
20   Boyz gang?
21              THE DEFENDANT:  Yeah.
22              THE COURT:  And that that gang's activities
23   affected interstate commerce, you might not know
24   about that but that's okay, that's what they would
25   have to prove, and that you were employed by,
```

```
 1   associated with this enterprise, the Greene Homes
 2   Boyz gang, and that you knowingly, not accidentally,
 3   agreed to participate in some way with the affairs of
 4   this enterprise, the Greene Homes Boyz, through a
 5   pattern of racketeering activity.  Do you understand
 6   that you're charged with that?
 7           THE DEFENDANT:  Yes, ma'am.
 8           THE COURT:  And then the second is the VCAR
 9   attempted murder or aiding and abetting, this
10   enterprise, the Greene Homes Boyz existed, it engaged
11   in activities affecting interstate commerce, it
12   engaged in racketeering activities which is the
13   drugs, drug distribution, and that you attempted to
14   or you did aid others to commit murder or attempted
15   murder in violation of state law, and that you
16   committed this crime of violence to, in this case,
17   maintain or increase your position in the Greene
18   Homes Boyz.  Do you understand that that's what
19   you're charged with?
20           THE DEFENDANT:  Yes, ma'am.
21           THE COURT:  We have now gotten to the key
22   event of today, Mr. Jones.  Do you have any questions
23   for me or for your lawyer before we move on?
24           THE DEFENDANT:  I have one question.
25           THE COURT:  Okay.
```

```
 1              THE DEFENDANT:  When we do -- when we go to

 2    sentencing, right, it's you're the one sentencing me,

 3    giving me the time, and looking through the evidence

 4    and stuff, right, but we just -- like, they show you

 5    stuff and then we tell you stuff and they tell you

 6    stuff?

 7              THE COURT:  Correct.

 8              THE DEFENDANT:  And then it's your decision?

 9              THE COURT:  Yes.

10              THE DEFENDANT:  All right.

11              THE COURT:  There will be a presentence

12    investigation report that will reflect what the

13    government's evidence is and will reflect what the

14    probation officer concludes from her investigation,

15    and I believe it will be a her, in preparation of the

16    report that will be -- that report is submitted to

17    you and ultimately to the Court and your input is

18    encouraged.

19              THE DEFENDANT:  Okay.

20              THE COURT:  Does that answer your question?

21              THE DEFENDANT:  Yes, ma'am.  I just wanted to

22    make sure that you're going to be the one to read

23    through things, that you're going to be the one to

24    see things, and have your own point of view on

25    things -- not point of view, but more or less, you're
```

1    going to determine everything from your own mind

2    because you're the person that's fair.

3              THE COURT:  Yes.

4              THE DEFENDANT:  That's what I wanted to make

5    sure.

6              THE COURT:  Yes.  There is a rubric within

7    which the Court does that analysis, that is the

8    advisory sentencing guidelines, which are not binding

9    but the Court considers them, and what we call the

10   3553 factors which include deterrence, public

11   protection, just sentence, advancing the respect for

12   the law.

13             THE DEFENDANT:  Okay.

14             THE COURT:  And other things.  All right.

15   Any other questions?

16             THE DEFENDANT:  No, ma'am.

17             THE COURT:  Please tell me then in your own

18   words what it is that you did that shows that you

19   are, in fact, guilty of these two charges that you

20   are offering to plead guilty to.

21             THE DEFENDANT:  I, Laheem Jones, in

22   association with others --

23             THE COURT:  I'm going to ask you to pull that

24   microphone closer.

25             THE DEFENDANT:  Okay.  I, Laheem Jones, was

1    in association with others aided and abetted -- I

2    mean, aided and abetted by buying -- I mean, by

3    purchasing gasoline for the purpose of burning a

4    car -- burning a car that was present at the

5    Bridgeport courthouse while -- courthouse.  While I

6    was away in jail for a number of years, I was a part

7    of a group that sold drugs in the Bridgeport -- in

8    Bridgeport for a number of years.  My burning the car

9    on January 27, 2020, was to help the group over --

10   help the group even though I was not at the

11   courthouse.

12          THE COURT:  The group meaning?

13          THE DEFENDANT:  The GHB or G$B.

14          THE COURT:  And how was your burning the car

15   on January 27, 2020, to help the Greene Homes Boyz

16   even though you were not at the courthouse where the

17   shootings took place?

18          THE DEFENDANT:  To help them evade authority.

19          THE COURT:  What does that mean to you?

20          THE DEFENDANT:  To help them evade

21   prosecution.

22          THE COURT:  For the shootings at the

23   courthouse?

24          THE DEFENDANT:  Yes.

25          THE COURT:  And the VCAR count charges that

1   this crime of violence that you engaged in, namely in

2   essence destroying evidence, was for the purpose of

3   maintaining or increasing your position in the Greene

4   Homes Boyz; is that accurate?

5            THE DEFENDANT:  Can you repeat that again,

6   please?

7            THE COURT:  Yeah.  You recall that an element

8   of the Count 2, the VCAR attempted murder and aiding

9   and abetting, is that the crime of violence that you

10  committed, namely burning evidence of your fellow

11  Greene Homes Boyz's shootings at the courthouse,

12  was -- had a purpose and the purpose was to maintain

13  or increase your position, your status, your

14  authority, within the Greene Homes Boyz?

15           THE DEFENDANT:  Yes.

16           THE COURT:  Is that correct?

17           THE DEFENDANT:  Yes, ma'am.

18           THE COURT:  Is the government satisfied?

19           MS. KAOUTZANIS:  Your Honor, as Mr. Jones has

20  stipulated to in the plea agreement, if Your Honor

21  could just inquire further on two points.  I'm just

22  trying to find the stipulation.  So in the plea

23  agreement, Mr. Jones stipulated that he himself was

24  involved in selling drugs on behalf of the group,

25  that's the first point, and second, that he agreed

 1   with others that they would attempt to murder

 2   these -- not that he himself shot them, but that he

 3   aided and abetted an attempted murder as he's

 4   factually stipulated to.

 5          THE COURT:  So as part of the racketeering

 6   charge, did you sell drugs on behalf of the Greene

 7   Homes Boyz?

 8          THE DEFENDANT:  Yes.  I sold drugs in

 9   association with them.

10          THE COURT:  And did you agree with others in

11   the Greene Homes Boyz to murder or to attempt to

12   murder rival gang members?

13          THE DEFENDANT:  I agreed to retaliate with

14   other allies that tried to hurt us.

15          THE COURT:  You agreed to retaliate against

16   whom?

17          THE DEFENDANT:  The people that was trying to

18   hurt us.

19          THE COURT:  Who's that?

20          THE DEFENDANT:  Huh?

21          THE COURT:  Who's that?

22          THE DEFENDANT:  Opposition, the other side of

23   towns.

24          THE COURT:  Can you be more specific?

25          THE DEFENDANT:  All persons who left the

```
 1   courthouse.
 2          THE COURT:  Now, a lot of people left the
 3   courthouse that day.  What do you mean?
 4          THE DEFENDANT:  Trevon Wright, Jaheim Warren.
 5          THE COURT:  You agreed with your other Greene
 6   Homes Boyz members to murder or attempt to murder
 7   Mr. Wright and Mr. Warren in retaliation for their
 8   organization's conduct; is that correct?
 9          MR. CROSLAND:  Can I have one moment with
10   Mr. Jones?  He has a question for me.
11          THE COURT:  I can't understand you.
12          MR. CROSLAND:  Can I have one moment with
13   Mr. Jones?  He has a question for me.
14          THE COURT:  Certainly.
15          THE DEFENDANT:  Your Honor --
16          THE COURT:  I just want to clarify one thing.
17   Ms. Kaoutzanis, when you said something about a
18   stipulation in the plea agreement, there is no
19   separate document called "stipulation," correct?
20          MS. KAOUTZANIS:  No, Your Honor.  Sorry.  I
21   was just referring to the third paragraph on page 4.
22          THE COURT:  Thank you.
23       Have you finished consulting with your counsel?
24          THE DEFENDANT:  Yes, ma'am.  So we had a
25   general agreement to kill any opposition that was
```

1    against us.

2         THE COURT:  That included Trevon Wright and

3    Jaheim Warren, correct?

4         THE DEFENDANT:  Yes, ma'am.

5         THE COURT:  And the agreement was to kill

6    them when they left the state superior court?

7         MR. CROSLAND:  Can I have one second?

8         THE COURT:  Yes.  Would you please look at

9    page 4 of the plea agreement stipulation?

10        MR. CROSLAND:  Yes.  I see it.

11        THE DEFENDANT:  Yes, ma'am.

12        THE COURT:  Yes, what are you saying yes to?

13        THE DEFENDANT:  The stipulation on page 4.

14        THE COURT:  No.  I want to hear that you --

15   in your words what you had agreed to do with your

16   fellow Greene Homes Boyz members with respect to

17   Mr. Warren and Mr. Wright.

18        MR. CROSLAND:  Can I have one second?

19        THE DEFENDANT:  All right.  In my own words,

20   I agreed to kill all opposition that left the

21   courthouse, which were Trevon Wright and JD or Jaheim

22   Warren.

23        THE COURT:  But you were not there at the

24   courthouse?

25        THE DEFENDANT:  No, ma'am.

**A - 119**

54

```
 1            THE COURT:  And the car that you described
 2   that you purchased gas to burn, whose car was that?
 3            THE DEFENDANT:  I have no idea.
 4            THE COURT:  Why are you burning that car?
 5            THE DEFENDANT:  Because it was used in the
 6   courthouse shooting.
 7            THE COURT:  And who was it used by?
 8            THE DEFENDANT:  Other allies.
 9            THE COURT:  Who?
10            THE DEFENDANT:  No, ma'am.  I do not remember
11   who was driving the car.  I just was called to burn
12   the car.
13            THE COURT:  Who told you to burn the car?
14            THE DEFENDANT:  Ma'am, I don't remember who
15   told me to burn the car.
16            THE COURT:  Was it one of your fellow Greene
17   Homes Boyz?
18            THE DEFENDANT:  Yes, ma'am.
19            THE COURT:  And did they say why you should
20   burn the car?
21            THE DEFENDANT:  No.  They didn't tell me why.
22   They just told me to burn the car.
23            THE COURT:  Why did you think you were
24   supposed to burn the car?
25            THE DEFENDANT:  Because I didn't want them to
```

1    go to jail.

2              THE COURT:  Ms. Kaoutzanis, is the government

3    satisfied at this point?

4              MS. KAOUTZANIS:  Yes, Your Honor.

5              THE COURT:  I'd like to ask the government

6    then to summarize what Mr. Jones did that makes him

7    guilty of the two charges he intends to plead guilty

8    to and what the government's evidence would be to

9    those two charges if this case had continued to

10   trial.

11             Mr. Jones, you need to listen carefully

12   because I'm going to ask you after she's finished

13   whether you agree with her summary of what you did or

14   whether there are things you disagree with.  All

15   right?

16             THE DEFENDANT:  Okay.

17             MS. KAOUTZANIS:  Thank you, Your Honor.  If

18   the case were to go to trial, the government would

19   prove the following through, among other evidence,

20   the testimony of civilian witnesses, law enforcement

21   witnesses, cooperating defendants, video

22   surveillance, text messages, pictures, videos,

23   telephone records, YouTube rap videos, forensic

24   evidence including DNA evidence, fire and

25   arson-related evidence, and cell site evidence.

1              The government would first establish that

2     beginning around 2012, Mr. Jones was part of the

3     formation of what was in the early stages of the

4     Greene Homes Boyz gang that was formed in the Charles

5     F. Greene Homes housing projects and there would be

6     at least one cooperating defendant who would testify

7     about Mr. Jones' role in being present and how the

8     gang gradually over the years developed rival gangs.

9     Throughout the course of the conspiracy charged in

10    the superseding indictment, those rival gangs were

11    East End gang members and gangs from 150 or the west

12    side of Bridgeport.

13             It is correct that Mr. Jones was in jail for

14    a portion of the charged conspiracy, but he never

15    withdrew from the conspiracy and upon returning from

16    jail, he immediately resumed his role in the Greene

17    Homes Boyz gang and cooperating defendants would

18    further testify there were others like Mr. Jones who

19    would go to jail, come out, and resume their role in

20    the gang.

21             Mr. Jones' particular allegiance and

22    affiliation with the Greene Homes Boyz gang would be

23    shown not only through the cooperating defendants but

24    through the government obtained search warrant for

25    his Facebook records.  There are records in which he

1    coordinates with other gang members, has

2    conversations about guns, posts messages referring to

3    the gang and, like, for example, just as an example,

4    on January 27, 2020, at 10:23 p.m., Mr. Jones posted

5    on Facebook, "If you fuck with the" -- N-word -- "I

6    don't fuck with you, Rek," which was Myreke Kenion,

7    "Gang 100."  And then I think it continues -- sorry.

8    And that it's.

9         So he has messages like that that the

10   government would rely upon at trial.  The government

11   would also have relied upon the YouTube videos that I

12   have spoken about previously including videos like

13   "We Da Opps" which has a refrain referring to

14   Heemdog, which is Mr. Jones, and basically talks

15   about the gang and the opposition gang and has other

16   Greene Homes Boyz members in the video.

17        And then there was other YouTube videos as

18   well including "Love All My Brothers," and then "Off

19   My Chest," which kind of talks about the history of

20   the gang and some shootings that the government would

21   have intended to present upon at trial.

22        So aside from the enterprise itself, the

23   government would have shown the effect on interstate

24   commerce through multiple messages of various Greene

25   Homes Boyz members dealing narcotics.  Mr. Jones

1    himself has a number of Facebook messages in which

2    he's clearly dealing narcotics with references to

3    fire, slabs, perc, plat, which is marijuana, all

4    specific terms known to law enforcement, and also

5    there would be cooperating defendants who would be

6    able to testify to the meaning of those terms.

7         The government had also intended to call one

8    individual who bought narcotics from the Greene Homes

9    and there was also a series of controlled buys into

10   Mr. Jones that the government would have presented on

11   at trial.

12        And then with regards to the courthouse

13   shooting, which forms the second set of racketeering

14   acts for the racketeering conspiracy and also the

15   basis for the VCAR attempted murder, the government

16   would have established that on January 26th, Myreke

17   Kenion was shot at approximately 5:37 p.m.  Myreke

18   Kenion was a Greene Homes Boyz's associate.  Right

19   after his murder -- he was shot right outside of the

20   Green homes -- there was a number of communications

21   between Greene Homes Boyz members showing that they

22   knew about his death and were considering

23   retaliating.  Those included communications between

24   Asante Gaines and Mr. Jones, Asante Gaines and

25   Calderon.

1          And then at 8:21, Mr. Gaines wrote to

2    Mr. Jones, "Love u mane."  Mr. Jones responded, "On

3    kah grave," which is a reference to a deceased GHB

4    gang member, Khalil Diaz, "I'm out rental allat bro."

5    And then Mr. Jones continued, "On kah," again

6    referring to Khalil Diaz, "I'm heart broken, he was

7    my little circle."  Those messages continue

8    throughout the night and into the next morning.

9          As specific to Mr. Jones, the next morning

10   Mr. Gaines leaves New Haven, which we know from his

11   GPS, starts traveling to Bridgeport.  He sends out a

12   message saying, "I said I'm put another Niqqa on the

13   news regardless."  And then he says it's -- "Tre and

14   JD at court," referring to how Trevon Wright and

15   Jaheim Warren are at court, so that's at 10:59 a.m.

16         Meanwhile, Asante Gaines is trying to call

17   Isreal.  He reaches Isreal, Marquis Isreal, and then

18   there's communications between Marquis Isreal and

19   Destine Calderon, the number of calls, Diomie

20   Blackwell and Asante Gaines, and Asante Gaines

21   between -- and Asante Gaines and Laheem Jones.

22         At 11:24 a.m. -- so the shooting occurs at

23   noon.  At 11:24 a.m., Mr. Gaines and Mr. Jones call

24   Shajuan Perry who is an inmate in prison -- actually,

25   I'm sorry.  Shajuan Perry calls Asante Gaines' cell

1  phone from prison.  They're talking about how Myreke

2  Kenion was killed.  Mr. Jones gives his telephone

3  number, says that "Shit is crazy," and then Asante

4  Gaines says I'm "about to leave, I'm in the hood,"

5  and he says, "I can't even say too much, ya feel me."

6      So that call at 11:36, there's a sound of two

7  car doors slamming, and three minutes later, Asante

8  Gaines' GPS bracelet indicates he was in front of the

9  courthouse.  Asante Gaines, Destine Calderon, and

10  Diomie Blackwell are in the blue Volkswagen.  Diomie

11  Blackwell goes into the courthouse to see if Trevon

12  Wright and Jaheim Warren are inside, that's reported

13  back, and after waiting outside with multiple

14  telephone calls between the various cars, when Jaheim

15  Warren and Trevon Wright exit the courthouse at

16  12:10 p.m., they walk down the steps as captured on

17  video surveillance and as soon as they get into the

18  waiting Chevrolet Impala, a black Subaru in the

19  opposite direction comes next to it and fires

20  23 shots inside the Chevy Impala.

21      At that point, all the various parties kick

22  into gear.  The Subaru starts traveling to Naugatuck.

23  Diomie Blackwell and Laheem Jones each get their own

24  car.  Laheem Jones is captured on video surveillance

25  buying bleach, lighter fluid, and gasoline.  Diomie

1    Blackwell gets his Charger and he trails the

2    Subaru -- sorry, and a gas can.  I said gasoline.  A

3    gas can with gasoline.

4         So Diomie Blackwell and his Charger trails

5    the blue Volkswagen and the Subaru up.  There's

6    communications between Asante Gaines and Laheem Jones

7    regarding what to do with the car.  There's actual

8    communications where they talk about where to meet

9    up.  They all end up meeting up at a parking lot at

10   the Walmart in Naugatuck.  Laheem Jones says I'll do

11   the -- sends a message to Asante Gaines saying at

12   12:59 or -- sorry, 12:59 p.m., 1 p.m., "Send location

13   of the car, I'll do the rest."

14        The Subaru ends up getting parked in

15   Naugatuck.  It's burnt.  Laheem Jones' documents with

16   his name on it are found in the car partially burned.

17   His DNA evidence is found in the car.  The gas can is

18   found in the car.  And Laheem Jones' cell phone, we

19   obtained cell site data, his data matches the other

20   defendants which puts them in a location consistent

21   with being at the courthouse, although it is

22   impossible to say because the Greene Homes are also

23   very close to the courthouse, but a location with

24   being at or near the courthouse during the time of

25   the shooting, and then traveling up to Naugatuck to

1    burn the car before returning to Bridgeport.

2            And after the shooting, there is the "Person

3    of Interest" YouTube video where there's credit taken

4    for the shooting, and eventually, Marquis Isreal --

5    the same day, Marquis Isreal, Destine Calderon, and

6    Asante Gaines were arrested in Bridgeport traveling

7    back in the blue Volkswagen.

8            THE COURT:  Mr. Jones, you heard the

9    government's summary of what it claims you did.  Do

10   you agree with that summary or is there any aspect of

11   it you disagree with?

12           THE DEFENDANT:  I agree with everything the

13   government said, just the times might be a little

14   off, but mostly, I agree.

15           THE COURT:  I understand that you and

16   Mr. Crosland have prepared a petition to be submitted

17   to the Court to enter a plea of guilty.  Have you

18   read that petition and discussed it fully with your

19   attorney?

20           THE DEFENDANT:  That's correct.

21           THE COURT:  The purpose of the petition is to

22   make sure that you are aware of what you are doing,

23   what you are giving up, and doing that before we are

24   in the formal court proceedings.

25           THE DEFENDANT:  Yes, ma'am.

```
 1              THE COURT:  All right.  Has the government
 2    reviewed a copy of this petition?
 3              MS. KAOUTZANIS:  Your Honor, I reviewed a
 4    copy of the petition.  If I can just have one moment
 5    to look at one thing quickly.
 6              MR. CROSLAND:  Yes.
 7              MS. KAOUTZANIS:  Yes.  Thank you, Your Honor.
 8              THE COURT:  All right.  Will Mr. Crosland and
 9    Mr. Jones please sign the petition and hand it to the
10    clerk for filing?
11              MR. CROSLAND:  Yes.  We'll do that right now.
12              Your Honor, on behalf of Mr. Jones, the
13    petition has been signed by myself and Mr. Jones.
14    May I approach the clerk?
15              THE COURT:  Yes.
16              MR. CROSLAND:  Thank you.
17              THE COURT:  I'm going to amend your petition
18    where it leaves out the additional imprisonment term
19    that you would be subject to if you violated a term
20    of supervised release.  It's two years additional.
21    I'm going to give this back and you can initial and
22    date it.
23              MR. CROSLAND:  May I approach?
24              THE COURT:  Let me finish reading the rest.
25    You both do it and date it, please, just initials
```

 1   will be fine.

 2          Would you mind initialing it?

 3          MS. KAOUTZANIS:  Not at all.

 4          THE COURT:  All right.  Would you please put

 5   Mr. Jones to plea?

 6          THE CLERK:  In the matter of *United States of*

 7   *America v Laheem Jones*, case number 3:20-cr-126,

 8   assigned to Judge Arterton as to Count 1 of the

 9   superseding indictment charging you with violation of

10   Title 18 United States Code Section 1962(d), what is

11   your plea?

12          THE DEFENDANT:  Guilty.

13          THE COURT:  As to Count 2 of the superseding

14   indictment charging you with violation of Title 18

15   United States Code Section 1959(a)(5), what is your

16   plea?

17          THE DEFENDANT:  Guilty.

18          THE CLERK:  Your Honor, the defendant has

19   pled guilty to Counts 1 and 2 of the superseding

20   indictment.

21          THE COURT:  Thank you.  On the basis of the

22   petition to plea, which Mr. Jones and his counsel

23   have signed, the answers that Mr. Jones has given

24   while he's under oath on the record and in the

25   presence of his attorney to the Court's questions,

1  based on the remarks of defense counsel and the

2  remarks of the assistant U.S. attorney, I find

3  Mr. Jones is competent to plea.  He knows of his

4  right to a trial.  He knows what the maximum possible

5  sentence is.  He knows what the maximum period of

6  supervised release is and what the maximum period of

7  reincarceration is for violations of supervised

8  release.  He knows the sentencing guidelines are not

9  binding but they must be considered by the Court, and

10  he knows that he has a statutory right to appeal his

11  sentence, which he has waived with respect to any

12  sentence that is 360 months or less.

13       I find there's a factual basis for the

14  defendant's plea, that he has knowingly and

15  intelligently waived his right to a jury trial, that

16  he has entered his plea voluntarily, knowingly, and

17  of his own free will.

18       Accordingly, a finding of guilty on the

19  charges will enter forthwith and the case is referred

20  to the United States Probation Office for the

21  presentence investigation.

22       A United States probation officer will

23  interview you and prepare a presentence investigation

24  report on you.  By the close of business today, the

25  probation office will have assigned a probation

1   officer to do this report.  That will be conveyed by

2   e-mail to Mr. Crosland and to the government.  It

3   will trigger the preparation and scheduling of the

4   presentence interview with you at Wyatt with the

5   probation officer and your lawyer.  That needs to

6   take place as soon as possible.

7          The government will convey to the probation

8   office the essential points of the investigation for

9   inclusion in the presentence report.  This report

10  will be submitted to the Court to assist in

11  determining the appropriate sentence.     The

12  probation officers work for the Court.  They don't

13  work for the government.  So your cooperation with

14  them will generally be of benefit to you.

15         It is important that you carefully discuss

16  with your attorney what you say to the probation

17  office because this -- this presentence report is

18  very important in the calculation of your advisory

19  guidelines and consideration of your sentence.

20  Please read it and review it with your attorney in

21  person both in its preliminary form, after which you

22  can give input to the probation officer, and then in

23  its final form, which is the form that gets submitted

24  to the Court.

25         You asked if you can have input into this

```
 1    presentence report and the answer is yes and you do

 2    that after you have -- when you speak with the

 3    probation officer and after you have read the

 4    preliminary presentence report and you can have

 5    further input after the final report is delivered.

 6            Do you have a question, Mr. Jones?

 7            THE DEFENDANT:  Is it possible to, like,

 8    write you a letter about like --

 9            THE COURT:  Yes.

10            THE DEFENDANT:  Like, my whole --

11            THE COURT:  Yes.

12            THE DEFENDANT:  Young to old, meaning from my

13    childhood to now?

14            THE COURT:  You can send whatever letter you

15    want to the Court.

16            THE DEFENDANT:  Okay.

17            THE COURT:  You will give -- you can send it

18    directly or you can give it to the probation officer

19    who will include it in the materials with the

20    presentence report that are given to the Court.

21            THE DEFENDANT:  It doesn't matter which way,

22    I can give it to her, the probation officer, and it's

23    going to do the same thing as if I was sending it to

24    you?

25            THE COURT:  Correct.
```

```
 1          Mr. Jones is detained.  All right.
 2   Sentencing is scheduled for February 23rd at 3:00 in
 3   courtroom number two.  The presentence report, the
 4   initial presentence report will be disclosed to
 5   Mr. Jones, to Mr. Crosland, and to the government by
 6   January 3, 2022.  Any objections or comments shall be
 7   communicated to the probation officer no later than
 8   January 17th.  The final version of this presentence
 9   report will be filed with the Court and counsel by
10   January 31, 2021.  Defendant's sentencing memorandum
11   shall be filed by February 7th.  The government's
12   sentencing memorandum will be filed by February 10th.
13   Any replies will be filed by February 14th.
14          Are there any questions or comments
15   concerning this sentencing schedule?
16          MS. KAOUTZANIS:  Not from us, Your Honor.
17          MR. CROSLAND:  Yes, Your Honor.  On behalf of
18   Mr. Jones, I was just -- January 31st is the final
19   PSI, correct?
20          THE COURT:  Yes.
21          MR. CROSLAND:  Okay.  And that's it, Judge.
22   Thank You.
23          THE COURT:  A written scheduling order will
24   be filed shortly.  These deadlines must be met.  I do
25   not intend at this point to give any extensions.
```

 1   Enough is known about this case and Mr. Jones is

 2   entitled to representation by his attorney in a

 3   prompt and diligent fashion to carry out what he is

 4   concerned about, which is the content of the

 5   presentence report.

 6        MR. CROSLAND:  May I inquire in terms of

 7   sentencing and preparation, as you just stated, I

 8   guess all courts are different, but at all of the

 9   federal defenders' seminars that I've been to,

10   different courts allow some audio-visual

11   presentations in terms of creating the sentencing

12   memo and the sentencing itself.  Would this Court

13   allow us to put together that type of presentation?

14        THE COURT:  Yes.  But do it within the

15   deadlines.  I'm not going to extend these deadlines

16   and we've had enough delay in communication with

17   Mr. Jones.  So that should be your top priority.

18        MR. CROSLAND:  It is.  I accept that

19   enthusiastically.  And if it's appropriate, I was

20   waiting to just ask for an acknowledgement from the

21   government as to page 9 of the plea agreement,

22   there's three asterisks at the bottom that says,

23   "Defendant further agrees that all trial exhibits and

24   discovery materials that have been provided to him in

25   preparation for trial will be returned," just for the

```
 1   record, we never accepted them and I think the box is

 2   sitting on the government's table.  If they can just

 3   acknowledge that we returned that and we have no

 4   further obligations with that material.

 5          THE COURT:  Have you looked at that,

 6   Ms. Kaoutzanis?

 7          MS. KAOUTZANIS:  Those are the exhibits.

 8   I'll talk to Attorney Crosland after about how to get

 9   back the grand jury transcripts.  The exhibits have

10   been returned.  Thank you.

11          THE COURT:  All right.  If you have any

12   uncertainties, Mr. Crosland, about how the sentencing

13   guidelines will be considered, how federal sentencing

14   will proceed, I recommend you contact people in the

15   federal defenders' office or otherwise on the CJA

16   panel who are fully knowledgeable about how this

17   works.  All right?

18          MR. CROSLAND:  Yes, Your Honor.  Thank you

19   for that.

20          THE COURT:  Thank you.  We stand in recess.

21          (Proceedings adjourned, 12:39 p.m.)

22

23              C E R T I F I C A T E

24   RE:  UNITED STATES OF AMERICA v. LAHEEM JONES
                  No. 3:21-cr-126-JBA

25
```

1           I hereby certify that the within and

2    foregoing is a true and accurate transcript taken in

3    the aforementioned matter to the best of my skill and

4    ability.

5

6                    /s/ Corinne T. Thomas

7               CORINNE T. THOMAS, RPR
                Official Court Reporter
8            United States District Court
                 141 Church Street
9           New Haven, Connecticut 06510
                  (203) 809-0848

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO.:  3:20-cr-00126-JBA-5** |
| | : | |
| **v.** | : | |
| | : | |
| **LAHEEM JONES** | : | **MARCH 30, 2022** |

**MEMORANDUM IN AID OF SENTENCING**

### I.     INTRODUCTION

The great Langston Hughes once said, "Hold fast to your dreams because if dreams die, life is like a broken wing bird, which cannot fly." It so important that we be strong fierce advocates for our clients, and their lives, their ability to thrive and survive. It's amazing how many problems people have, and these problems are often more difficult they can handle alone, helping people just impacted me so tremendously, that I decided long ago that I would never give up no matter how poor I was or how difficult the situation. I would keep fighting for justice even if I found that I was in waters way over my head, which is where I find myself in this very serious Federal case, but Laheem Jones needs me, and I promised myself that I would always be a voice for those with no voice, and those with no ability to pay for proper legal representation.

The truth be told we lawyers find ourselves before courts doing same old thing, writing memos that all look the same and sound the same. The fact is, the court is aware of the sentencing guidelines, the court understands the guidelines are discretionary, and as the first black female Supreme Court Justice nominee, Ketanji Brown Jackson reminds us, sentencing itself is a

1

discretionary act.  She also reminds us that it is not a numbers game, that persons before the court are human, and in fashioning a sentence the court must always be aware of that.

In preparing this memo I have read a tremendous amount of other sentencing memorandums.  Ironically, they all sound alike and look alike.  They all outline the same argument as it relates to sentencing factors, all of which again the court is aware of.    As a black man what is more disheartening is that in the many sample memos that I have read, I can literally replace the name of the defendants in those memos with Laheem Jones and sign it.  The level of poverty, broken homes, violence, drugs, and kids living in so called housing projects is alarming.  Yet lawyers sight articles that talk about this stuff, they highlight in memo after memo the fatherless homes, the cracked-out mothers, and the violence as they ask the court for leniency.

The same poverty and broken homes that lead those young men and women to a life of crime is the same poverty and broken homes that has led Mr. Jones to the court here today.  He too grew up in the streets with no guidance.  He went to jail at 17 years young, and basically grew up there.  The life of so many black boys and girls is like a "project" and experiment that never ends.  It is so sad and heart breaking.  I have heard the court remark in sentencing a co-defendant, and I paraphrase, "that just because one grows up in a housing project doesn't mean they would turn to a life of crime," and that is very true, I am an example of that.  However, the same is true of COVID-19.  Just because we are all living in a worldwide pandemic doesn't mean that we will all get COVID or even die from it.   Yet we cannot dismiss the reality that many living in this environment have been impacted greatly, and so many have died.  To date 6.13 million people have died from COVID worldwide.  The impact of living in certain environments can be deadly.

2

I intend not to spend the court's time reading about how Laheem grew-up in poverty and in violence, and neglect, he did, and it really impacted his life in a negative way, this is highlighted in the PSR.  In addition, there are multiple defendants in this case, and having read the memos of the co-defendants it is clear the court has heard the same argument over and over again.  Also, having sentenced more than one co-defendant in this case to date, the Court is aware of the offense conduct that brings Mr. Jones before the Court.

Therefore, I will only distinguish his conduct and certain parts of his life from that of others, as I think it is important to do so.   Having listened to the court highlight the conduct of others when sentencing them in this case,  I have listened to the court point out how certain conduct of other defendants impacted it's sentencing determination, as such, I will attempt to be specific about Mr. Jone's life and his role in the courthouse shooting in particular.

Laheem Jones, was arrested pursuant to a grand jury indictment filed with the court on August 5, 2020, with a superseding indictment ("indictment") returned on February 21, 2021.  Mr. Jones entered a plea of guilty to Count One of the Superseding Indictment charging him with Conspiracy to Engage in a Pattern of Racketeering Activity (RICO Conspiracy) in violation of 18 U.S.C. Section 1962(d), which the court accepted on November 19, 2021.

Mr. Jones's plea was entered pursuant to a plea agreement submitted to the court.   The plea agreement details the parties' stipulated calculation under the United States Sentencing Guidelines, which essentially comports with the calculation made by the United States Probation Office.  Notwithstanding, for the reasons discussed further below, Mr. Jones submits that a

3

sentence below the advisory Guideline range is appropriate and will satisfy the policies and purposes of 18 U.S.C. § 3553(a)(2) in this case. As such, Mr. Jones asks the Court to consider a period of imprisonment of sixty months (60) months.

II.   **LEGAL STANDARD**

A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime. *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (*en banc*). In reaching its sentencing decision, the Court must consider each of the factors set forth in 18 U.S.C. § 3553(a) to make an individualized sentencing determination. See *United States v. Booker*, 543 U.S. 220, 245-46 (2005); *Gall v. United States*, 552 U.S. 38, 59 (2007). The Court should begin by calculating the applicable Sentencing Guidelines range. However, "[t]he Guidelines are *not mandatory* on sentencing courts; they are also *not to be presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009).

Rather than relying on the Guidelines, a sentencing court must make an individualized assessment as to the appropriate sentence based on the facts presented and in light of each of the factors set forth in 18 U.S.C. § 3553(a). The Court may impose a below-Guidelines sentence based entirely on policy considerations, including disagreements with the Guidelines. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *United States v. Seval*, 293 F. App'x 824, 836-37 (2ⁿᵈ Cir. 2008) (unpublished summary order) ("the Supreme Court has made it clear that sentencing judges may consider the general appropriateness of a Guideline range"). This is particularly true when considering Guidelines that are not based on the Sentencing Commission's traditional empirical and experiential study. *See Kimbrough*, 552 U.S. at 109.

4

Title 18, United States Code § 3553(a) provides the framework within which a sentencing

judge must determine the appropriate sentence for a defendant:

<u>Factors to be considered in imposing sentence</u>. The Court shall impose a sentence
sufficient, but not greater than necessary, to comply with the purposes set forth in
paragraph (2) of this subsection. The court, in determining the particular sentence
to be imposed, shall consider:

    (1)    the nature and circumstances of the offense and the history and
characteristics of the defendant;

    (2)    the need for the sentence imposed –

        A.    to reflect the seriousness of the offense, to promote respect for the
law, and to provide just punishment for the offense;

        B.    to afford adequate deterrence to criminal conduct;

        C.    to protect the public from further crimes of the defendant; and

        D.    to provide the defendant with needed education or vocational
training, medical care, or other correctional treatment in the most
effective manner;

    (3)    the kinds of sentence available;

    (4)    the kinds of sentence and the sentencing range established for—

        A.    the applicable category of offense committed by the applicable
category of defendant as set forth in the Guidelines

    (5)    any pertinent policy statement—

        A.    issued by the Sentencing Commission

    (6)    the need to avoid unwarranted sentence disparities among defendants with
similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Guideline § 1B1.1 sets forth a three-step process for the sentencing court to follow in determining a "reasonable" sentence. The first step requires the sentencing court to determine the correct Guideline range for the case.  In the second step, the sentencing court must determine whether a departure from the Guideline range is warranted due to the presence of extraordinary circumstances "of a kind" or "to a degree" that were not adequately considered by the Commission. These two steps will produce a sentence that is "under the framework set out in the Guidelines."

The third step requires the sentencing court to consider the factors under 18 U.S.C. § 3553(a) taken as a whole in determining an appropriate sentence.  In this third step, the court must determine whether to impose a "variance" sentence, which is a sentence outside of the Guideline range (many courts have called this "a non-Guidelines sentence") by considering the factors set forth in Section 3553.

Ultimately and most importantly, the Court should be guided by its statutory mandate to order a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing, while considering as well how best to impose "individualized justice." *United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005), *abrogated on other grounds*, *United States v. Fagans*, 406 F.3d 138, 142 (2d Cir. 2005)

III.    **DISCUSSION**

a. <u>Characteristics of the Defendant</u>

6

Laheem Tyrone Jones was born August 6, 1994 in Bridgeport, Connecticut to the non-marital union of Christopher Coleman 47, and Mycheral Walker, 43.  Mr. Jones has three maternal half-siblings.  The eldest, Dha'moni Lockhart was shot and killed on June 16, 2021 at the age of 21.  The violent death of his brother happened while this current case was pending, and it has impacted Mr. Jones tremendously.  In fact, after a brief discussion with counsel and counsel for the government about the death of his brother, Mr. Jones on the second day of jury selection decided to enter into a plea agreement and start working towards putting his life back together so that he can have a chance to be home to support his mother and two remaining siblings.  He was very moved by the words of the government's lawyer Jocelyn Kaoutzanis.  She walked over to him and talked of this brother's death, the importance of changing his life, and he was very moved, almost in tears.  He later commented, "she is tuff but I think underneath it all she has a heart."  We often take kindness for granted, but many of these young boys have never had anyone care for them, so even under these circumstances it means a lot.

In addition to Dha'moni who was killed, Mr. Jones' other siblings, Brooklyn Ortiz, 12, and London Ortiz, 9, reside with Laheems's mother, Mycheral Walker.  Mr. Jones considers himself a father-figure to his two younger siblings.  He considers his mother his best friend and advised that she has carried the role of both mother and father his whole life.  As of this writing, his father is currently locked-up in jail for heinous crimes related to children.  PSR ¶ 102

Mr. Jones was raised in the toughest parts of Bridgeport and his housing situation was unstable in his formative years.  He grew up in the Charles F. Greene Housing Projects in Bridgeport but never really had a place to call home in his early youth.  PSR ¶ 104.  As he got older, he moved around to different houses around Bridgeport.  PSR ¶ 8.  During the PSR interview Mr. Jones explained how he would never have a bed to sleep in at night, and explained how he would sleep at the homes of different friends.

Normally, one would think this meant that Mr. Jones was allowed to sleep at a friend's home with the permission of the parents, and that he would have a bed to sleep in.  Instead, Mr. Jones explained to P.O. Lindo how sleepovers actually worked.  Because all of his friends were poor, he would make sure that he didn't stay at the same friend's home more than twice in a week.  And by sleeping over what he explained was that he would stay at a particular friends' home so late watching T.V. until the parents or grandparents fell asleep, then he would fall asleep sitting up on the sofa.  In the morning he would apologize for this and make his way to the streets hoping to find food, and perhaps school.

Counsel can write page after page about the suffering Mr. Jones has endured as a young man, but it is clear that the court understands the suffering that Mr. Jones and many like him has had to endure in places like the Greens.  As highlighted in other submissions in this case, there are articles written by professionals that talk about how kids like Laheem gravitate towards gangs as a way to survive.

As discussed in the PSR, gangs have been around in Bridgeport far before Mr. Jones was born. Over the past years, local street gangs in Bridgeport, Connecticut joined forces and coalesced into two broad alliances. These gang alliances were geographically based and centered around public housing projects in the city of Bridgeport. The first alliance was composed of the following gangs: the Greene Homes Boyz/GHB and the O.N.E. The GHB or the Hots was centered around the Charles F. Greene Homes Housing Project. The O.N.E. which stands for the "Original North End," and alternatively "Only North End." Was based in the Trumbull Gardens Housing Complex in Bridgeport in an area referred to as the "Terrace." PSR ¶ 8.

Mr. Jones recalls how it was very difficult for him to move around the city as a young man. If you walked through the wrong neighborhood, you could be shot and killed just because you didn't belong there. He remembers having to walk very long routes to get to his mother's job in a certain part of Bridgeport and run really fast through a certain part of the town that was dangerous for him to be.

The life Mr. Jones had to live I wouldn't wish it on my worst enemy. As the PSR details his father is in prison for sexual assault. According to the Connecticut Department of Correction website, Mr. Coleman, Laheems' father is currently incarcerated at Cheshire Correctional Institute in Chesire, Connecticut. In 2013 Laheem's father was convicted of Cruelty to Persons, Illegal Possession of Child Pornography, 2nd Degree Sexual Assault of a Minor, Promoting a Minor in an Obscene Performance, and two counts of Risk of Injury to a Minor Involving Contact with the Intimate Parts of Someone Under the age of 16 (more specifically, Mr. Coleman orchestrated sexual contact between a 9 year old and a 14 year old).

9

We can only imagine what Laheem had to endure as a child growing up with a father that was abusive, cruel, and who is in jail for being Cruel to Persons.  This type of abuse and neglect is no environment for a young person to have to grow up in, and it affected Mr. Jones in a very negative way, and it led to his making the wrong choices and hanging with the wrong people, selling drugs to survive.  Mr. Jones reported to probation that his older cousin "tried to touch me" while he was living at his aunts house in Bridgeport, Connecticut.  He advised that his older cousin did this to another male and was subsequently incarcerated for it.  PSR ¶ 121.

His housing projects was like a cell block at a jail, and it was very hard not to be affiliated with a gang when the entire projects was a gang.  GHB is the Greens, it is the place he lived, the people he was around, and it was not good.  If he was around doctors and lawyers and scientist, I have no doubt in my mind he would have grown up to be one of brightest doctors, lawyers or scientist.

### b. Characteristics of the Offense

The characteristics of the offense are detailed in the PSR in Paragraphs 7 through 39.  Having sentenced more than one co-defendant in this case to date, the Court is very aware of the offense conduct that brings Mr. Jones before the Court for sentencing.

Mr. Jones takes full responsibility for his part in the enterprise and activities of the same, as detailed in the PSR and his own admission at the time he entered his change of plea.

For example, regarding the courthouse shooting, Mr. Jones was not present, and did not know of or plan to shoot anyone.  He is remorseful for having decided to get involved in burning a car after the fact.  Having spent seven (7) years in jail he knew of the pain and suffering of jail and didn't want others to suffer as he did and made the wrong choice to break the law.

Mr. Jones also understands that the courthouse shooting was purportedly motivated in some part by the murder of Myreke Kenion the night before.  However, Mr. Jones did not know of a plan do retaliate nor did he participate in the shooting.  He knew people were in pain as a result of the loss, and that everyone was talking about what happened.  He also talked to others about what happened, but was never texting or talking to anyone about breaking the law by shooting anyone. He was only home from jail for about a year and did not want to go back.  However, growing up poor and living from place to place, relying on others to make it through the night, when placed in a positon to help others who helped him, he made the wrong choice and broke the law.  A decision that he regrets, and has been in jail for two years because of.

As it relates to drugs, Mr. Jones both used and sold drugs.  Mr. Jones first tried Percocet in 2019 and became addicted to it.  10's, 20's, 30's whatever he could get his hands on he would use, and he used drugs daily.  PSR ¶ 117.

He understands his selling drugs in connection with others makes him apart of the R.I.C.O., however, when you look at the drug quantity, it would make these guys millionaires, which Mr. Jones was far from. None of them made money or could even afford to buy the quantity stipulated too.  The Government has advised that the exact drug quantities are *unavailable* and therefore it is

11

not possible to calculate an exact converted drug weight total.  In an effort to accept responsibility Mr. Jones has stipulated to at least 60 kilograms.[1]

Notwithstanding, these comments are offered only in furtherance of Mr. Jones's efforts to be forthright and candid with the Court about the role he played, as well as the group mentality that went into this enterprise and its activities.

### c. Sentencing Considerations

Mr. Jones was on the cusp of turning his life around at the time of his arrest.  This is not to minimize or deflect his responsibility for the serious criminal conduct he stands convicted of. However, it is offered as a demonstration of his capacity and desire for change in his life.

Mr. Jones has used the very limited opportunities at Wyatt to demonstrate his desire for change to the court while he has been detained.  He has completed various programs while at the Donald W. Wyatt Detention Center.  He has also maintained a job while in jail that he is very proud of, and he has not broken any rules or gotten any tickets.

### 1. **General and Specific Deterrence**

Among the sentencing considerations that the Court will consider is general and specific deterrence.  However, it should be noted that "lengthy prison sentences cannot be justified on a

---

[1] Note, there is a legal theory that holds that one should only be responsible for the drugs associated with their part of or time of joining an enterprise.  Mr. Jones was in jail during a large part of this conspiracy, and for the small time he was out, he was involved with a tiny portion of drugs, far from that which was stipulated too.

deterrence-based, crime prevention basis." Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013).

Mr. Jones stands before the Court convicted of crimes that demonstrate a marked disrespect for the rule of law.  However, given the inadequacy of incarceration itself to change individual or community-based behaviors, the defendant respectfully asserts that deterrence should not play a significant role in fashioning the appropriate sentence in this case.

2. **Seriousness of the offense and punishment**

Mr. Jones has acknowledged his criminal conduct and the enterprise involved in this case. However, that enterprise is much more complicated than the "Green Homes" or the "GHB" or other monikers of a street gang.  Mr. Jones was socially, politically, economically, and familial related to the co-defendants and others in Bridgeport.  He grew up with them and experienced similar traumas and tribulations.  He had to learn to fight for himself and his siblings. He was tethered to his peers, who he turned to for support.

Mr. Jones sold drugs and engaged in violent acts.  He did these things because they were expected of him by his friends and family.  He did them because he grew up to expect nothing more of himself or out of his life.

3. **Vocational and Skill-Building Programs**

Cognitive behavioral skill-building is more effective in reducing future criminal behavior than punishment even among persons at high-risk of reoffending.  Patricia Clark, Office of Justice Programs, National Institute of Justice, *Preventing Future Crime with Cognitive Behavioral Therapy*, 265 Nat'l Instit. of Just. J 22 (2010).

13

Mr. Jones has expressed a desire to utilize his period of imprisonment to better himself and his life upon his release.   He wishes to engage in counseling to remain drug-free.   He hopes to take advantage of programs to learn to be the best he can be in prison and after his release from prison.  He aspires to complete college courses.   Mr. Jones hopes to utilize whatever BOP programming he can to have marketable vocational skills.

Mr. Jones' plans for the future include obtaining his CDL.  He explained to probation, "My good friend told me if I do that, he'll buy me a truck."  Mr. Jones further advised probation that he is also interested in the restaurant business and construction.  He noted, "I love landscaping.  If I was rich, I would build a children's hospital.  I read this thing about Saint Jude's Hospital and it basically showed the beginning of the hospital, about getting funding, and how it's about who you know."  He explains he wants to get a restaurant for his mom.  PSR ¶ 133.

## IV. <u>CONCLUSION</u>

Mr. Jones will be stand before the court to be sentenced on April 6, 2022.  He understands the seriousness of the crimes he has committed.  This journey both before he was arrested and after has provided teachable moments for Mr. Jones.  I have journed to Wyatt Rhode Island to meet with Mr. Jones on many occasions during the pendency of this case.  The last time I visited him he said that he had a huge headache that went away after I spoke with him.  He said that after

reading so many of the sentencing memos of others, and listening to them talk about their lives, it was hard for him to know what to do with so much information and so much uncertainty.

He gave me a hug and thanked me for making it call make sense, and for giving him hope. "Thank you Darnell, I am sorry I gave you such a hard time when we first met, it is just hard for me to trust people." I was moved then, and I am moved even now as I write those words. I wasn't born with a silver spoon, and I could never imagine that my life would have purpose for others. Watching Laheem grow and mature in front of me has been very emotional.

Helping people like Laheem is why I here, and when you feel that joy from that other person, because this tremendous burden has been lifted from them… that gives you more and more energy, and love for people, and love for what you're doing.

While he was not at the courthouse on the day of the shooting, he realizes that his activities both before that day, on that day, and after that day has impacted his life forever, and is the reason he was once again taken away from his family. After serving his entire youth life in jail he has once again been taken away from his family and has been in jail for almost two years (2). When you add that to the seven (7) years he just served, that is a total of nine (9) years in jail.

He is before the Court with an understanding of the seriousness of his role in the criminal enterprise and its activities, but also with hope that after he serves a period of incarceration, he will be able to start a new life in a productive way. All he talks about is his mother's pain from losing her son, his brother to murder. He explains that he has experienced a lot of violence in his life, have seen many people die, but death never impacted him the way it has impacted him after after

his little brother was shot and killed, and watching his mother's pain.  This level of pain has made him realize what other families go through when the shooting and killing happens in Bridgeport. This pain he says "hits" different.  This is a pain he does not want for his nice (9) year old and seven (7) year old siblings.

He understands that if he is sentenced to 5-10 years on top of the 9 years he has done so far of his life, that would be a cumaltive of 15 to 20 years of his 27 years on this earth.  That would mean that he only spent seven (7) years of his time on earth out of prison.  He is praying that the court give him another and final chance at life.  Because of all the time he has spent in jail, he grew up there, so in society he is like a seven (7) year old child.  Further substantial incarceration will be highly detrimental to his development and only continue the experiment that has brought so many black boys before the court for decades.

As such, Mr. Jones respectfully requests that the Court consider a period of incarceration that punishes him and deters him from further criminal activity, but also that provides him the services and support to make something of his life.  Counsel ask the court to consider affording Mr. Jones with the acceptance of responsibility points as it said it would consider.  As the Court would recall, Counsel was on a murder trial and was not able to discuss the Plea offer with Mr. Jones and that is why he was unable to accept the Plea.  I take the blame for that.  The Court did say that it would consider giving him those points, and the Government stated it takes no position and will leave it up to the court.

Mr. Jones pleads with this honorable Court to consider a sentence of sixty  (60) months'

incarceration as sufficient but not greater than necessary to serve justice in his case.

> THE DEFENDANT
> Laheem Jones

> By_____/s/_____

> Darnell D. Crosland, Esq.
> CROSLAND LAW GROUP, LLC.
> 1200 Summer Street Suite 202
> Stamford, CT 06905
> (203) 921-1782
> (203) 921-1223
> Fed Bar No. CT 25629
> info@croslandlaw.com

17

<u>CERTIFICATION</u>

     This is to certify that on March 30, 2022, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                        /s/ Ct 25629
                    Darnell D. Crosland, Esq.

18

**<u>ATTACHMENTS</u>**

To Whom It May Concern:

My name is Khaliq Brown, and I am a licensed Realtor in the state of Connecticut. I'm here today to tell you how I know Laheem Jones, how is character is, and how I plan to assist in the continuance of his growth and developmental process during his incarceration, and upon his release.

Laheem and I met while I was living with my mother and brother in the Greene Homes Apartments. We became good friends during our freshman year at Warren Harding High School, where we both shared a common interest in going to teen parties, the school basketball games, and in general having fun. Laheem would always have a vibrant smile on his face when you saw him, then he'd usually follow with a little joke just to make you laugh. That is Laheem! A guy with a big heart who always finds the most joy in making other people around him happy. He always wanted people around him to see him as a reliable individual. He found joy in helping others out especially in dire times of need.

Laheem grew up in a dysfunctional environment. He lived with his mother, little sisters and his little brother, whom sadly and unfortunately isn't here with us anymore, as he was a victim to gun violence. His home was complete but when his mother lost her job and times got hard, he was forced to split from his immediate family and live with cousins and aunts during his childhood years. I recall times when Laheem was homeless, sleeping from couch to couch. That is until my mom allowed him to live with us in our Greene Homes Apartment. He stayed with us for about 6 months until he left to live with his uncle. Even while, from my perspective, internally suffering due to being separated from him family, he found a way to remain a happy individual.

As teens, we didn't always have the proper guidance nor the exposure to working a full-time job nor being a law-abiding citizen. We

would talk daily on how we wanted to earn an honest living, but we did not know how or what to do. The older men in the Greene Homes Projects were the only folks we had to look up to for financial instruction, but most of them were either in the streets, or struggling. We followed behind their selling drugs because this is what we were exposed to daily, and we witnessed the type of money they were making, therefore we followed. We lived in low-income homes therefore when we wanted something, we couldn't rely heavily on our parents to support our wants when they barely could support our needs.  Unfortunately, we both ended up going to prison in 2012, spending our late teens and early twenties incarcerated, serving 7 years (me) and 6 years (Laheem).

It's unfortunate that Laheem is in such a predicament again, however I know that he has more support and positive advocates this time around, I am one of them. I know when I was incarcerated, having a positive support system and encouraging peers, helped me grow into an educated and disciplined man. I have been talking to Laheem since he's been incarcerated, and I am a firm believer that our peers from the same age bracket are our greatest influencers. Therefore, I will continue to assist my brother's cultivation while he's incarcerated and upon, and beyond, his release. I have already sent him books that I believe would be much benefit to him upon his journey.

Laheem has spoken of investing into properties to sustain a financially balanced life, and he has even started educating himself on real estate investing, perhaps me being an agent inspired him; however, the point I am trying to make is he has my support because I believe in his character.  He wants to give back to his community by mentoring the troubled youth and sharing his experience which might prevent a few from going to jail, he always wants to lend a helping hand. Laheem wants to break the cycle, and I believe his character will prevail.

I truly believe Laheem would thrive in society upon his release because "he has gained more knowledge over the last year than he gained his entire life," those are his words. I believe he has become inspired and inclined to live the life of a law-abiding citizen, and what's even better is that he has acquired a keen understanding and love for real estate, which is a potential career that will keep him away from the streets. I am a walking example. He deserves another chance at life and this time he has the support.

If you have any questions or concerns you can reach me at 4752256361

Best Regard,
Khaliq Brown

Dear your honor,

My name is Anthony Marshall, I am a violence prevention professional.
I worked for RYASAP/Street Safe Bridgeport, but then started my own
program Peace In The Streets (PITS)! Street safe Bridgeport is a non-
law enforcement-based program, which focuses on stopping gang and
group violence in the city of Bridgeport. Our approach is simple, we
do asset mapping throughout this community, in order to build trusting
relationships with youth and their families. We mentor youth, enroll
them into college, help them find employment, re-enroll them in high
school, put them in safe houses if they want out of the gang, trauma
groups, and try to get them to understand the wrong they have done.
Our hope is to make a positive impact in their lives in hopes that
they will change their path, which in turn will keep them safe.
I have known Laheem's Jones since he was a baby. He grew up with a
single parent who was very very young at the time. His environment was
not an environment in which the average person would raise a child,
let alone a young black male in. In his growing up he witnessed so
many hardships that traumatized him up until this very day. I am not
making any excuses for his behavior in the past, because many of our
you make mistakes. What I want to do is point out the positive aspects
he has in his life, and in his character. He is a very intelligent
young man, to the point where I can never understand why he did not
pursue a higher education! He is a very responsible young man that his
mom counts on when he comes to the help raising of his little sisters.
I believe that his intentions on trying to elevate to positive success
is there, I just believe it was the environment, and the company that
was kept. I am someone who has dealt with so many different young men
in his situation. I will say he has hope! My plan for him when he is
released, is to have a job set up for him, have him travel with me to
tell his story to other young brothers, so they don't make the same
mistakes he did! I am doing community service work by being involved
with many of the zoom sessions dealing with how we can help the youth
get past this violence. I also believe and will help him focus on his
spiritual faith! I feel that if many of these young men get in tune
with that they will see themselves as the kings they are! I strongly
believe he will be successful out on bond, in a positive manner.
Myself personally, in other mail Activist out here in the city of
Bridgeport are on the same page when it comes to this young man. For
any questions you can contact me and I will elaborate more on how he
can be trusted out on bond.

Sincerely,
Anthony Marshall
CEO PITS- Peace In The Streets
Violence prevention professional
203-583-9234

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 3:20-cr-126 (JBA) |
| | : | |
| v. | : | |
| | : | |
| LAHEEM JONES a.k.a. "Heemie" | : | April 1, 2022 |
| | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Government respectfully submits this sentencing memorandum in connection with

defendant Laheem Jones' sentencing hearing, currently scheduled for April 6, 2022.  For the

reasons detailed below, the Government asks that the Court adopt the findings of fact in the

Presentence Report ("PSR") and impose a sentence of at least twenty years in prison.  Such a

sentence is below the recommended Guidelines range of 360 months, but, in the Government's

view, is minimally necessary to achieve the purposes of sentencing including the need to reflect

the seriousness of the offense conduct, the extreme risk of recidivism, as demonstrated by the

defendant's Criminal History Category and his conduct in this case, and the failure of his prior

eight-year jail sentence to deter him from extremely violent conduct.

Laheem Jones was a founding member of the Greene Homes Boyz gang, a deadly street

gang in Bridgeport, that was responsible for multiple shootings against rival gang members and

those suspected to be disrespectful to the group during the course of the conspiracy.  Although he

was incarcerated for a number of years, Laheem Jones remained a respected member of the gang

throughout that time, and certainly never renounced his membership in the gang.  To the

contrary, Jones immediately resumed his criminal activity upon his release from prison—dealing

drugs and possessing, using, and glorifying the GHB's use of firearms, and joining in the

continued gang war of which he had been a major part prior to his incarceration.  Although he

was not a trigger-puller in the daylight January 27, 2020 shooting at the Golden Hill courthouse in Bridgeport, witnesses the Government would have called to trial would have testified that Jones encouraged peers to use violence, and cellular and social media evidence would have shown that Jones was an integral part of the premeditated agreement and effort to kill four East End gang members and associates.

As he admitted during his plea hearing, Jones knew exactly what his fellow GHB gang members and O.N.E. allies had agreed to, sharing their intent to kill, and Jones certainly did not change his mind after the gruesome shooting was completed.  Taking on his mantle as a gang leader, he ultimately took control of burning the Subaru after the shooting in an effort to conceal evidence of the attempted murders so that this violent crew could escape unscathed, ready to do more damage to control the streets of Bridgeport.  Jones unfortunately continues to minimize his role in these criminal acts and his role within the gang—suggesting that he has not yet fully accepted responsibility for his actions and raising questions about his likelihood of recidivism. Laheem Jones' criminal activity, his role in the conspiracy, his general glorification of violence and promotion of the gang lifestyle, and his minimization of his offense conduct, all warrant a sentence of at least twenty years.

I.   **BACKGROUND**

   A.   **Procedural History**

After an investigation spanning over a year, and a multi-month grand jury presentation, a New Haven grand jury returned an eight-count Superseding Indictment charging Laheem Jones along with seven other GHB members and/or associates, with various racketeering and narcotics offenses, including attempted murders of rival gang members, from 2014 through 2021.  *See* Docket Entry No. 92.  Laheem Jones was charged with racketeering conspiracy (Count One);

VCAR Assault with a Dangerous Weapon and VCAR Attempted Murder/Aiding and Abetting in

VCAR Assault with a Dangerous Weapon and VCAR Attempted Murder (Count Two); and

VCAR Conspiracy to Commit Murder and Conspiracy to Commit VCAR Assault with a

Dangerous Weapon (Count Four).  *See* Docket Entry No. 92.

**B.**   **Plea Agreement and Sentencing Guidelines Stipulation**

After the first day of jury selection, on November 19, 2021, Laheem Jones was the very

last defendant in this case to plead guilty—pleading guilty to RICO conspiracy and the divisible

portion of Count Two charging him with VCAR attempted murder and aiding and abetting in the

same in a written plea agreement, whereupon the Government agreed to dismiss the remaining

parts of Count Two and Count Four.  *See* Docket Entry No. 381 at 1.  The written plea agreement

further contained the following factual stipulation:

> The parties stipulate that (1) the narcotics quantity for which the defendant is
> responsible, as a result of his role in the conspiracy, is at least 60 kilograms but
> less than 80 kilograms of converted drug weight; (2) from approximately 2014
> until the present, Laheem Jones was a member and/or associate of the Greene
> Homes Boys, a.k.a. GHB, a.k.a. G$B; (3) that in furtherance of the GHB
> enterprise, Mr. Jones conspired to traffic marijuana, heroin, cocaine base and
> Percocet pills and ( 4) on or about January 27, 2020, the defendant agreed with
> other fellow GHB enterprise members and Original North End ("O.N.E.") allies
> that they would retaliate against opposition gang members, Trevon Wright a.k.a.
> "Tre," Jaheim Warren a.k.a. "JD," and all persons with them when they left State
> Superior Court by killing them in order to increase or maintain his standing within
> GHB.

*See* Docket Entry No. 372 at 4.  The parties agreed that each underlying act of racketeering

should be treated as a separate count of conviction under the Sentencing Guidelines.  Each of the

four attempted murders was determined to start at a level 33 based on the premeditation and

planning that the defendant exhibited; further increases were made based on the seriousness of

each victim's injuries.  *See* Docket Entry No. 372 at 5.  Under the parties' calculations, this

resulted in a total base offense level of 41, which dropped to 39, if the Court decided to give

Jones a reduction for acceptance of responsibility. *Id.* at 5. During plea negotiations with all of the defendants, the Government provided notice that it would not move for acceptance of responsibility for those defendants who pleaded guilty on the eve of trial. Because jury selection had already begun in the case of Laheem Jones when he decided to plead guilty, the Government defers to the Court as to whether he should be given the additional two-point reduction. *See* Docket Entry No. 372 at 5. Assuming the Court did give Jones a two-point reduction, with Criminal History Category V, Jones was determined to have a Sentencing Guidelines range of 360 months to life imprisonment, which dropped to an effective Guidelines range of 360 months because Jones' sentence was statutorily capped by the two counts to which he pleaded guilty. *Id.*

The Draft Presentence Report was issued on January 3, 2022, and the final Presentence Report on March 24, 2022. *See* Docket Entry Nos. 381, 480. The Probation Officer found that that a 2-level reduction pursuant to USSG §3E1.1(a) was not warranted and that a 2-level enhancement, pursuant to USSG §3C1.1, for obstruction of justice applied. [1] PSR ¶ 5. However, the Probation Officer also found Laheem Jones to be Criminal History Category III, rather than the V the parties had calculated. *Id.* Nonetheless, a total offense level of 43, coupled with a Criminal History Category III, resulted in a Guidelines imprisonment range of life in prison, which became 360 months due to the statutory maximum. *See* PSR ¶¶ 62-89, 132.

### C. Underlying Facts

Had the case proceeded to trial, the Government would have proven beyond a reasonable doubt that Laheem Jones was a founding member of the Greene Homes Boyz gang and stayed involved in the group throughout his incarceration on state charges, immediately resuming his involvement and continuing his criminal activity on behalf of the group upon his release from

---

[1] The Government agrees with Probation that this enhancement is appropriate. With regards to Jones, whether or not the enhancement is added, he is statutorily capped at 360 months.

**A - 165**

prison.  Jones sold drugs on behalf of the group, promoted and glorified gang violence, and aided

and abetted other gang members and associates in trying to kill four rival gang members on

January 27, 2020.  As this Court is aware from prior filings in this case, for the past several

years, the Greene Homes Boyz/GHB (based in the Charles F. Greene Homes Housing Project in

Bridgeport) and the O.N.E./"Original North End," (based in the Trumbull Gardens Housing

Complex) have been allied against local gangs from the East End and the P.T. Barnum Housing

projects and the 150 Group, both of which are on the West Side of Bridgeport.  The two sides

have engaged in a brutal gang war that has terrorized the city.

      1.      **Evidence of Jones' Membership in the GHB and his Promotion and Glorification of the Gang Lifestyle**

Laheem Jones a.k.a. "Heemie" was a founding member of the Greene Homes Boyz gang

and a close Original North End associate.  Jones helped start the gang, which was composed of

young Greene Homes Housing complex residents in 2012 along with several other Greene

Homes residents, and in response to the formation of the 150 Gang on the West Side of

Bridgeport and a gang on the East Side of Bridgeport.  At first, the gangs would engage in fist

fights, but after a shooting that resulted in the death of a girl with whom Jones was close, the

Greene Homes Boyz began supplying themselves with guns and engaging in shootings of rival

gang members.  Jones encouraged GHB recruits to engage in violence against their rivals.  Jones

himself was arrested and tried for a murder of an East Side associate, but was acquitted in

Bridgeport Superior Court.  Upon his release, he continued his involvement in the gang—from

the "trenches to the cells" (or from the battleground of Bridgeport to the Connecticut jail cells) as

codefendant Undrea Kirkland raps in "Spoo2xGlizzys Off My Chest" and back again.  Jones'

continued membership in, and promotion of, the GHB enterprise was exhibited through social

media postings and YouTube videos and had the case proceeded to trial, the Government would

have also relied on cooperating witnesses to testify to the same.  The below are some examples of Jones' promotion of the gang, the GHB code of conduct, glorification of violence and targeting opposition gang members through Facebook messages.



In this first message, Jones was promoting the gang code of conduct, including not cooperating with authorities ("NEVER Fold and wouldn't give up a SOUL") and then he tags the gang ("#OnGang") and refers to incarcered GHB members ("FREEbROS").  Similarly, in a November 3, 2019 message exchange with "Yp Que" or Quoron Washington (the singer in many of the rap videos posted by the group), Jones calls out gang members who have not committed criminal acts for the gang like he has ("If u don't put in work for Nuski KingKah . .. stop acting like u Gang").  Washington responds "WEDAOPPS" which is a reference to the refrain in one of his rap songs in which "WEDAOPPS" refers to Jones, Benejan and others.

**Other Participants**

100029490404722 - Yp Que  ; 100000454580679 - Laheem Jones

| Date/Time | | Status | | Attachments |
|---|---|---|---|---|
| First Message | 11/03/2019 at 22:55:20 | Privileged **0%** 0/2 | Pertinent **100%** 2/2 | Photos Videos |
| Last Message | 11/03/2019 at 23:04:57 | Unreviewed Messages | 0 | |

**Conversation Thread - {0} - 2**

| Date/Time | Sender ID | Sender Name | Message |
|---|---|---|---|
| 11/03/2019 22:55:20 | 100000454580679 | Laheem Jones | If u don't put in work for NUSKI KINGKah Glizzy Feddi stop acting like u Gang u a bitch who Pretending |
| 11/03/2019 23:04:57 | 100029490404722 | Yp Que | #WEDAOPPS |

As part of his involvement in the group, Jones also has multiple messages relating to firearms. For example, in the below message, Jones tells "Sant Kahland" or Asante Gaines that he sold his prior gun ("whop") to buy a glock ("glizzy") and although he did not have a firearm, he was about to buy one for $650.  Gaines then told Jones that he cannot be without a gun ("Doe u can't be wopless") and Jones—who had previously spent years in prison and knew he was not supposed to have or be near firearms—reassures him, that he has a gun to hold ("till I get mines" "[a]nd thts not for long").

| 20713 | 11/13/2019 20:32:54 | 100000454580679 | Laheem Jones | Am I bugging I sold my whoop to buy a glizzy the little dumb dudes did sum weirdo shit so I let them buy it moni tell fab and niggas sum weirdo shit |
|---|---|---|---|---|
| 20714 | 11/13/2019 20:33:47 | 100023264622546 | Sant Kahland | So u don't got no wop? |
| 20715 | 11/13/2019 20:34:09 | 100000454580679 | Laheem Jones | Go bout to grab one for me for 650 |
| 20716 | 11/13/2019 20:34:49 | 100023264622546 | Sant Kahland | Go not reliable anything could happen but if u totting something |

| 20724 | 11/13/2019 20:37:31 | 100023264622546 | Sant Kahland | Doe u can't be wopless |
|---|---|---|---|---|
| 20725 | 11/13/2019 20:37:49 | 100000454580679 | Laheem Jones | Bro I got sumthin but they let me hold tht fm |
| 20726 | 11/13/2019 20:38:11 | 100000454580679 | Laheem Jones | I cnt just give tht up they let me hold it till I get mines |
| 20727 | 11/13/2019 20:38:17 | 100000454580679 | Laheem Jones | And Thts not for long |

Similarly, on December 8, 2019, Jones said to GHB associate Michael Lockhart and other GHB

members, as he had presumably purchased that Glock for $650 by that point, "Gotta keep my glizzy on

me just in case y'all fuck niggas want to play !! !!" –showing how shooting and hunting opposition gang

members was a game to him and other GHB members.

| Date/Time | Sender ID | Sender Name | Message |
|---|---|---|---|
| 12/08/2019 14:44:07 | 100000454580679 | Laheem Jones | Gotta keep my glizzy on me just in case y'all fuck niggas wanna play !!! |
| 12/08/2019 14:46:49 | 100002301221736 | Michael Lockhart | ???? |
| 12/08/2019 14:47:28 | 100000454580679 | Laheem Jones | @[100002301221736:2048:Mikey BuckWorld] Imma cum see you tonight bro I'm sorr imma cum |
| 12/08/2019 14:47:53 | 100043549355339 | Rekeworld Ricky | ???????? |
| 12/08/2019 14:47:58 | 100002301221736 | Michael Lockhart | kopy bro just hit me |
| 12/09/2019 13:24:33 | 100044045900840 | Moet Gb | Big facts |

Then there are the following videos from the recording studio—some of which the Government intends to

play at sentencing—sent by Jones on February 25, 2020, in a group chat, where Jones appears with other

GHB members flashing gang signs and with numerous firearms.  This was at the time at which the "4E

YP Que and Timo" video was filmed.



These are just some examples of the numerous videos and postings in which Jones advertises his status with the group.

Laheem Jones also featured prominently in several GHB rap videos. In "We Da Opps" posted to YouTube on April 30, 2020, the refrain references Laheem Jones as "Heem Dog" with "Blick" or

Benejan "TD" or Demetrius Robinson and "Q" or Quorun Washington as "the Opps" with "semi-Glocks" in a clear threat to opposition gang members.

| | |
|---|---|
| U/M2: | [Music in the background] Heemdog Peto, Q, the opps. They don't know who threw them shots. |
| U/M: | [In the background] Gang, gang—[Voices overlap] |
| U/M2: | [Music in the background] Bitch, who the opps? Fuck that, we the opps. Moni, Blick, T-D the hots. Yoli' [PH] hop out semi-Glocks. |
| U/M: | [In the background] Ha, ha, ha—[Voices overlap] |
| U/M2: | [Music in the background] Bitch, who the opps? Fuck that, you the opps. Heem Dog, Peto, Q, the Opps. They don't know who threw them shots. |
| U/M: | [In the background] Threw them shot—[Voices overlap] |
| U/M2: | [Music in the background] Bitch, who the opps? Fuck that, we the opps. Moni, Blick, TD, the Hots. |



At eleven seconds into the video as pictured above, Laheem Jones appears holding a firearm

pointed at the camera.  The refrain of the song is: "Who da opps, fuck that you da opps,

heemdog, Peteoo, Q da opps, they don't know who threw them shots, bitch, who da opps, fuck

that we the opps, moni, blick, TD, the hots, yoli hop out semi-glocks"  "Heemdog" is Laheem

Jones, "Peteoo" and "Q" are the signers in the video; "moni" is Lockhart, "blick" is Benejan and

"TD" is Demetrius Robinson.  *See* https://www.youtube.com/watch?v=Kgo27-SLess.  The

"Hots" is what the GHB gang members call themselves.  In the video, which appears to be

filmed in the Greene Homes Housing project, gang members hold firearms, flash gang signs and

"All rats die" is written on the wall.  Laheem Jones appears again at 2:05 in the video and is

holding a wad of cash and wearing a black winter hat covered by a hood, Benejan to his left.



At about 2:14 in the video, Quoron Washington raps: "heemdog said we'll run it up, so I'm out here runnin track meets…" referring to running up drug money. Perhaps most striking, at the end, the video shows a snippet of a selfie video of Myreke Kenion and states that it was made "In Loving Memory of Myreke Kenion" (2:59). As the Court is aware, the GHB members, including Jones, who tried to assassinate four East End gang members on the courthouse steps, did so to retaliate for Kenion's murder. There can be no doubt that Jones continued to glorify the violence, the gang lifestyle and the hegemony of GHB, a.k.a. "the Hots" even after the courthouse attempted murders.

Nor did his arrest on the instant case diminish Jones' standing; to the contrary, it raised it. In "Love All My Brothers,", the video begins with mugshots of those GHB members (to include Benejan and Jones) arrested in March of 2020 on state charges.



At 1:06 in the video, Dhamoni Lockhart says: "I love all my brothers, Blick I'd die for em . . . Heemie I ride wit em" meaning that he would do anything for them. Again, firearms are present throughout the video and Laheem Jones appears again at 1:09 in the video.



Lyrics in the video include messages like the following: "I'd kill the whole city thinking you got

one up on me. We got so many guns, nigga you can't get no money;" "going to war with the city,

ya niggas can't get up on me."

### 2.    Jones' Narcotics Trafficking

GHB and O.N.E. members were also involved in extensive narcotics trafficking.

Cooperating defendants would explain how members "flexed" or shared customers and how they

sold drugs together.  Witnesses the Government had available to call at trial would have testified

that immediately upon his release, Laheem Jones began supplying GHB members with narcotics.

This testimony was strongly corroborated by Jones' social media.  Laheem Jones and the other

defendants advertised over Facebook and regularly communicated and coordinated with each

other to conduct narcotics sales.  The below paragraphs provide some examples of the messages

uncovered on social media relating to narcotics trafficking.

On March 7, 2019, Jones was asked how much that "pz" or piece of narcotics was going

for and he responded with $24 bro, I'm trying to get cheaper" and then referred to "pink plat" a

strain of marijuana.

| 03/07/2019 19:41:36 | 100000473128137 | Ty Banks | My guy |
|---|---|---|---|
| 12/13/2019 15:06:17 | 100000454580679 | Laheem Jones | Bro I got it bro no bap |
| 12/13/2019 15:07:04 | 100000473128137 | Ty Banks | How much the pz going for |
| 12/13/2019 15:15:34 | 100000454580679 | Laheem Jones | 24 bro fire im trynna get cheaper |
| 12/13/2019 15:44:23 | 100000473128137 | Ty Banks | I get it for 22/23the plat |
| 12/13/2019 15:46:19 | 100000454580679 | Laheem Jones | Yeah it's pink plat bro it's fire no cap |
| 12/16/2019 11:20:45 | 100000473128137 | Ty Banks | Ima grab a qp from you in a lil if you around bro |
| 12/16/2019 11:49:05 | 100000454580679 | Laheem Jones | Just hit me bro |

Similarly, in the following exchange, he again coordinated regarding marijuana sales in May of

2019 and referred to how the "sour" strain was $150.

| 05/15/2019 12:16:07 | 100000454580679 | Laheem Jones | I got it but I'm Ot rite now |
|---|---|---|---|
| 05/15/2019 12:17:24 | 100003115090346 | Northend Souldier | Damn... I'm in new haven.. I was bouta come out there... hit me when u get bck I need a zip |
| 05/15/2019 12:19:31 | 100000454580679 | Laheem Jones | Ight but the sour 150 |
| 05/15/2019 12:19:43 | 100000454580679 | Laheem Jones | I'm out here now |
| 05/15/2019 12:20:12 | 100003115090346 | Northend Souldier | U in new haven? |
| 05/15/2019 12:20:28 | 100000454580679 | Laheem Jones | Nah bpt |
| 05/15/2019 12:20:41 | 100003115090346 | Northend Souldier | Ite... it's the stanky dour ? |
| 05/15/2019 12:20:57 | 100003115090346 | Northend Souldier | A d I'm bout to be omw out there |
| 05/15/2019 | 100000454580679 | Laheem Jones | Nah str8 bud |

Jones' Facebook messages also evidence the connection between guns and drugs and the

use of both like in the below message where Laheem Jones thanks "Kino Laden" for helping him

and says he will give him the "whoop" or gun to hold as long as he does not let anyone else

touch it and in the same message discusses how many "slabs" of crack cocaine he had left.

| 54830 | 07/10/2019 22:10:58 | 100000454580679 | Laheem Jones | Ight tht good Imma get you rite bc u been helping me bro |
| 54831 | 07/10/2019 22:18:08 | 100000454580679 | Laheem Jones | Word to kah |
| 54832 | 07/10/2019 22:18:28 | 100000454580679 | Laheem Jones | Bro I give you the whoop dnt let nigga touch it |
| 54833 | 07/10/2019 22:18:35 | 100020585834858 | Kino Laden | Ight bet bro and I gotchu w whatever |
| 54834 | 07/10/2019 22:18:43 | 100020585834858 | Kino Laden | And I'ma be the only one w it |
| 54835 | 07/10/2019 22:19:33 | 100000454580679 | Laheem Jones | Copy bro how much slabs u got left |
| 54836 | 07/10/2019 22:22:25 | 100020585834858 | Kino Laden | I'ma count em rn I got like 30 sumn left |

In the below messages also from July of 2019, Jones coordinated to buy more narcotics and do a resupply "Ight I need tht 150 bro."

| 54865 | 07/12/2019 10:48:08 | 100000454580679 | Laheem Jones | It's got a f out there rite now wat you made yesterday |
| 54866 | 07/12/2019 10:48:11 | 100000454580679 | Laheem Jones | Tht 200 |
| 54867 | 07/12/2019 10:50:31 | 100020585834858 | Kino Laden | I ain't make that much yesterday only made like 100 bro |
| 54868 | 07/12/2019 10:53:18 | 100000454580679 | Laheem Jones | Ight I need tht 150 bro |
| 54869 | 07/12/2019 10:53:27 | 100000454580679 | Laheem Jones | Imma buy a little more |
| 54870 | 07/12/2019 10:53:59 | 100020585834858 | Kino Laden | Igh bet bro |
| 54871 | 07/12/2019 10:57:09 | 100000454580679 | Laheem Jones | I need it now lol bro so I cn go get the joint |
| 54872 | 07/12/2019 10:57:57 | 100020585834858 | Kino Laden | Oh ight wya bro and I'm boutta get a ride rn |
| 54873 | 07/12/2019 10:58:14 | 100000454580679 | Laheem Jones | Wya imma cum to you |
| 54874 | 07/12/2019 10:59:42 | 100020585834858 | Kino Laden | I'm on center Street you wanna meet me inda h? |
| 54875 | 07/12/2019 11:05:46 | 100000454580679 | Laheem Jones | Meet me at nanago park |
| 54876 | 07/12/2019 11:12:32 | 100020585834858 | Kino Laden | Alright boutta walk there now bro |
| 54877 | 07/12/2019 11:13:07 | 100000454580679 | Laheem Jones | Ight bro and we will talk wen u get here hurry up bc I'm bout to light up if u wanna hit the blunt |
| 54878 | 07/12/2019 11:13:23 | 100020585834858 | Kino Laden | Ight bro |
| 54879 | 07/12/2019 | 100000454580679 | Laheem Jones | Bro I'm bout to slid bro |

Then in September of 2019 and October, Jones' Facebook messages show that he was selling Percocet and advertising the amount and type of product he had on hand.  He also stated that he was in the "Hollow" or the Greene Homes Housing Project area in the October of 2019 messages, referring to gang territory and the area in which he most commonly sold narcotics.

| 09/11/2019 11:20:37 | 100001895776976 | Jayworld Dre | yerks? |
|---|---|---|---|
| 09/11/2019 11:21:12 | 100000454580679 | Laheem Jones | Yea |
| 09/11/2019 11:21:31 | 100000454580679 | Laheem Jones | I got 5 and 10rps and 7.5s |
| 09/11/2019 11:22:48 | 100001895776976 | Jayworld Dre | how many 7.5s you got? i'll take em all |
| 09/11/2019 11:24:14 | 100000454580679 | Laheem Jones | Like 15 |
| 09/11/2019 11:26:53 | 100001895776976 | Jayworld Dre | what about the 10s how many you got? |
| 09/11/2019 11:27:08 | 100001895776976 | Jayworld Dre | cause i could really grab everything fm just tryna see how many you got |
| 09/11/2019 11:39:04 | 100000454580679 | Laheem Jones | 10 |
| 09/11/2019 11:41:23 | 100001895776976 | Jayworld Dre | i'll give you $155 for the 7s and 10s |
| 09/11/2019 11:42:22 | 100000454580679 | Laheem Jones | Bro got the 7.5 |
| 09/11/2019 11:43:03 | 100001895776976 | Jayworld Dre | i'll take em just see if he'll do 5 a piece since i'm buying a lot fm |
| 09/11/2019 11:44:16 | 100000454580679 | Laheem Jones | He said 6 each |

| Date/Time | Sender ID | Sender Name | Message |
|---|---|---|---|
| 09/11/2019 14:20:26 | 100024268612099 | Quincey Jamal Blackman | Wat kinda yerks yu got |
| 09/11/2019 14:21:05 | 100000454580679 | Laheem Jones | Rod |
| 09/11/2019 14:21:10 | 100000454580679 | Laheem Jones | Rps 10 |
| 09/11/2019 14:21:16 | 100000454580679 | Laheem Jones | And 5s |
| 09/11/2019 14:21:51 | 100024268612099 | Quincey Jamal Blackman | iiigh I'm near da bakery meet me somewhere |
| 09/11/2019 14:23:09 | 100000454580679 | Laheem Jones | Federal |
| 09/11/2019 14:23:15 | 100000454580679 | Laheem Jones | Rite there imma cum |

**Conversation Thread - {0} - 4**

| Date/Time | Sender ID | Sender Name | Message |
|---|---|---|---|
| 10/08/2019 22:50:51 | 100038533864315 | OG OG | Bro wya i need a yerkkk my bitch bugging |
| 10/08/2019 22:51:24 | 100000454580679 | Laheem Jones | I'm around bro I'm in the hollow |
| 10/08/2019 22:52:04 | 100038533864315 | OG OG | Im in 2 right now im boutta shower and shit then ima walk over |
| 10/08/2019 22:52:31 | 100000454580679 | Laheem Jones | Ight |

In December of 2019, Jones coordinated regarding buying a quarter pound of pink plat marijuana and posted a picture of himself with a large quantity of cash—likely money owned from narcotics sales.

| | | | |
|---|---|---|---|
| 12/13/2019 15:46:19 | 100000454580679 | Laheem Jones | Yeah it's pink plat bro it's fire no cap |
| 12/16/2019 11:20:45 | 100000473128137 | Ty Banks | Ima grab a qp from you in a lil if you around bro |
| 12/16/2019 11:49:05 | 100000454580679 | Laheem Jones | Just hit me bro |
| 12/16/2019 14:13:55 | 100000454580679 | Laheem Jones | Call me from now on bro I don't really be in my messagers call me mane 3059759027 |

| Date/Time | Sender ID | Sender Name | Message |
|---|---|---|---|
| 12/31/2019 18:50:20 | 100000454580679 | Laheem Jones | Rpn sent a photo.<br>attachments/0304839025.jpg |



**A - 178**

Again, these are just some examples of the types of messages uncovered on social media involving Jones and narcotics trafficking. As detailed in the PSR, after a series of controlled buys of crack cocaine from Jones in the Greene Homes Housing complex, Jones was arrested on March 30, 2020. Specifically, on January 21, 2020, a controlled informant purchased crack cocaine from an individual he knew as "Jay," later identified as Laheem Jones. PSR ¶ 99. On January 29, 2020, another controlled purchase was arranged during which the controlled informant purchased crack cocaine from Laheem Jones inside the Greene Homes housing complex. *Id.* This second controlled buy was captured on video. *Id.* On February 20, 2020, the informant called Jones on the telephone in the presence of detectives and made a plan to purchase crack cocaine. After purchasing the crack cocaine and turning it over to law enforcement, the confidential informant reported that, during the controlled purchase, Jones stated to the informant, "You came at the right time . . . I lost mad grams . . . I didn't add enough baking soda and I lost like 36 grams. It's been crazy." *Id.* This statement suggests that Jones was not only selling the drugs, but mixing them for distribution. On March 5, 2020, a state arrest warrant was issued, and Jones was subsequently arrested on March 30, 2020. *Id.*

As previously mentioned, witnesses at trial would be expected to testify that Laheem Jones dealt narcotics in the Greene Homes housing project, that he coordinated with other GHB members to sell narcotics and that he often supplied younger members.

### 3.   Attempted Murders of Trevon Wright, Jaheim Warren, Khalil Heard and Jaffar Ali

Laheem Jones also was part of the planning and aided and abetted in the attempted murders of opposition gang members and associates Trevon Wright, Jaheim Warren, Khalil Heard and Jaffar Ali on the steps of the Bridgeport State courthouse on January 27, 2020, in furtherance of the Greene Homes gang.

     a.    **_Murder of Myreke Kenion_**

On January 26, 2020, at approximately 5:37 p.m., at 27 Highland Avenue, Myreke Kenion and Dandre Brown (GHB members/associates) were shot, right next to the Greene Homes Housing Complex in a drive-by shooting committed by East End gang members.  Kenion was pronounced dead after being transported from the crime scene, and Brown was transported to Bridgeport Hospital for non-life-threatening gunshot wounds.  At 8:21 p.m., Gaines wrote on Facebook messenger, "love you mane" referring to Myreke Kenion.  Jones responded, "on kah grave (again reference to Diaz) I'm out rental allat bro" (referring to being in a rental car).  At 8:25 p.m., Jones continued "on kah I'm heart broken mane he was my little circle" and Gaines responded "Rs lil bro use really use be w Niqqas."  That evening, the defendants began coordinating to retaliate and kill opposition gang members who killed Kenion.

| 20858 | 01/26/2020 20:21:54 | 100023264622546 | Sant Kahland | Love u mane |
|---|---|---|---|---|
| 20859 | 01/26/2020 20:25:09 | 100000454580679 | Laheem Jones | On kah grave I'm out rental allat bro |
| 20860 | 01/26/2020 20:25:23 | 100000454580679 | Laheem Jones | On kah I'm heart broken mane he was my little circle |
| 20861 | 01/26/2020 20:31:28 | 100023264622546 | Sant Kahland | Rs lil bro use really use be w Niqqas |

Meanwhile, Jones had the following exchange with Rpn Dom who has not yet been identified at 8:55 p.m., a little over three hours after Kenion's homicide.

| | | | |
|---|---|---|---|
| First Message | 01/26/2020 at 20:55:44 | Privileged **0%** 0/8 | Pertinent **100%** 8/8 | Photos 0 Videos 0 |
| Last Message | 01/27/2020 at 08:43:58 | Unreviewed Messages 0 | | |

**Conversation Thread - {0} - 8**

| Date/Time | Sender ID | Sender Name | Message |
|---|---|---|---|
| 01/26/2020 20:55:44 | 100000454580679 | Laheem Jones | Please try and get it |
| 01/26/2020 20:56:14 | 100000454580679 | Laheem Jones | I'm outside today |
| 01/26/2020 21:04:32 | 100012586812810 | Rpn Dom | I gotchu |
| 01/26/2020 23:25:19 | 100000454580679 | Laheem Jones | Bro if light cum out sumone Gunna find it bro u gotta be on it we need tht |
| 01/26/2020 23:25:32 | 100000454580679 | Laheem Jones | Thts the last gun he had to |
| 01/26/2020 23:34:19 | 100012586812810 | Rpn Dom | I'll give u yuh money if it's not there |
| 01/27/2020 08:43:46 | 100000454580679 | Laheem Jones | Bro fuck tht whoop |
| 01/27/2020 08:43:58 | 100000454580679 | Laheem Jones | If it's not there we go half and buy a better one |

This message suggests that Jones was asking Rpn Dom to collect the firearm that Kenion had when he was shot. By the next morning, Jones decided to forget that firearm and stated that if it could not be found, they would just purchase another one. This message in particular suggests that Jones was intending to retaliate or at the very least was aware of others' intentions to do so.

At 9:54 p.m., Gaines communicated with Bert Carter, Kenion's brother, on Facebook messenger advising Carter to be careful and to think about any retaliatory acts before he did them and that Gaines was ready to take care of things for Carter. Marquis Isreal's telephone records reveal that he tried calling Calderon to no avail at 10:46 p.m. and then again at 11:14 p.m. when the two spoke for 47 seconds. At 12:00 a.m., Gaines tried to FaceTime Benejan, but no one picked up. At 1:03 a.m., Isreal called Warren. At 2:12 a.m. Gaines called Calderon, but there was no answer. At 2:13 a.m., Gaines texted Calderon, "Niqqa my key in ya car"—presumably referring to the blue Volkswagen rental that Calderon was using.

    b.    ***Courthouse Shooting: Attempted Murders of Wright, Warren, Ali and Heard***

At 9:46 a.m., on January 27, 2020, three hours before the courthouse shooting, Fabian Francis sent the following messages to Chaz Dear (both GHB members charged separately):

"Dey aint on shit bro only mire lor heavy nd tyeise gon drop suttin for em they on dat shit u was sleep when was on ft wit me ina car last night."  The evidence would establish that Francis was telling Dear in this exchange that Amire Newsome ("mir"), Joshua Gilbert ("lor heavy") and Tyiese Warren (all O.N.E. members and allies of the GHB) were going to drop off guns to the GHB and O.N.E. gang members planning to retaliate.  Approximately twenty minutes later at 10:07 a.m., Asante Gaines' GPS bracelet shows that he left New Haven and headed to Bridgeport, in the process trying to call Destine Calderon several times.  At 10:23 a.m., Calderon and Gaines connected and spoke again for 36 seconds.

While that was happening, Jones posted the following—indicating that he was ready for the courthouse shooting.



This Facebook message referred back to Myreke Kenion—"Rek Gang."

At 10:24 a.m., Gaines made a FaceTime call to Benejan and the call lasted for two minutes and seven seconds.  At 10:59 a.m., Gaines sent a snapshot message to O.N.E. member Joshua Gilbert: "I said I'm put another Niqqa on the news regardless this shit just make me step harder that's it bro but if Niqqas not on that shit gotta stay away from Niqqas that it and tre and

jd at court."  "[T]re" was a reference to Trevon Wright and "JD" is Jaheim Warren, both of whom had killed Myreke Kenion the night before.



At 11:24 a.m., *half an hour before the shooting*, inmate Shajuan Perry (an incarcerated GHB member), called Gaines' cell phone from prison.  In this call, Gaines began by telling Perry, "Shit crazy, they killed Bert's Little Brother Last night . . . That shit is some bull shit." (Bert is a reference to Bert Carter who is Kenion's brother).  Laheem Jones, *who was with Gaines in the Greene Homes* and was identified by name, gave his telephone number, and also commented that "Shit is crazy."  Gaines told Perry that he was "about to leave" and that he was "in the hood."  Gaines then said, "I can't even say too much" "Ya feel me."  Gaines said that he had spoken to Bert Carter and that he knew of the murder and that things had been "hectic lately."  This call makes clear that Jones and Gaines were together in the Greene Homes housing complex up to at least half an hour before the shooting and immediately before Gaines went to

the courthouse—making it difficult for Jones to argue that he did know what his codefendants were planning.

At 11:26 and 11:31 a.m., Blackwell and Gaines spoke for 45 and 26 seconds, respectively.[2]  At 11:36 a.m., there was the sound of two car doors slamming and a car turning on.  Three minutes later, at 11:39 a.m., Gaines' GPS indicates that he was in front of the courthouse.  Meanwhile, as of 11:37 a.m., the blue Volkswagen "lookout car" driven by Calderon (with windows tinted by the defendants) was parked in front of the courthouse near the side exit.  A minute later, Isreal called Warren and, at 11:39 a.m., Blackwell exited the blue Volkswagen Golf and as of 11:41 a.m., can be seen inside on the video checking the court list.

At 11:43 a.m., Gaines sent a SnapChat message to Isreal saying "still here" –apparently, communicating to Isreal that the targets were still at the courthouse and that Gaines was still there is as a lookout.  At 11:44 a.m., Blackwell can be seen on video inside the courthouse making a call (which law enforcement officers later learned was a FaceTime call to Gaines).  At 11:45 a.m., Blackwell left the courthouse and returned to the blue Volkswagen.  At 11:57 a.m., a gray 2014 Subaru Forester (stolen out of Stamford, Connecticut on January 8, 2020), which is the car from which the shooters fired, was parked outside the courthouse down the street from the exit.  At 11:50 a.m., Warren called Isreal and again at 11:53 a.m., presumably so they could coordinate where Warren would join Isreal.

As of 11:57 a.m., the Subaru Forester (shooter car) with Isreal inside was parked on Golden Hill Street outside the courthouse with a clear view to the main entrance waiting.  At 12:05 p.m., Gaines FaceTimed Jones for one minute and two seconds; at 12:07 p.m. for nineteen seconds; and at 12:08 p.m. for just under one minute.  Notably, between 12:04 p.m. and 1:57

---

[2] Between 11:02 a.m. and 1:01 p.m., Gaines was in cellular contact with or attempted cellular contact with Blackwell approximately eight times.

**A - 184**

p.m., Gaines was in cellular contact with or attempted cellular contact with Jones approximately twenty-six times.  And one minute after Gaines hung up with Jones at approximately 12:10 p.m., Warren and Wright were captured on video footage exiting the courthouse and walking to a waiting black 2000 Chevrolet Impala, which was being driven by Khalil Heard with Jaffar Ali (East End associates) in the front passenger seat.   Jones thus spoke by Facetime with Gaines one minute before the shooting commenced (and numerous times leading up to and after the shooting)—underscoring Jones' involvement and assistance in the attempted murders even if not physically present in the Volkswagen with Gaines.

As it has in previous hearings, Government counsel intends to play the video of the attempted murders and subsequent flight of the defendants as well as the court reporter's recording of the shots fired and the chaos that broke out inside the courthouse at the sentencing hearing.

The below is a screenshot of the video of the shooting.



At 12:11 p.m., the Bridgeport Police Department ("BPD") responded to the courthouse shooting and discovered that Trevon Wright and Khalil Heard had been shot multiple times. Heard had sustained multiple gunshot wounds to his back, shoulder and wrist, and Wright had been shot in the side of his chest.  Wright appears to have been left totally or at least partially

paralyzed.  Jaffar Ali was grazed in the head and shot in the left thumb, and Jaheim Warren was grazed in the ribs.  The vehicle that the victims had been sitting in had sustained approximately 23 entry bullet holes in the driver's side and windshield area as depicted in the below photographs taken by the BPD showing the carnage left behind at the scene of the crime.










The yellow markers indicate the shell casings sprayed across the crime scene.  The below picture shows the steps of the courthouse as the victims tried to run inside for help and the inside of the courthouse as the court security officers and emergency medical technicians attempted to keep the victims alive.





Members of the BPD were able to collect video surveillance from Bridgeport City cameras from various locations near, in, and around the courthouse, as well as cameras from a number of local businesses in close proximity to the courthouse. Those cameras show much of the activity in and around the courthouse before and after the shooting. The video of the shooting shows the flash from the firearms being fired from the Subaru.

      **c.**      ***After the Attempted Murders***

Video surveillance from city cameras further shows that, after the shooting, the Subaru used in the shooting fled eastbound toward Main Street in Bridgeport, Connecticut and then headed to the Route 8 turnpike heading northbound.



As the shooting occurred, the blue Volkswagen pulled away, making a U-turn, and then turned west onto Golden Hill Street towards Lyon Terrace. At 12:14 p.m., Gaines called Laheem Jones who did not answer, because, as later determined through video surveillance—*three minutes after the shooting*—Jones was purchasing a container of lighter fluid and bleach at Hidalgo Market at 175 Pequonnock Street in Bridgeport (minutes away from the courthouse).



At 12:15 p.m., Gaines tried calling Jones again, who again did not answer, presumably because he was still buying the bleach and lighter fluid.  At 12:16 p.m., Gaines tried calling again and when he could not get through, he messaged Jones "Wtf."  At 12:17 p.m., Jones was captured on video inside the store and outside putting a black bag inside a silver Volkswagen Jetta, which is the car he was driving up to Naugatuck.  At 12:20 p.m., Jones called Gaines and they spoke for 19 seconds.  Meanwhile, at 12:20 p.m., Gaines did an internet search on his cellphone for information about the courthouse shooting.

At 12:23 p.m., Jones was captured on video footage arriving at the E&M Park Mobil Gas station at 1705 Park Avenue in Bridgeport in the silver Volkswagen Jetta and was captured on video inside the store purchasing a red gas can and filling it with gasoline.



At 12:25 p.m., Jones left the gas station with the gas can.  This gas can matches the

appearance of the gas can found, partially burnt, in the gray Subaru in Naugatuck.  From 12:34 to

12:37 p.m., there was a relevant text message exchange between Jones and Gaines in which

Gaines told Jones to meet at the Walmart in Naugatuck and sent him the exact address. The

following conversation occurred:

- "16 right?" (exit 16)

- "exit"

- "Nah it's straight"

- "bro"

- "Nigga, I'm here already, wtf"

- "1100 new haven"

- "Rd Naugatuck" – (Walmart Location)

- "ct"

Approximately, ten minutes later they were in contact in the Walmart parking lot and as of 12:38 p.m., Gaines' GPS bracelet confirmed that he was in this location.[3]  At 12:45 p.m., Isreal made a FaceTime call to Calderon for 46 seconds and, at 12:46 p.m., he called Blackwell for 12 seconds. At 12:48 p.m., when Jones was in the white Volkswagen waiting at Walmart, he texted Gaines "here" and "wya" (where you at) to which Gaines responded, "pulling up."  At 12:53 p.m., Isreal's telephone had activity off a tower in Naugatuck approximately half a mile from the Walmart and at 12:53 p.m., Gaines made a FaceTime call to Jones for 16 seconds. At 12:55 p.m., video surveillance shows the blue Volkswagen Golf (Gaines) and the white Volkswagen Jetta (Jones) leaving the Walmart parking lot.  At 12:56 p.m., Jones made a FaceTime call to Gaines for 25 seconds and again at 12:58 p.m. for 32 seconds.  Finally, at 12:58 pm., Jones tried calling Gaines twice, but there was no answer.

From 12:57 p.m. to 1:38 p.m., Isreal called Calderon in seven FaceTime calls, only two of which were answered.  At 12:59 p.m., Jones called Gaines by FaceTime.  At 1:00 p.m., Jones texted Gaines to "send location of the car I'll do the rest" and Gaines responded, "I'm good now."  At 1:01 p.m., Blackwell FaceTime called Gaines and Gaines' GPS showed that he was located at 98 Greenwood Street in Naugatuck.  At 1:02 p.m., Gaines made a Facetime call to Jones, at 1:04 p.m., Jones made a FaceTime call to Gaines for 45 seconds and at 1:05 p.m. Gaines sent a text message to Jones stating "Greenwood [St.]"  At 1:18 p.m., Gaines made a

---

[3] Shortly after the shooting, a parole officer contacted the detectives and told them that a parolee he was supervising, Asante Gaines, was at the scene of the courthouse shooting based on his GPS data.  The GPS device, that Gaines had been required to wear as a condition of his parole, showed that Gaines was in front of the courthouse for about half an hour prior to the shooting and that he left the area at the exact time the shooting occurred.  Immediately after the shooting, Gaines' GPS then showed travel consistent with him being in the blue Volkswagen that had been parked at the courthouse prior to the shooting and that, after the shooting, he went to Rennell Street in the South End of Bridgeport and then to Naugatuck.

FaceTime call to Jones for 31 and at 1:57 p.m., Gaines made a FaceTime call to Jones that lasted for two minutes and twenty-seven seconds.

At 2:14 p.m., Thomas Perez called the Naugatuck Police to report a suspicious vehicle parked in front of his house at 98 Greenwood Street.  When Naugatuck police officers arrived, they located the gray Subaru that was involved in the attempted murders, which was partially burnt with an accelerant and a one-gallon gas can on the passenger seat floor.  The gray Subaru was processed for evidence by the BPD, and DNA swabs were taken from areas in the car and evidence found within it.  Located in the Subaru were two spent shell casings and one live round of ammunition.  Also seized from the vehicle were partially burnt medical documents bearing the name of "LAHEEM JONES."  A bottle of bleach and lighter fluid were also found at the scene and the cap from the bleach was found in the vehicle.  Below are pictures of the Subaru as it was found in Naugatuck.










Finally, at 2:23 p.m. on January 27, 2020, BPD officers located the blue Volkswagen on the west side of Bridgeport. BPD officers attempted to stop the car, but it fled, ultimately crashing into a fence in the area of Pine Street and Fairfield Avenue in Bridgeport. Three of the four occupants were arrested as they ran from the car and the fourth eluded capture—Asante Gaines (front passenger); Destine Calderon (driver) and Marquis Isreal (rear passenger) were arrested. Isreal had 1.4 grams of crack cocaine, 5.6 grams of heroin, and approximately $165 in cash on him at the time. The fourth individual who eluded capture at the time was subsequently identified as Tyiese Warren.

### 4.      Forensic Evidence and Cell Site Evidence

A number of DNA swabs were collected from the crime scene of the burnt 2014 Subaru used in the courthouse shooting. The BPD also processed the blue Volkswagen and took DNA swabs as evidence. The defendants' DNA matched profiles in various locations in both cars. As to Laheem Jones specifically, the DNA profile from the bleach bottle cap found in the car was at least 100 billion times more likely to occur if it originated from Laheem Jones and two unknown individuals than if it originated from three unknown individuals. In his PSR interview, Jones admitted that he "purchased the gasoline to burn a car in order to help my friends from going to jail." *See* PSR ¶ 45.

A gunshot residue kit was also performed on Marquis Isreal when he was arrested on January 27, 2020, which was positive for gunshot residue. Cell site analysis reveals that Isreal, Gaines, Blackwell, Calderon, Jones and Warren's telephones were consistent with being in the area when and where the courthouse shooting occurred and that they traveled to Naugatuck after the shooting. The Greene Homes Housing Project is next to the courthouse, so the cell site evidence does not conclusively establish that they were at the courthouse, but it is consistent with

them being there and then shows their travel to Naugatuck to burn the vehicle used in the

shooting.

Using ballistics analysis, the courthouse shooting has now been linked to three other

incidents: a shooting on January 14, 2020, at 255 Hancock Avenue (in which the two guns used

in the courthouse shooting were also used), a shooting on February 20, 2020, at 172 St. Stephens

Road (near the P.T. Barnum Housing Projects), and a shooting on February 23, 2020, at 746

Pearl Harbor Street.  All of these shootings involved the same 9-millimeter firearm.  These

shootings all occurred in different areas of Bridgeport (the South End, the West End, and the

East End), all of which, as noted above, are part of the opposition—further suggesting that they

were shootings committed by GHB or O.N.E gang members.  Below is the NIBIN chart

depicting these additional shootings.



## 6.     Victim Impact

Jaheim Warren was murdered in December of 2020 after he was almost killed on January 27, 2020.  Trevon Wright (who is currently paralyzed from the waist down and is separately charged) does not wish to participate in this case.  Khalil Heard does not intend to attend sentencing, but the Government will provide a report of a recent interview of him to defense counsel and the Probation Officer and intends to read from that report at the sentencing.  As this Court has heard at prior sentencings, Heard was struck in the back six times and the right wrist one time.  He suffered a collapsed lung and had to have an emergency chest tube inserted to keep him alive.  He was in the hospital for two and a half weeks after the incident and still has bullet fragments in his back as well has having a loss of sensation to his fingers and numbness to his back.  Heard stated he suffers from PTSD as a result of having been shot and to this day, becomes anxious and nervous when he hears a car backfire.

Jaffar Ali also does not wish to participate in this case, but, as with Heard, the Government will provide a report of a recent interview of him to defense counsel and the

Probation Officer and intends to read from that report at the sentencing. Ali was shot in his lower thumb and hand and received a bullet wound in his head. He still cannot fully bend his thumb and suffers from a lack of sensation in that area, and he had to have his head stapled after the shooting. Ali has bullet fragments in his head and suffers migraines, which he never suffered before the shooting. Ali further recounted that he cannot play and interact with his nine-year-old son the way he did before he was shot and that he has been diagnosed with PTSD following the shooting. It is also still "stressful" for him to travel to the courthouse as it brings up painful memories.

The four Judicial Marshals present at the courthouse during the shooting have spoken at prior sentencings. The Government intends to read some of what they have said previously into the record.

II.   **DISCUSSION**

Following the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220, 243-245 (2005), which rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to: "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *See United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006). The § 3553(a) factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant;" (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, and (d) "to provide the defendant with needed educational or vocational training, medical care, or other

correctional treatment in the most effective manner;" (3) the kinds of sentences available; (4) the sentencing range set forth in the guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a).

The Second Circuit reviews a sentence for reasonableness. *United States v. Canova*, 412 F.3d 331, 350 (2d Cir. 2005). The reasonableness standard is deferential and focuses "primarily on the sentencing court's compliance with its statutory obligation to consider the factors detailed in 18 U.S.C. § 3553(a)." *Id*. Here, there is no basis for the departure requested by defense counsel and all of the relevant factors weigh in favor of a sentence above the Guidelines range originally agreed to the parties. *See* 18 U.S.C. § 3553(a).

### A.     Laheem Jones' Arguments for a Below Guidelines Sentence Should Be Rejected by this Court

Although Jones admitted during the plea hearing that he agreed with others to attempt to kill four people, permanently paralyzing one of them and putting other innocent bystanders at risk, and he pleaded guilty to racketeering conspiracy for his role in the Greene Homes Boyz gang, he nonetheless asks for a sentence of only five years to account for his criminal conduct here.  The Government also believes that a below Guidelines sentence is appropriate—based primarily on the fact that Jones was in jail during many of the other attempted murders and acts of violence committed by the group—but a five-year sentence falls far short of the type of sentence mandated by a close consideration of the Section 3553(A) factors.

### B.     Section 3553(A) Factors

The nature and seriousness of the offense, Jones' prior criminal history and the need for deterrence and to protect the public, all weigh in favor of a sentence of at least twenty years as requested by the Government.

**A - 198**

1.      **The Nature and Seriousness of the Offense**

The nature and seriousness of the offense conduct here could not have been more serious. Jones was involved in the founding of the Greene Homes Boyz gang—which whether or not based on family ties and the need to support others in broken homes—became a violent street gang responsible for inflicting a tremendous amount of harm in the city of Bridgeport.  As detailed above, Jones promoted the gang, he advertised the gang code of conduct—including not "snitching" and retaliating against opposition gang members, and he glorified violence.  Defense counsel asserts that Jones is taking full responsibility for his part in the enterprise (*see* Defense Memorandum at 10) and Jones admitted in his plea agreement to conspiring with others to traffic marijuana, heroin, cocaine base and Percocet pills (*see* Docket Entry No. 480-5 at 4).  These are all toxic substances that destroy the lives of others and Jones saw firsthand what they did to people, including his mother, and yet decided to sell them to others.

Most troubling however was Jones' role in the courthouse shooting and his current minimization of that role (*see* Defense Memorandum at 11) ("However, Mr. Jones did not know of a plan [t]o retaliate . . .").  It is simply incredible to argue that he did not know that there was a plan to shoot anyone when he was with Asante Gaines in the Greene Homes Housing Project up until minutes before Gaines and the other defendants laid in wait outside the courthouse for their targets and when he was buying materials to burn the car three minutes after the shooting.  It is also simply incredible to argue that he was not planning violence and retaliation with others after the murder of Myreke Kenion when he was talking about getting a firearm right immediately after Kenion's death and when he posted on Facebook, less than two hours before the attempted murders at the courthouse "[i]f you fuck with niggas, I don't fuck with you. Rek gang." Further, what would be the need to burn a car if there was no premeditated plan to shoot anyone?  And

there is simply no way that Jones could have mobilized into action so quickly—buying gasoline and bleach and heading up to Naugatuck—without having advance warning or a plan in place.

Finally, any doubt about Jones' state of mind can be erased by Jones' cell site, which puts him at a location at or near the courthouse—suggesting that he was at least nearby—and his constant calls, text messages and FaceTime calls with the other defendants who were at the courthouse and doing the shooting.  To even suggest now, after having stipulated that he participated in a pre-meditated plan to kill "Tre" and "JD," that he had no idea of the premeditated murder plan reveals significant minimization that does not portend well for his risk of recidivism.  *See* Docket Entry No. 381 at 4 ("on or about January 27, 2020, the defendant agreed with other fellow GHB enterprise members and Original North End ('O.N.E.') allies that they would retaliate against opposition gang members, Trevon Wright a.k.a. 'Tre,' Jaheim Warren a.k.a. 'JD,' and all persons with them when they left State Superior Court by killing them in order to increase or maintain his standing within GHB").

## 2.    Laheem Jones' History and Characteristics

Laheem Jones is unique among his codefendants for two primary reasons.  First, cooperating defendants would have testified that he was a founding member of the group and was involved in the GHB since 2012.  Jones disputes that he helped found the group, but does not seem to dispute his involvement in it for all those years.  Second, Laheem Jones was in jail for a number of years.  Although, on one hand, his involvement in the acts charged in the racketeering conspiracy was necessarily more limited because he was in custody, on the other hand, he maintained his membership and association with the gang while in jail and upon his release from state custody in 2019, at least one cooperating defendant would have testified that he, like other gang members, was provided with a "welcome home" package, which often

included a firearm, by the gang.  As the Facebook messages, videos glorifying the gang and its

violence, and his participation in the courthouse attempted murders cited above demonstrate,

seven years in prison did nothing to rehabilitate or at least mitigate the danger to the community

of Jones.  Jones saw and experienced years of jail based on criminal activity he committed and

yet, he returned again to that activity upon his release.  While many of the other defendants can

argue that they have never spent significant periods of time incarcerated, Laheem Jones has, and

it clearly did not deter him.  In fact, Jones was released to supervised parole on March 7, 2019

and 5 days after he completed his term of supervised parole (on January 22, 2020), he was

involved in the courthouse shooting.  PSR ¶ 92.

Jones' criminal history also demonstrates a history of drug dealing and acts of violence—

the same type of conduct for which he is charged here.  He has two convictions for attempt to

commit first degree assault for which he was arrested in 2012 (he was sentenced to eight years in

jail concurrent); a conviction for the sale of illegal drugs for which he was arrested in 2012 (he

was sentenced to ten years of jail, five to serve, probation); and second degree robbery for which

he was arrested in 2013 (sentenced to ten years in jail, four to serve, probation)  PSR ¶¶ 92-94.

Of note, Laheem Jones' conviction for second degree robbery in 2013 related to a robbery that

was committed when an individual was outside Building #4 in the Greene Homes housing

complex and was robbed by a group of individuals, including Jones—once again demonstrating

Jones' group-involved criminal activity dating back to as early as 2013.  PSR ¶ 94.  The point

worth underscoring here is that Jones chose to engage in violent acts for years before the

courthouse shooting.  That act of violence must be considered against the context of his fairly

significant criminal history for someone as young as he is.  Jones also has six pending charges

related to the sale of narcotics from March 13, 2020.  PSR ¶ 99.  In November of 2012, Jones

was also charged with murder, first degree assault and first-degree reckless endangerment for the January 8, 2012 shooting death of Justin Thompson, 14; and shooting injuries to Trevon Phidd, 20, and Benny Turner, 21, but was acquitted after trial.  PSR ¶ 100.

In terms of his background and circumstances, the PSR and the sentencing memorandum submitted by defense counsel detail the difficult circumstances of Laheem Jones' youth, including an incarcerated father and a mother who struggled with substance abuse and could not provide for the family.  As defense counsel highlights, there are many defendants who come from similar circumstances as Jones and there is no doubt that impoverished circumstances lead to less choices and trauma begets trauma, but as Government counsel has sought to highlight repeatedly throughout this case, at some point, the trauma must end.  Choosing to perpetuate trauma means continuing the cycle of violence.  It is also not disputed that Jones had close familial and community ties to many in the GHB, but it is simply not the case—as suggested by his mother—that the police made them a gang.  It also does not appear to be the case—as suggested by defense counsel—that Jones "sold drugs and engaged in violent acts" "because they were expected of him by his . . . family."  *See* Defense Memorandum at 13.  Jones and his codefendants themselves chose to create a gang, sell drugs, and engage in volent acts and it is for those decisions that they must be punished.

Additionally, unlike his co-defendant Benejan, Isreal, Warren (before United States District Judge Kari A. Dooley), and even Blackwell, who argued that their brains were not fully formed at the time of their criminal conduct, Jones has no such excuse.  A twenty-five year old man at the time of the courthouse shooting who had previously been punished for violent behavior, Jones should have known better.  Certainly, he had a fully developed brain.  If he intended to keep his peers away from the pain and suffering of prison, as he now claims, he

should have counseled them not to retaliate and to provide information they knew about Myreke Kenion's murder to the police. Rather, he along with his GHB and O.N.E. peers chose to be the prosecutor, judge and executioner of Trevon Wright and Jahiem Warren, and anyone who was with them. Jones' willingness to resort to vigilante justice even though he was older than many of his peers and his participation in the most public acts of violence demonstrates that he presents a substantial risk of recidivism and merits a sentence of at least twenty years of imprisonment.

###### 3.     The Need to Promote Respect for the Law, Protect the Public and Provide Just Punishment

Jones and his co-defendants' conduct demonstrated that they have no respect for the law. Jones seems to recognize the impact of the violence and how it is destroying the community (*see* PSR ¶110 (telling the Probation Officer that seven of his close friends were shot and killed)) and yet he chose to involve himself in and promote the gun violence that had taken the lives of so many that he knew. Jones, like his peers, sought to create a parallel system of justice in Bridgeport. One that punished citizens because they lived in a certain area. One that punished them not with criminal records, fines and even incarceration, but with maiming, paralysis and death. Jones started the GHB gang and participated in its most public, egregious and wanton act of violence. Curiously, Jones uses his intimate knowledge of incarceration as a justification for burning the Subaru, saying that he "didn't want others to suffer as he did and ma[k]e the wrong choice to break the law." Docket Entry No. 492 at 11. Jones' very argument demonstrates his continued danger to the community – in order to prevent his brother gang members from going to jail, he will use whatever means necessary to secure their freedom.

Although the Government commends and encourages Jones' desire to remain drug free and to do what he can to obtain vocational and educational training while in prison, at this point, he does present a danger to the community. He has unfortunately demonstrated on repeated

occasions that he is willing to engage in criminal conduct placing the lives of others at risk whether it is through drug dealing or acts of violence.  The very concept of just punishment warrants a sentence of at least twenty years.

### 4.       Need to Accomplish Specific and General Deterrence

With regards to specific deterrence, as previously noted, Jones was not previously deterred even having served time in prison.  His statements during his presentence interview with Probation that he "did not know the courthouse shooting happened at all" and his attempts to minimize his role and say that all he did was purchase the gasoline and bleach—which would be hard to deny in light of the fact he was captured on video doing so (all echoed in the defense memorandum) — strain credulity and suggest that Jones has not fully accepted responsibility for what he did.  PSR ¶¶ 47-48.  They also underscore the need for specific deterrence.  As the PSR notes, the "imposition of significant criminal sentences (8 years' imprisonment, and 10 years' imprisonment (5 years to serve), respectively) for prior violent acts (Attempted Assault 1st Degree and Robbery 2nd Degree) have not dissuaded or deterred Mr. Jones, nor has state probation or parole supervision.  He committed the narcotics trafficking portion of the offense while on parole, and the courthouse shooting of January 27th occurred within days of his completion on parole and while on probation."  PSR ¶ 161.

Jones argues that he should receive a sentence of 60 months of imprisonment primarily because a sentence of "5-10 years on top of the 9 years he has done so far . . . . would mean  that he has only spent seven (7) years of his time on earth out of prison."  S*ee* Docket Entry No. 492 at 16.  Although Jones was released for two years, during which he dealt drugs, glorified gang violence and helped plan a murder and its coverup, and was not five years old when imprisoned, Jones' argument turns deterrence and the theory of incremental punishment on its head.  *See United*

**A - 204**

*States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001)("[o]bviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve.  That reason requires an appropriate relationship between the sentence for the current offense and the sentences, particularly the times served, for the prior offenses.  If, for example, a defendant twice served five or six years and thereafter committed another serious offense, a current sentence might not have an adequate deterrent effect unless it was substantial, perhaps fifteen or twenty years").  Here, Laheem Jones participated in the attempted murder of four persons and took charge of the arson the group planned to cover their tracks after having served a seemingly deterring seven year term in prison.  A sentence of less than twenty years would not deter him and would send the wrong message to others.  The Government appreciates that Jones may have significantly changed how he views violence after losing his brother, but, unfortunately, in light of his prior conduct, the need for specific deterrence remains a significant concern.

**III.**   <u>**CONCLUSION**</u>

For the foregoing reasons, the Government respectfully asks the Court to adopt the

factual findings in the Presentence Report and to impose a sentence of at least twenty years.

Respectfully submitted,

LEONARD C BOYLE
UNITED STATES ATTORNEY

*/s/ Jocelyn Courtney Kaoutzanis*
JOCELYN COURTNEY KAOUTZANIS
Fed. Bar No. CT30426
RAHUL KALE
STEPHANIE T. LEVICK
ASSISTANT UNITED STATES ATTORNEYS
U.S. Attorney's Office, District of Connecticut
157 Church Street
New Haven, Connecticut 06510

<u>CERTIFICATION OF SERVICE</u>

     I hereby certify that on April 1, 2022, a copy of the foregoing was filed electronically, by facsimile and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

                         */s/ Jocelyn Courtney Kaoutzanis*
                         JOCELYN COURTNEY KAOUTZANIS
                         ASSISTANT U.S. ATTORNEY

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF CONNECTICUT
 2

 3    _____ )

      UNITED STATES OF AMERICA,      )
 4                                   ) No. 3:20-cr-00126-JBA-5
                      Plaintiff,     )
 5                                   ) April 6, 2022
      v.                             )
 6                                   ) 2:28 p.m.
                                     )
 7    LAHEEM JONES,                  ) 141 Church Street
                                     ) New Haven, Connecticut
 8                    Defendant.     )
      _____)
 9

10              EVIDENTIARY SENTENCING HEARING
                          VOLUME I
11

12    B E F O R E:

13          THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

14
                         Official Court Reporter:
15                       Corinne T. Thomas, RPR
                           (203) 809-0848
16

17    A P P E A R A N C E S :

      For the Government:
18
                JOCELYN J. COURTNEY KAOUTZANIS, AUSA
19              STEPHANIE TSAY LEVICK, AUSA
           U.S. Attorney's Office - NH
20         157 Church Street, 25th Floor
           New Haven, CT 06510
21         (203) 821-3700
           E-mail: jocelyn.kaoutzanis@usdoj.gov
22                  stephanie.levick@usdoj.gov

23              RAHUL KALE, AUSA
           U.S. Attorney's Office - BPT
24         1000 Lafayette Boulevard, 10th Floor
           Bridgeport, CT 06604
25         (203) 696-3029
           E-mail: Rahul.Kale@usdoj.gov
```

```
1   For the Defendant:

2              DARNELL DEONAS CROSLAND, ESQ.
           L/O DARNELL D. CROSLAND
3          1200 Summer Street, Suite 202
           Stamford, CT 06905
4          203-921-1782
           E-mail:  info@croslandlaw.com
5

6              (Call to Order, 2:28 p.m.)

7          THE COURT:  Good afternoon, ladies and

8   gentlemen.  Please be seated.  We are here this

9   afternoon in the matter of United States of America v

10  Laheem Jones, 20-cr-126.

11         May I have appearances of counsel starting

12  with the government?

13         MR. KALE:  Rahul Kale on behalf of the United

14  States.  With me at counsel table is Assistant U.S.

15  Attorney Jocelyn Kaoutzanis, to her left is Assistant

16  U.S. Attorney Stephanie Levick, and to her left is

17  our paralegal specialist, Peggy Rossi.  Good

18  afternoon, Your Honor.

19         THE COURT:  Good afternoon.  And for

20  Mr. Jones?

21         MR. CROSLAND:  Good afternoon, Your Honor.

22  Mr. Darnell Crosland representing Mr. Jones.

23  Mr. Jones is present.

24         THE COURT:  Good afternoon, Mr. Crosland.

25  Good afternoon, Mr. Jones.
```

1          Would you please give me information about

2    the notification to the victims of the hearing?

3          MS. KAOUTZANIS:  Yes, Your Honor.  Mr. Jones

4    is directly tied to the courthouse shooting as a

5    result of his plea agreement.  With regard to those

6    victims, notification was made.  As Your Honor is

7    aware, Jaheim Warren is deceased, Mr. Wright does not

8    wish to participate in the proceedings, and the other

9    two victims, Khalil Heard and Jaffar Ali, were

10   interviewed and we will read some of what they said

11   regarding their injuries and what they still feel.

12   We also intend to read some of the statements from

13   the court marshals who Your Honor has heard in court

14   at prior proceedings.

15          THE COURT:  All right.  Mr. Jones is before

16   the Court for sentencing on two counts, Count 1,

17   conspiracy to engage in a pattern of racketeering

18   activity in violation of 18 United States Code

19   1962(d), and Count 2, VCAR attempted murder and

20   aiding and abetting in violation of 18 United States

21   Code 1959(a)(5) and (2).

22          I will also note for the record that

23   Probation Officer Lauren Harte is here even though

24   the presentence report was prepared by Monika Lindo.

25          As a result of the filings in relation to

1  this sentencing, the Court viewed major disputed

2  facts to require an evidentiary hearing.  The

3  defendant has objected to an evidentiary hearing and

4  requested adjournment of the sentencing.

5        Do you wish to be heard, Mr. Crosland,

6  further?  Are you saying that I do not have authority

7  to conduct an evidentiary hearing?

8        MR. CROSLAND:  Good afternoon again.  I'm

9  absolutely not saying that you don't have the

10  authority to have an evidentiary hearing, but what I

11  was articulating was that on the eve of the

12  sentencing, we were given notice that the Court would

13  like an evidentiary hearing.  I tried my best to

14  contact Wyatt to apprise Mr. Laheem Jones of the

15  Court's wishes and also to discuss what the Court's

16  doing.  We were unable to do so directly because of

17  communication issues with the jail.  I attached my

18  attempts to my submission to the Court to show that

19  the jail said it's impossible to reach him.

20        I did have a chance to speak with him through

21  a family member last night around 9:30, 10:00 almost,

22  and he thought that the Court was moving in the right

23  direction to look into these things and he wanted to

24  be heard on that same level.  In terms of the things

25  that the Court was inquiring, he thought that was

```
 1   refreshing.  Obviously, he wanted me to be able to
 2   hear from him so he can rebut those things at a
 3   proper evidentiary hearing.
 4        So the whole genesis of my papers yesterday
 5   was to say that if the government's fact witnesses to
 6   the issues at hand are not available, that we should
 7   perhaps put the sentencing and the evidentiary
 8   hearing off until April 25th.  That's all I was
 9   saying.  I wasn't questioning the Court's authority.
10        THE COURT:  All right.  You understand that
11   the Court has a great deal of leeway in deciding what
12   kind of evidence is appropriate for and -- to enable
13   the Court to determine the extent and kind of
14   punishment to be imposed.  That can include hearsay.
15   The original witnesses do not need to be present if
16   the content of what is presented is in the Court's
17   view appropriate, probative, and to be used in making
18   the sentencing determinations.  So even if the
19   original people making the statements to which others
20   having heard those statements may testify, that
21   doesn't mean that we can't go forward.
22        MR. CROSLAND:  I would agree with that, Your
23   Honor.  I would only apprise the Court of the fact
24   that in proceeding in a fair and just manner, if the
25   Court's going to use fact witnesses or other hearsay
```

1    evidence, et cetera, that's fine; however, Mr. Jones

2    still has to have an opportunity to address those

3    issues and rebut those issues and having -- he didn't

4    even know there was going to be a hearing today, so

5    he couldn't even prepare and assist his counsel.  So

6    we have two things --

7            THE COURT:  He didn't know there was going to

8    be a sentencing hearing today?

9            MR. CROSLAND:  Judge, I said he didn't know

10   there was going to be an evidentiary hearing today.

11           THE COURT:  You didn't say that.

12           MR. CROSLAND:  I'll say it again.  He didn't

13   know there was going to be an evidentiary hearing

14   today.  So in fairness in this process, what I was

15   articulating for Mr. Jones is regardless of what the

16   Court uses at this hearing, Mr. Jones should at least

17   be able to prepare to address or refute what the

18   government presents.  And having not even known there

19   was going to be an evidentiary hearing or prepare

20   with counsel, then I just thought I should let the

21   Court know that and I thought the Court might

22   appreciate that.  And so that's what I did.

23           With that being said, I followed up with the

24   motion saying that perhaps we should allow Mr. Jones

25   to be apprised that there should be an evidentiary

1    hearing.  He appreciates that, and, in fact, he

2    supports that.  So I don't want the Court to think

3    that I was objecting to that.  What I'm saying is

4    that in the interest of justice, I don't think

5    anyone's prejudiced if we were to have a short

6    continuance so he can prepare for that, and also at

7    the same time continue to prepare for his sentencing,

8    which is very vital and important.  That's what I was

9    saying.

10          THE COURT:  Does the government wish to be

11   heard?  The government filed an objection in

12   opposition.  Do you wish to be heard further,

13   Mr. Kale?

14          MR. KALE:  No, Your Honor.  Well, I guess

15   briefly, I should say, Your Honor, counsel had made

16   two vehement objections to what was in the PSR.  It

17   is our obligation at that point under federal

18   sentencing laws that we have to present evidence that

19   if Your Honor finds by a preponderance, Your Honor

20   can find those facts to be true.  So accordingly, we

21   have -- and Your Honor noted these two objections --

22   under Rule 32, of course, Your Honor, can note the

23   objections and there may be many that are pertinent

24   towards sentencing.  Your Honor has noted to and we

25   were prepared to present evidence on both of those

1   issues that under Rule 32 are going to be, I take it,

2   important to sentencing.

3           So that's -- I simply say that a FATICO

4   hearing is always a potential in a sentencing

5   hearing, especially when a defendant disputes a fact.

6   So therefore, I'm not quite sure what the lack of

7   notice is because, again, it was driven by the

8   defendant's objection to a fact that was in the PSR.

9           THE COURT:  I don't know what the objection

10  is either since it is prompted by Mr. Jones'

11  statements that seemed to present a disputed fact.

12  So I'm going to deny your motion to adjourn the

13  sentencing.  We will proceed.  We'll proceed apace.

14  If we don't finish today, we will schedule a

15  continuation as soon as possible, ideally tomorrow.

16          MR. CROSLAND:  Your Honor, if I can just be

17  heard as to what counsel said.  I think it's

18  important for counsel to put on the record what

19  vehement objections that he's referring to that I

20  made to the PSR that prompts the hearing, because

21  perhaps I'm missing this, but I did submit my

22  responses to the PSR, and maybe I don't know my own

23  passion, I don't remember anything being vehemently

24  objected to in the PSR.  So I think that that needs

25  to be clarified and that should be put on the record.

1          THE COURT:  Have you read the government's

2     sentencing memo?

3          MR. CROSLAND:  Yes.

4          THE COURT:  The issue on which the Court

5     thought an evidentiary hearing was needed was whether

6     Mr. Jones was a founding member of the Greene Homes

7     Boyz and the nature of his involvement in the time

8     frame, and secondly -- well, it was that his role

9     consisted of burning the car was without knowledge

10    that the -- of what his fellow GHB gang members and

11    O.N.E. allies had agreed to and were going to do.

12         What I'd like to do is proceed with what I

13    believe are the undisputed portions of the sentencing

14    presentence report and then we can proceed to the

15    evidentiary portion.  Is that satisfactory?

16         MS. KAOUTZANIS:  That's fine for us, Your

17    Honor.

18         MR. CROSLAND:  No objection.

19         THE COURT:  All right then.  Mr. Jones, have

20    you read the presentence report that Ms. Lindo

21    prepared about you?

22         THE DEFENDANT:  Yes, ma'am.

23         THE COURT:  And do you understand the

24    contents of that report?

25         THE DEFENDANT:  Yes, ma'am.

1          THE COURT:  And have you had the opportunity

2   you wanted to give input to what's in that report

3   either to probation or through your attorney?

4          THE DEFENDANT:  Yes, ma'am.

5          THE COURT:  Is there any reason we should not

6   impose sentence today or whenever we get to the

7   conclusion of the sentencing hearing?

8          THE DEFENDANT:  No, ma'am.

9          THE COURT:  Okay.  All right then.  In using

10  the November 2021 guidelines, we are looking at each

11  underlying act of the racketeering charge as a

12  separate count of conviction, that is the four

13  attempted murders are each deemed and fall under the

14  sentencing guideline for those whose object would

15  have been first degree murder if successful.  The

16  additional guideline increases are based on the

17  amount of injury to the victims.  And third, that a

18  two-level enhancement has been used for each of those

19  acts for obstruction of justice, that is 1C1.1, which

20  is Mr. Jones' destruction of the car that was used in

21  the shootings at the courthouse.  So let me just run

22  through that with some specifics but not in great

23  detail.

24          So for Count 1, the RICO conspiracy, the --

25  which is one of the acts is the distribution,

1    conspiracy to distribute the controlled substances

2    under 2D1.1(a)(5) and (c)(10), he has stipulated to

3    60 to 80 kilograms of converted weight.  That is an

4    offense level 20.  Taking the -- both the RICO

5    conspiracy in Count 2, the VCAR attempted murder, and

6    aiding and abetting, starting with Trevon Wright

7    under 3E1.1, because the object of the offense was

8    first degree -- would have been first degree murder,

9    it's an offense level 33.  Because Mr. Wright was

10   seriously and permanently paralyzed under

11   2A2.1(a)(1), there's a four-level increase.  Under

12   1C1.1, because Mr. Jones willfully obstructed

13   justice, as I earlier described, there's a two-level

14   increase and that is an offense level totaling 39.

15          With respect to the attempted murder of

16   Jaffar Ali, again, the object of the offense if

17   accomplished would have been first degree murder

18   under 2A2.1(a)(1), it's an offense level 33.  As Mr.

19   Ali was seriously wounded under 2A2.1(b)(1)(B), there

20   is a two-level increase.  And because 1C1.1 for

21   obstruction of justice applies, there is a two-level

22   increase to 37.

23          For -- I think I skipped one -- Mr. Jaheim

24   Warren, because that attempted murder would have been

25   a first degree murder if accomplished, it is a

1    level 33.  And with the obstruction of justice, there

2    is a two-level increase, so it is a 35.

3         With respect to the attempted murder and

4    aiding and abetting the murder of Khalil Heard, under

5    2A2.1(a)(1), it is a level 33 because he was

6    seriously injured.  Under 2A2.1(b)(1)(B), there's a

7    two-level increase and a two-level increase for

8    obstruction of justice for a level 37 for that one.

9         The presentence report sets out the multiple

10   count adjustment that takes place when there are

11   multiple counts and concludes, I believe without

12   objection, that it is a level 43.  The statutory cap

13   on these offenses combined is 360 months.  And so

14   that is the statutory -- that is the guideline is

15   360 months.

16        What needs to be assessed is whether or not

17   there will be acceptance of responsibility given and

18   that will be held in abeyance pending argument and

19   the hearing as to -- we'll take that up to come up

20   with the final guideline.

21        Is there any objection to the factual

22   statements in the presentence report that bear on

23   sentencing?

24        MS. KAOUTZANIS:  Not from the government's

25   perspective, Your Honor.

1          MR. CROSLAND:  Not from the defense.

2          THE COURT:  And the Court -- there being no

3    objections, the Court will adopt the factual

4    statements in the presentence investigation report.

5          MR. CROSLAND:  Your Honor, if the Court --

6    I'm just looking at my list of the items that I

7    submitted in response to the presentence report and

8    I'm assuming the Court's accepting it having read my

9    9 or 11 things that I did point out.

10         THE COURT:  You submit that to probation and

11    probation has made the adjustments where she thinks

12    they're appropriate.  Are there objections that you

13    continue to claim?

14         MR. CROSLAND:  No, Judge.

15         THE COURT:  All right.  Then I think we need

16    to proceed with evidence that will resolve the

17    dispute that I'm going to by shorthand call whether

18    Mr. Jones was a founder of Greene Homes Boyz gang,

19    and, B, whether he knew of the planned attempted

20    murders at the Bridgeport courthouse that are the

21    subject of this case dated -- the attack being

22    January 27, 2020, in which Trevon Wright, Jaheim

23    Warren, Jaffar Ali, and Khalil Heard were the

24    victims.

25         All right.  I will invite the government to

1    proceed.

2          MR. KALE:  Thank you, Your Honor.  We have

3    three witnesses, but just to begin, as I noted in our

4    memo, one of these facts that we will prove is, I

5    think, a direct contradiction of an element that

6    Mr. Jones admitted to at his plea proceeding where he

7    said he agreed to retaliate against others that he

8    was -- he agreed to kill Tre and JD at that

9    proceeding.  I just note for the record, Your Honor,

10   to the extent that this is some attempt to get back

11   his plea, I cite the Court to *Blackledge*,

12   B-L-A-C-K-L-E-D-G-E, *v Allison*, A-L-L-I-S-O-N, which

13   is a Supreme Court case, 431 U.S. 63 from 1977, and

14   they note that the -- in that case, the Supreme Court

15   noted the representations of the defendant, his

16   lawyer, and the prosecutor at -- they say such a

17   hearing, but the plea hearing as well as any findings

18   made by the judge accepting the plea constitute a

19   formidable barrier in any subsequent collateral

20   proceeding, solemn declarations in open court carry a

21   strong presumption of verity, the subsequent

22   presentation of conclusory allegations unsupported by

23   specifics is subject to summary dismissal as are

24   contentions that in the face of the record are wholly

25   incredible.

1          I point back to the plea agreement, which is,

2     I believe, a -- contained in Document 480-5, there's

3     a stipulation of offense conduct to which Mr. Jones

4     agreed and he said in there, and I'm going to number

5     4 which was enumerated, that on or about January 27,

6     2020, the defendant agreed with other fellow GHB

7     enterprise members and Original North End,

8     parenthetical, O.N.E., closed parenthetical, allies

9     that they would retaliate against opposition gang

10    members, Trevon Wright a/k/a "Tre," Jaheim Warren

11    a/k/a "JD," and all persons with them when they left

12    state Superior Court by killing them in order to

13    increase or maintain his standing within GHB.

14          So in the face of that, we received --

15    there's a filing from counsel.  There's also an

16    e-mail yesterday.  And I said vehemently.  It says in

17    response to Probation Officer Lindo saying there's

18    going to be a hearing on whether he -- if he knew

19    about the shooting, please be prepared to address

20    both matters.  Attorney Crosland replied:  Good day,

21    Laheem Jones was not a founding member of GHB and he

22    did not know of the shooting.  Again, we are somewhat

23    flummoxed in the sense that this is in direct

24    contravention of the solemn oath that Mr. Jones took

25    and then not only signed in the plea agreement before

```
 1   Your Honor but then also verbally stated in the plea
 2   agreement.
 3        We are happy to present evidence because I
 4   think this goes potentially to the acceptance that
 5   Your Honor is discussing because we think this is a
 6   complete rejection of acceptance.  And pursuant to
 7   our plea agreement, we had noted we were not going to
 8   take any position on acceptance from Your Honor, but
 9   I believe that by denying conduct that he's made,
10   he's actually breaching our plea agreement.
11        So based upon that breach, if Your Honor
12   finds that he was -- he did know about this shooting,
13   and we'll present circumstantial evidence of that,
14   we'd respectfully ask that Your Honor not give him
15   acceptance of responsibility.
16        So I apologize for that preamble, but based
17   upon that, I would at this point ask to call
18   Lieutenant John Andrews from the Bridgeport Police
19   Department.
20        THE COURT:  Thank you.
21        MR. CROSLAND:  Your Honor, if they're doing a
22   preamble, I have to respond or I can wait until after
23   their evidence, but the entire recitation that
24   counsel just made flies in the face of the spirit of
25   the negotiation.  Your Honor was the one who had us
```

```
 1   do the petition.  You were very careful asking the
 2   questions during that proceeding.  Counsel knows from
 3   the beginning of this entire case, they even
 4   represented, that Mr. Jones, who was the fifth one on
 5   the indictment, wasn't as culpable as the rest, that
 6   he wasn't there.  There was issues about the cell
 7   phone towers.  They knew that there was this idea
 8   about a door slamming or whether, in fact, he knew
 9   anything about this, and at the plea agreement, in
10   order to for us enter this plea agreement, he had to
11   stipulate that he knew of the gangs, that he knew
12   that they were violent, et cetera.  That was just an
13   overall stipulation.
14        Now, they're trying to make it seem like that
15   he knew on this particular day they were going to
16   shoot or kill anyone and that's a total
17   misrepresentation and when --
18        THE COURT:  That's not what the plea
19   agreement says, though.  The plea agreement says
20   under stipulation there are four things, the fourth
21   is on or about January 27, 2020, the defendant agreed
22   with other fellow GHB enterprise members and Original
23   North End, O.N.E., allies that they would retaliate
24   against opposition gang members Trevon Wright a/k/a
25   "Tre," Jaheim Warren a/k/a "JD," and all persons with
```

1   them when they left state Superior Court by killing

2   them in order to increase and maintain his standing

3   within the GHB.  And that is a statement, a

4   stipulation that he signed, and that in the colloquy

5   with the Court, he continued to endorse.

6          MR. CROSLAND:  I was present for that, Your

7   Honor, and what I'm saying to the Court is if the

8   government is going to be totally honest and upfront,

9   we've had discussions about this at nausea and the

10  Court knows that there would not -- he would not have

11  been able to enter a plea agreement unless he agreed

12  to everything.

13         THE COURT:  Right.

14         MR. CROSLAND:  And that was the spirit of it.

15  But as stated in my sentencing memo, Attorney

16  Kaoutzanis even walked over to our table the same

17  day that -- the second day of jury selection and we

18  discussed this.  And, you know, again, this is not an

19  anomaly having defense stand here and try not to

20  anger anyone, it's just what happens, and I don't

21  want that to carry over to Mr. Jones.  But Mr. Jones

22  accepted responsibility on the second day of jury

23  selection and he had to agree that he knew that there

24  was going to be retaliation, that these gentlemen

25  were engaged in violence, et cetera, but he never

1    gave up his particular role.

2         And maybe at the appropriate time -- the

3    government can say what they want to say.  At the

4    appropriate time, I'm going to ask the Court to

5    assess sentencing Mr. Jones for who Mr. Jones is and

6    for what we presented was his involvement here.  He

7    signed that plea agreement saying that he knows of

8    this group, he's in this town, he knows of the

9    violence, he's done wrong things.

10        THE COURT:  I just read what he agreed to and

11   it was very specific to January 27, 2020, and his

12   knowledge.  So that's what we're focused on.  It is

13   not the general question.  And I'll ask the

14   government to proceed and then the defendant can

15   cross and rebut.

16        MR. KALE:  Thank you, Your Honor.  Again,

17   we're proceeding on both points.  With your

18   permission, may I --

19        MR. CROSLAND:  I object.  We're not

20   proceeding on both points.  The Court made it clear

21   that as to the issue of whether Mr. Jones was a

22   founding member, I think we will address that, and we

23   will proceed with the things that we have no dispute

24   to or --

25        THE COURT:  Okay.  I said there were two

```
 1   issues that we would be proceeding on, one of which
 2   was whether he was a founding member.  We will be
 3   proceeding on that.  So I don't understand why you're
 4   saying that we're only proceeding on one of these
 5   issues.
 6              MR. CROSLAND:  The whole idea, you said that
 7   we will proceed down the line of sentencing, we'll do
 8   what we can now and we'll table what's in dispute.
 9              THE COURT:  No, no, no.  We are not tabling
10   what's in dispute.  That's what we're doing right
11   now.
12              MR. CROSLAND:  All right.  I'll reserve my
13   objection until I hear what comes in because
14   Mr. Jones has a right to be prepared and to be able
15   to refute what's presented.
16              MR. KALE:  Your Honor, may I call Lieutenant
17   John Andrews to the stand?
18              THE COURT:  Yes.
19              John Andrews, sworn.
20              THE CLERK:  Please be seated and state your
21   name for the record spelling your first and last
22   name.
23              THE WITNESS:  My name is John Andrews,
24   J-O-H-N, last name Andrews, A-N-D-R-E-W-S.
25              THE COURT:  And your place -- address of your
```

```
 1    place of business?
 2           THE WITNESS:  My place of business address is
 3    the Bridgeport Police Department at 300 Congress
 4    Street, Bridgeport, Connecticut 06604.
 5           THE COURT:  Thank you.  You may proceed,
 6    Mr. Kale.
 7           MR. KALE:  Thank you, Your Honor.
 8           DIRECT EXAMINATION OF JOHN ANDREWS
 9    BY MR. KALE:
10      Q.   How long have you been with Bridgeport Police
11    Department?
12      A.   I've been with the Bridgeport Police
13    Department since June of 1998.
14      Q.   And I know I said it, but what is your rank?
15      A.   I'm a lieutenant in the police department.
16      Q.   And how long have you been a lieutenant?
17      A.   Since December of 2021.
18      Q.   And prior to becoming a lieutenant, what did
19    you do with the Bridgeport Police Department?
20      A.   I was a sergeant with the Bridgeport Police
21    Department assigned to the FBI Bridgeport Safe
22    Streets Task Force.
23      Q.   And how long have you been a member of the
24    FBI Safe Streets Task Force?
25      A.   For Safe Streets, it's been since 2013.
```

1    Q.    And prior to going on the Safe Streets Task

2    Force, were you assigned to any particular units

3    within the Bridgeport Police Department?

4    A.    I was assigned to the tactical narcotics

5    team.  I was assigned to the narcotics division as an

6    undercover.  I was assigned out of the chief's office

7    to the Connecticut State Police Statewide Narcotics

8    Task Force, the Office of Internal Affairs, Joint

9    Terrorism Task Force with the FBI.  I bounced around.

10   Q.    You mentioned you were with the narcotics

11   unit at the Bridgeport Police Department; is that

12   right?

13   A.    Yes.

14   Q.    When were you with the narcotics unit?

15   A.    As an undercover, I was with the narcotics, I

16   believe, in 1999, and then with the tactical

17   narcotics team, it was 2002 to 2004-ish.

18   Q.    Now, during your time there, were you

19   familiar with narcotics activity in the Greene Homes?

20   A.    Yes.

21   Q.    During your time -- would you actually go in

22   as an undercover?

23   A.    Not at the Greenes, no.

24   Q.    Would you monitor what was going on in the

25   Greenes?

1     A.    Yes.

2     Q.    At that time, was there a Greene Homes Boyz

3   gang in the Greene Homes?

4           MR. CROSLAND:  Objection.  Leading.

5           THE COURT:  Overruled.

6   BY MR. KALE:

7     Q.    Was there a Greene Homes Boyz gang in the

8   Greene Homes area at that time?

9     A.    No.

10    Q.    Now, as a member of the FBI --

11          THE COURT:  At that time as in 2004?

12          MR. KALE:  Yes, Your Honor.

13  BY MR. KALE:

14    Q.    Is that when you left?

15    A.    I left in 2004, Your Honor.

16    Q.    Now, I'm going -- as a member of the FBI Safe

17  Streets Task Force and the Bridgeport Police

18  Department, did you provide assistance to the grand

19  jury investigating allegations of racketeering in

20  Bridgeport?

21    A.    Yes.

22    Q.    And as part of that assistance to the grand

23  jury, did you contact potential witnesses?

24    A.    Yes.

25    Q.    Was there one of those potential witnesses

```
 1    with the initials KJ?

 2        A.    Yes.

 3        Q.    At the time you contacted KJ, was he

 4    incarcerated or was he at liberty?

 5        A.    He was incarcerated.

 6        Q.    And do you know what sentence he was serving

 7    at that point, if you know?

 8        A.    I don't remember.  I know it was

 9    firearm-related charges.

10        Q.    And was it roughly ten years suspended after

11    three?

12              MR. CROSLAND:  Objection.  Leading.

13              THE COURT:  Sustained.

14    BY MR. KALE:

15        Q.    When you met him, was he about to get out of

16    jail or had he had a lengthy sentence?

17        A.    He was about to go into parole.

18        Q.    Okay.  Now, where did you meet him?

19        A.    I met him at the correctional facility at

20    MacDougall-Walker.

21        Q.    And what day did you pick him up?

22        A.    It was on or about December 3, 2020.

23        Q.    Now, what was the main purpose behind your

24    picking him up?

25        A.    We picked him up on a writ for the U.S.
```

1   Attorney's Office to transport him from the

2   correctional facility to the United States Attorney's

3   Office in Bridgeport to interview him about a

4   shooting he was involved in wherein he was the victim

5   shot by Undrea Kirkland.

6       Q.   And was that shooting in 2015?

7       A.   Yes.

8       Q.   And you said you brought him to the U.S.

9   Attorney's Office?

10      A.   I did.

11      Q.   And who was present at the interview?

12      A.    It was myself, it was then Sergeant Jason

13  Amato, Assistant U.S. Attorney Rahul Kale, yourself,

14  and Assistant U.S. Attorney Jocelyn Kaoutzanis, who

15  was over the phone.

16          THE WITNESS:   Sorry.  I mispronounced your

17  name.

18  BY MR. KALE:

19      Q.   AUSA Kaoutzanis?

20      A.   Yes.

21      Q.   During the course of the interview, did he

22  discuss being a victim of the shooting?

23      A.   Yes.

24      Q.   Now, what, if any, gang in Bridgeport did KJ

25  say he was associated with?

1      A.     He was associated with the 150 group.

2      Q.     And during the course of the interview, did

3    he talk about the Greene Homes Boyz?

4      A.     Yes.

5      Q.     And what, if any, relation did the 150 gang

6    have with Greene Homes Boyz?

7      A.     They were feuding.

8      Q.     And did -- who did he say were members of the

9    Greene Homes Boyz prior to his shooting in 2015?

10          MR. CROSLAND:  Objection.  Hearsay.

11          THE COURT:  Overruled.

12          THE WITNESS:  I'm sorry, Your Honor.  I

13    didn't hear.

14          THE COURT:  You may answer.

15   BY MR. KALE:

16     Q.     Who did he say were members of the Greene

17   Homes Boyz prior to his shooting in 2015?

18     A.      He gave several names, Undrea Kirkland,

19   Joshua Robles, Diomie Blackwell, Dha'moni Lockhart,

20   Destine Calderon Simmons or Destine Simmons Calderon,

21   Laheem Jones, Fabian Francis, Wack -- I forget his

22   real name -- Jahmari Cooper rather, Russell

23   Gilchrist, and there might have been one or two more.

24   I don't remember.

25     Q.     And what, if anything, did KJ say about

1  Laheem Jones' relation to the Greene Homes Boyz gang?

2     A.   He said that he moved into the Greenes in

3  2012 and helped bridge the gap between Marina Village

4  and the Greene Homes.

5          MR. CROSLAND:  Objection, Your Honor.  Who

6  moved in?

7          THE COURT:  Mr. Jones is what you just said.

8  So the question was what did KJ say about Laheem

9  Jones' relation to the Greene Homes Boyz gang and he

10  said he moved into the Greenes in 2012 and helped

11  bridge the gap between Marina Village and Greene

12  Homes.

13  BY MR. KALE:

14     Q.   And with regard to the gang itself, what role

15  did he say, if any, Laheem Jones played?

16     A.   He said that he bridged the gap and started

17  the group in Greene Homes.

18     Q.   Just to be clear, did he use -- when you say,

19  "started the group," did he use the word founder?

20     A.   I think he said started.

21     Q.   Now -- and when specifically did he say

22  Laheem Jones started the Greene Homes Boyz?

23     A.   He said that when he moved into the Greenes

24  in 2012 was when that happened, as far as I

25  understood him.

1    Q.   Now, what, if any, acts of violence did this

2   KJ associate with Laheem Jones?

3    A.   He talked about a shooting where Laheem Jones

4   was accused with Kyle Brodie of shooting Justin

5   Thompson and he said that he was tried and found not

6   guilty.

7    Q.   So he knew the result of the case?

8    A.   Yeah.

9    Q.   And what was his belief as to Jones' part of

10   it?

11        MR. CROSLAND:  Objection to "his belief."

12   BY MR. KALE:

13    Q.   What did he say was Laheem Jones' role

14   despite the not guilty verdict?

15    A.   He believed he did it.

16    Q.   Now, at the time of the interview, you

17   mentioned this before, I apologize, did the witness

18   say how long he expected -- much longer he expected

19   to be incarcerated?

20        MR. CROSLAND:  Motion to strike the answer,

21   "He believed he did it."  That was the subject of my

22   objection.

23        THE COURT:  I'm going to overrule the

24   objection.

25        This is what he told you, yes?

```
 1              THE WITNESS:  Yes, ma'am.
 2              THE COURT:  So when you say, "he believed,"
 3    that was his words?
 4              THE WITNESS:  It was the way I understood
 5    what he said, yes.  That came from him.
 6              MR. CROSLAND:  That's my objection.
 7              THE COURT:  Why don't you give us the best of
 8    your recollection of his words.
 9              THE WITNESS:  He believed he was responsible
10    for the shooting.  He said he went to trial and was
11    found not guilty.
12              MR. CROSLAND:  Claim it.  Same.  I claim it.
13    It's the same thing.  He didn't give us the words.
14              THE COURT:  He said those are his words.
15    That's what your objection was.  Overruled.
16    BY MR. KALE:
17       Q.   And if you know, was he paroled a few months
18    later?
19       A.   Yes.
20              MR. KALE:  I have no further questions, Your
21    Honor.
22              THE COURT:  Cross-examination.
23              MR. CROSLAND:  Thank you, Judge.
24              CROSS-EXAMINATION OF JOHN ANDREWS
25    BY MR. CROSLAND:
```

1     Q.    Lieutenant, what's your name?

2     A.    John Andrews.

3     Q.    Are you currently employed with the

4  Bridgeport Police Department now?

5     A.    Yes, sir.

6     Q.    And you mentioned that you were assigned in

7  the past to a task force by the chief, right?

8     A.    Yes.

9     Q.    Okay.  And is that the chief that's there

10  now?

11     A.    No.  The first chief was Chief Chapman, he

12  assigned me to statewide narcotics.  Chief Gaudett

13  assigned me to JTTF.

14     Q.    Excuse me a moment.  Gaudett, you're calling

15  Gaudett a chief?

16     A.    Yes.  Chief Gaudett was the chief when I got

17  to the task force.

18     Q.    Isn't it assistant chief or the chief of the

19  Bridgeport Police Department?

20     A.    Chief Gaudett was the chief of police.

21     Q.    Okay.

22     A.    And then Chief Chapman was the chief of

23  police and then I continued in the task force

24  throughout the other chiefs.

25     Q.    Okay.  And you testified that Mr. Jones lived

```
 1   at the Greene Homes, correct?

 2      A.   Yes.

 3      Q.   And did you have any knowledge, personal

 4   knowledge, that he lived in the Greene Homes?

 5      A.   No.

 6      Q.   Okay.  You never saw a lease with him living

 7   in the Greene Homes, did you?

 8      A.   No.

 9      Q.   Okay.  And you can't say if Mr. Jones moved

10   into Greene Homes in 2004, can you?

11      A.   No.

12      Q.   Okay.  Do you know how old Mr. Jones is?

13      A.   No.

14      Q.   Okay.  And you did prepare for your testimony

15   today with the government, correct?

16      A.   Correct.

17      Q.   Okay.  And you got a call probably yesterday

18   on this?

19      A.   Yes.

20      Q.   Okay.  And you guys discussed what you're

21   going to testify to today?

22      A.   Yes.

23      Q.   Okay.  And do you know Mr. Jones' mother?

24      A.   Yes.

25      Q.   And do you know when she moved in -- do you
```

1   know if she ever lived in the Greene Homes?

2       A.    No.   I don't think -- I don't know that she

3   did.   I know where she lived somewhere off lower Park

4   Avenue, I think Lafayette.

5       Q.    Okay.   And do you know if Mr. Jones lived

6   with her?

7       A.    I was told he was, yeah.

8       Q.    Living with her on Lafayette?

9       A.    Uh-huh.

10      Q.    But you never knew if the two of them lived

11  in the Greene Homes?

12      A.    No.

13      Q.    Okay.   And you spoke about a gentleman named

14  KJ, correct?

15      A.    Yes.

16      Q.    And do you know his real name?   You don't

17  have to put it on the record.

18      A.    Yes.

19      Q.    But you know who he is, right?

20      A.    Yes.

21      Q.    And you met KJ when he was in prison?

22      A.    Yes.

23      Q.    And it's fair to say KJ wanted to get out of

24  prison?

25      A.    Yeah.   I would think he would.

1     Q.    No one wants to be in prison, right?

2     A.    Right.

3     Q.    And the government sent you to go get KJ to

4    come talk to them, correct?

5     A.    Yes.

6     Q.    Were you present at all for the discussions

7    with the government and KJ?

8     A.    Yes.

9     Q.    Okay.  So there was no discussions that the

10   government may have had with KJ outside of your

11   presence?

12    A.    Not that I'm aware of, no.

13    Q.    So KJ was under your control at all times?

14    A.    Yes.

15    Q.    So when you brought him to the government,

16   where did you bring him?

17    A.    To the conference room.

18    Q.    Where?

19    A.    At 1000 Lafayette in Bridgeport, 10th floor.

20    Q.    And you sat in with them while they talked to

21   him?

22    A.    Yes.

23    Q.    And you, I think, referenced that, I think,

24   this gentleman and this young lady was at the

25   meeting?

```
 1      A.    Only Attorney Kale was.

 2      Q.    Attorney Kaoutzanis was on the phone?

 3      A.    Yes.

 4      Q.    And after the meeting was over, you took

 5   custody of Mr. KJ and took him out of there?

 6      A.    Yes.

 7      Q.    Okay.  And I think they said after he spoke

 8   with the government, Mr. KJ was later paroled, right?

 9      A.    Yes.

10      Q.    And you don't know if his testimony helped

11   him get paroled?

12      A.    No.

13      Q.    You don't know, right?

14      A.    No.

15      Q.    But he did cooperate, right?

16      A.    Yes.

17      Q.    Okay.  And you found him to be cooperative?

18      A.    Yes.

19      Q.    Okay.  And the information that he gave you,

20   you didn't independently go and verify any of that

21   information, did you?

22      A.    No.   I knew it to be consistent for the most

23   part just from what I heard in the past, but I didn't

24   take any steps to independently, you know, go through

25   the whole statements that he gave.
```

1      Q.    Right.  People tell you things and you

2  believe it was consistent with something out there,

3  right?

4      A.    Consistent with other people I've interviewed

5  in the past over this, yes.

6      Q.    Okay.  And anything specifically consistent?

7      A.    Yes.  The consistent -- consistently

8  consistent was the names associated with the Greene

9  Homes housing complex.

10     Q.    Okay.  So he told you that the list of people

11 that you read out today in court --

12     A.    Yes.

13     Q.    -- were members of the Greene Homes projects?

14     A.    Yes.  Greene Homes project.

15     Q.    And the Greene Homes is a project, right?

16     A.    Yes.  It's a federally-subsidized housing

17 project.

18     Q.    Is that Charles F. Greene projects?

19     A.    Yes.

20     Q.    And it was recently remodeled, correct?

21     A.    It was remodeled years ago.  I don't think it

22 was recent.

23     Q.    Okay.  We might dispute that.  So the people

24 who live in those Charles F. Greene projects are the

25 people who are on that list that you read, right?

 1      A.    No.  Not all of them.

 2            MR. KALE:  Objection.  I withdraw that, Your

 3    Honor.

 4            MR. CROSLAND:  Thank you.

 5            THE COURT:  So the question was?

 6            MR. CROSLAND:  I'll withdraw the question

 7    too.  I'll do a new one.

 8    BY MR. CROSLAND:

 9      Q.    The people that you read off on that list,

10    you didn't verify whether they had a lease to live

11    there or not?

12      A.    A lot of them didn't live there.

13      Q.    I said to you --

14            MR. KALE:  Objection.  Argumentive.

15            THE COURT:  Wait a second.  Question, "The

16    people that you read off on that list, you didn't

17    verify whether they had a lease to live there or

18    not?"  Answer, "A lot of them didn't live there."

19    Next question, please.

20    BY MR. CROSLAND:

21      Q.    Did you go to the leasing office -- strike

22    that.

23            Did the Greene Homes housing have a leasing

24    office?

25            MR. KALE:  Objection.  Relevance.

```
 1              THE WITNESS:  Yes.

 2              MR. CROSLAND:  Claim it.

 3              THE COURT:  Let him proceed so we can see if

 4    it's relevant.

 5    BY MR. CROSLAND:

 6      Q.    Did they?

 7      A.    Yes.  They have a tenant list.

 8      Q.    Okay.  And did you check that tenant list to

 9    see if anybody on that list that KJ gave you was on

10    that list?

11      A.    No.

12              MR. CROSLAND:  Thank you.

13              THE COURT:  Any redirect?

14              MR. KALE:  No, Your Honor.  Thank you.

15              THE COURT:  Thank you then, Lieutenant.  You

16    may step down and you are excused.

17              MR. KALE:  Your Honor, may I call Special

18    Agent Andrew Pappas?

19              THE COURT:  Yes.

20              Andrew Pappas, sworn.

21              THE CLERK:  Please be seated and state your

22    name for the record spelling your first and last name

23    and also give us the town of your employer.

24              THE WITNESS:  My name is Andrew Pappas, first

25    name Andrew, A-N-D-R-E-W, last name Pappas,
```

1   P-A-P-P-A-S, and I work in Bridgeport, Connecticut.

2          MR. CROSLAND:  May it please the Court, I may

3   have made a mistake and I'll accept that, but if

4   anybody else is going to testify, I ask that they

5   step outside the courtroom so we can have fairness in

6   the testimony.  I didn't realize they're all sitting

7   here.

8          THE COURT:  That's fine.  I'll grant the

9   sequestration order and I'll ask any witnesses to

10  kindly step outside unless you've testified, and if

11  you've testified, you still can't talk to anybody who

12  hasn't testified.

13         MR. CROSLAND:  Thank you, Judge.

14         THE COURT:  You may proceed.

15         MR. KALE:  Thank you, Your Honor.

16         DIRECT EXAMINATION OF ANDREW PAPPAS

17  BY MR. KALE:

18  Q.    What do you do for a living?

19  A.    I'm a special agent with the FBI.

20  Q.    About how long have you been with the FBI?

21  A.    Since March of 2019.

22  Q.    And what did you do before you came to the

23  FBI?

24  A.    I was in the Marine Corps and I was an

25  infantry officer and force reconnaissance officer.

```
1        Q.    And how long were you doing that?

2        A.    Just over seven years.

3        Q.    And what did you do prior to that?

4        A.    Prior to that, I was in college.

5        Q.    Now, are you assigned to any particular unit

6   in the FBI?

7        A.    Yes.  I'm assigned to the Bridgeport Safe

8   Streets Task Force.

9        Q.    And as part of your job with the Bridgeport

10  Safe Streets Task Force, did you become involved in a

11  grand jury investigation in violence and drug dealing

12  among neighborhood gangs in Bridgeport, Connecticut?

13       A.    Yes, I did.

14       Q.    And was there a particular gang in which you

15  focused?

16       A.    Yes.  I focused on the East End gang.

17       Q.    And what -- was there a gang war going on in

18  Bridgeport at that time?

19       A.    Yes.

20             MR. CROSLAND:  Objection to the way it's

21  classified, the question, "Was there a gang war going

22  on."

23             THE COURT:  Do you want to rephrase it to

24  make clear what the term "gang war" meant?

25             MR. KALE:  Of course, Your Honor.
```

1    BY MR. KALE:

2        Q.    To your knowledge, what types of gangs were

3    there in Bridgeport in 2016 to 2020?

4        A.    There were multiple neighborhood-based gangs

5    and they would conduct violent activity against one

6    another back and forth and also conduct narcotic

7    activity as part of the gang.

8        Q.    And you mentioned one of the gangs that you

9    focused on was the East End gang?

10       A.    That's correct.

11       Q.    Who were the rivals of the -- who would the,

12   as you said, East End gang commit violence against

13   what other neighborhood gangs?

14       A.    The Greene Homes Boyz and O.N.E., the Only

15   North End.

16       Q.    And now, in the course of your investigating

17   the East End gang, did you obtain access to an East

18   End gang member who had told the Bridgeport Police

19   that he participated in a murder?

20           MR. CROSLAND:  Objection, Your Honor.  Form

21   of the question.

22           THE COURT:  When you say that murder, what

23   are you referring to?

24           MR. KALE:  Participated in a murder, I should

25   have said.

```
 1              THE COURT:  I'm going to permit the question.
 2              THE WITNESS:  Yes.
 3    BY MR. KALE:
 4       Q.   And did that person plead guilty to federal
 5    racketeering conspiracy charges before Judge Victor
 6    Bolden in Bridgeport?
 7       A.   Yes.
 8       Q.   Did that person enter into a cooperation
 9    agreement with the United States?
10       A.   Yes.
11       Q.   Now, in preparation for a Greene Homes trial
12    including Mr. Jones, Laheem Jones, before this Court,
13    were you present for witness preparation of that East
14    End gang member in Bridgeport, Connecticut?
15       A.   Yes.
16       Q.   Was he alone or was he with a lawyer?
17       A.   He was with his attorney.
18       Q.   And what was the date of that witness
19    preparation session?
20       A.   It was on or about November 4, 2021.
21       Q.   And was that East End gang member -- was he
22    familiar with Laheem Jones?
23       A.   Yes.
24       Q.   And how -- did he say how he was familiar
25    with Laheem Jones?
```

1      A.    He said he had bought marijuana from

2  Mr. Jones, and I believe it was 2011 or 2012, from

3  the Greene Homes, physically in the Greene Homes.  He

4  also said that he saw Mr. Jones in numerous social

5  media photos and at numerous parties around that time

6  frame.

7      Q.    And what did the East End gang member say was

8  Mr. Jones' role in regard to the Greene Homes Boyz

9  gang?

10          MR. CROSLAND:  Objection.

11          THE COURT:  I'm sorry.  Are we talking about

12  two people, one who was an East End gang member and

13  one who is just called a person?

14          MR. KALE:  I apologize if -- may I rephrase,

15  Your Honor?

16          THE COURT:  Mm-hmm.

17  BY MR. KALE:

18      Q.    Well, let me put it this way:  Did the East

19  End gang member -- what did the East End gang member

20  say in the interview you were a part of regarding

21  what he thought -- or what were the words he used as

22  to Mr. Jones' relation to the Greene Homes gang?

23          MR. CROSLAND:  Objection, Your Honor.

24  Compound, just unartful.

25          THE COURT:  No.  I think we got it.

**A - 249**

43

```
 1   Overruled.
 2        Do you understand the question?  Do you want it
 3   rephrased?
 4        THE WITNESS:  I understand, Your Honor.
 5        He said that he was a founding member.
 6   BY MR. KALE:
 7     Q.   Now, what did he -- did he provide any
 8   statements to you as to why he believed Mr. Jones was
 9   a founding member?
10     A.   Yes.  He told me that he saw Mr. Jones in
11   numerous social media photos with six or seven other
12   Greene Homes Boyz associates and they would display
13   the Greene Homes Boyz sign, which he described as
14   putting the index finger to the thumb and extending
15   three fingers -- the other three fingers vertically.
16   He also said that he saw Mr. Jones and the other
17   Greene Homes Boyz associates at numerous parties
18   around this time frame.
19        MR. KALE:  And Your Honor, just for the
20   record, may I have the record reflect that the
21   witness sort of did a -- put out his right hand in
22   the manner in which he was describing?  I won't
23   redescribe it.
24        THE COURT:  Yes.
25   BY MR. KALE:
```

**A - 250**

44

1    Q.   Now, did he mention seeing Mr. Jones at a

2   funeral?

3    A.   Yes.  In 2012, there was a funeral for a

4   female named -- last name Jahnae, her street name or

5   nickname was "Nu Nu," I believe.  This female was

6   killed as an inadvertent victim in a gang shooting.

7   And at the funeral, Mr. Jones was in attendance along

8   with Kyle Brodie, an individual named Kwan, K-W-A-N,

9   I don't know his real name, Diomie Blackwell, Asante

10  Gaines, and Undrea Kirkland.

11   Q.   And what, if anything, did the East End gang

12  member say about those other people you just named

13  and any affiliation they had?

14   A.   He described them as also Greene Homes Boyz

15  members.

16   Q.   Now, did he discuss to you what Greene Homes

17  Boyz members would say to show that they really meant

18  something?

19       MR. CROSLAND:  Objection.

20       THE COURT:  Basis?

21       MR. CROSLAND:  What would they say to mean

22  that they meant something?

23       THE COURT:  Do you understand the question?

24  Do you want it rephrased?

25       THE WITNESS:  I understand, Your Honor.

```
1              THE COURT:  I'm going to permit the question.
2              THE WITNESS:  So to indicate that they were
3    being honest or truthful or truly meant something,
4    they would say, "word to 50, word to Rich, word to
5    Ky," and these were all individuals that were killed
6    in the gang violence that were members of the Greene
7    Homes Boyz.  So it was an ode to their death.
8              MR. KALE:  I have nothing further for the
9    witness.  Thank you, Your Honor.
10             THE COURT:  Cross-examination.
11             CROSS EXAMINATION OF ANDREW PAPPAS
12   BY MR. CROSLAND:
13     Q.    What's your name again?
14     A.    My name is Andrew Pappas.
15     Q.    Mr. Pappas, Officer Pappas?
16             THE COURT:  Agent Pappas.
17             THE WITNESS:  Special Agent Pappas.
18   BY MR. CROSLAND:
19     Q.    Special Agent Pappas, that's good.  Special
20   Agent Pappas, you're law enforcement, correct?
21     A.    Yes, sir.
22     Q.    And you would train, like, police officers in
23   that post-certification stuff?
24     A.    I wouldn't call myself a police officer, sir.
25   I would not call myself a police officer.
```

1      Q.    Did you get training similar to police

2   officers?

3      A.    I got law enforcement training.

4      Q.    Fair enough.  And just to go back to the top,

5   you just testified about words that people use to

6   mean -- to show that they're serious.  Do you

7   remember that?

8      A.    Yes, sir.

9      Q.    Okay.  And when -- you said they will say,

10  "word to Ky," right?

11     A.    Yes, sir.

12     Q.    Okay.  And I think you said you were in

13  college before you came upon the government's job,

14  correct?

15     A.    No, sir.  I was in the Marine Corps for over

16  seven years.

17     Q.    Yeah.  But you had to -- you went to college

18  after the Marine Corps?

19     A.    No, sir.  Before the Marine Corps.

20     Q.    Okay.  So you were in college before you got

21  on this job?

22     A.    Correct.  But not right before.

23     Q.    I didn't say right before.  Just before?

24     A.    It was before, correct.

25     Q.    Thank you, sir.  And so you're familiar when

1   people are talking -- I'm assuming these are

2   inner-city kids you're testifying about?

3       A.    The individual I spoke to was a member of the

4   East End gang.  He's from the East End of Bridgeport.

5       Q.    Is that the inner city?

6       A.    I'm not going to pretend that I am an expert

7   in the demographics of Bridgeport or what is or what

8   is not the inner city.  He was from the East End of

9   Bridgeport.

10      Q.    Okay.  Don't pretend, but was --

11          MR. KALE:  Objection, Your Honor, to that

12  loose statement.

13          MR. CROSLAND:  I'll withdraw it.

14  BY MR. CROSLAND:

15      Q.    The East End, is that in the suburbs?

16      A.    I would not regard it as the suburbs.

17      Q.    All right.  And are you familiar when people

18  in that East End area or in the inner city in general

19  use the word "word"?

20      A.    I've heard it used in a casual reference, but

21  it's not something I use in context.  I don't really

22  know.

23      Q.    So would you agree if you said to me it's

24  going to snow tomorrow, and I said, "word," that

25  would be what you're talking about, I wouldn't have

1  to say, "word to Ky" or "word" to anybody, just

2  "word" means, like, are you serious?  Just honest

3  answer.

4      A.    I would consider it being more like not a

5  question but recognizing what you're saying.

6      Q.    Okay.  Yeah.

7      A.    It's not terminology I use.

8      Q.    I'm saying I use it.  Black people use this

9  terminology.  But you're familiar with it, right?

10          MR. KALE:  Objection to testifying, Your

11 Honor.

12          THE COURT:  I'm going to sustain that

13 objection.

14 BY MR. CROSLAND:

15     Q.    So how did you say it?  When you say "word,"

16 it's as just a confirmation?  Can you say it again?

17     A.    It's not what I said.  It's what I was told

18 and what the individual told me was "word to Ky," for

19 example," Ky, an individual, being Khalil Diaz.

20     Q.    Right.  I'm just saying "word."  "Word" is,

21 like you said a second ago, it means, like, a

22 confirmation?

23     A.    I really wasn't referring to just the word.

24 I was referring to the phrase and what I was told it

25 meant.

 1    Q.   Okay.  Are you familiar when -- with the

 2  phrase "on gang"?

 3    A.   No.

 4    Q.   Okay.  And so your testimony today is you

 5  never heard anybody use "on gang"?

 6    A.   I've heard the word used before, but it's not

 7  something I'm familiar with.

 8    Q.   Okay.  And when you heard it used before, in

 9  what context was it used?

10    A.   I don't know the context.  I don't really

11  know what they're referring to.

12    Q.   Okay.  And you've been working since 2019

13  with the FBI?

14    A.   Yes.

15    Q.   And you've been a special agent since 2019?

16    A.   Yes.

17    Q.   And your job was to investigate gangs in the

18  East End?

19    A.   Yes.

20    Q.   Okay.  And you listened to conversations

21  between those gangs?

22    A.   Yes.

23    Q.   You watched videos involving those gangs?

24    A.   Yes.

25    Q.   And you arrested gang members probably,

**A - 256**

50

```
 1   right?

 2       A.    Yes.

 3       Q.    Okay.  And your testimony here today is that

 4   you -- in those videos you watched and those

 5   interviews you watched, you never heard these kids

 6   saying "on gang," like meaning true?

 7       A.    "On gang," no.

 8       Q.    Okay.  Fair enough.  What year was the

 9   funeral of Jahnae?

10       A.    I was told it was 2012.

11       Q.    And who told you that?

12       A.    The East End gang member that Mr. Kale was

13   referring to.

14       Q.    The cooperator?

15       A.    Yes, sir.

16       Q.    And where is that cooperator now?

17             MR. KALE:  Objection, Your Honor.  Relevance

18   and safety, Your Honor.

19             MR. CROSLAND:  Claim it.

20             THE COURT:  What is the relevance?

21             MR. CROSLAND:  The relevance of the question

22   is if he knows who he's talking about.  I didn't put

23   the person's name on the record.

24             THE COURT:  Your question, I thought, was

25   where is he now and the testimony has related to
```

```
 1    2012.  So what's the relevance of where this person

 2    is now?

 3            MR. CROSLAND:  Okay.  I'll withdraw that

 4    question.

 5    BY MR. CROSLAND:

 6    Q.    Were you working with this cooperator?

 7    A.    Yes.

 8    Q.    Okay.  And did you accompany this cooperator

 9    to speak with Mr. Kale and his team?

10    A.    Yes.

11    Q.    Okay.  And you were working with the

12    cooperator when you were working with investigating

13    the East End, correct?

14    A.    Yes.

15    Q.    And this cooperator told you, to be specific,

16    that he saw Laheem Jones in videos; is that correct?

17    A.    He said he saw him in social media photos.

18    Q.    Photos, not videos, photos?

19    A.    Yes, sir.

20    Q.    And I was writing when you were doing your

21    gang sign, so I apologize.  Can you show me the sign

22    that this cooperator said that he saw Mr. Jones or

23    others throwing up?

24    A.    Yes, sir.

25    Q.    That's, like, three fingers up and a little
```

1   pinch?

2   A.    Yes, sir.  Index finger to thumb is what he

3   described and demonstrated.

4   Q.    Do you know what that means?

5   A.    The cooperating defendant told me that it

6   meant it was a sign of the Greene Homes Boyz

7   indicating membership.

8   Q.    Okay.  And do you know if the East End has a

9   sign?

10  A.    Yes.

11  Q.    What is it?

12  A.    I believe based on the investigation, the

13  sign is three fingers indicating an E.

14  Q.    Okay.  And do you know if there's a special

15  sign for a boss?

16  A.    I'm not aware of a sign for a boss.

17  Q.    Do you know if there's a special sign for the

18  GHB founder?

19  A.    I'm not aware if there's a special sign for

20  the GHB founder.

21  Q.    And in your investigation, you saw -- you

22  learned from the cooperator that there was several

23  individuals who were part of the Greene Homes Boyz,

24  correct?

25  A.    He referenced six or seven individuals that

1    he commonly saw together at that -- around that time

2    frame.

3        Q.    And the testimony that you gave here today

4    when Mr. Kale was questioning you, to be specific,

5    was he recognized Mr. Jones from photos in 2012,

6    correct?

7        A.    From photos and from parties, and also from

8    buying marijuana from him in the Greene Homes.

9        Q.    Around 2012, correct?

10        A.    That's correct.

11        Q.    And you didn't independently corroborate any

12    of that, did you?

13        A.    Specifically that information, no.

14        Q.    That's specifically what I'm asking you.

15        A.    That's correct.

16        Q.    What about the East End, this is the sign,

17    I'm holding up three fingers sort of like it's

18    supposed to be an E, correct?

19        A.    That based on the investigation is what is

20    apparent, yes.

21        Q.    Am I doing this correct?

22        A.    It seems you are, yes.

23        Q.    That's correct, okay.  And how long did you

24    investigate the East End?

25        A.    I started in August 2020.

1      Q.    Okay.  And in investigating the East End, you

2  also learned -- is it safe to say you learned of who

3  the rivals of the East End are?

4      A.    I learned of them, yes.

5      Q.    Okay.  And you also learned, safe to say,

6  about the other projects in the neighborhood?

7      A.    Yes.

8           MR. CROSLAND:  Your Honor, can I have one

9  moment?

10 BY MR. CROSLAND:

11     Q.    Are you familiar with a project or housing

12 complex called Marina Village?

13     A.    I've heard of it.

14     Q.    Okay.  And what about 150?

15     A.    150, I just know to be the western part of

16 Bridgeport.

17     Q.    And do you know -- the 150 and Marina Village

18 is the same place, right?

19     A.    That I don't know.

20     Q.    Okay.  So you never looked that up?

21     A.    No.  150 and Marina Village are not really

22 the subject of my investigation.

23     Q.    Okay.  So you don't know whether they are the

24 same place or not?

25     A.    No, I don't.

1      Q.    Okay.  So back to the East End, this is your

2    territory, right?

3      A.    It's not my territory.  It's the sign of the

4    gang I was investigating.

5      Q.    This is the sign.  I said is the East End

6    your territory.

7      A.    No.  It's not my territory.

8            MR. KALE:  Asked and answered.

9            THE COURT:  I think there was some confusion.

10   So --

11           MR. CROSLAND:  I'll rephrase, Your Honor.

12   BY MR. CROSLAND:

13     Q.    So you were assigned to the East End at one

14   point?

15     A.    Can you rephrase the question?

16     Q.    Were you assigned to the East End at one

17   point?

18     A.    I was not assigned.

19     Q.    Tell me what your involvement with the East

20   End was.

21     A.    I'm involved in multiple homicides and

22   attempted shootings conducted by the East End gang.

23     Q.    Okay.  And so you had to investigate the East

24   End gang, right?

25     A.    Yes.

**A - 262**

56

1    Q.    And that's when you learned of the sign, for

2  instance, right?

3    A.    That's correct.

4    Q.    And in learning of the signs of the East End,

5  did you learn if there's a sign that connotates

6  founding members?

7    A.    No.  I did not learn of such a sign.

8    Q.    Okay.  And your cooperator, did he just --

9  your testimony is that your cooperator saw

10  Mr. Jones in videos -- strike that -- at parties and

11  photos in 2012, correct?

12    A.    2011 and 2012, yes.

13         MR. CROSLAND:  Thank you, sir.  I appreciate

14  it.

15         THE COURT:  Anything further, Mr. Kale?

16         MR. KALE:  No.  Thank you, Your Honor.

17         THE COURT:  Thank you.  You may step down.

18  Thank you.  Lieutenant, can I get you to put your

19  mask back on while you're out there.  Thank you.

20         MR. KALE:  Your Honor, may I call Special

21  Agent Barrett Hyde?

22         THE COURT:  Yes.

23         MR. KALE:  I apologize, Your Honor.  I

24  thought he was in the hall.  He was right here.

25         Barrett Hyde, sworn.

```
 1              THE CLERK:  Please be seated and state your
 2   name for the record, spell your first and last name,
 3   and give us the town of your employer.
 4              THE WITNESS:  Good afternoon.  Good
 5   afternoon, Your Honor.  My name is Barrett Hyde,
 6   B-A-R-R-E-T-T, last name is Hyde, H-Y-D-E.  I'm a
 7   special agent here in Connecticut with ATF, the
 8   Bureau of Alcohol, Tobacco, Firearms and Explosives,
 9   and the address for my employment is 150 Court
10   Street, Unit 643, New Haven, Connecticut.
11              THE COURT:  You may proceed.
12              MR. KALE:  Thank you, Your Honor.
13              DIRECT EXAMINATION OF BARRETT HYDE
14   BY MR. KALE:
15     Q.    How long have you been with the ATF?
16     A.    Seven years.
17     Q.    And what did you do before you were with the
18   ATF?
19     A.    I was an attorney.
20     Q.    And are you assigned to any specific office
21   in the ATF?
22     A.    Yes.
23     Q.    Is it the New Haven office?
24     A.    Yes, sir.
25     Q.    As part of your job with the New Haven office
```

1    of the ATF, did you become involved in a grand jury

2    investigation into violence and drug dealing among

3    neighborhood gangs in Bridgeport, Connecticut?

4        A.    Yes.

5        Q.    And was there a particular gang in which you

6    focused?

7        A.    Yes.

8        Q.    Which gang?

9        A.    Greene Homes Boyz.

10       Q.    And in fact, were you the so-called case

11   agent on *United States v Marquis Isreal, et al*?

12       A.    Yes.

13       Q.    As case agent, did you become familiar with

14   the courthouse shooting?

15       A.    I did.

16       Q.    And briefly, just for the record, what was

17   the courthouse shooting or what do you understand

18   that to be meaning?

19       A.    Sure.  So on January 27, 2020, there was a

20   shooting that occurred out in front of the steps of

21   the GA2 courthouse located in Bridgeport,

22   Connecticut.  And through my investigation and

23   working with my state and local partners, we

24   determined that members of the Greene Homes Boyz did

25   the shooting against rival gang members on that

59

1  afternoon.

2     Q.   And if you know, what gang were the rivals a

3  part of?

4     A.   East End.

5     Q.   Now, as with regard to just the GHB motive

6  for the courthouse shooting, what did your

7  investigation reveal?

8     A.   Sure.  So when we started looking into the

9  why, the why of which, you know, why a shooting

10  occurred on January 27, 2020, our understanding, and

11  we came across evidence, that there was a shooting

12  the night prior of a young gentleman who was a GHB

13  associate, his name is Myreke Kenion, and he was

14  murdered right outside on Highland Ave which runs

15  right next directly to the Greene Homes housing

16  projects.  There's a corner store, Junco Market, and

17  there's the two buildings, building number 4 and

18  building number 5.  And in between that on that

19  street corner, he was killed.

20     Q.   And just for the court reporter, you said

21  Junco, is that J-U-N-C-O?

22     A.   Yes.

23     Q.   And now, are you familiar with Laheem Jones?

24     A.   I am.

25     Q.   And how are you familiar with him?

1      A.    Through investigating him through this case.

2      Q.    Now, through your investigation, what did you

3  do as part of your investigation?  That includes

4  witness interviews?

5      A.    Sure.  We had witness interviews.  We looked

6  at different evidence and footage related to the

7  courthouse shooting and people that may have been

8  associated or suspects in those shootings.

9      Q.    And now, the courthouse shooting, was that

10  the original focus of the first indictment?

11      A.    Yes.

12      Q.    Did the -- was there a superseding

13  indictment?

14      A.    There was.

15      Q.    And did that expand upon the general focus of

16  just -- did it go beyond the courthouse shooting?

17      A.    Yes.  So once we started looking into the

18  people who were responsible for the courthouse

19  shooting, that obviously expanded as we started to

20  get warrants for people's phones, social media

21  accounts, to include other members of GHB and

22  associates of GHB with O.N.E. gang as well.

23      Q.    Okay.  And in interviewing witnesses and

24  looking at evidence, and going back to 2011, what

25  role do you understand Laheem Jones to have had in

1    the Greene Homes Boyz gang?

2      A.    So from speaking to witnesses, I know that,

3    and from what they have told me, that he was a member

4    of GHB, and that in 2010, 2011, he was asking people

5    to come to that area, the housing complex there in

6    GHB, and become members of GHB.

7      Q.    Now, I'm going to turn your attention to

8    November 9th and November 17, 2020 too.  I know

9    that's two days, but do I have you focused on that

10   time period?

11     A.    Yes.

12     Q.    And were you in sort of what we call trial

13   prep at that time?

14     A.    Yes.

15     Q.    Did you speak to an incarcerated witness who

16   had signed a cooperation agreement with the

17   government?

18     A.    I did.

19     Q.    And what, if any, relation did the

20   incarcerated witness have to the Greene Homes Boyz

21   gang?

22     A.    So that person was a member of the Greene

23   Homes gang and had been a member for some period of

24   time going back a ways.

25     Q.    And when you say that, how do you know that?

1       A.    We asked him specifically if he was and he

2   stated that he was a member.

3       Q.    Was that witness aware of Laheem Jones?

4       A.    Yes, he was.

5       Q.    And did the witness say when he first met

6   Mr. Jones?

7       A.    Yes.

8       Q.    And where did he first meet Mr. Jones?

9       A.    So the witness stated to us that he had known

10  Mr. Jones since they were very little, that they had

11  actually grown up together in the Pequonnock Village

12  apartments, which is now no longer in the city of

13  Bridgeport, but they grew up there together, and when

14  that was knocked down, they still remained friends,

15  and then eventually met up back again in the city of

16  Bridgeport, more specifically in the Greene Homes

17  area.

18      Q.    Okay.  Now, you said they met up again.  Did

19  the witness explain to you how they -- why they met

20  up again?

21      A.    Yes.  So what that person told us is that

22  around 2010, Mr. Jones was living in the Greene Homes

23  and this person was living in another town outside of

24  Bridgeport but located here in Connecticut close by,

25  and that person told us that Mr. Jones was basically

**A - 269**

63

```
 1  speaking to him on Facebook Messenger or social media
 2  and asking him to come to the Greene Homes and become
 3  part of a gang there.
 4      Q.   And what, if anything, did the witness say
 5  Mr. Jones promised him if he came over and became
 6  part of the gang?
 7          MR. CROSLAND:  Objection.  Assuming facts not
 8  in evidence.
 9          THE COURT:  Why don't you start with a
10  preliminary question of whether he said anything
11  about that?
12  BY MR. KALE:
13      Q.   Did Mr. Jones talk about -- any more about
14  that Mr. Jones had recruited him?
15      A.   Yes.
16      Q.   What, if anything, did Mr. Jones say to this
17  witness?
18      A.   He said that we were out there, meaning that
19  they were out at the Greene Homes, that they were
20  selling drugs, and he could come in to sell drugs
21  with them, and that he would be safe if he came to
22  the Greene Homes as part of the gang.
23      Q.   And did this individual take up Mr. Jones on
24  that offer?
25      A.   Yes.
```

**A - 270**

64

1     Q.    And once the witness became part of the

2  Greene Homes group, what did he say Laheem Jones

3  asked him to do?

4     A.    Several things, one which is to sell drugs

5  which Mr. Jones provided to him on occasion.  He also

6  asked him to fight other sides of the city that they

7  were rivals with at that time and to be part of the

8  gang and that degree.  So fight, sometimes carry

9  firearms, and sell drugs.

10    Q.    Now, did this witness mention the nickname

11  Nu Nu?

12    A.    Yes.

13    Q.    And what, if anything, did the witness say

14  about Nu Nu?

15    A.    So that was a -- excuse me --

16    Q.    Take your time.

17    A.    That was a defining moment, according to the

18  witness, for the Greene Homes Boyz.  This young woman

19  who went by the name Nu Nu or they called Nu Nu was

20  killed and this witness stated that both Mr. Jones

21  possibly, a gentleman named Khalil Diaz and -- were

22  with Nu Nu, that they were walking to an aunt's house

23  that they knew in that area that they could hangout

24  at sometimes at the house, whether it was late at

25  night or some period of time, it was a hang out, and

1   that Khalil Diaz was the target of a rival gang

2   shooting at him.  They missed the target.  They shot

3   Nu Nu and Nu Nu died and it was someone that was

4   influential to the gang, Greene Homes Boyz, someone

5   that they looked up to or admired, and that was

6   problematic for the Greene Homes at that time.

7       Q.   What, if anything, did this witness say GHB

8   members agreed to do after Nu Nu was killed?

9       A.   They wanted to retaliate against the gang for

10   what they did murdering Nu Nu.

11       Q.   When you say, "retaliate," did he mention any

12   form of retaliation?

13       A.   To go shoot someone from the East End.

14       Q.   And in your investigation, is law enforcement

15   aware of any such retaliation?

16       A.   Yes.

17       Q.   What did the witness say about Mr. Jones'

18   membership in GHB gang after he was in prison?

19       A.   So there was a period of time that the

20   witness said that Mr. Jones was incarcerated and we

21   asked him about whether or not that means that when

22   he's incarcerated, he's no longer a member of the

23   Greene Homes Boyz, and the witness said to the

24   contrary, that just because Mr. Jones was in jail,

25   that didn't mean that he lost any allegiance to the

1    Greene Homes Boyz.  So while he's in, he's still a

2    member, and when he gets out, he still retains that

3    membership within GHB.

4        Q.    Have you seen a video called "Spoo2xGlizzy"

5    or something to that effect?

6        A.    I'll tell you, Attorney Kale, I've seen a lot

7    of videos in this case, so I'm sure I have seen it.

8    I'm not sure exactly--

9        Q.    It's by Undrea Kirkland.

10            MR. CROSLAND:  Objection.  Leading.  And I'm

11    not sure what video we're talking about.

12            THE COURT:  I'm going to sustain the leading

13    and ask you to rephrase your question.

14    BY MR. KALE:

15        Q.    Have you seen any video put out by GHB

16    members where they say they are members from the

17    trenches to cells?

18        A.    Yes.

19        Q.    And based on your investigation, what does

20    that mean?

21        A.    Essentially that the trenches when they're

22    out there in the streets, to the cells when they're

23    incarcerated, no matter where they are, incarcerated

24    or not, they're still part of the gang and they're

25    still a brotherhood.

1     Q.   Now, what did the witness say, if anything,

2 about Laheem Jones coming out of prison?

3     A.   Essentially, that when he came out of prison,

4 he was still a member and he was still doing the

5 things that they would all do inside the Greene Homes

6 housing complex and as part of the gang.

7     Q.   When he came out, was he provided anything?

8     A.   Yes.

9     Q.   What did the witness say he was provided?

10     A.   He was provided with a weapon, a firearm, and

11 also clothes and possibly money, but a weapon and

12 firearm were provided to him so that he could be up

13 on his feet.

14     Q.   Now, what did that witness say about Laheem

15 Jones and firearms when he was not in prison?

16     A.   When Mr. Jones is not in prison, the witness

17 stated that he always knew Mr. Jones to be carrying a

18 firearm or had a firearm on him and he also knew him

19 to sell narcotics, drugs out of the Greene Homes

20 housing complex.

21     Q.   What, if anything, did he say about selling

22 narcotics?

23     A.   So specifically, Mr. Jones was someone that

24 would get a large amount of drugs or what he

25 described to be a large amount of drugs from an

**A - 274**

68

```
 1    individual that he knew the street name as Killer,

 2    and he described that Killer would be a large

 3    provider of drugs, that he would give those to

 4    Mr. Jones.

 5           MR. CROSLAND:  Objection, Your Honor.

 6    Relevance.

 7           THE COURT:  Your claim?

 8           MR. KALE:  Your Honor, we are at this FATICO

 9    hearing.  We are proving -- this goes to history,

10    characteristics.  It also goes to the nature of the

11    crime.  So it's we're talking about --

12           THE COURT:  I'll permit the question.  Go

13    ahead.  Overruled.

14           THE WITNESS:  Thank you.  That Killer

15    provided Mr. Jones drugs and Mr. Jones would break

16    those drugs up and give them to other dealers to deal

17    the drugs with.

18    BY MR. KALE:

19     Q.    And you said "other dealers."  Any dealer or

20    what type of dealer?

21     A.    All within the Greene Homes.  So what this

22    witness told us is that they share in drugs.  They

23    share customers as well.  So when a large amount of

24    drugs would come in, they would split that up or

25    divvy it up depending on how much money they put in
```