# 22-521-CR(L)

## 22-674-CR(CON), 22-1160-CR(CON), 22-1324-CR(CON), 22-1390-CR(CON)

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



UNITED STATES OF AMERICA,

*Appellee,*

*v.*

DESTINE CALDERON, TYIESE WARREN, AKA LOOSE SCREW, JACQUON BENEJAN, AKA BLICK, UNDREA KIRKLAND, AKA SPOODA,

*Defendants,*

MARQUIS ISREAL, AKA GARF, DIOMIE BLACKWELL, AKA YAMO, JACQUON BENEJAN, AKA BLICK, ASANTE GAINES, AKA SANTI, LAHEEM JONES, AKA HEEMIE,

*Defendants-Appellants.*

————————————

*On Appeal from the United States District Court for the District of Connecticut*

═══════════════════════

## APPENDIX FOR DEFENDANT-APPELLANT LAHEEM JONES VOLUME II OF II Pages A-275 to A-530

═══════════════════════

LAW OFFICE OF JAMES M. BRANDEN
*Attorneys for Defendant-Appellant Laheem Jones*
80 Bay Street Landing, Suite 7j
Staten Island, New York 10301
212-286-0173

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
----------------------------------------x

UNITED STATES OF AMERICA,

                Appellee,                    Docket No.
                                                22-521-cr

       -against-

LAHEEM JONES,

                Defendant-Appellant.

----------------------------------------x

**APPENDIX**

*Page No.*

Docket Entries. . . . . . . . . . . . . . . . . . . . . A1-24

The Indictment. . . . . . . . . . . . . . . . . . . . A25-36

The Petition to Enter a Guilty Plea . . . . . . . . . . A37-52

The Guilty Plea Agreement . . . . . . . . . . . . . . A53-65

The Change of Plea Hearing. . . . . . . . . . . . . . A66-136

Defendant's Sentencing Memorandum . . . . . . . . . . A137-160

The Government's Sentencing Memorandum. . . . . . . . A161-206

The Sentencing, Volume I. . . . . . . . . . . . . . . A207-360

The Sentencing, Volume II . . . . . . . . . . . . . . A361-522

The Judgment. . . . . . . . . . . . . . . . . . . . . A523-528

The Notice of Appeal. . . . . . . . . . . . . . . . . A529-530

i

1    and deal out of that area and deal for the Greene

2    Homes.

3        Q.    Now, Special Agent Hyde, as you earlier said,

4    you were a -- your original focus was sort of on the

5    courthouse shooting; is that right?

6        A.    Yes.

7        Q.    I'm going to turn your attention to the

8    courthouse shooting.  Do I have you focused on that

9    right now?

10       A.    Yes.

11       Q.    With regard to the courthouse shooting, can

12   you just tell us general types of evidence you looked

13   at?

14       A.    Sure.  It was a two-year long investigation

15   on that and we looked at various different things,

16   but we certainly looked at video camera evidence from

17   closed-circuit televisions from different areas in

18   the city of Bridgeport.  We looked at cell phone data

19   and messages that came from that.  We looked at

20   social media.  We did DNA warrants as well to collect

21   DNA samples and test against certain things.  There

22   was ballistic evidence that we looked at.  There was

23   gunshot residue evidence that we looked at.

24            So I don't want to belabor the point, but

25   there was a mound of evidence that we looked at over

1    that two-year period.

2        Q.    Now, in relation to, you said, cell phone

3    evidence, if I can focus you on that.  Was it just

4    calls or were you able to determine when certain

5    other types of communication were used?

6        A.    Right.  So this shooting in particular

7    occurred and there was multiple people that were

8    involved in the shooting.  So what we did as part of

9    our investigation is we wrote for or Bridgeport wrote

10   for and looked at different cellular data which

11   showed us where cell phones were hitting that were

12   attributable to certain people, where those things

13   were located at the time of the shooting occurring,

14   and we also looked at seized phones and seized

15   Facebook as well that they would use sometimes.

16        The seized phones, we would go into those

17   phones after writing for them looking at the

18   messaging that was going back and forth, the actual

19   words or calls and call detail records, the incoming

20   and outgoing calls, and then we also wrote for their

21   Facebook as well, their social media accounts.  So

22   oftentimes these days, young people will use a

23   Messenger app on their Facebook accounts to

24   communicate with one another and that's what these

25   gentlemen did as well.  So we looked at those

1   messages as well.

2      Q.   Did you amalgamate all this evidence into

3   sort of a time line?

4      A.   I tried my best to, yes.

5         MR. KALE:  And I'm going to ask my colleague

6   to pull up Government's Exhibit 34 for this

7   sentencing hearing.

8   BY MR. KALE:

9      Q.   And this is, I take it, a multipage document;

10  is that right?

11        MR. CROSLAND:  I just want to make the record

12  clear that we're not at the sentencing hearing.

13        THE COURT:  I'm sorry?

14        MR. CROSLAND:  I think it's important to make

15  the record clear that we are not at the sentencing

16  hearing.

17        THE COURT:  Yeah, we are.

18        MR. CROSLAND:  Very well.  Okay.

19  BY MR. KALE:

20     Q.   Is this document that's labeled Government's

21  Exhibit 34, is this the time line you prepared?

22     A.   Yes, it is.  So this was a different time

23  line outline, if you want to call it that, that I

24  prepared during the course of my investigation.

25        THE COURT:  This Exhibit 34, have you given a

1   copy to Mr. Crosland?

2           MS. KAOUTZANIS:  Yes, Your Honor.  It's in

3   the binder on the desk next to him.

4           THE COURT:  And do I have that in the binder?

5           MS. KAOUTZANIS:  Yes, Your Honor.  And we

6   have an extra binder too if anyone needs it.

7           THE COURT:  Go ahead.

8           MR. KALE:  Thank you, Your Honor.

9   BY MR. KALE:

10   Q.   I know you have different dates in here.  I'm

11   going to focus you on January 26, 2020, and

12   January 27, 2020; is that okay?

13   A.   That's okay.  I would just say, so I maybe

14   should have used larger font.  I'm just having

15   trouble.  If this can be expanded on my screen just

16   so I can more readily read it.

17   Q.   Okay.

18   A.   Thank you.

19           MR. KALE:  So I'm going to ask my colleague

20   to turn to page 2 of Government's Exhibit 34.

21           And Your Honor, may I have it in evidence?

22           THE COURT:  Yes.

23           MR. KALE:  Thank you, Your Honor.

24   BY MR. KALE:

25   Q.   Page 2, if we could start at the third line

**A - 279**

73

1   down, what happened at 5:30 p.m. -- is that 5:30, I

2   should say?

3       A.   Yes.  So it's in military time.  So again,

4   this is something that I put together as all these

5   different pieces of evidence is coming in and

6   reviewing these different things that I discussed in

7   terms of as much as a minute-by-minute time line that

8   I could put together so that I could fully understand

9   what transpired both on the day of the courthouse

10  shooting and the night before the courthouse

11  shooting.

12          So this is on January 26, 2020.  So this is

13  the night before the courthouse shooting at 5:30, as

14  you referenced.  And at that point, we had looked at

15  -- and this is all things that we looked at and these

16  are my notes to it, that Asante Gaines, who is a

17  defendant in this case, a member of GHB, does a

18  Facebook Messenger to a woman named Ann Rose and that

19  he's located in the Greene Homes to mean the Greene

20  Homes housing complex.  Mr. Gaines at that time was

21  also on a GPS monitoring and I confirmed that, that

22  that was the case, while looking at his GPS

23  monitoring as well.

24      Q.   And in fact, was he on fairly precise GPS

25  monitoring?

**A - 280**

1    A.    Yes.

2    Q.    And around that time, where precisely did his

3    GPS monitoring show him to be?

4    A.    It's right off of Highland Ave, which is

5    where the Greene Homes is located.

6         THE COURT:  You're going to need to pull that

7    microphone over.

8         THE WITNESS:  I'm sorry, Your Honor.

9         So I looked at where Mr. Gaines was located

10   on his GPS, and specifically, Mr. Gaines at that time

11   was excluded -- the Court had excluded him from being

12   in the Greene Homes housing complex.  So any time --

13   BY MR. KALE:

14   Q.    What does that mean, "excluded"?

15   A.    It means that he was not allowed to go into

16   that area.  So any time the GPS hit in that area, it

17   would create a different color or a different line

18   item showing that he's not supposed to be in that

19   area.  When he would leave, the color would change on

20   the data that I looked at, but specifically, he was

21   in the Greene Homes at that time on GPS monitoring

22   right off of Highland Ave, which is where the Greene

23   Homes housing complex is located.

24   Q.    And seven minutes later, what happens in the

25   Greene Homes?

1    A.    Sure.  So after telling two women that he's

2    in Greene Homes at the time and confirming that, as

3    well as an associate of his, at 17:37, so 5:37 p.m.,

4    that is when Myreke Kenion is murdered right outside

5    the Greene Homes housing complex.

6    Q.    In fact, was he murdered on Highland Avenue

7    in front of Junco's Market?

8    A.    Yes.

9    Q.    Now, after that murder, do you see messages

10   from co-defendants and Mr. Jones about the murder?

11   A.    Yes.

12   Q.    And I'm going to specifically turn you to the

13   entry next to 20:25.  Is that 8:25 p.m.?

14   A.    Yes.

15   Q.    And can you explain to the Court what was

16   happening at 8:25 p.m. based on your investigation?

17   A.    So there's various messages that are going on

18   between the co-defendants in this case, but

19   specifically at 20:25, they are starting to -- and

20   they've done it a little bit before, they're starting

21   to talk about the homicide of Myreke Kenion.  And at

22   20:25, my investigation revealed that Laheem Jones

23   used Facebook Messenger again.  He Facebooks another

24   co-defendant, Asante Gaines, at that time and writes

25   to Asante Gaines:  On Kah, I'm heartbroken man, he

1    was my little circle.

2        Q.    And do you know what "Kha" means?

3        A.    So "Kha" is in reference to a former GHB

4    member named Khalil Diaz.  He was an influencer in

5    the group and when he was killed, he's elevated his

6    status within the group.  So you'll see often

7    messages between GHB members and when they say, "on

8    Kah," it's supposed to basically say -- like, to

9    provide emphasis that -- you know, that on my life or

10   on my fallen brother's life and then something

11   substantial after.

12       Q.    And just so -- it's a little above, so I

13   don't need to go into that.  And then I'll fast

14   forward you to 11:25 p.m. that evening.

15       A.    Okay.

16       Q.    Can you explain to the Court the message that

17   Laheem Jones sends out on Facebook at that time?

18       A.    Sure.  So during that period --

19           MR. CROSLAND:  Objection, Your Honor.  He

20   said whether Laheem Jones sent this out.  Can he

21   explain what this is?

22           THE COURT:  Your question was -- why don't

23   you go back.

24           MR. KALE:  Sure.

25   BY MR. KALE:

1      Q.    At -- at 11:25 p.m., what, if any,

2    communication do you see from Mr. Jones?

3      A.    There's a Facebook message.

4      Q.    And what does the Facebook message say?

5      A.    So Laheem Jones is writing a Facebook message

6    to another individual by the Facebook name of Rpn Dom

7    and he states:  Bro, if light come out, someone going

8    to find it, bro, you gotta be on it, we need that,

9    that's the last gun he had too, I'll give you money

10   if it's not there.

11     Q.    And what is your understanding of what he's

12   referring to there?

13     A.    So my understanding from the investigation is

14   that when Myreke Kenion was killed, that the group

15   that he was with had at least one or two firearms on

16   their persons, and in the hectic aftermath of the

17   shooting, Myreke being shot there on the street and

18   dropping on the street, that there may have been a

19   gun lost at that time that was kicked out in the

20   street.  And so my understanding was that they were

21   concerned about if the sun came up the next morning,

22   that someone, probably the police, were going to find

23   the gun and he was concerned that they needed that

24   gun or a gun at that time, if they didn't have that,

25   Mr. Jones was going to provide money to purchase a

1  firearm.

2          MR. KALE:  Now, I'm going to ask my colleague

3  to highlight the bottom half of this page 2 from

4  1/27/20 on or the whole.

5  BY MR. KALE:

6      Q.   So even after midnight, are GHB members or

7  co-defendants messaging each other?

8      A.   Yes.  It goes on throughout that night of the

9  26th through that early morning of the 27th, the day

10  of the courthouse shooting.

11      Q.   Now, I'm going to turn your attention to

12  10:23 p.m. -- a.m., sorry.  It is a.m.; is that

13  right?

14      A.   Yes.

15      Q.   And there's two entries, two things are

16  happening at once; is that fair to say?

17      A.   Yes.

18      Q.   I'll turn your attention to the second entry.

19  What is that?

20      A.   So that is a message that Mr. Jones posted on

21  his social media and it's a reference to the death

22  the night prior of a member of GHB, a young member of

23  GHB, Myreke Kenion, who was killed.

24      Q.   And does he use a short form for Mr. Kenion,

25  "Rek"?

1    A.    Yup -- yes, I should say, so Rek is in

2    reference to Myreke Kenion.

3          MR. KALE:  Now, I'm going to ask my colleague

4    to turn to page 3 and just highlight the first six or

5    seven messages.

6    BY MR. KALE:

7    Q.    I'm going to start you at the top.  At 10:59,

8    do you see any message from Asante Gaines to someone

9    else?

10   A.    I do.

11   Q.    And can you explain to the Court what that

12   message was?

13   A.    Sure.  So that is a message from Asante

14   Gaines in a chat that we located by looking through

15   the evidence that we obtained and it was a message to

16   Joshua Gilbert about what Mr. Gaines had knowledge of

17   at that time at 10:59 in the morning, specifically

18   that he was telling Mr. Gilbert that he was -- about

19   putting people on the news and stating specifically

20   that "Tre and JD at court."

21   Q.    Now, who is Joshua Gilbert, to your

22   knowledge?

23   A.    That is an O.N.E. gang member from the city

24   of Bridgeport that GHB is allied with.

25   Q.    Is it fair to say they were aligned at that

```
 1  time?

 2      A.   Yes.

 3      Q.   Now, what is your understanding from speaking

 4  with witnesses and other law enforcement about what

 5  is meant by putting people on the news?

 6      A.   That they were going to commit a shooting or

 7  try to commit a homicide and that that would

 8  obviously garner a lot of media attention.

 9      Q.   And do you know who Tre and JD are?

10      A.   Trevon Wright and Jaheim Warren.

11      Q.   And just so the record is clear, is it Trevon

12  Wright?

13      A.   Wright, sorry.

14      Q.   And what do you know by "at court"?

15      A.   Specifically referencing that Gaines had

16  knowledge that they were at the GA2 courthouse in the

17  city of Bridgeport.

18          MR. KALE:  Now, going down, a bit down to

19  11:26 a.m., again -- actually, before that to

20  11:24 a.m., if you can actually expand that a little

21  bit.  I apologize.  My fault.

22  BY MR. KALE:

23      Q.   At this point, do you know where Mr. Gaines

24  is located?

25      A.   Yes.
```

1      Q.    Where was he at that point?

2      A.    He's in the Hollow section of Bridgeport,

3   more specifically in the Greene Homes housing

4   complex.

5      Q.    And how do you know that?

6      A.    So two different -- well, actually, three

7   different avenues for that, the first being that

8   Mr. Gaines was on GPS monitoring which showed that he

9   was there at that time.  The second thing is

10  Mr.  Gaines had at least two cell phones on him at

11  that time with both the data, the cellular data,

12  showed that he was in the area at that time.  And

13  also, him jumping on a phone call at that time and

14  saying that he was in that area.

15     Q.    Now, at 11:26, you say he jumped on a phone

16  call.  With whom did he jump on a phone call?

17     A.    So there was an inmate at the Connecticut

18  Department of Corrections that had called Mr. Gaines.

19  We heard that call and I was able to listen to it as

20  part of this investigation and Mr. Gaines was with

21  Mr. Jones at that time when they received a call from

22  an inmate by the name of Shajuan Perry.

23     Q.    And is that S-H-A-J-U-A-N?

24     A.    Yes.

25     Q.    And Perry is P-E-R-R-Y?

1     A.    Yes.

2     Q.    Now, I'm going to ask -- we don't have to

3  play the whole thing, but the audio, was that

4  recorded by Connecticut Department of Corrections?

5     A.    That's correct.  So every call I've ever

6  listened to that originates from Connecticut

7  Department of Corrections, it always has a preamble

8  before the inmate will get on saying this call is

9  recorded, and then throughout the call, there's a

10  constant beep that occurs momentarily throughout that

11  indicating that it's still being recorded so the

12  person on the phone call knows that that's the case.

13        MR. KALE:  So at this time, I move to admit

14  Government's Exhibit 25 into evidence for the FATICO

15  hearing, the audio.

16        THE COURT:  Exhibit 25 is the audio from the

17  Perry call at the correctional facility; is that

18  correct?

19        MR. KALE:  Yes, Your Honor.

20        THE COURT:  It's an exhibit.

21  BY MR. KALE:

22     Q.    And then may I -- did you prepare a

23  transcript or did you have people prepare a

24  transcript of that call?

25     A.    Yes.

1      Q.   And have you previously looked at what has

2   been marked as Government's Exhibit 25T?

3      A.   Yes.

4      Q.   And is that a fair and accurate transcript of

5   the call?

6      A.   Yes, it is.

7      Q.   But we haven't been able -- we haven't paired

8   it; is that fair to say?

9      A.   Yes.

10          MR. KALE:  Your Honor, I'd also move to admit

11   for the FATICO hearing purposes Government's

12   Exhibit 25T.

13          THE COURT:  All right.

14          MR. KALE:  So I'm going to ask my colleague

15   to start around the bottom of page 3.

16          THE COURT:  Am I to find that in my notebook?

17          MR. KALE:  Yeah.  Under 25T, page 3.

18          So we're going to play the audio starting at

19   the bottom of page 3 and just play a short portion.

20          (Audio played.)

21          MR. KALE:  Sorry.  We're starting at page 2,

22   Your Honor.

23          (Audio played.)

24   BY MR. KALE:

25      Q.   Again, this call started around 11:26 a.m.;

**A - 290**

```
 1   is that right?

 2       A.    Yes.

 3       Q.    And it was Asante Gaines -- it was a call to

 4   Asante Gaines' phone?

 5       A.    Yes.

 6       Q.    Asante Gaines says:  Heemie's here.  Do you

 7   understand who Heemie was?

 8       A.    Yes.

 9       Q.    And who was that?

10       A.    That's Mr. Jones.

11       Q.    So Mr. Jones was with Asante Gaines at that

12   point?

13       A.    Yes.

14       Q.    And again, Asante Gaines at that point was

15   located in the Greene Homes?

16       A.    That's correct.

17       Q.    Okay.  Now, does, in fact, later in the

18   conversation Mr. Jones give Mr. Perry his phone

19   number?

20       A.    Yes.

21       Q.    And was it a phone number starting with area

22   code 305?

23       A.    Yes, it was.

24       Q.    Now, rather than play this whole

25   conversation, do you at a certain point hear a door
```

1    slamming?

2         A.    Yes.

3         Q.    How many doors do you hear slamming in the

4    call?

5         A.    Two.

6         Q.    And what time -- I'm going to look at your

7    time line again.

8              MR. KALE:  If I can ask my colleague to go

9    back to Government's Exhibit 34 in evidence at page 3

10   and go from 11:36 -- we can block out from 11:36 on

11   and a little bit.

12   BY MR. KALE:

13        Q.    Do you hear the two doors slamming around

14   11:36 a.m.?

15             MR. CROSLAND:  Objection on leading.

16             MR. KALE:  I'll rephrase, Your Honor.

17   BY MR. KALE:

18        Q.    When do you hear the two doors slamming?

19        A.    At 11:36.

20        Q.    Now, how far is the Greene Homes from the

21   Golden Hill courthouse?

22        A.    It's very close.  So the Greene Homes housing

23   complex abuts Route 8.  So all you have to do, if you

24   could, is just cross over Route 8 and you're only

25   about two blocks away from the GA2 courthouse located

1   on Golden Hill Ave.

2       Q.    Now, you have here 11:37, blue Volkswagen

3   Golf parked on Golden Hill Street.  Can you explain

4   to the Court what that means?

5       A.    Sure.  So as part of this investigation, we

6   determined that there was multiple vehicles that were

7   involved in the courthouse shooting, one of those of

8   which is the blue Volkswagen Golf.  We determined

9   that to be essentially the spotter car for what

10  happened on that day and we were able to grab certain

11  video and certain still video from that morning

12  showing that that blue Volkswagen came in and parked

13  just up the hill on Golden Hill from the GA2

14  courthouse.

15      Q.    So just to be clear -- and I should go back.

16  Just going back to that phone conversation, does

17  Laheem Jones talk to Mr. Perry for a while?

18      A.    Yes.

19      Q.    So --

20          MR. CROSLAND:  Objection as to "a while."

21  BY MR. KALE:

22      Q.    Does Mr. Jones speak to Mr. Perry for the

23  bulk of that ten-minute conversation?

24          MR. CROSLAND:  Objection, Your Honor, as to

25  "bulk."

1        THE COURT:  More than half, three quarters,

2   or what percentage of the conversation did Mr. Jones

3   speak to Mr. Perry?

4        THE WITNESS:  I don't recall the exact

5   percentage.  I apologize, Your Honor.

6   BY MR. KALE:

7   Q.   No problem.  Was it more than a minute?

8   A.   Yes.

9   Q.   And the call doesn't end when the two doors

10  are heard slamming, does it?

11  A.   It ends briefly after that.

12  Q.   Soon after that?

13  A.   Yes.

14  Q.   Okay.  So 11:36 is when the doors are

15  slamming, and 11:37 is when the blue Volkswagen Golf

16  is in the Golden Hill Street?

17  A.   Yes.

18  Q.   And through your investigation, did you

19  determine who was in the Volkswagen Golf?

20  A.   Yes.

21  Q.   Who was in there?

22  A.   Asante Gaines was located in the Volkswagen

23  Golf, Destine Calderon was located in the Volkswagen

24  Golf as a driver, his half-brother, Diomie Blackwell,

25  was located in the Golf as well.

1    Q.    And you said Mr. Blackwell.  A few minutes

2    later, if I can turn your attention to, it's on the

3    screen, 11:44 -- or actually, sorry, 11:39, so a

4    minute after they get there, what, if anything, does

5    Mr. Blackwell do?

6    A.    Sure.  So Mr. Blackwell is a co-defendant in

7    this case.  He can be seen on video from the

8    courthouse outside.  He exits that Volkswagen Golf

9    and you can see him coming down the street and then

10   going up the courthouse steps into the courthouse

11   itself.

12   Q.    And at this point, what does Mr. Gaines' GPS

13   -- where does it show him to be?

14   A.    So the data that we looked at shows that he

15   is -- his phones are in the area of the GA2

16   courthouse at that time.

17   Q.    Now --

18   A.    And I should say, and I apologize, Attorney

19   Kale --

20        MR. CROSLAND:  Objection.  No question

21   pending.

22        THE COURT:  Sustained.

23   BY MR. KALE:

24   Q.    And how else do you know Mr. Gaines was at

25   the Golden Hill courthouse?

1     A.    Thank you.  His GPS.

2     Q.    Now, approximately five minutes later, you

3  have here 11:44.  What happens at 11:44?

4     A.    So at 11:44, Mr. Blackwell can be seen on

5  video footage inside of the courthouse making a

6  FaceTime call at that period.  So Mr. Blackwell goes

7  into the courthouse, checks the court docket for that

8  day.  You can actually see in that video that the two

9  victims, Tre and JD, or Trevon Wright and Jaheim

10  Warren, are in the video at some point and he walks

11  right by them and then proceeds to go up to -- it's a

12  criminal defense attorney area where they have

13  offices and meeting locations that they can meet with

14  people that are there at court that they're

15  representing and he makes a call on his phone.  You

16  can see him looking down at the phone and talking to

17  his phone for a period of about two minutes and

18  23 seconds.

19     Q.    And were you able to do a phone analysis --

20  forensic analysis of Asante Gaines' phone?

21     A.    Yes.

22     Q.    From that forensic analysis, were you able to

23  determine who Diomie Blackwell was contacting for

24  those two minutes and 23 seconds starting at

25  11:44 a.m.?

1    A.    We determined he was calling Mr. Gaines,

2  talking to Mr. Gaines via FaceTime.

3            THE COURT:  Keep your voice up, please.

4            MR. KALE:  Sorry.  If you can pull the

5  microphone closer.

6            THE WITNESS:  Sure.  We determined, Your

7  Honor, that he was calling Mr. Gaines using FaceTime.

8  BY MR. KALE:

9    Q.    And subsequent to this between 11:45 and

10  11:50, are various co-defendants contacting each

11  other?

12    A.    Yes.

13    Q.    And I'm going to turn you to the very bottom

14  of this page, basically the last two entries here.

15  Do you see those last two entries?

16    A.    I do.

17    Q.    There's one at 12:05.  Can you explain to the

18  Court what your investigation revealed about that

19  entry?

20    A.    Sure.  So the important time to note in this

21  reference is that at 12:11, the courthouse shooting

22  actually occurs.  So at the bottom of this page, you

23  can see I made a note that at 12:05, our

24  investigation revealed that Asante Gaines FaceTimes

25  Laheem Jones for a minute and two seconds, and then

1    again two minutes later at 12:07, Asante Gaines

2    FaceTimes Laheem Jones for 19 seconds.

3            MR. KALE:  And if I can ask my colleague to

4    indulge me and turn to page 4 of the exhibit.

5    BY MR. KALE:

6        Q.   If we can just look at the top five or six

7    lines.  That top line, is this another FaceTime

8    contact between Asante Gaines and Laheem Jones?

9        A.   Yes.

10       Q.   And what time was that?

11       A.   So that's at 12:08.  So this is three minutes

12   prior to the shooting and Asante Gaines FaceTimes

13   Laheem Jones for 51 seconds.  So that's a total of

14   three different FaceTime calls from Asante Gaines --

15   in between Asante Gaines and Laheem Jones totaling

16   more than two minutes.

17       Q.   And I'm going back and I know -- I'm just

18   sort of -- to be sure, back at 10:59, Mr. Gaines had

19   said he was going to put some people on the news; is

20   that right?

21       A.   That's correct.

22       Q.   And said JD and Tre are at court?

23       A.   Yes.

24       Q.   So this is about an hour and eight minutes

25   later?

1      A.    Give or take, yes.

2      Q.    Now, what happens at 12:11?  You kind of

3    mentioned it earlier but if you can reiterate.

4      A.    Yes.  Thank you.  So at 12:11 is when the

5    courthouse shooting occurs.  We know that time

6    because the City of Bridgeport has a ShotSpotter

7    activation at that time for the amount of shots that

8    were fired at that time, which is approximately 21 or

9    22 shots.  That goes off and gives us a time stamp at

10   12:11 on that afternoon.

11     Q.    Now, is there also an audio recording from

12   inside the courthouse of the shooting?

13     A.    Yes.

14     Q.    And do you recall a judge saying that it's

15   12:13?

16     A.    Yes.

17     Q.    But that's fairly close to 12:11?

18           MR. CROSLAND:  Objection to that whole

19   section.  Leading, Your Honor.  I ask that it be

20   stricken.

21           MR. KALE:  Your Honor, this is a sentencing

22   hearing.

23           THE COURT:  Is there an audio recording, yes,

24   that's not going to get stricken.  Do you recall that

25   the judge said it's 1213, you need to clarify that

1   and I will strike that's fairly close to 12:11.

2          MR. KALE:  Your Honor, if I could ask my

3   colleague to pull up Government's Exhibit 1.  Your

4   Honor, this has previously been played before this

5   Court, but it's an audio recording from *Connecticut v*

6   *Bianco* that was taken by a court reporter.  I'd move

7   for it to be admitted again to this sentencing

8   hearing.

9          THE COURT:  It may be.

10          MR. KALE:  If I can ask my colleague to

11   indulge me and play Government's Exhibit 1.

12          (Audio played.)

13   BY MR. KALE:

14     Q.   Just for the record, did you hear the judge

15   mention 12:13?

16     A.   Yes, I did.

17     Q.   Now, at 12:14, going back to Government's --

18          MR. KALE:  And I apologize to my colleague.

19   Going back to Government's Exhibit 34 in evidence, if

20   we can go back -- if we can kind of blow up the area

21   from 12:13 down to 12:21.

22   BY MR. KALE:

23     Q.   At 12:14, two things are happening.  Can you

24   explain to the Court why you have these two different

25   things happening at 12:14?

1    A.    Sure.  So the first thing that's happening at

2    12:14 that my investigation -- our investigation

3    found is that Asante Gaines is trying to FaceTime

4    Laheem Jones, but that attempt at 12:14, according to

5    the data that we looked at, Mr. Jones does not

6    answer.  At that time, based on video that we

7    obtained from Hidalgo Market located in Bridgeport,

8    Connecticut, that's close by the courthouse, Laheem

9    Jones can be seen purchasing bleach and lighter fluid

10   from that market at that time.

11       Q.    Just to be sure, Mr. Jones was with

12   Mr. Gaines up until about 11:36 or so at least?

13       A.    Yes.

14       Q.    And while he's not answering his cell phone,

15   what is Mr. Jones doing again?

16       A.    Mr. Jones is inside the store purchasing the

17   bleach and the lighter fluid from the market.

18       Q.    And then when does Mr. Jones actually put the

19   bleach into the car he's driving?

20            MR. CROSLAND:  Objection.  Assuming facts not

21   in evidence.  He never testified that Mr. Jones put

22   anything in the car.

23            THE COURT:  Okay.  Go back one step.

24   BY MS. KAOUTZANIS:

25       Q.    You said you saw the video from the Hidalgo

```
 1   Market?

 2       A.    Yes.

 3       Q.    What exactly does Mr. Jones do in the Hidalgo

 4   Market?

 5       A.    So there's a view from behind the counter, so

 6   you can see what he's purchasing, and he purchases

 7   bleach in the small, white bottle, I think it's

 8   Clorox, and he purchases lighter fluid from the clerk

 9   in there and then exits the store.  There's an

10   outside view and you see him get into a vehicle and

11   drive off.

12       Q.    And what time does he seem to get into the

13   vehicle?

14       A.    So it's three minutes later and that occurs

15   at 12:17.

16       Q.    And after he gets into the vehicle, does he

17   contact Asante Gaines?

18       A.    He does.

19       Q.    And for how long does he contact Asante

20   Gaines?

21       A.    So they speak after that for 19 seconds and

22   they use FaceTime again to communicate.

23       Q.    Now, again, they've been using FaceTime,

24   based on your investigation, since before the

25   shooting; is that right?
```

**A - 302**

96

1      A.    Yes.

2      Q.    To communicate?

3      A.    Yes.  So they've been together in person face

4  to face.  They use FaceTime to communicate before the

5  shooting actually occurs.  Now, the shootings have

6  occurred and they're FaceTiming after as well.

7      Q.    And were you able to find video surveillance

8  of where Mr. Jones went next?

9      A.    Yes.

10     Q.    And where did Mr. Jones go next according to

11 your investigation?

12     A.    He went to a Mobil Gas Station that's located

13 a little bit further west in the city of Bridgeport.

14     Q.    And was there video from that Mobil Gas

15 Station?

16     A.    Yes, there was.

17     Q.    And what, if anything, does Mr. Jones do at

18 that Mobil Gas Station?

19     A.    Mr. Jones parks the vehicle that he's driving

20 outside next to one of the pumps.  He enters into the

21 store.  He proceeds to go to part of the store where

22 there's gas canisters that are located for purchase.

23 He purchases one of the red gas containers and then

24 goes outside to fill up the gas container.  Mr. Jones

25 on video realizes that he's not paid for the gas, so

1   he goes back into the store to the clerk, gives the

2   clerk more money so he can pump gas at the pump, and

3   then proceeds to fill up that gas can and then leave.

4       Q.   I know I'm jumping ahead.  You mentioned a

5   bleach container.  Where was this bleach container

6   found later?

7       A.   It was found outside a vehicle that was

8   burned up in Naugatuck, Connecticut.

9       Q.   And you mentioned this gas tank.  What color

10  was it?

11      A.   It was a red gas can.

12      Q.   And where was this gas can found?

13      A.   That was located inside the vehicle, which is

14  a Subaru Forester, that was attempted to be burned up

15  in Naugatuck.

16      Q.   Now, I'm going to turn your attention to

17  around the same time on our time line back on

18  Exhibit 34.

19          MR. KALE:  If I can have my colleague drop

20  down to the bottom half of the page 4 of Exhibit 34.

21  Actually, if we can go up two lines.  I apologize.

22  My fault.

23  BY MR. KALE:

24      Q.   So at the same time or immediately after

25  Mr. Jones purchases the gasoline, does Mr. Gaines do

1   any sort of web search?

2       A.    Yes.

3       Q.    What does he do a web search of?

4       A.    So at 12:26, he searches the web for the

5   courthouse shooting eight times.

6       Q.    Now, going to the bottom here, there's a sort

7   of conversation there.  Based on your investigation,

8   when was the next point at which Mr. Jones and

9   Mr. Gaines spoke?

10      A.    So they spoke between --

11      Q.    I apologize.  Communicated, I should say.

12      A.    Sure.  So they communicated between the time

13  of 12:34 and 12:37 that afternoon.

14      Q.    And what was going on in this communication?

15      A.    There was both text messages and FaceTimes

16  between Mr. Jones and Mr. Asante Gaines referencing

17  them meeting up at the Walmart located up in

18  Naugatuck.

19      Q.    Okay.  And I know this part is not in dispute

20  so I won't go into it, but they go up to Naugatuck;

21  is that correct?

22      A.    Right.  So there's several vehicles that are

23  involved, that blue Volkswagen that we referenced

24  earlier, the Subaru Forester which is the car that

25  was actually used by the shooters, there's Mr. Jones'

1    vehicle that he's driving at that time, and there's

2    also a Dodge Charger that's driven by Mr. Blackwell.

3    All four of those vehicles head on Route 8 northbound

4    to meet up up in Naugatuck so that they can burn the

5    car.

6        Q.    Now, going back, this text message

7    conversation at 12:34 to 12:37, is that the

8    discussion that's happening here?

9        A.    Yes.

10           MR. CROSLAND:  Objection.

11           THE COURT:  I'm sorry.  "The text message

12    conversation at 12:34 to 12:37, is that the

13    discussion that's happening here," what does that

14    mean?

15           MR. KALE:  I apologize.  I'll rephrase that,

16    Your Honor.

17    BY MR. KALE:

18        Q.    On page 4 of Government's Exhibit 34 in the

19    line that says 12:34 to 12:37, you said there's been

20    text messages between Laheem Jones and Asante Gaines;

21    is that right?

22        A.    That's correct.

23        Q.    Is what you have below the 12:34-12:37, is

24    that the content of the text messages?

25        A.    Right.  That's the content of the text

1   messages between Mr. Jones and Mr. Gaines during that

2   time period.

3      Q.   Now, Exit 16, do you know what Exit 16 on

4   Route 8 is or what town it's in?

5      A.   I don't.

6      Q.   Is it in Bridgeport?

7           MR. CROSLAND:  Objection.  He just said he

8   doesn't know.

9           THE COURT:  Sustained.

10  BY MR. KALE:

11     Q.   And do you see there's an address given, 1100

12  New Haven Road, Naugatuck?  Do you see that?

13     A.   Yes.

14     Q.   What is located at 1100 New Haven Road,

15  Naugatuck?

16     A.   There's a Walmart located there.

17     Q.   Okay.  And are Mr. Gaines' and Mr. Jones'

18  cars seen later at that Walmart?

19     A.   Yes.

20     Q.   Together?

21     A.   They were seen leaving together and from that

22  location.

23     Q.   Now, I'm going to -- was a cellular analysis

24  survey team report prepared analyzing Mr. Jones' cell

25  site information?

1      A.    Yes, it was.

2      Q.    On this -- at the time of the courthouse

3  shooting?

4      A.    Yes.

5          MR. KALE:  I'm going to ask my -- Your Honor,

6  I'm going to move to admit Government's Exhibit 24,

7  which is the FBI task presentation.

8          THE COURT:  I don't seem to have 24.

9          MR. KALE:  Your Honor, may I approach?

10          THE COURT:  I'm thinking we should take a

11  five-minute recess.  Do you mind?

12          MR. KALE:  Not at all, Your Honor.

13          (Recess taken.)

14          THE COURT:  Please be seated, ladies and

15  gentlemen.

16          Mr. Kale, I do have Exhibit 24.  What did you

17  want to do it with it?

18          MR. KALE:  Your Honor, I'm moving to have it

19  as a full exhibit, Your Honor.

20          THE COURT:  Fine.  I think we need a witness.

21          MR. KALE:  Yes.

22          THE COURT:  All right.  You may proceed.

23          MR. KALE:  Thank you, Your Honor.

24  BY MR. KALE:

25      Q.    As part of the investigation, did Special

 1    Agent James Wines of the FBI prepare a cellular

 2    analysis survey team report about Mr. Jones' cell

 3    phone?

 4        A.    Yes.

 5        Q.    And was that cell phone number 305-975-9027?

 6        A.    Yes, it was.

 7        Q.    And just going back, was that the same number

 8    that Mr. Jones gave to Shajuan Perry in the phone

 9    call we heard part of earlier?

10        A.    That's correct.

11            MR. CROSLAND:  I'm going to object.  If this

12    is an Agent Wines' report, then Agent Wines should be

13    testifying.

14            THE COURT:  They're just talking about the

15    similarity of the telephone number.

16            MR. CROSLAND:  Maybe I'm just lost on that.

17    I'll let the Court -- I'm going to listen.  I thought

18    this was testifying to something on the report.  I'll

19    withdraw it.

20    BY MR. KALE:

21        Q.    Have you spoken with Special Agent Wines

22    about how he prepared this report?

23        A.    Yes.

24            MR. CROSLAND:  Renewed objection.  I think

25    this is exactly what we're going to do.  He's

 1  testifying about Agent Wines' report.

 2          THE COURT:  He's going to testify from the

 3  report that's right here.  I'm going to let him do

 4  that.

 5          MR. CROSLAND:  Note my objection for the

 6  record.  Thanks.

 7          MR. KALE:  I'm going to ask my colleague to

 8  turn to page 8 of Government's Exhibit 24 in

 9  evidence.

10  BY MR. KALE:

11      Q.   And is this -- can you describe to the Court

12  what was included in this report on page 8?

13      A.   Sure.  So we provided the raw data to

14  generate this report from the different various

15  warrants we looked at and the evidence we obtained as

16  part of this investigation.  And on page 8 in

17  preparing for trial, a portion of this report was

18  prepared so that you can understand different

19  landmarks that were important on the day of the

20  courthouse shooting.

21          So what we're looking at there on page 8 is a

22  legend where it shows the different color codes for

23  the courthouse, the location of the market that

24  Mr. Jones purchased bleach and lighter fluid from,

25  the gas station he purchased gas from, the Walmart

1   where everyone met up after the shooting, and then

2   where they attempted to burn the car, the Subaru

3   Forester.

4          MR. CROSLAND:  They're referring to page 8

5   and I don't see a page 8.  The page 8 that I have

6   doesn't refer to what the witness is talking about,

7   so I'm a little lost.

8          MR. KALE:  Government's Exhibit 24, page 8.

9          MR. CROSLAND:  Thank you, Judge.

10  BY MR. KALE:

11     Q.   And then just briefly going to page 31 of

12  Government's Exhibit 24.  Again, I can read from

13  this, it says:  The following slides show LTE data

14  activity for 305-975-9027; is that correct?

15     A.   Yes.

16     Q.   What's LTE data?

17     A.   So LTE data is certain data that comes in

18  from the cell phones, so a request from the carrier,

19  in this case for Mr. Jones' phone, it was Sprint.

20  And it's the data from how the cell phone is hitting

21  the towers back and forth.  And specifically, there's

22  certain carriers, like Sprint here, or Verizon that

23  we wrote for for other phones that will give more

24  accurate analysis to us for how far away a phone is

25  in particular to a cell tower.

1          So Sprint gives us something additionally

2     hear called PCM or per call measurement data and that

3     is a more accurate analysis that we were able to look

4     at to determine where that phone may be located and

5     to explain in that slide.

6          Q.   And it mentions towards the bottom

7     curved-gray shapes.  What does that mean?

8          A.   So when the team gets the raw data and they

9     analyze it for where the phone is hitting, the curved

10    gray shapes are basically an area that they determine

11    is a possibility of where that phone may be located

12    at that time.  So you have a cell phone tower.

13    There's slides in here to kind of explain it more,

14    what I'm talking about, but a cell tower will

15    broadcast or receive information from a certain

16    sector and when they find that sector from the

17    ingoing and outgoing calls or data that's coming from

18    the phone, the PCM data can say that that phone is

19    located a certain mileage away or a measurement away

20    from that cell tower.

21          So what they do is they take that point and

22    they bust it out point one and bring it in point one

23    and that's basically the scope of anywhere that phone

24    can be found when that data comes in.

25          Q.   And when you say, "point one," what

**A - 312**

```
 1   measurement are you referring to with point one?

 2       A.    That's the gray point one miles.

 3       Q.    Is it miles?

 4       A.    Yes.

 5             MR. KALE:  Okay.  Now, I'm going to turn your

 6   attention -- or ask my colleague to turn to page 32

 7   of Government's Exhibit 24 in evidence.

 8   BY MR. KALE:

 9       Q.    Again, is this showing phone activity for

10   Mr. Jones' phone as it says right here?

11       A.    Yes.

12       Q.    What time is it showing activity from?

13       A.    This is at 11:32 in the morning of the

14   courthouse shooting and Mr. Jones' phone is

15   communicating with that cell tower located in the

16   exhibit.

17       Q.    And then there's sort of -- it almost looks

18   like a baseball diamond?

19       A.    Right.

20       Q.    Can you just briefly, after your conversation

21   with Special Agent Wines, what that means?

22       A.    Sure.  So cell towers like this one, and

23   there's various different types of cell towers, but

24   cell towers will usually have the ability to go 360

25   degrees.  So they usually break it up into three
```

 1    different sectors, 120, 120, 120.  So when Mr. Jones'

 2    phone is communicating with that cell tower, there's

 3    a direction that it's communicating with.  So that

 4    particular cell tower, that 120 degree that they have

 5    right there on the cell tower, is the part that's

 6    communicating.  So it gives a direction of where the

 7    phone is.  So you start with the direction and then

 8    when you add in the PCM data, you have a distance.

 9       Q.    Now, you mentioned that gray curve.  There's

10    obviously a gray curve here.  What again does the

11    gray curve show in this slide?

12       A.    Sure.  So as I described before to the best

13    of my ability, that is showing the PCM data.  So we

14    know that Mr. Jones' phone is communicating with that

15    cell tower and essentially that phone can be located

16    anywhere within that PCMD range.  So you see at the

17    bottom it says 1.07 miles.  Sprint has determined

18    that when Mr. Jones' phone calls that cell tower,

19    it's approximately 1.07 miles away, and when you take

20    that 120 degrees, that's where you get that

21    gray-shaded area, the point one plus, point one

22    minus, that it's somewhere in that area.

23       Q.    So what, if anything, does it tell you about

24    where Mr. Jones' cell phone was?

25       A.    So that's where we would look if we were

 1   trying to track the cell phone, and we do that on

 2   occasion to try to locate fugitives or people with

 3   arrest warrants.  But what that tells me is that

 4   Mr. Jones' phone is located in the Greene Homes at

 5   that time at 11:32.  So it's a little bit difficult

 6   to see, but you see the red indicator for the

 7   courthouse.  Just a couple blocks away, obviously, is

 8   the Greene Homes housing complex and that's located

 9   on Highland Avenue.  So if you look just underneath

10   where it says the Hollow, you can see Highland Ave

11   and Mr. Jones' phone is within that area.

12        Q.    And you also knew, as you earlier testified

13   before the break, that Mr. Jones was with Mr. Gaines

14   at around 11:32 a.m.?

15        A.    That's correct.

16        Q.    And Mr. Gaines had GPS showing exactly where

17   he was?

18        A.    Yes.

19        Q.    And where was he?

20        A.    He was in the Greene Homes.

21        Q.    So is that why you were -- he could be

22   anywhere in the gray area, but based upon that other

23   knowledge --

24             MR. CROSLAND:  Objection.  Compound.

25             MR. KALE:  Again, Your Honor, it's a

```
 1   sentencing hearing.

 2          THE COURT:  Can we just finish the question?

 3   BY MR. KALE:

 4     Q.   What are you basing your conclusion that he

 5   was in the Hollow on?

 6          MR. CROSLAND:  Objection.  I just want to

 7   state for the record, Your Honor, this is a

 8   sentencing hearing.  This is the evidentiary portion

 9   and if the rules of evidence don't apply, then please

10   let me know.

11          THE COURT:  They don't.

12          MR. CROSLAND:  This is the evidentiary

13   portion, so we don't have no rules?

14          THE COURT:  The limitations of the federal

15   rules of evidence do not apply, correct.

16   BY MR. KALE:

17     Q.   Why do you say he's in the Hollow?

18     A.   Sure.  So you can't just look at one set of

19   data.  So when you look at Mr. Jones' phone, I know

20   that from the data that's been provided from Sprint

21   in the PCM that it can be anywhere within that band.

22   So again, it's not exactly precise.  They can't put

23   it down to the exact, you know, inch of ground that

24   it's on, but they can say it's within this area.  So

25   that covers that section.
```

 1          When you look at this data, in addition to

 2     the call that was made from Shajuan Perry to

 3     Mr. Jones and to Mr. Gaines, them saying that they

 4     were in that area, and then you look at also the GPS

 5     monitoring of Mr. Gaines at that time being in that

 6     area, I can conclusively say that they were together

 7     based on the call and that the phone that Mr. Jones

 8     had on him was in that area at that time.

 9          MR. KALE:  I'm going to ask my colleague now

10     to turn to page 33 of Government's Exhibit 24 in

11     evidence.

12     BY MR. KALE:

13     Q.    As the slide says, it covers between 11:45

14     and 12 p.m.; is that correct?

15     A.    That's correct.

16     Q.    And there seems to be three different cell

17     phone towers playing here?

18     A.    Yes.

19     Q.    Can you explain what this is showing?

20     A.    So that is showing that between 11:45 and

21     12 p.m. on the morning of the courthouse shooting,

22     which occurred at 12:11, but at that period of time,

23     15 minutes, Mr. Jones' phone is hitting off of three

24     different cell towers located in the city of

25     Bridgeport and there is an area that is important

1   based on when you look at the PCM data of the three

2   different cell towers during that 15-minute interval.

3       Q.   And what is that area that's important?

4       A.   Again, by looking at this data, you can kind

5   of see some overlap.  So that allows you to look at

6   three different data sources and say there is an

7   excellent chance that that phone is located where all

8   those things coincide.  And so again, all those

9   things coincide from the data set that's at 11:46 in

10  the top right, 11:51 at the bottom portion, and 11:52

11  to 11:59 on the far left of this exhibit, that

12  Mr. Jones' phone is most predominantly probably

13  located there in the Greene Homes area in the Hollow

14  of Bridgeport.

15      Q.   And again, is it fair to say that the LTE

16  site data for the bottom right one is more precise

17  than the other two for PCMD?

18      A.   It is just because it gives a lower distance

19  that the phone is out from that cell tower, but as

20  I've come to understand, you have to take all three

21  of them combined to really do the best analysis of

22  where that phone is located.

23          MR. KALE:  I'm going to ask my colleague to

24  turn to Government's Exhibit 24, page 34.

25  BY MR. KALE:

1      Q.    And this is between 12 and 12:12 p.m.; is

2   that correct?

3      A.    Yes.

4      Q.    What, if anything, does the cell site data

5   show for movement of Mr. Jones' phone between those

6   two times?

7      A.    So it shows, again, that -- and I've kind of

8   described it in the last two, I'm happy to elaborate,

9   but again, Mr. Jones' phone is located in the Greene

10  Homes section and located close by to the Bridgeport

11  courthouse, which is indicated in that red marking,

12  and that's during the time of the courthouse shooting

13  which occurred at 12:11.  So this is 12 to 12:12.

14         MR. KALE:  Now, I'm going to ask my colleague

15  to turn to page 35 of Government's Exhibit 24 in

16  evidence.

17  BY MR. KALE:

18     Q.    And does this show that the cell phone is

19  moving at this point?

20     A.    Yes, it does.  So this is now two minutes

21  preceding the courthouse shooting, which occurred at

22  12:11.

23     Q.    Preceding or --

24     A.    I'm sorry.  After.  Thank you.  After the

25  courthouse shooting, post.  So this is occurring at

1    12:13 to 12:21 and what you can see is that

2    Mr. Jones' phone starts to move away from the

3    courthouse, which is delineated in red, and it starts

4    moving west through the city, and we've indicated the

5    two points for Hidalgo Market, which is in green, and

6    the Mobile Gas Station, which is in blue, and the

7    sector that they are hitting off of again gives the

8    distance.  And then the PCM data helps with that

9    distance, it gives the location, the direction, and

10   the distance as well.

11       Q.   So the cell phone seems to be moving west

12   from where it was earlier?

13       A.   That's correct.

14          MR. KALE:  And then I'm going to ask my

15   colleague to turn to Government's Exhibit 24,

16   page 36.

17          THE WITNESS:  So again, we're going further

18   away in time.  Now, it's 12:22 p.m. to 12:27, and

19   during that five-minute period, Mr. Jones' phone is

20   again communicating with cell towers in Bridgeport

21   owned and operated by Sprint and what you can see is

22   that the cell phone of Mr. Jones is moving further

23   west over to the area of the Mobil Gas Station.

24   BY MR. KALE:

25       Q.   And does that coincide with the video you had

1    seen during your investigation of the Mobil Gas

2    Station?

3        A.    Yes.

4            MR. KALE:  Now, I'm going to ask my colleague

5    to turn to Government's Exhibit page 37 --

6    Government's Exhibit 24, page 37.  I apologize.

7    BY MR. KALE:

8            And can you explain to the Court what's

9    happening between 12:27 and 12:30?

10       Q.    So again, this is post shooting.  This is now

11   a three-minute snippet of Mr. Jones' phone

12   communicating with the cell towers in the city of

13   Bridgeport, and now, what you'll start to see is that

14   Mr. Jones' phone starts to go north out of the city

15   of Bridgeport corresponding with Route 8 northbound.

16           MR. KALE:  And I'll ask my colleague to turn

17   to page 38 of Government's Exhibit 24.

18   BY MR. KALE:

19       Q.    And is this the next three-minute period?

20       A.    Yes.  So that's 12:31 p.m. to 12:34.  And

21   again, this is consistent with Mr. Jones' phone

22   hitting these cell towers that are along Route 8

23   northbound heading up to Naugatuck, and you can see

24   that because you have that short period of time, only

25   three minutes, where it starts hitting at at the

1   12:31 in the lower portion, and then at the top, at

2   12:34 at the end of that.  It's consistent with the

3   phone traveling in a car up Route 8 to be able to get

4   from point A at the bottom to point B at the top.

5       Q.   And in the further exhibit -- we don't have

6   to go through them because I don't think it's at

7   issue here, but does the phone go up towards

8   Naugatuck?

9       A.   It does.

10      Q.   And then comes back to Bridgeport?

11      A.   It does.

12           MR. KALE:  I have no further questions for

13   this witness.  Thank you, Your Honor.

14           THE WITNESS:  Thank you.

15           THE COURT:  Cross-examination.

16           MR. CROSLAND:  Your Honor, I'm just noting

17   it's 5:00.  What time does the Court plan to stop

18   just so --

19           THE COURT:  Maybe we'll continue another half

20   hour.

21           CROSS EXAMINATION OF BARRETT HYDE

22   BY MR. CROSLAND:

23      Q.   Good evening.

24      A.   Good evening.

25      Q.   Once a lawyer, always a lawyer.

1    A.    I guess so, yes.  It has a nice ring to it.

2    Q.    So Attorney Barrett, how long have you been

3    with the ATF?

4    A.    Seven years.

5    Q.    Seven years, okay.  And did you get special

6    training?

7    A.    I did.

8    Q.    And did you have special training in phone

9    technology?

10   A.    Yes.

11   Q.    And you prepare the same reports that

12   Attorney -- Agent Wines does?

13   A.    I don't, no.

14   Q.    Okay.  Is that a different type of

15   preparation?

16   A.    Yes, it is.

17   Q.    Okay.  And Agent Wines is a specialist in the

18   cell phone tower stuff, right?

19   A.    He is.

20   Q.    And I think you testified that Agent Wines

21   told you how to tell us what you told us today?

22   A.    Right.  So essentially, all that data that's

23   compiled into that report is data that we brought

24   together and provided to Agent Wines.  He has the

25   ability to make those maps and those reports.

1     Q.    Okay.

2     A.    So --- and then we worked on it with him and

3   whatever and I was also able to speak to him as well

4   about his report.

5     Q.    Okay.  So I think you testified just in the

6   latter part of your testimony that -- that the

7   shooting was 12:11, right?

8     A.    Yes.

9     Q.    And I think you testified at 12:11,

10  Mr. Jones' phone was located near -- strike that.

11        Before 12:11, his phone was located at the

12  Greene Homes?

13    A.    Yes.

14    Q.    And that's based on the scientific evidence

15  we talked about with the cell phone tower data?

16    A.    That's based on the data that we received

17  from Sprint for that number for Mr. Jones.

18    Q.    And at 12:11, when the courthouse shooting

19  took place, his phone, according to the data, is it

20  by the Mobil Gas Station?

21    A.    We'd have to go back to the exhibit, but it's

22  not located at the Mobil Gas Station at 12:11.

23    Q.    It was not?

24    A.    No.  It's later on, I believe.

25    Q.    You don't have anything up?

```
 1      A.     No.

 2             MS. KAOUTZANIS:  We can pull it up.

 3             MR. KALE:  Just tell us the page number.

 4             MR. CROSLAND:  Thank you so much.

 5      Exhibit 24, page 24, if you'd be so kind.

 6      BY MR. CROSLAND:

 7      Q.     So Attorney Barrett, just looking at

 8      Exhibit 24, page 34, is that in front of you?

 9      A.     Exhibit 24, page 34, yes.

10      Q.     And does this say phone activity for

11      January 27, 2020, from 12 p.m. to 12:12 p.m.?

12      A.     Yes, sir.

13      Q.     Okay.  So the courthouse shooting was

14      somewhere in between there, 12:11?

15      A.     Yes.

16      Q.     And the red key at the top, Agent Wines

17      prepared this?

18      A.     Yes.

19      Q.     Okay.  And so would you agree that what he

20      put in the key in red, is that the Golden Hill

21      courthouse?

22      A.     Yes.

23      Q.     And corresponding to that in the middle of

24      the page where it says red, is that more or less the

25      Golden Hill Bridgeport courthouse?
```

1      A.    Yes.  Located at 172 Golden Hill Street.

2      Q.    And again, you're the expert at these.  Mr.

3  Jones' phone, where is it located on this page?

4      A.    So I don't want to announce myself as an

5  expert in this.  I've just done these warrants before

6  and looked at these things before --

7          THE COURT:  Would you keep your voice up,

8  please?

9          THE WITNESS:  Sorry.  So the phone is located

10  somewhere within those areas, the bands from the PCM

11  data that's located there.  So again, you're looking

12  at six different cell towers on this one.  You look

13  at it as a group and you see that they all correspond

14  and kind of overlap in a certain general area, and

15  while I can't say and I don't think Jim Wines can say

16  the precise location of that phone, if you were

17  looking for that phone or the person holding that

18  phone, you would look in those general areas.

19  BY MR. CROSLAND:

20      Q.    Okay.  And by "general areas," you mean the

21  areas that are on this map, right?

22      A.    Right.  So one of the areas that has a lot of

23  overlay or overlap is the Greene Homes and then you

24  can see some overlap as well going to the actual

25  courthouse itself.

**A - 326**

120

1    Q.   Okay.  But no overlap at the courthouse from

2    what I'm seeing?

3    A.   There is PCM data that the cell tower in that

4    location, when you look at that again, that

5    120 degrees puts the phone in that area.

6    Q.   Okay.

7    A.   Do you --

8    Q.   I see what you're talking about.  Just coming

9    away from science a little bit, you did

10   investigate -- you are a case agent on this case,

11   right?

12   A.   Yes, sir.

13   Q.   So you learned who was at the courthouse,

14   right?

15   A.   In terms of the suspect or the victims?

16   Q.   Humans and -- let's start with suspects.  You

17   learned what suspects were there, right?

18   A.   Yes.

19   Q.   And who were they?

20   A.   Asante Gaines was there, Destine Calderon,

21   Diomie Blackwell, Marquis Isreal, Tyiese Warren, in

22   that location was Mr. Jones.

23   Q.   Okay.  I don't want to get confused because I

24   get confused easy.  So the first four people you

25   said, those are people that were at the courthouse

1    that you learned from your investigation, right?

2        A.    So I learned that there were certain people

3    that were located in the blue Volkswagen Golf and I

4    learned there were certain people that were located

5    in the Subaru Forester.  The evidence pointed me in

6    that direction.

7        Q.    Okay.  Got you.  And I'm going to stay with

8    you, if I can.  So the Volkswagen Golf, was that the

9    Volkswagen Golf that was at the Greene Homes housing

10   that you heard the door slamming on?

11       A.    I don't know what car that was.

12       Q.    Okay.  Was that the car that Asante Gaines

13   was in?

14       A.    So the Volkswagen Golf was the car that

15   Asante Gaines was in.

16       Q.    Okay.  I don't want to confuse you.

17       A.    No, no.  If you ask me a specific car and who

18   was in those, I can say that.

19       Q.    I'll just ask you again so I feel

20   comfortable.  The Volkswagen Golf was the car that

21   Asante Gaines was in?

22       A.    Yes.

23       Q.    And that car was at the courthouse?

24       A.    Yes.

25       Q.    Okay.  And was anybody else in that car that

1    you know?

2        A.    Yes.

3        Q.    Who else?

4        A.    Destine Calderon and Diomie Blackwell.

5        Q.    Okay.  So three people in that car.  And

6    aside from the victims, was there another car that

7    the suspects were in or associated with?

8        A.    Yes.

9        Q.    What was that?

10       A.    So there was a dark-colored or black Subaru

11   Forester.

12       Q.    And who was in that?

13       A.    So the Volkswagen Golf, the blue, was located

14   up the hill a little ways, and then several spaces

15   down located closer to where the actual shooting

16   occurred is the Subaru Forester.  Inside of that car

17   is Marquis Isreal and Tyiese Warren.

18       Q.    Okay.  So Isreal and Warren in that car and

19   then three others in the other car?

20       A.    Yes.

21       Q.    And Jones is not in any of those cars?

22       A.    Not that I know of.

23       Q.    Just to back up a little bit, you talked

24   about the phone towers receiving data from people's

25   cell phones, correct?

 1      A.     Right.

 2      Q.     Okay.  And are you familiar with what they

 3   call triangulation?

 4      A.     Triangulating what, a cell phone?

 5      Q.     In terms of towers that -- are you familiar

 6   with cell phones admitting signals that hit on

 7   towers?

 8      A.     Sure.

 9      Q.     You testified to that, right?

10      A.     Sure.

11      Q.     And from your training, cell phones would try

12   to locate the strongest signal in order -- from the

13   towers that are around, correct?

14      A.     So I'll say that what I've come to understand

15   is that they will try and hook in with the closest

16   one for better reception, but if that one is busy,

17   they may bump out to different ones.

18      Q.     Okay.  Exactly.  That's what I'm getting at.

19   So the cell phone is going to try to communicate with

20   the strongest signal, and if not, it could go to

21   another tower that may even be further from where the

22   person is?

23      A.     I know that -- here's what I'll say, I know

24   that they can communicate with different cell towers

25   and sometimes it's not always the closest one.

1   That's really the extent of what I know about that.

2       Q.    That's fair enough.  I can use that.  And so

3   in trying to locate where an individual is precisely,

4   you can't just use the closest cell phone tower to

5   make that determination, can you?

6       A.    Well, from what I understand is when you have

7   PCM data like this, it's not precise but it's more

8   precise, right.  The less precise data would be

9   something that came in that didn't have PCM data.  So

10  just say it's hitting off this cell tower and we

11  don't know what direction it is and we don't have any

12  PCM data, but when you have something like this,

13  Sprint does PCMD, Verizon does RTT, we write for that

14  because we want a better direction and distance away

15  from that cell tower.

16      Q.    Okay.  And that technology that Verizon or

17  Sprint has, RTT or the PCM, that data is abstracted

18  how?

19      A.    So when we write the warrants to get that

20  data, they provide it to us in a big data set and

21  we're able to analyze that and create things like

22  this.

23      Q.    Okay.  Very well.  And in addition to what

24  you just testified to, this PCM data showed Mr. Jones

25  at the Green housing, and what time do you recall?

```
 1        A.    So you have to go back to the first slide for
 2    him.  And I'd have to look at the exact time, but
 3    it's obviously preceding the actual shooting itself.
 4        Q.    And you testified also about the
 5    ShotSpotters, right?
 6        A.    Yes.
 7        Q.    And do you recall the government playing
 8    audiotape where you heard a judge in court while the
 9    shots were being fired?
10        A.    Yes.
11        Q.    Okay.  And do you recall hearing the judge
12    say 12:13?
13        A.    Yes.
14        Q.    Okay.  As the shots were being fired, right?
15        A.    I believe he actually says it before the
16    shots are fired, right.
17        Q.    Right.  Very close in time?
18        A.    Yes.
19        Q.    You even heard him say, "off the record"?
20        A.    I believe so, yes.
21        Q.    If you don't, we can play that again.
22        A.    No.  I think that's a fair interpretation.
23        Q.    Okay.  So at 12:13, the judge screams, "off
24    the record," and you hear bang, bang, bang, bang,
25    bang, you hear all these shots, right?
```

**A - 332**

126

1      A.     On or about that time.

2      Q.     Okay.  And you recall testifying that the

3   ShotSpotter gave a time stamp of 12:11?

4      A.     Yes.

5      Q.     So that's a bit of a discrepancy of 11, 12,

6   13, about a two-minute discrepancy, correct?

7      A.     Between 12:11 and 12:13?

8      Q.     Right.

9      A.     Right.  Again, so it's two different systems,

10   right.

11      Q.     That's what I was going to ask you that, but

12   let me get there so I can look good.  So the time

13   stamp of the ShotSpotter is a different technology

14   than the judge's clock, I guess?

15      A.     Right, counsel.  I mean, you know, there can

16   be a clock up at the judge's desk, an old-time clock

17   or something like that, right.  We don't know.

18      Q.     We don't know, okay.  So we just have to use

19   what we have.  All right.  And are you an expert in

20   ShotSpotter?

21      A.     No.

22      Q.     And in your investigation in this case, you

23   used more than just this technology to locate where

24   phones are, you also used other technology to

25   determine text messages and FaceTime and stuff,

1   right?

2        A.    Right.  I don't want to say it's different

3   technology.  We wrote for different accounts and cell

4   phone accounts and things like that and when that

5   data set comes in, we analyze that data, so social

6   media accounts, Facebook accounts, Sprint, Verizon,

7   whatever cell phone that they're using.

8        Q.    And in doing so, you were able to locate text

9   message communications between individuals, correct?

10       A.    Yes.

11       Q.    And you were also able to -- strike that.

12             You weren't able to actually record FaceTime

13   communications where we can play it and see it,

14   right?

15       A.    No.

16       Q.    But you can -- through your work, you were

17   able to say this is a FaceTime communication?

18       A.    Right.  So I have to try and corroborate

19   evidence as it comes to me, right.  So an example is

20   when Mr. Blackwell goes into court and I see him on

21   video looking down at his phone and talking to his

22   phone and then I look at the data set from his phone

23   that says a FaceTime message goes from his number to

24   Asante Gaines, I can't obviously see that video,

25   right.  When you FaceTime your loved ones, your

1  family, your coworkers, they don't record that and

2  put that in there.  But I have to put those data

3  points, those two pieces of evidence together.

4      Q.    To come to your own conclusion or at least to

5  present it to the government and they can conclude

6  what they want?

7      A.    I just take the data as it is, right, and if

8  I see a FaceTime call, and we're using this as an

9  example, and someone looking down at their phone for

10  that same period of time at the exact time, you --

11      Q.    You collect that stuff and you turn it over

12  to the government?

13      A.    Exactly.

14      Q.    And did you collect any text messages in

15  straight English with anyone saying to Mr. Jones,

16  hey, we're planning to go shoot up the courthouse?

17      A.    In straight English, no.

18      Q.    Okay.  In your investigation, did you learn

19  who the shooter was at the courthouse?

20      A.    There were two shooters.

21      Q.    Isreal was one?

22      A.    Yes.

23      Q.    Who was the other?

24      A.    Warren.

25      Q.    Warren, okay.  And is that Tyreke Warren?

1     A.    I believe it's Tyiese Warren.

2     Q.    Tyiese Warren?

3     A.    Yeah.

4     Q.    And Asante Gaines, we talked a lot about him

5   talking to Mr. Jones today.  Do you recall that?

6     A.    Sure.

7     Q.    And Asante Gaines wasn't a shooter, was he?

8     A.    It didn't show that in my case.

9     Q.    It didn't?

10     A.    Right.

11     Q.    And you would agree that the gentleman who

12   was killed the night before, is that Kenion?

13     A.    Myreke Kenion.

14     Q.    Myreke Kenion, that that -- people were

15   mourning his death, right?  Would you agree that

16   people were sad about that?

17     A.    I can only go off the text message.  I didn't

18   speak to those people directly on that night or talk

19   to them or console them.  I can only go off of the

20   text messages that I saw going back and forth of the

21   co-defendants on that night.

22     Q.    I'm going to apologize to you.  The people

23   who killed him obviously weren't mourning him.  So I

24   asked a bad question.

25           Did you ascertain who killed him?

1     A.    So this is a joint case and another part of

2     the government, another agency that we worked with,

3     took on that sector of the case.  We took on

4     different sectors, right.  So I believe it was

5     ascertained who did that, but again, that wasn't

6     my -- it wasn't my part of the case.

7     Q.    Okay.  So I'm not going to ask you who you

8     found out.

9     A.    Thank you.

10    Q.    But I will ask you this:  Not the people who

11    killed him, but his friends and loved ones, it's fair

12    to say there was a lot of talk between them because

13    they were mourning his death?

14    A.    So again, and I'm not trying to be

15    argumentive, the things that I looked at were the

16    text messages or Facebook messages or social media

17    that were pertinent to the co-defendants in this

18    case.

19    Q.    Okay.  So the co-defendants, did you learn of

20    any of the co-defendants saying stuff like we lost

21    our little brother?

22    A.    Yes.

23    Q.    And by mourning, wouldn't that be an

24    articulation of mourning?

25    A.    Sure.

1     Q.    And I'm not trying to be argumentive either.

2     A.    Sure.  I just don't want to say something

3  that occurred outside of the evidence that I was

4  trying to corral in and look at and analyze.

5     Q.    Right.  But you would agree that we had a lot

6  of discussion on direct examination about the

7  communications surrounding the death of Mr. Kenion?

8     A.    Right.  There was communications that we

9  talked about on my direct from Asante Gaines and also

10  your client as well, Mr. Jones.

11     Q.    Okay.  And in those communications, you would

12  characterize some of that as people being upset and

13  mourning the death of this young man?

14     A.    Again, I don't want to speak for the person

15  that's writing it.  I can only look at what was said,

16  but it seemed to me that they were upset about the

17  death at that point.

18     Q.    Right.  Okay.  And you did testify about your

19  views on other writings such as "on Ky" and stuff

20  like that, right?

21     A.    Sure.  So that is one specific thing that

22  I've seen as I've looked through these Facebook

23  records and cell phone records and things like that

24  that I see quite often within the group or the Greene

25  Homes Boyz and how they communicate or speak with one

1    another.

2       Q.    Right.  And you have to make your

3    determination of what "on Ky" means, right?

4       A.    Right.  So I don't know what it means when I

5    first start looking into it, but as I understand it

6    and talk to witnesses and talk to law enforcement

7    that's in that area, I come to find out that that's

8    what it's referencing.

9       Q.    Okay.  Fair enough.

10          MR. CROSLAND:  And if the government would be

11   so kind to pull up the audio of the doors closing on

12   this Volkswagen at the Greene housing project, I'd

13   appreciate that.

14          MR. KALE:  Just for the record, it's 24T --

15   25T, sorry, 25T.  The audio is 25.  I'm sorry.

16          MR. CROSLAND:  Exhibit 25 audio January 27th,

17   call from Shajuan Perry to Asante Gaines.

18          (Audio played.)

19          MR. CROSLAND:  Can you stop it for a second?

20   BY MR. CROSLAND:

21      Q.    Did you hear, I'm just trying to stay out of

22   the newspapers?

23      A.    I'd have to look at the transcript honestly.

24   I mean, if you play it back, I'm happy to listen more

25   closely on it.

1       Q.    In the interest of time, I can do that, but

2    let me ask you, and maybe I don't have to, staying

3    out of the newspapers, I think you testified to

4    getting in the newspapers, what that means, right, so

5    the converse, what do you take from, I'm just trying

6    to stay out the newspapers?

7       A.    I take from that that someone --

8            MR. KALE:  Objection.  Calls for speculation,

9    Your Honor.

10            MR. CROSLAND:  My claim is -- it's in the

11    transcript.  It's the same testimony.

12            THE COURT:  Do you have any information

13    bearing on the meaning of that sentence in the

14    transcript?

15            THE WITNESS:  I don't.

16            THE COURT:  Okay.

17            MR. CROSLAND:  We can play the whole thing

18    from the beginning.

19            THE COURT:  He doesn't have any independent

20    knowledge.  We know what it is.  We don't know from

21    him if there's any additional meaning to be attached

22    to it.

23            MR. CROSLAND:  I thought he said if he saw

24    the transcript, he would know, but we can move on.

25            THE COURT:  Is that right?  If you looked at

 1   the transcript, would you know any more about the

 2   meaning of that sentence?

 3             THE WITNESS:  No.  Counsel asked me did I

 4   hear a certain portion.

 5             THE COURT:  Okay, okay.

 6             MR. CROSLAND:  Very well.  Can we get to the

 7   part with the door slamming?

 8             MS. KAOUTZANIS:  It was just played.

 9   BY MR. CROSLAND:

10   Q.    Did you hear the door slamming?

11   A.    Yes.  Right at the end.

12   Q.    You heard?

13   A.    Yes.

14   Q.    All right.  That's fine.  So you testified

15   that you heard doors slamming, and at that time,

16   there was a phone call between a person in prison and

17   Asante Gaines?

18   A.    So it was Shajuan Perry is an inmate in the

19   Connecticut Department of Corrections and he's

20   calling Asante Gaines' phone and they're having a

21   discussion.  At some point during that call, your

22   client, Mr. Jones, jumps on the phone and then starts

23   talking to the inmate as well.

24   Q.    Okay.  And once the doors close -- Asante

25   Gaines is the one with the tracking device, right?

1      A.    Asante Gaines is the person that has a GPS

2   monitoring device on him at that time.

3      Q.    So he leaves, correct?

4      A.    Yes.

5      Q.    And through your investigation, Mr. Jones'

6   phone remains at the Greene Homes; is that correct?

7      A.    So that's difficult to say, right.  So I know

8   that I can look at Mr. Gaines' GPS and see where that

9   goes.  I can look at Mr. Gaines' cell phone and I can

10  see where that goes.  Again, I cannot precisely say

11  what it is, but I can see what towers it's hitting

12  on, the RTT, the PCMD, and I can see where Mr. Jones'

13  phone is at that time.  It's all in that location, in

14  that area of the Hollow, the Greene Homes, located

15  close by the Bridgeport courthouse.

16     Q.    Right.  So definitively, Mr. Gaines' GPS

17  takes him -- you can know exactly where he's going,

18  right?

19     A.    I can look at the GPS data and I can put

20  Mr. Gaines, his monitor, at the courthouse shortly

21  thereafter, I believe it's in my time line, at that

22  time.

23     Q.    Right.  And Mr. Jones who doesn't have a GPS,

24  you have to rely on where his phone might have been,

25  right?

1        A.    Yes.  Relying on that, and I'm relying on

2    that call that comes in and Mr. Jones, your client,

3    gets on the phone and says this is my number.

4        Q.    Right.  So that call came in and placed

5    Mr. Jones at the Greene Homes housing projects?

6        A.    So Mr. Gaines is with him, right.  They're

7    passing the phone off, just as you and I would do

8    that.  Mr. Gaines has a couple phones.  Mr. Jones has

9    a couple phones.  You look at all that data together.

10   It all correlates in that area.

11       Q.    And I'm sorry if I'm just too

12   unsophisticated.  Mr. Jones' phone is located at the

13   Greene Homes according to your professional

14   scientific analysis, correct?

15       A.    If you look at the data set, right, which is

16   in that CAST report, there's certain times where that

17   phone is located in the area of Greene Homes.

18       Q.    Thank you.  And Mr. Gaines, Asante Gaines,

19   his GPS takes him to the courthouse, right?

20       A.    There's a GPS plot that is at the courthouse

21   before the shooting occurs.

22       Q.    A GPS what?

23       A.    So the GPS will provide a data set, right,

24   when we request the GPS data and it will give a

25   certain time and a certain plot of where that is.  So

1   if you look at my time line, there's a delineation, I

2   believe, on there that shows that Gaines' GPS is

3   located on Golden Hill Avenue.

4       Q.   And in English, Mr. Asante Gaines is on

5   Golden Hill Avenue?

6       A.   So he doesn't come out of the car, right, but

7   I know his GPS is there and I know we're listening to

8   the calls and looking at his two phones.  So

9   essentially, that's what the evidence leads me to

10  believe is that he is there on Golden Hill.

11      Q.   Got you.  Okay.  You testified earlier about

12  -- I'm forgetting the gentleman's name, but yes.

13  Mr. Hines.  Sorry.  You testified -- you said there

14  was an incarcerated witness.  I don't think you said

15  his name.  Do you recall this incarcerated witness

16  that you guys didn't mention his name?

17      A.   That we did interviews of?

18      Q.   Yes.

19      A.   Yes.

20      Q.   Can we just call him the incarcerated

21  witness?

22      A.   Sure.

23      Q.   You testified there was an incarcerated

24  witness that told you that he, the incarcerated

25  witness, was a member of the Greene Homes Boyz gang,

1   right?

2   A.    Yes.

3   Q.    And you recall saying that he told you that

4   his membership went back and you said some time.  Do

5   you remember that?

6   A.    Yes.

7   Q.    Okay.  When did you -- what year did you

8   interview this incarcerated witness?

9   A.    I interviewed him on two occasions in 2021.

10  Q.    2021, okay.  And do you know how far back

11  this incarcerated witness' membership in the GHB

12  went?

13  A.    From what I recall, it was the Pequonnock

14  Village broke up in 2010, and then Mr. Jones reached

15  out to this incarcerated individual during that time

16  and into 2011, and then in that time of 2012, 2013,

17  he became a member.

18  Q.    2012, 2013?

19  A.    Yes.

20  Q.    That's when he became a member?

21  A.    Yes.

22  Q.    Okay.  And you said Mr. Jones -- he told you

23  Mr. Jones had reached out to him?

24  A.    Right.  That Mr. Jones communicated with him

25  using Facebook, social media, and asked him to come

1   to the Greene Homes and wanted to get him there to do

2   what they were doing at that time.

3       Q.    Okay.

4       A.    To become part of the group.

5       Q.    And obviously, I'm not saying everyone in

6   jail are dishonest, but this is an incarcerated

7   individual you're talking to, right?

8       A.    Yes.

9       Q.    And you testified a second ago when we were

10  talking about cell towers that your job is to

11  corroborate things, correct?

12      A.    As best as I can yes.

13      Q.    And just so I'm clear, what do you mean by

14  corroborate?

15      A.    So if we're talking about data sets, right, a

16  good example, I would say is, Asante Gaines.  So I

17  know Asante Gaines has a phone and I look at the cell

18  tower records for Asante Gaines' phone which put him

19  in the area of the Greene Homes and then outside the

20  courthouse and then traveling up to Naugatuck, and I

21  want to try to corroborate that, and the way I did in

22  that case, and this is just an example, is I also

23  collect his GPS data, and when you overlay that --

24  there's slides that show if you need a specific

25  example, you can see that they correlate.  The cell

1   phone tower says one thing.  The GPS says almost the

2   exact same thing.  So that's how I try to do that.

3       Q.   Okay.  And the whole idea, you agree, is to

4   try to be able to seek the truth or to rely on the

5   data sets on the conclusion that you're making?

6       A.   I'm just trying to -- right.  I'm just trying

7   to investigate the case and I'm looking at the

8   evidence that I'm trying to obtain and put that in to

9   see where it leads me.

10      Q.   Okay.  And hopefully, it leads you to be able

11  to make a truthful conclusion, right?

12      A.   Yes.  As much as possible, absolutely.

13      Q.   Okay.  And when this incarcerated individual

14  is telling you stuff, obviously in your experience as

15  a law enforcement officer, would you agree that

16  incarcerated individuals sometimes lie?

17      A.   Yes.

18      Q.   Okay.  And in this particular individual, the

19  incarcerated individual, were you able to corroborate

20  what he was telling you in terms of his membership in

21  the GHB and his conversation with -- let me -- I'm

22  compounding.  Let me drag that back.

23           This individual told you, I think, that

24  between 2012 and 2013, that he spoke to Mr. Jones,

25  correct?

```
 1       A.    That he was hanging out with Mr. Jones at

 2   that time, right.

 3       Q.    Okay.  And did you see any picture of him

 4   hanging out with Mr. Jones around that time?

 5       A.    No.

 6       Q.    Okay.  Did you see any cell phone -- do you

 7   have any cell phone data between him talking to

 8   Mr. Jones around that time?

 9       A.    No.

10       Q.    So you weren't able to corroborate through

11   that means, right?

12       A.    We interviewed him.

13       Q.    My question is specific.  I don't want to be

14   tough on you.  You weren't able to corroborate it

15   through cell phone means, correct?

16       A.    Right.

17       Q.    And not through pictures either, right?

18       A.    That's correct.

19       Q.    Okay.  And I think you said that he said that

20   he grew up with Mr. Jones, right?  They lived in the

21   Pequonnock place that broke down?

22       A.    Yes.  That they tore down.

23       Q.    Okay.  Do you know if Mr. Jones was living in

24   the Greene Homes between 2012 and 2013?

25       A.    Only from what people have told me.
```

1     Q.    Is that a no, you heard that but you don't

2   know?

3     A.    Correct.  I was not around in 2012 and 2013.

4     Q.    So you don't know?

5     A.    I don't know at that time period, right.

6     Q.    You don't know if he lived there between 2012

7   and 2013?

8     A.    I don't.

9     Q.    Okay.  Do you know how old Mr. Jones was in

10  2010?

11    A.    I don't.

12    Q.    And if I told you he was 15 years old, would

13  you have any reason to disbelieve that?

14    A.    If that's what you're saying your client is

15  at that time, I'll take your word for it.

16    Q.    But you did read his date of birth and you

17  know everything about Mr. Jones' from your

18  investigation, right?

19    A.    No.

20    Q.    You know at least his age, right, his date of

21  birth?

22    A.    I'm sure there's a report where I delineate

23  his name and his date of birth.  I just have not

24  looked at it recently.

25    Q.    So if I lied to you about that, you can

1   easily bust me?

2     A.    I'm not trying to bust you on your client's

3   age.

4     Q.    Right.  And I think you testified that -- so

5   many people are testifying, I forget.  Were you the

6   one who testified when Mr. Jones got out of jail, he

7   got the welcome package with the gun?

8     A.    What I understood from one of the witnesses

9   that we interviewed is that he was provided with a

10  gun, clothes, when he came out of incarceration.

11    Q.    And that's some GHB welcome home program?

12    A.    I don't know if it's a welcome home program.

13  I can go off of what the witness told us which is

14  when he came home, these are the things that they

15  give to members, and specifically Mr. Jones, to get

16  him kind of up and running, so to speak.

17    Q.    And they give these to members, right?  You

18  just said that.  I'm not tricking you.

19    A.    No.

20    Q.    You just said these are things they give to

21  members, right?

22    A.    I can only speak to --

23    Q.    Right?  You just said it two seconds ago.

24  They give it to members, right?

25    A.    Right.  That's my understanding from speaking

1    to the witness.

2       Q.    Okay.  And you weren't able to corroborate

3    that, were you?

4       A.    I was not.

5       Q.    And he didn't say Mr. Jones came home and

6    since Mr. Jones was the boss and the founder, he got

7    special treatment to some guns and clothes, did he?

8       A.    No.

9       Q.    Okay.  He referred to him just as a member

10   like anybody else?

11      A.    If we're referencing coming home and what he

12   got.

13      Q.    Yeah.  That's what I'm talking about.  He

14   just referred to him as a member, members gets this

15   stuff?

16      A.    He said specifically that when Mr. Jones came

17   home, he got that stuff.  It wasn't a question of

18   membership at that point or anything like that.

19      Q.    Do you recall you testifying that he said

20   that even when you go to jail or Mr. Jones went to

21   jail, he remained a member of the gang?

22      A.    Yes.

23      Q.    And he did say member of the gang, right?

24      A.    That's the best that I can recall, yes.

25      Q.    You testified to that earlier?

1    A.    I believe so, yes.

2    Q.    Okay.  And you didn't find any charters of

3  any organized meetings between the Greene Homes Boyz

4  and members, did you?

5    A.    No, sir.

6    Q.    You didn't find any organizational chart with

7  Mr. Jones being the founding CEO?

8    A.    No.

9    Q.    Like Elon Musk is the head of Tesla or

10  something, right?

11    A.    Yes.

12    Q.    And they have organizational charts, right?

13    A.    It's a multibillion dollar company, I should

14  hope so, yes.

15    Q.    Right.  Subject to RICO and everything else,

16  right?

17    A.    I don't want to get into that, but --

18    Q.    Okay.

19         MR. CROSLAND:  Can I have one moment?  Your

20  Honor, I just realized I went over 5:30.  It's

21  20 minutes to.

22         THE COURT:  Are you finished?

23         MR. CROSLAND:  No.  I was just --

24         THE COURT:  Finish up.

25         MR. CROSLAND:  Thank you, Your Honor.

```
 1              THE COURT:  Let's try to keep it narrowly to
 2   what we're about today.
 3              MR. CROSLAND:  That's what I've been doing,
 4   Judge.
 5              THE COURT:  This is not a trial.
 6              MR. CROSLAND:  That's what I've been doing,
 7   Judge.
 8   BY MR. CROSLAND:
 9      Q.   So I'm going to take you to this portion of
10   your direct when you were talking about after the
11   shooting and still staying connected to Mr. Jones'
12   phone.  Do you recall that, that line?
13      A.   I do.
14      Q.   Okay.  And so the shooting at the courthouse
15   took place at 12:11; is that right?
16      A.   Yes.
17      Q.   Okay.  And you continued to examine evidence
18   connected with Mr. Jones' phone after the shooting,
19   right?
20      A.   Yes.
21      Q.   And you testified that the shooter was
22   Marquis Isreal?
23      A.   That's one of the shooters, yes.
24      Q.   And the other was Tyiese?
25      A.   Warren.
```

1    Q.   And you didn't testify this morning that

2  there was any communication between Mr. Warren and

3  Mr. Jones, did you?

4    A.   That's correct.

5    Q.   And you didn't testify that there was any

6  communication between Mr. Isreal and Mr. Jones, did

7  you?

8    A.   That's correct.

9    Q.   Okay.  And you did testify that Mr. Jones was

10  at a gas station, correct?

11    A.   Yes.

12    Q.   And was he also at a convenience store?

13    A.   Hidalgo Market.

14    Q.   Hidalgo Market?

15    A.   Yes.

16    Q.   And do you know exactly what time he was at

17  Hidalgo Market?

18    A.   Yes.

19    Q.   What time was that?

20    A.   I'd have to again look at my time line, but

21  it's after -- minutes after the courthouse shooting

22  occurs.

23    Q.   Okay.  Did he go to Hidalgo Market before the

24  gas station or after the gas station?

25    A.   I believe he went before.

1    Q.   And in fact, when the shooting was taking

2    place, his phone had been at Hidalgo Market?

3    A.   When the shooting is taking place and we can

4    go back to the exact time, it's hitting off that area

5    of the Hollow, the Bridgeport courthouse, and then

6    minutes after that, his phone starts to shift west to

7    Hidalgo Market further west to the Mobil.

8    Q.   Okay.  But you've already testified that you

9    know -- today at least, you know who was at the

10   courthouse and Mr. Jones wasn't one of them, you

11   testified to that, right?

12   A.   So I know that he was in the area.  I know

13   that he wasn't in the shooter car and I know that he

14   wasn't in the Volkswagen as well.

15   Q.   Okay.  And the gas station is in the area, if

16   you want to use that word, right?

17   A.   It's blocks away.  I mean, you can --

18   Q.   In the area or not in the area, I'll take

19   either one?

20   A.   I can't give you in the area or not in the

21   area.  I can just give you plots on a map which show

22   it specifically, but yes.  I mean, it's blocks away

23   or just a few minutes of travel away, if that's --

24   Q.   I'm trying.  What's in the area?

25   A.   What's in the area to me?

```
 1      Q.    Yes.
 2            MR. KALE:  Objection.  Relevance, Your Honor.
 3            MR. CROSLAND:  Claim it.
 4            THE COURT:  Everybody is talking about the
 5      amount of proximity to the courthouse, Mr. Jones was
 6      at the gas station.  Isn't that sufficient?
 7            MR. CROSLAND:  I'm only trying to help you.
 8      You're the trior of fact.  If that's sufficient with
 9      you, I'm fine.  I'm just doing my job to establish
10      what's in the area and where was he at the time and
11      at the time of the shooting, so I'll move on.
12            THE COURT:  You can get those crisp answers.
13      Let's get that.  All right?
14            MR. CROSLAND:  I'm definitely trying.
15      BY MR. CROSLAND:
16        Q.    Crisp answer.
17        A.    Sure.
18        Q.    Mr. Jones --
19            THE COURT:  At the time of the shooting,
20      where was his cell?
21            THE WITNESS:  So we'd have to look at the
22      data set, but it shows that -- and again, we have an
23      exhibit that shows that specifically, Your Honor, and
24      it shows that he was in the area of the Greene Homes
25      housing complex when the shooting occurs, which is
```

 1    literally two blocks away from the courthouse.

 2              MR. CROSLAND:  Okay.  That's fair.

 3              THE WITNESS:  And we're talking about,

 4    counsel, just for clarification, the phone.

 5    BY MR. CROSLAND:

 6      Q.    Okay.  That's fair.  So his phone was in the

 7    Greene housing at the time the shooting took place,

 8    which is a couple blocks away?

 9      A.    It's in that area.

10      Q.    You just said it.  I'm just saying what you

11    said.  It was in that area when the shooting took

12    place, right?

13      A.    Yes.

14      Q.    And before the shooting took place, his phone

15    was in that area and, in fact, he was talking to

16    Asante Gaines in that area?

17      A.    He is on a Connecticut Department of

18    Corrections --

19      Q.    Phone in that area speaking to a guy in jail,

20    right?

21      A.    Yes.

22      Q.    And then after the shooting took place, his

23    phone has him at Hidalgo Market and at at the Mobil

24    Gas Station?

25      A.    His phone does.  And then we also reviewed

 1  video from those two establishments, those two

 2  businesses, showing that he's there.

 3      Q.   Okay.  So while the courthouse shooting is

 4  taking place, he's in the area of the Greene Homes,

 5  and after the courthouse shooting, he's in the area,

 6  and not only by phone but also by video of the gas

 7  station and the market before and after?  That's

 8  where he is before and after, right?

 9      A.   Okay.  So just you're asking me a couple of

10  questions there.

11      Q.   Let me clean it all up.

12      A.   Sure.

13      Q.   Let me handle the heavy work here and I'll go

14  slow.  So before the shooting, you have him in the

15  area of Greene Homes housing project, right?

16      A.   Right.  So we look at the data.

17      Q.   Right.  The data has -- I'll say that, the

18  data has him in the area of the Greene Homes housing

19  project, right?

20      A.   Yes.

21      Q.   Okay.  And you also know he's there because

22  you hear him talking to someone at the Department of

23  Corrections with Mr. Gaines and Mr. Gaines' GPS is

24  there?

25      A.   Yes.

1    Q.    So we're good with that, right?

2    A.    Yes.

3    Q.    Okay.  And then after the shooting, you see

4    him on video at Mobil and Hidalgo?

5    A.    Yes.

6    Q.    So that's before and that's after, right?  So

7    we know where he's at?

8    A.    We see his movement.

9    Q.    Right.  Before and after?

10   A.    Right.

11   Q.    Thank you.  I think the questions from there

12   just, I think, talked about him going up to Naugatuck

13   and to the Walmart.  Do you remember that?

14   A.    Right.  The phone on the data set shows that

15   that phone is traveling up north on Route 8 to

16   Naugatuck.

17   Q.    And I won't bore you.  Those things are not

18   in dispute, as far as I'm concerned.  So I'm not

19   going to bore you with that, but if I can have one

20   second.

21   A.    Thank you.

22   Q.    Just a couple last questions.

23        Aside from analyzing the data that shows him

24   going up towards Naugatuck -- were you a part of the

25   team that went up to Naugatuck?

```
 1        A.    No.

 2        Q.    Did you see any video with Mr. Jones up in

 3   Naugatuck?

 4        A.    Not Mr. Jones, no.

 5        Q.    Okay.

 6        A.    I should say this, the car that he was

 7   driving, I saw a video of that coming and going from

 8   Naugatuck in the direction of travel, but not

 9   Mr. Jones outside the car in Naugatuck.

10        Q.    All right.  Fair enough.  So that's all you

11   know about the car?

12        A.    I know the car, I know the actual wording of

13   the text messages going back and forth, and I know

14   the phone location or the approximate phone location

15   based on the cellular data.

16        Q.    Okay.  And all that phone messages, no one

17   talked about saying Mr. Jones was a founder of the

18   GHB in that phone message you're talking about,

19   right?

20        A.    That's correct.

21             MR. CROSLAND:  All right.  Thank you.

22             THE WITNESS:  Thank you, sir.

23             THE COURT:  Thank you very much.  You are

24   excused.  You may step down.

25             Have we finished with the government's
```

1    evidentiary offering?

2          MR. KALE:  Yes, Your Honor.

3          THE COURT:  We will resume tomorrow at 10:30

4    and I would like to know, if possible, before 10:30

5    whether Mr. Crosland will present any witnesses,

6    anybody other than Mr. Jones.

7          MR. CROSLAND:  I'll let you know before 10:30

8    or you want me to tell you now or I can tell you

9    tomorrow?

10          THE COURT:  If you can tell me before 10:30.

11          MR. CROSLAND:  I will, Judge.

12          THE COURT:  We stand in recess.  Thank you.

13          (Proceedings adjourned, 5:49 p.m.)

14

15              C E R T I F I C A T E

16    RE:  UNITED STATES OF AMERICA v. LAHEEM JONES
                No. 3:20-cr-00126-JBA-5

17

18          I hereby certify that the within and

19    foregoing is a true and accurate transcript taken in

20    the aforementioned matter to the best of my skill and

21    ability.

22              /s/ Corinne T. Thomas

23          CORINNE T. THOMAS, RPR
              Official Court Reporter
24        United States District Court
              141 Church Street
25        New Haven, Connecticut 06510
              (203) 809-0848

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF CONNECTICUT
 2

 3    _____ )
      UNITED STATES OF AMERICA,       )
 4                                    )  No. 3:20-cr-00126-JBA-5
                         Plaintiff,   )
 5                                    )  April 7, 2022
      v.                              )
 6                                    )  10:49 a.m.
                                      )
 7    LAHEEM JONES,                   )  141 Church Street
                                      )  New Haven, Connecticut
 8                       Defendant.   )
      _____)
 9

10              EVIDENTIARY SENTENCING HEARING
                            VOLUME II
11

12    B E F O R E:

13          THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

14

                        Official Court Reporter:
15                      Corinne T. Thomas, RPR
                          (203) 809-0848
16

17    A P P E A R A N C E S:

      For the Government:
18

19              JOCELYN J. COURTNEY KAOUTZANIS, AUSA
                STEPHANIE TSAY LEVICK, AUSA
20        U.S. Attorney's Office - NH
          157 Church Street, 25th Floor
21        New Haven, CT 06510
          (203) 821-3700
22        E-mail:  jocelyn.kaoutzanis@usdoj.gov
                   stephanie.levick@usdoj.gov
23
                RAHUL KALE, AUSA
24        U.S. Attorney's Office - BPT
          1000 Lafayette Boulevard, 10th Floor
25        Bridgeport, CT 06604
          (203) 696-3029
          E-mail:  Rahul.Kale@usdoj.gov
```

```
 1   For the Defendant:

 2            DARNELL DEONAS CROSLAND, ESQ.
         L/O DARNELL D. CROSLAND
 3       1200 Summer Street, Suite 202
         Stamford, CT 06905
 4       203-921-1782
         E-mail:  info@croslandlaw.com
 5

 6       (Call to Order, 10:49 a.m.)

 7       THE COURT:  Good morning, counsel, ladies and

 8   gentlemen.  Please be seated.

 9       All right.  On the two areas in which we have

10   a factual dispute, namely whether he knew -- whether

11   Mr. Jones knew of the plan to attempt to murder

12   rivals at the courthouse on January 27, 2020, or not,

13   and secondly, when he became active in Greene Homes

14   Boyz gang and whether he was a founder of it, does

15   the government have any further evidence?

16       MS. KAOUTZANIS:  The government does not

17   intend to call any further witnesses.  At some point,

18   I would like to make some arguments before the Court,

19   but no further witnesses at this point.

20       THE COURT:  Mr. Crosland, do you have

21   evidence to put forward?

22       MR. CROSLAND:  Good morning, Your Honor.

23   Yes, I do.  Thank you so much.

24       THE COURT:  Please call your first witness.

25       MR. CROSLAND:  Thank you, Your Honor.  I call
```

 1   Anthony Marshall.

 2           Sit right here, Mr. Marshall.

 3           (Anthony Marshall, sworn.)

 4           THE CLERK:  Please be seated.  State your

 5   name for the record, spelling your first and last

 6   name, and give us the town of your employer.

 7           THE WITNESS:  My name is Anthony Marshall

 8   Thompson.  The employer town is Bridgeport and I am

 9   my own employer.

10           THE COURT:  All right.  You may take your

11   mask off while you testify.

12           You may proceed, Mr. Crosland.

13           MR. CROSLAND:  Thank you, Your Honor.

14    DIRECT EXAMINATION OF ANTHONY MARSHALL THOMPSON

15   BY MR. CROSLAND:

16     Q.    Good morning, Mr. Marshall.

17     A.    Good morning.

18     Q.    Mr. Marshall, how old are you today?

19     A.    Forty-five.

20     Q.    And your town of employment is Bridgeport?

21     A.    Yes.

22     Q.    And can you tell the Court what you do for

23   employment?

24     A.    I have a program, a youth and adult program,

25   that deals with the gang violence in the city of

 1   Bridgeport.  I do mentoring.  I have safe houses and

 2   different other entities for the youth in Bridgeport

 3   and all over the state of Connecticut.

 4      Q.   And tell us a little bit about how you deal

 5   with the violence prevention in your job.

 6      A.   So one of the ways I deal with the violence

 7   prevention is I map out all over the city of

 8   Bridgeport, I reach out -- I go into the inner cities

 9   and talk to the youth that's standing on the corners

10   or even if they're at certain groups, games,

11   basketball games and things of that nature.  I go

12   where I know that they're going to be and I speak

13   with them.  I give them options and ways to change

14   their lives.  I map out also with probation.  I map

15   out with parole.  I also map out with DCF.  I map out

16   also with child guidance and other entities that they

17   have in Bridgeport.

18      Q.   And child guidance is an agency?

19      A.   Agency, yes.

20      Q.   And what does child guidance do?

21      A.   Child guidance deals with the youth that they

22   -- somewhat like the younger kids that have problems,

23   like traumas, things of that nature, they try to get

24   them into programs.  They help them if they need

25   schooling and things of that nature.  They help them

```
 1   with that.
 2       Q.    So you work with families as well as
 3   individuals?
 4       A.    Yes.
 5       Q.    And do you also work with young children?
 6       A.    Yes.  The ages actually starts with
 7   kindergarten all the way up to 35.
 8       Q.    Very well.  And did there come a time where
 9   you met an individual named Laheem Jones?
10       A.    Yes.
11       Q.    And do you see Laheem Jones in the court
12   today?
13       A.    Yes.
14       Q.    Okay.  And roughly how many years have you
15   known Mr. Jones?
16       A.    I knew him all his life.
17       Q.    And did it come to your knowledge that
18   Mr. Jones went to prison at one point?
19       A.    Yes.
20       Q.    Okay.  And roughly how long ago was that or
21   can you tell me what you know about him going to
22   jail?
23       A.    I came home in 2012.  He was in prison in
24   2012.  I found out from his mother that he was in
25   prison in 2012.
```

1     Q.    And he was -- when you found out he was in

2     prison in 2012, do you know roughly when he was

3     released and were you still in contact with him when

4     he was released?

5     A.    Yes.  He was released March 7, 2019.

6     Q.    Very well.  And can you tell the Court, did

7     you have any interactions when he was released, and

8     if so, what were those interactions?

9     A.    Yes.  Being -- at that particular time, I was

10    working in a program called Street Safe Bridgeport.

11    I was actually the face of Street Safe Bridgeport.

12    It's a non-law enforcement program in Bridgeport that

13    also deals with the gangs and groups in Bridgeport.

14    I was -- I was placed as his mentor.  I was placed as

15    his mentor, and through the probation, we connected

16    and they said the only way for him to be released is

17    for his mentor to come pick him up because he has to

18    be placed on a bracelet monitor, has to pick him up

19    and bring him to the place he was going to be

20    residing in Waterbury, Connecticut.

21    Q.    And you were his mentor through probation?

22    A.    Through probation.

23    Q.    And did you, in fact, follow that and pick

24    him up?

25    A.    Yes.  I had to follow their rules, their

1    protocol.

2        Q.    Okay.  And you went to pick him up as a part

3    of probation's protocol, yes?

4        A.    Yes.

5        Q.    And you didn't go to pick him up because you

6    were a member of Greene Homes Boyz, were you?

7        A.    No.

8        Q.    And you're not a member of Greene Homes Boyz,

9    right?

10       A.    No.

11       Q.    And you never were?

12       A.    No.

13       Q.    And when you went to pick him up, you didn't

14   bring a kit with a gun and clothes and give him a

15   welcome home package, did you?

16       A.    Not at all.  Well, the welcome home package

17   that we gave him, his mother gave him some money and

18   I gave him some money, because the program --

19       Q.    So the Court knows, what did you do in terms

20   of after you picked him up?  Where did you take him

21   to?

22       A.    After we picked him up, we brought him

23   directly -- as the probation said, we brought him

24   directly to his aunt's house in Waterbury,

25   Connecticut, where he was placed on a GPS monitor --

1  not a GPS, a house monitor.  He was placed on a

2  monitor and he could not leave from that house.

3      Q.    And what are some of the things as a mentor

4  that you do for young people like Mr. Jones?

5      A.    So what I do is I basically try to see where

6  they're at as far as, like, how they came to where

7  they are at now, if they're dealing with certain --

8  how can I say -- traumatic things that goes on in the

9  inner city.  So I see where their head space is at

10  and try to find out why they do the certain things

11  that they do.  And when I find that, a lot of them

12  talk about certain things that happened in the past.

13  So one of the main things I do is I get them into

14  counseling and that's one of the main things I did

15  with Laheem Jones.  He got into counseling and he was

16  in counseling at Jewel of Joys in Bridgeport,

17  Connecticut.

18          So he was going there for therapy to work --

19  because I told him that's one of the main things he

20  needs to do in order to get himself acclimated back

21  into society, because that's one of the things that I

22  did to get back into society because I was

23  incarcerated at one time, and in order to get back

24  into society, I went through therapy to be able to

25  cope and be able to function back in society.

1     Q.    And when you say acclimated and to get back

2  into society, is there a sense of becoming

3  institutionalized when you're in jail?

4     A.    Yes.

5     Q.    What does that mean?

6     A.    So for instance, with me, I was incarcerated

7  for a decade and a half, and when I first came home,

8  my -- from the halfway house, the halfway house

9  allowed me to go to a Walmart, and when they brought

10  me to a Walmart, I never saw a Walmart, never knew

11  what it was, it never existed to me.  And so when I

12  was walking through the doors alone, that was

13  shocking to me.  And then when I finally got through

14  the doors, I never experienced a cell phone that they

15  have, that's out now.  The cell phones that was out

16  in the 2000s, I never experienced that.

17         So when I seen people talking on phones --

18  they wasn't really talking on the phone but they had

19  their phone in their hand but they were just talking

20  and all I seen was -- and I never knew nothing about

21  the ear buds, I never knew nothing about none of that

22  stuff.  So when I seen that, it made me panic and I

23  passed out and I had a panic attack at Walmart and

24  they had to rush me back to the medical and halfway

25  house.

1          But that's one of the ways because I was so

2     confined for so many years, so for me to be out in

3     society, it was hard.  So I had to go through

4     therapy.  I had to seclude myself so I could get

5     myself acclimated back into society to be able to

6     function the way I'm able to function now.

7          Q.    So would you say -- you talk about therapy.

8     Would you say --

9          MS. KAOUTZANIS:  Your Honor, I'm going to

10    object at this point.  I'm having a hard time seeing

11    this line of questioning as to either Mr. Jones'

12    founding status or his knowledge that they were

13    trying to kill these people on January 27th.

14          THE COURT:  Mr. Crosland.

15          MR. CROSLAND:  Yes, Your Honor.  I'm not

16    going to argue with the government.  I'm following

17    the same protocol that we followed yesterday.  I know

18    with sentencing, we have some latitude.  I'm tying it

19    up right now into -- I'm bringing it back around to

20    Mr. Jones if I can just have a little bit of space.

21          THE COURT:  Let's do that, please.

22          MR. CROSLAND:  I will.  Thank you, Judge.

23    BY MR. CROSLAND:

24          Q.    So you just heard the government say whether,

25    in fact, Mr. Jones knew there was going to be a

1    killing at a courthouse, you heard her say that?

2        A.    Uh-huh.

3        Q.    So my question to you was along the lines of

4    being institutionalized, when you're first out of

5    jail, is there a time that you have to start to learn

6    to make better choices?

7            MS. KAOUTZANIS:  Your Honor, objection.  This

8    has nothing to do with Mr. Jones.

9            THE COURT:  Sustained.  Let's relate this

10   evidence to Mr. Jones.

11           MR. CROSLAND:  Very well.

12   BY MR. CROSLAND:

13       Q.    I'll ask you this way:  When you were working

14   with Mr. Jones -- let me just put a foundation.  You

15   picked Mr. Jones up, you took him to the halfway

16   house, and you stayed mentoring with him, correct?

17       A.    Yes.  I took him to his aunt's house.

18       Q.    Took him to his aunt's house.  That's in

19   Waterbury?

20       A.    Yes.  Waterbury, Connecticut.

21       Q.    Okay.  And did you -- when you worked with

22   Mr. Jones, did you know Mr. Jones to be the head of

23   the Greene Homes Boyz?

24       A.    Not at all.

25       Q.    And tell me how you know this.

```
 1      A.    I know this because he never went there.  He
 2   never was there.  When I was with him or around him,
 3   he never was there because he couldn't leave the
 4   house.  So I wouldn't know or I never heard of
 5   anything like that.
 6      Q.    Okay.  And you said that you also work with
 7   gangs, right?
 8      A.    Yes.
 9      Q.    And you know gang structure?
10      A.    Yes.
11      Q.    Did you know Mr. Jones to be a CEO or head of
12   any gang structure?
13      A.    Not at all.
14      Q.    And you knew Mr. Jones before he was born
15   even?
16      A.    Yes.
17      Q.    Right.  As you hear the government speaking
18   to you now, can you tell this Court clearly whether
19   you continued to know Mr. Jones even after -- strike
20   that.
21            Did there come a point when his ankle monitor
22   and house arrest was relieved?
23      A.    Yes.
24      Q.    And tell us about that.
25      A.    His ankle monitor was relieved and he ended
```

1   up going to stay with his girlfriend.

2       Q.    Okay.  And you stayed in contact with

3   Mr. Jones at that time?

4       A.    Yes.

5       Q.    And even then, you weren't -- you weren't

6   aware of Mr. Jones again initiating individuals or

7   running the Greene Home Boyz?

8       A.    No.  Any time I picked him up or was with

9   Mr. Jones, we were going to therapy, he was going to

10  therapy, or he was going to places with me when I do

11  events as far as speaking to the youth about guns and

12  gang violence and things of that nature.  He would

13  come with me there or I would help him get his --

14  like, his IDs and cards and things of that nature.

15  So any time we interact, what I seen with him, he was

16  just focused on trying to get his self established

17  back into society, trying to get his job, trying to

18  get -- he was going to therapy, like I said, and all

19  the things that he can get to -- he was doing all the

20  things that he can do to get back comfortable with

21  society.  That's from what I had saw.

22      Q.    And would you agree, and if it's the case,

23  please let us know, that Mr. Jones, as you're working

24  with him, is still making mistakes and still trying

25  to get his life together, would that be a fair

```
 1   assessment?

 2       A.   Yes.

 3       Q.   And everyone you're working with aren't

 4   perfect at this point?

 5       A.   Everybody that I work with, a lot of them, I

 6   say that they are considered impulsive thinkers, and

 7   when I'm dealing with them, I try to get them to the

 8   mindset of thinking rationally about things.

 9       Q.   And just a couple last questions to make sure

10   I'm not missing anything.  Did you know Mr. Jones,

11   Laheem Jones, to have lived in the Greene Homes?

12       A.   No.  I actually didn't.

13       Q.   I'm talking about the projects.

14       A.   Yeah.  I never known him to live there

15   actually.

16       Q.   Okay.  So you never visited him there?

17       A.   No.

18       Q.   And you knew he lived with his aunt in

19   Waterbury?

20       A.   He lived with his aunt in Waterbury.

21       Q.   And then later on, he lived with his

22   girlfriend?

23       A.   Later on, he lived with his girlfriend.

24       Q.   And you continue to mentor the youth,

25   correct?
```

```
 1        A.    Yes.
 2              MR. CROSLAND:  Nothing further.
 3              THE COURT:  Cross-examination.
 4              MR. CROSLAND:  Your Honor, may I just
 5    inquire?  I have another witness.  I want to make
 6    sure he's not in the courtroom.  May I canvass?
 7    Mr. Brantley?  Thank you.
 8      CROSS-EXAMINATION OF ANTHONY MARSHALL THOMPSON
 9    BY MS. KAOUTZANIS:
10        Q.    Good afternoon, Mr. Marshall or Mr. Thompson?
11        A.    Mr. Marshall Thompson.
12        Q.    Mr. Marshall Thompson.  Sorry.  I want to
13    start out, what's the name of the organization you're
14    currently running?
15        A.    It's Peace in the Streets.
16        Q.    Peace in the Streets?
17        A.    Yes.
18        Q.    And how long have you been with that
19    organization?
20        A.    I created this organization back in 2019.
21        Q.    And fair to say you've worked with a number
22    of kids?
23        A.    Yes.
24        Q.    Sometimes they succeed --
25        A.    Yes.
```

 1     Q.    -- I assume, and a lot of times they don't?

 2     A.    No.  A lot of times they succeed and

 3   sometimes they don't.

 4     Q.    And with regard to Mr. Jones, so you said you

 5   came home from prison in 2012?

 6     A.    Yes.

 7     Q.    That was after shooting someone in the face,

 8   correct?

 9     A.    Yes.

10           MR. CROSLAND:  Your Honor, I object to the

11   argumentive nature for shooting someone in the face.

12   What's the relevance?

13           THE COURT:  There's been a big question about

14   a whole lot of this relevance.

15           MR. CROSLAND:  Yeah.  And I'm making a big

16   question right now as to that question, not about

17   anything else that happened in the past.  To tell

18   this man --

19           THE COURT:  Okay.  Are you objecting to the

20   question?

21           MR. CROSLAND:  I'm objecting to that form.

22           THE COURT:  I will sustain your objection and

23   ask you to move to your next question, please.

24           The WITNESS:  I can answer that.

25           THE COURT:  No.  It's not pending.

```
 1   BY MS. KAOUTZANIS:

 2      Q.   So when you came home in 2012, you don't know

 3   what Mr. Jones was doing while you were in prison?

 4      A.   I don't.

 5      Q.   Okay.  And when you picked him up, you were

 6   not living with him, correct?

 7      A.   No.

 8      Q.   You were not spending all day long with him,

 9   correct?

10      A.   No.

11      Q.   And you said you brought him to his aunt's

12   house in Waterbury where he stayed for six months,

13   right?

14      A.   Yes.

15      Q.   At that point, again, you were not living

16   with him; is that right?

17      A.   No.

18      Q.   And after that point, he moved back in with

19   his girlfriend to Bridgeport at 262 Harral Avenue,

20   correct?

21      A.   Yes.

22      Q.   And that's in the Hollow, correct?

23      A.   Yes.

24      Q.   And so that's near the Greenes housing

25   project?
```

 1     A.    It's in the Hollow.

 2     Q.    Near the Greenes housing project?

 3     A.    In the Hollow.

 4     Q.    Is it or is it not near the Greenes housing

 5   project?

 6     A.    In the Hollow.

 7     Q.    Now, with regard to Mr. Jones' founding

 8   status, you said you're 45 years old?

 9     A.    Yes.

10     Q.    So you're about 20 years older than Mr. Jones

11   and his friends?

12     A.    Yes.

13     Q.    And you're not a Greene Homes Boyz gang

14   member?

15     A.    No.

16     Q.    You're not a rival gang member?

17     A.    No.

18     Q.    You don't hang out with them in the Greenes?

19     A.    No.  Let me say this --

20     Q.    Yes or no is fine.

21     A.    Okay.

22     Q.    And you don't live in the Greenes, do you?

23     A.    No.

24     Q.    So you don't know what's happening every day

25   in the Greenes, do you?

```
 1     A.    Yes.

 2     Q.    Yes, you know?

 3     A.    Yes.

 4     Q.    Even without living there, you know that?

 5     A.    Yes.

 6     Q.    Okay.  And you don't sell drugs since your

 7   release, right?

 8     A.    No.

 9     Q.    You're not working with Laheem Jones and his

10   friends to sell drugs, right?

11     A.    No.

12     Q.    You're not carrying guns with Laheem Jones

13   and his friends, right?

14     A.    No.

15     Q.    You are not part of their social media or rap

16   videos, correct?

17           MR. CROSLAND:  Objection.

18           THE COURT:  I'm sorry.  What's your

19   objection?

20           MR. CROSLAND:  Not carrying guns like Laheem

21   Jones and his friends, that's not before this

22   gentleman.  There's no evidence that Mr. Jones and

23   his friends are carrying guns.

24           THE COURT:  Do you want to rephrase your

25   question or put it in two parts?
```

```
 1   BY MS. KAOUTZANIS:

 2       Q.    How about we do it like this, I think we

 3   established you were not spending all day long with

 4   Mr. Jones and his friends; is that right?

 5       A.    Uh-huh.

 6       Q.    And you don't know what they were doing

 7   during those hours that you were not with them,

 8   right?

 9       A.    Exactly.

10       Q.    You don't know how his friends perceived him;

11   is that right?

12       A.    Yes, I do.

13       Q.    From being there with them, you know that?

14       A.    I know how they perceived him.  I know how

15   all the kids perceive each other in the city.  I am a

16   violence prevention person.  I am in the city mapping

17   out and I'm in all these areas talking to these kids.

18       Q.    Okay.  Let's just stop there.

19       A.    No.  You asked me a question.

20             MR. CROSLAND:  Let him finish.

21             THE COURT:  No.

22             THE WITNESS:  You asked me a question.

23             THE COURT:  This is not responsive to the

24   question.  The question is:  "You don't know how his

25   friends perceived him" --
```

```
 1              THE WITNESS:  Yes, I do.
 2              THE COURT:  -- "is that right?"  "Yes, I do."
 3              MS. KAOUTZANIS:  Okay.  So --
 4              THE COURT:  Just a moment.  "From being there
 5      with them, you know that?"
 6              THE WITNESS:  Yes.
 7              THE COURT:  Yes.  Next question.
 8      BY MS. KAOUTZANIS:
 9        Q.    So to go back again, you did not spend all
10      day every day with Mr. Jones and his friends?
11              MR. CROSLAND:  Objection.  Asked and answered
12      ten times.
13              THE COURT:  Sustained.  No, not ten times.
14              MR. CROSLAND:  Excuse me.  Maybe five.
15              THE COURT:  Let's not be smart.  Okay.
16              MR. CROSLAND:  I won't be smart.
17              THE COURT:  Let's be organized and systematic
18      and professional and get this thing moving.
19              MS. KAOUTZANIS:  Your Honor, I can bring this
20      to a close.
21      BY MS. KAOUTZANIS:
22        Q.    The point I'm trying to establish here is you
23      were not privy to Mr. Jones' conversation with all of
24      his friends in the Greenes, correct?
25              MR. CROSLAND:  Objection.  Asked and
```

```
 1   answered.
 2           THE WITNESS:  Not all of his conversations.
 3           THE COURT:  Overruled.
 4   BY MS. KAOUTZANIS:
 5     Q.   And you have no idea what Mr. Jones was doing
 6   with his friends in the Greenes prior to 2012?
 7           MR. CROSLAND:  Objection.  Asked and
 8   answered.
 9           THE COURT:  It has not been asked and
10   answered.  Overruled.  The time frame is prior to
11   2012, do you know what Mr. Jones was doing with his
12   friends?
13           THE WITNESS:  Before 2012, right?
14           THE COURT:  Correct.
15           THE WITNESS:  No.  I was incarcerated.
16   BY MS. KAOUTZANIS:
17     Q.   And so your conclusions about Mr. Jones'
18   founding status are based on what people have told
19   you, not what you saw?
20     A.   No.  Not at all.
21           MR. CROSLAND:  Objection to form, "your
22   conclusions."
23           THE COURT:  Overruled.
24           THE WITNESS:  My conclusions, no.  Not at
25   all.  Again, it is because I am an outreach worker.
```

```
 1    I deal with all the gangs and groups in the city of
 2    Bridgeport.  So when I'm dealing with them, I
 3    conversate with every single one of them from each
 4    side of town and I get to know them and know what's
 5    going on.  This is how I deal with them to help them
 6    get out of the situations.  I have safe houses that I
 7    send a lot of them out of the state to change their
 8    lives.  This is how I have to.  I have to know what's
 9    going on.  I have to know how they perceive each
10    individual in their groups.  They're not gangs.  I
11    have to see how they perceive each other in their
12    groups.  I have to know the level of each person in
13    the group so I can see who is the --
14    BY MS. KAOUTZANIS:
15        Q.    Okay.  Thank you.
16        A.    I'm not done.
17        Q.    That's sufficient.  Thank you.
18        A.    Yeah.  Okay.
19        Q.    So you were working with Mr. Jones --
20        A.    Yes.
21        Q.    -- when he was involved in shooting up the
22    courthouse, correct?
23            MR. CROSLAND:  Objection, Your Honor.
24    Objection to form.
25            THE WITNESS:  I don't know nothing about him
```

```
 1    shooting up no courthouse.

 2            THE COURT:  Okay.  The time frame, please.

 3    BY MS. KAOUTZANIS:

 4       Q.   On January 27, 2020, you were working with

 5    Mr. Jones when he was involved in shooting up the

 6    courthouse, yes or no?

 7            MR. CROSLAND:  Objection.

 8            THE WITNESS:  I don't know him to be involved

 9    with shooting up a courthouse.

10    BY MS. KAOUTZANIS:

11       Q.   Were you working with Mr. Jones in January of

12    2020?

13            THE COURT:  I'm going to overrule your

14    objection.  We're focusing on the time frame of

15    January 27, 2020.

16            THE WITNESS:  And I answered it a number of

17    times.

18            THE COURT:  Were you working with Mr. Jones

19    then?

20            THE WITNESS:  Yes, I was.

21    BY MS. KAOUTZANIS:

22       Q.   And in fact, in March of 2020, you were in a

23    relationship with Mr. Jones' mother; is that right?

24            MR. CROSLAND:  Objection, Your Honor.

25    Relevance.
```

```
 1              MS. KAOUTZANIS:  It goes to the witness'
 2   bias, Your Honor.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  Actually, I wasn't.  We weren't
 5   together.  I wasn't in no relationship with her.
 6   BY MS. KAOUTZANIS:
 7     Q.    Were you living in a house with her in March
 8   of 2020?
 9     A.    Never.  I have my own place.
10     Q.    Were you in a house in March of 2020 when
11   there was a police raid and Dha'moni Lockhart threw
12   drugs out of the window?
13              MR. CROSLAND:  Objection, Your Honor.
14   Relevance.
15              MS. KAOUTZANIS:  Your Honor, I think I'm done
16   here.  Thank you.
17              THE WITNESS:  I can answer that, though.
18              MR. CROSLAND:  Objection, Your Honor.
19   Relevance.
20              THE COURT:  We're going to conclude.
21   Anything further, Mr. Crosland?
22              MR. CROSLAND:  Absolutely.  Thank you, Judge.
23   REDIRECT EXAMINATION OF ANTHONY MARSHALL THOMPSON
24   BY MR. CROSLAND:
25     Q.    Good morning again, Mr. Marshall.
```

 1    Mr. Marshall, I'm just going to follow up on a couple

 2    of questions that the government was trying to ask

 3    you just so we're clear.

 4         You speak to Laheem Jones -- you spoke to

 5    Laheem Jones and mentored him after he was released

 6    from prison, correct?

 7    A.    Yes.

 8    Q.    And you speak to and mentor other individuals

 9    in the city of Bridgeport for violence prevention?

10    A.    Yes.

11    Q.    And as part of your job in doing so, do you

12    get to know them and how they perceive other

13    individuals?

14    A.    Yes.

15    Q.    And is it important to know how they perceive

16    other individuals?

17    A.    Yes.

18    Q.    Why?

19    A.    Because that tells -- I need to see who is

20    the person that's influential.  So when I go to that

21    person and I find out who's most influential, I

22    target that person and I make sure I feed that person

23    all the positive so it can bounce off into his

24    friends.  And a lot of times, that's what happens.  A

25    lot of times, that's what happens.  Sometimes, it

1   doesn't, but the majority of time, it does.  And a

2   lot of the guys that I end up dealing with, I deal

3   with another program called VIP, the college prep

4   program, they end up going -- I put them on these

5   tours -- they've never experienced college in their

6   life.  I put them on these tours, bring them out of

7   state.  The next thing you know, they come back and

8   they say, listen, I want to get into school.

9       Q.    And you heard the government say to you a lot

10  of people fail and you disagree with that, right?

11      A.    I disagree with that 100 percent and I have

12  the proof of that with the guys that I work with.

13      Q.    So some people do fail, right?

14      A.    Some people do fail.  It happens.  I have

15  some calling me from prison saying I should have

16  listened to you.

17      Q.    And in doing that work, your goal is to do

18  what?

19      A.    To get them out of the streets and live a

20  successful life, a real life, the life that I wanted

21  to live, and now I realize that's why I'm doing what

22  I do.  I made my mistakes in the past.  I made a lot

23  of mistakes in the past, but no one is going to judge

24  me on my mistakes because I'm a grown man now and I

25  learned from them and it shows in my work.  So to

 1  throw something back at me, I have no problem with

 2  that because I deal with it and I love my experience

 3  because I am who I am now.

 4      MR. CROSLAND:  That's all I can ask for you.

 5  Thank you, sir.

 6      THE COURT:  Anything further?

 7      MS. KAOUTZANIS:  No, Your Honor.  Thank you.

 8      THE COURT:  Thank you then, Mr. Marshall

 9  Thompson.  You are excused.  You may step down.

10      Call your next witness.

11      MR. CROSLAND:  Your Honor, I can do it myself

12  or I can ask the marshals.  I'm trying to call

13  Mr. Brantley.

14      THE COURT:  Why don't you go find him.

15      MR. CROSLAND:  I reported to your courtroom

16  deputy this morning that several people who were here

17  yesterday thought we were going have a one day and

18  they won't be able to come back, but Mr. Brantley was

19  able to work out from his job that he can come but

20  he's eight minutes away.  So I'm not sure if we can

21  take a recess, but he's a vital witness of mine.

22  Again, we're trying the best under the circumstances.

23      THE COURT:  What is his name?

24      MR. CROSLAND:  His name is Roland Brantley.

25      THE COURT:  And what is the subject matter of

1    his testimony?

2         MR. CROSLAND:  His testimony is going to

3    address Mr. Jones living in the Greene Homes and he

4    was Mr. Jones' uncle and he can testify for when he

5    was living there and when he stopped living there and

6    he was like a father to Mr. Jones.

7         THE COURT:  Why don't I -- would it be

8    premature to hear your summaries that you wanted to

9    make in your arguments with respect to sentencing

10   factors of acceptance of responsibility and history

11   and characteristics specifically with Greene Homes

12   Boyz?  It's a little out of order to do that.

13        MS. KAOUTZANIS:  I'm happy to move forward

14   and do that.  I'd also just note with regard to where

15   Mr. Jones lives, the PSR at paragraphs 105 through --

16   I guess even back to 102 through 111, unobjected to

17   paragraphs lay out in detail where he was living

18   throughout his life.  So I'm not sure if that witness

19   is intending to contradict what's in the PSR, but I

20   think the unobjected to factual statements in the PSR

21   make clear where Mr. Jones was living since he was

22   born prior to his incarceration and then following

23   his incarceration.

24        MR. CROSLAND:  I'll just respond briefly that

25   this individual will establish that period of time

 1  and also whether Mr. Jones had an involvement or was

 2  the head of the Greene Homes Boyz.  So I thank the

 3  government for pointing out that part, but he's vital

 4  to testify to just a little bit more than that.

 5          THE COURT:  Anything further that you want to

 6  observe, argue, or present at this point?  I'm just

 7  trying to efficiently use what small amount of time

 8  we have.

 9          MS. KAOUTZANIS:  Your Honor, I would like to

10  present and argue on the two issues that the Court

11  has raised, but perhaps it makes more sense to do

12  that after the witness that Mr. Crosland has if he's

13  going to be testifying about Mr. Jones' founding

14  status.  I'm prepared to move on to sentencing if

15  Mr. Crosland's ready to do that or however Your Honor

16  prefers.

17          THE COURT:  We can do that.  All right.

18  Without having made a determination yet as to all of

19  the applicable guidelines, we can move on to hearing

20  from each side on whether there are aggravating or

21  mitigating circumstances.  Parties are agreed that

22  there is -- a variance is required in this case

23  because the guideline is 360 months which is more

24  than is reasonably needed to serve the goals of

25  sentencing here.

1          So why don't we start with you, Mr. Crosland,

2    on your arguments of the mitigating circumstances

3    that the Court should take into consideration.

4          MR. CROSLAND:  Just briefly, Your Honor, I do

5    believe the Court's aware that Mr. Laheem Jones

6    received a minor role and throughout the

7    guidelines --

8          THE COURT:  I'm sorry.  There's no minor role

9    that was accorded him in the presentence report.  So

10   I'm not sure I understand what you mean.

11         MR. CROSLAND:  I'll rephrase that.  Mr. Jones

12   is very young.  He was very young even at the time of

13   this incident.  The Court has my sentencing memo,

14   which I will stand on that, and I've already

15   articulated in the sentencing memo, as many of the

16   co-defendants have articulated, the way he grew up,

17   the homes that he lived in, the lack of resources and

18   guidance that he had.

19         As outlined in the legal memos, cases of --

20   there's a progeny of cases from *Miller v Alabama* on

21   down that talks about the Court considering an

22   individual's minor age in sentencing.  The -- I

23   believe all those are mitigators in -- that this

24   Court should consider in sentencing.  Obviously, if

25   the Court's asking me for a list, I don't want to

1    read over my whole memo again, but a list of the

2    things in his life that the Court can take notice,

3    which is in my memos, more specifically page 10, the

4    characteristics of the offense are detailed in the

5    PSR, we already know.  Mr. Jones takes full

6    responsibility for his part in the enterprise.  He is

7    remorseful for having decided to be involved.

8         We've articulated, factually speaking, that

9    he had a minor role in this incident.  As articulated

10   by Mr. Marshall who worked with kids in this area,

11   Mr. Jones had been out of jail for maybe a year at

12   this point and it takes a while to start to learn and

13   go through therapy and start to learn to become

14   uninstitutionalized and change your circle of friends

15   and better your decisions.  So I think as a

16   mitigator, the Court should look at that and consider

17   that in terms of making a determination.

18         He understands that -- on page 11, I

19   articulate that he understands that the courthouse

20   shooting was purportedly motivated by the death of

21   another individual from the town, Myreke Kenion.

22   Mr. Jones, as we've been discussing throughout this

23   hearing, didn't know and didn't participate in a plan

24   to execute these people and to do that.  He made a

25   bad decision afterwards and -- which he accepted

1   responsibility for.

2          Mr. Jones, as another mitigator, coming out

3   of jail, he not only was involved with selling of

4   drugs but also using drugs, and they talk about that

5   in the PSR, page PSR 117.  As it relates to the

6   drugs, Mr. Jones both used and sold.  Mr. Jones first

7   tried Percocets in 2019 and became addicted.  Tens,

8   20s, 30s, whatever he could get his hands on, he

9   would use, and that was a situation that was just

10  trying to mask the pain, trying to get back into

11  society, trying to change, and he didn't share that

12  with a lot of people.  That was something that he

13  struggled with on his own.

14          And again, Your Honor, in terms of a

15  mitigator, I would argue that the essence of plea

16  negotiations is not to say I didn't do this, I did

17  this part, I didn't do this, I did that part.

18  Mr. Jones accepted responsibility for everything so

19  we can have a plea that allows him to argue through

20  his sentencing memo and through his argument here

21  today of who he is, but we can't enter into a plea

22  and parcel out, almost make a defense while still

23  trying to enter into a global resolution.

24          So the PSR, I think, outlines who Mr. Jones

25  is, outlines his hardships, outlines what he's been

1    through, and he's only asking for the Court to

2    consider those things as mitigators.  He was very,

3    very young, and as I point out in my sentencing memo,

4    when you add the amount of years that he was in jail

5    so young to where he is now, he's only had like seven

6    years of maturity in free society.

7            I would acquiesce in terms of aggravators,

8    I'll acquiesce to whether, in fact, even if Mr. Jones

9    wasn't at the courthouse, he was associated with

10   these individuals who -- shooting anywhere is a bad

11   thing.  So I don't care if it's in the streets of

12   Bridgeport, in the Hollows as the government calls

13   it, or anywhere else, I think it's just as bad, but,

14   obviously, society looks at a shooting at a

15   courthouse, a place of some sanctity that we hold

16   very high, to be very bad, and I'm glad Mr. Jones

17   wasn't there.  I'm glad he didn't have a gun in his

18   hand, and being involved with that shooting.

19           Again, that's not to dispel the fact that he

20   did something bad afterwards, but I think as well as

21   that's an aggravator in terms of location and how it

22   happened and it's very shocking to our conscious, I

23   think as a mitigator, the Court should take into

24   consideration that Mr. Jones wasn't there, and,

25   again, all the other things that I've articulated in

1   my sentencing memo.

2         Also, just one of the last things I'll say in

3   terms of the global resolution, the idea of coming up

4   to a global resolution, when you look at the street

5   value that was stipulated to in terms of the drugs,

6   that street value is millions of dollars in drugs.

7   That wasn't articulated in the PSR anywhere.

8   Mr. Jones didn't even come close to having that kind

9   of money and I don't even think the whole enterprise

10  had that kind of money, if you could call them an

11  enterprise.

12        As Mr. Marshall articulated, these are groups

13  that for one reason or another hate each other, and

14  when you make that even worse when they're selling

15  drugs trying to make money and people are cutting

16  into your territory, this is what happens in these

17  inner cities and it has to stop.

18        So just as a mitigator, I'd point out to the

19  Court that Mr. Jones stipulated to the 60 kilograms,

20  but Mr. Jones clearly, based on the record that's

21  before us, wasn't living that lifestyle.  He lived

22  with his mom, his two sisters, who one of them are

23  here today, and I have to apologize because we were

24  supposed to be one day and today, she's having a

25  pizza party at school, Brooklyn, who was in the

1   court, and I had to apologize that she's missing the

2   pizza party because we're here another day.  And

3   you've read both his sisters, Brooklyn and London, in

4   the PSR, 12 and 9.

5          And so Judge, you know, I can go into this

6   more in my sentencing argument, but since we're out

7   of space, I kind of got caught off guard, but

8   mitigators in many of these cases and many of these

9   situations are -- I'm watching another mitigation

10  trial and it's going on for four or five days in

11  Florida.  So I can go on for hours telling you about

12  his life as mitigators, but I don't think the way we

13  jumped into this, you want me to spend the time doing

14  that.

15         My sentencing memo articulates it as well as

16  it's been articulated in many other sentencing memos

17  by the co-defendants.  It's the same place, the same

18  conditions, that exist that led young Mr. Jones to be

19  before the Court today and I ask the Court to

20  consider the writings, and not just what I'm saying

21  to you, but the writings that have been submitted and

22  also to apply the Court's own knowledge and awareness

23  of Bridgeport and what's going on in the Greenes and

24  in the Hollows and all of the projects around that

25  area and consider that all the articles that have

1  been articulated, the Harvard journals, the law

2  journals, that's been articulated, the *New York Times*

3  articles, in the other sentencing memos that the

4  Court has read in the same very case that I've read

5  them as well, all those sentencing memos do a much

6  better job at articulating these mitigators.

7        And so, you know, I'll say this in closing, I

8  have to rely on the Court to understand my

9  articulation through my memos and through the other

10  memos and I've been called just a state lawyer and

11  maybe that's all I am and maybe I'm ignorant, but I

12  don't want that to carry over to Mr. Jones.  Any

13  ineffectiveness of me, I'll take that, but I stand

14  here to speak on Mr. Jones and I will do so in my

15  closing presentation that I was prepared to give, but

16  just to respond to the Court respectfully and orderly

17  in terms of mitigators, I've articulated those in my

18  memos.  They are the same mitigators that the

19  co-defendants' lawyers have eloquently articulated

20  and cited and I've cited some sources that support

21  that as well.

22        But just in sum, Mr. Jones was very young.

23  Although he wasn't given a minor role, as the Court

24  articulated, factually, he had a minor role.  He was

25  just starting to go through therapy, et cetera, and

1  trying to get his life back together and he made a

2  stupid decision to destroy evidence after the fact

3  and I ask the Court to consider that.

4         THE COURT:  All right.  From the government.

5         MS. KAOUTZANIS:  Thank you, Your Honor.  I

6  think it makes sense to start out with the

7  seriousness of the offense conduct here, and to do

8  that, I'd just like to read into the record briefly

9  some of the statements from the victims who were shot

10 at the courthouse as well as the statements from the

11 court marshals who were present that day.

12        I know Your Honor has previously heard from

13 them, but for the purposes of this sentencing, so

14 Jaheim Warren has since been killed.  Trevon Wright

15 does not wish to participate.  Jaffar Ali, who was

16 sitting in the victim's car outside the courthouse on

17 January 27th, was shot through his thumb and hand as

18 well as his head.  He still can't use his thumb.  He

19 recalled having his head stapled together in the

20 hospital with ten staples.  He still has migraines

21 and he's stated that he suffers from PTSD and can't

22 play with his son in the way that he was able to

23 before the shooting.

24        There's also Khalil Heard who was driving the

25 car on the day of the shooting.  He was struck in the

```
 1   back six times and the right wrist.  When he got to
 2   the hospital -- the marshals saved his life at the
 3   scene by operating on his chest.  When he got to the
 4   hospital, he had to have an emergency chest tube
 5   inserted to keep him alive.  He still has bullet
 6   fragments in his back.  He still has a loss of
 7   sensation to his fingers and numbness and he still
 8   suffers from PTSD.  These two victims thought they
 9   were just going to pick up their friends at the
10   courthouse when they were shot at 23 times.
11          And then Your Honor has also heard the
12   testimony of four of the court marshals who were
13   present that day.  They described -- Joshua DeLeone
14   had described how he felt it was an active shooter
15   situation, how he was rushing to try to save the
16   lives of the people there.  And he described how
17   afterwards, he too suffered from what can only be
18   termed PTSD in some form saying, quote, I mean, like,
19   you could be walking to your car and someone could
20   close that car door too loud and while you know
21   that's not what it is, you immediately gravitate to
22   that area to look to see what it is.  And he
23   described the horror of cutting the clothes off of
24   one of the individuals, Mr. Ali, the sucking chest
25   wound, and trying to treat him on the floor of the
```

1   courthouse waiting for medics to arrive.

2        Marshal DeLeone also testified in front of

3   this Court -- I'm sorry.  Marshal Quinones also

4   testified in front of this Court and she, again,

5   described how frightened she was running outside to

6   help the people outside, how she saw the gun come out

7   and the shooting begin, and she described finding the

8   driver and then seeing how bloody the scene was,

9   scrambling to get any help she could get with the

10  materials they have, and then again, how they were

11  trying to treat Mr. Heard inside and he just couldn't

12  breathe.  And again, she said, I quote, So it's

13  definitely an experience I didn't think I was going

14  to go through so early, and she says how -- she

15  continued, quote, I always try to now, like, just,

16  you know, be more observant than I was before because

17  you never know what's going to happen, end quote.

18        And then the Court also heard the testimony

19  of Judicial Marshals Adrianna Velez and Kimberly

20  Miller.  Those two also recounted running outside.

21  Marshal Velez tried to keep Trevon Wright conscious.

22  She tried to help him when he was telling her he was

23  going to die.

24        And similarly, Marshal Miller, Kimberly

25  Miller, said she too ran outside.  She tried to help

 1   Mr. Wright who is paralyzed already by that point,

 2   and they both described how they went back inside.

 3   Judicial Marshal Miller said she had never seen so

 4   much blood in her life.  Again, it was the middle of

 5   a Monday afternoon and they were just at work on that

 6   day.

 7          So to go back to the circumstances of how

 8   these attempted murders came about and Mr. Jones'

 9   involvement, and then I'd like to speak a little more

10   broadly about his larger involvement in the gang.  I

11   would like to begin if we can start with government

12   Exhibit 34 and at page 2, if we can just bring that

13   up and just zoom in, again, to the first half of that

14   page.

15          So Special Agent Hyde went over this in

16   detail yesterday, but just to highlight again

17   Mr. Jones' involvement in the planned, premeditated,

18   calculated attempted murders, we start out with

19   Myreke Kenion getting murdered at 5:37 p.m.  And then

20   if we can bring up as a split screen, if we can go

21   first to Government Exhibit 31 , and if you can just

22   zoom in on Government Exhibit 31.

23          So this is one of the Facebook messages that

24   Special Agent Hyde tried to testify about.  So not

25   only does Mr. Jones know as of 8:55 that Myreke

 1   Kenion is dead, but he's communicating with Rpn Dom

 2   trying to get a firearm as Special Agent Hyde

 3   testified to.  And in fact, he says at the end -- so

 4   this continues through January 26th, the conversation

 5   continues up until 11:34 that night.

 6           The next morning, Laheem Jones is up early on

 7   January 27, 2020, and he says, 8:43 a.m.:  Bro, fuck

 8   that whoop, which is referring to the gun, and he

 9   continues, quote, and this is at 8:43.  So I guess

10   three-plus hours before the shooting starts, if it's

11   not there, we go half and buy a better one, referring

12   to buying a better firearm.

13           And if we could next bring up Government

14   Exhibit 32 in place of Government Exhibit 31.  So --

15           THE COURT:  These have been copied to both

16   sides?

17           MS. KAOUTZANIS:  Yes, Your Honor.  They were

18   sent last week and he has a binder as well.

19           And these were testified to about yesterday

20   as well by Special Agent Hyde, but so you --

21           THE COURT:  Thirty-one and 32?

22           MS. KAOUTZANIS:  Government's Exhibit 34 and

23   32.

24           So you have this message on January 27, 2020,

25   from Mr. Jones, again, 10:23 a.m., so an hour and a

1   half or so before the courthouse shooting starts, If

2   you fuck with N word, I don't fuck with you, Rek

3   gang, referring to Myreke Kenion, and if you go to --

4          Ms. Rossi, if you could just highlight, if

5   you could go back to Government Exhibit 34 and just

6   highlight the bottom half of that page.

7          So what's important to note here is that

8   while Laheem Jones is posting these types of

9   messages, the rest of the gang is mobilizing.  So

10  there are the constant communications beginning

11  shortly after Myreke Kenion is killed the night

12  before from Asante Gaines, Tyiese Warren, Laheem

13  Jones to Asante Gaines, Laheem Jones to Asante

14  Gaines, Asante Gaines to Bert Carter, Myreke Kenion's

15  brother, Laheem Jones to RPN Dom, Tyiese Warren, and

16  then starting again the morning of January 27th with

17  Asante Gaines to Jacquon Benejan, Marquis Isreal to

18  Tyiese Warren, Asante Gaines to Destine Calderon,

19  Asante Gaines to Destine Calderon, Asante Gaines to

20  Destine Calderon, Asante Gaines to Benejan.

21          And then in that time period, you have Laheem

22  Jones posting this at the same time, you have

23  Asante -- not the same time, I guess, but about

24  20-plus minutes later, you have Asante Gaines telling

25  Joshua Gilbert that he's going to put people on the

  1  news and the communications continue, so Asante

  2  Gaines with Marquis Isreal.

  3          If we can go to Government Exhibit 34 at the

  4  next page, page 3, and just if you can highlight the

  5  first half of that page.

  6          Again, the premeditation, the planning, the

  7  coordination continues.  Asante Gaines -- sorry, is

  8  that page 3?  Okay.

  9          So continuing down, you have Asante Gaines --

 10  sorry, Marquis Isreal and Tyiese Warren, then Diomie

 11  Blackwell calling Asante Gaines, Marquis Isreal

 12  trying to FaceTime Asante Gaines, and then at 11:24,

 13  we have that phone call that we heard yesterday

 14  through Special Agent Hyde's testimony where Asante

 15  Gaines and Laheem Jones are present together in the

 16  Greene Homes in very close proximity to the

 17  courthouse and they're talking to Shajuan Perry who

 18  is in prison.  That call starts at 11:24.  The car

 19  doors -- I should say on that call, Asante Gaines is

 20  telling Shajuan Perry how Bert Carter's brother was

 21  killed, how things are crazy.  He tells him he's in

 22  the hood with Laheem Jones.

 23          The call continues.  At 11:36, as we heard

 24  yesterday on the call, you heard the sound of the two

 25  car doors slamming and the car driving away.  11:37,

1  the video shows that the Volkswagen Golf, which is

2  the car with Destine Calderon, Asante Gaines, Diomie

3  Blackwell, is parked outside the courthouse.

4  Meanwhile, you have Marquis Isreal calling Tyiese

5  Warren for the 13th time.

6          And Ms. Rossi, I'm going to ask you to pull

7  down Government Exhibit 34 and bring up instead

8  Government Exhibit 2, which is the video of the

9  courthouse shooting.

10          (Video played.)

11          MS. KAOUTZANIS:  So it starts out outside the

12  courthouse steps.  So we know that as of 11- -- I'm

13  sorry, as of 11:36, Asante Gaines and Laheem Jones

14  are together.  Now, this video of Diomie Blackwell

15  going up into the courthouse, that occurs at 11:39,

16  so that is three minutes after Laheem Jones was with

17  Asante Gaines.  Diomie Blackwell exits the blue

18  Volkswagen and enters the courthouse.  He's checking

19  the court list.  And in the meantime, you have Asante

20  Gaines to Marquis Isreal confirming that he's still

21  there at the courthouse.

22          And if we could go ahead, Ms. Rossi, to

23  minute four in the video.

24          (Video played.)

25          MS. KAOUTZANIS:  So while this video is

```
 1   playing, and shortly, the victims are going to leave
 2   the courthouse, let's go over what's happening in the
 3   background.  So by this time, Diomie Blackwell has
 4   reported to Asante Gaines regarding how the victims
 5   have been spotted in the courthouse.  There's further
 6   calls with Tyiese Warren and Marquis Isreal.  And at
 7   12:05, so most critically, and if we can zoom in on
 8   this, so 12:05, Asante Gaines by now we know is
 9   sitting in the blue Volkswagen with -- Diomie
10   Blackwell has now come back in the car.  They're
11   parked at one entrance to the courthouse.  The black
12   Subaru is on the other side.  They're waiting for the
13   victims to come out.  Asante Gaines is FaceTiming
14   Laheem Jones for one minute at 12:05 from that blue
15   Volkswagen outside of the courthouse on FaceTime
16   talking to him from the spotter car.  At 12:07, he
17   calls again for another 19 seconds.  And at 12:08, he
18   calls again for another 51 seconds.
19           (Video played.)
20           MS. KAOUTZANIS:  And in this part of the
21   video that you're seeing on the screen now, you can
22   see a black Subaru -- I'm sorry.  This first shows
23   the victims getting into the Impala and then shortly,
24   you'll see the black Subaru driven by Tyiese Warren
25   and Marquis Isreal come pull up next door and
```

```
 1   23 shots fired into the car with the four victims in
 2   broad daylight with civilians on the sidewalks next
 3   to it outside of the step of the courthouse and then
 4   the chaos that ensues as those victims try to rush in
 5   and get help.
 6         Now, meanwhile, what is Laheem Jones doing?
 7   So as Special Agent Hyde testified to yesterday,
 8   Laheem Jones' cell site places him in the area around
 9   the Greene Homes and the courthouse.  It is not
10   precise enough to say exactly where he is, but we can
11   say with certainty that his cell phone was in the
12   area of the Greene Homes and the courthouse from the
13   time in which he was with Asante Gaines in the Greene
14   Homes up until when he goes exactly three minutes
15   after the shots were fired to Hidalgo Market to
16   purchase bleach and lighter fluid.
17         And what is also important to highlight on
18   this time line that Special Agent Hyde testified to
19   yesterday is that there are no communications between
20   the defendants and Laheem Jones after 12:08 until
21   12:13.  So the last call that Asante Gaines has on a
22   FaceTime call with Laheem Jones that lasts until two
23   minutes before the shooting starts is the last time
24   that Laheem Jones speaks to the defendants, the other
25   defendants.  So he goes and he purchases bleach and
```

```
 1    lighter fluid from Hidalgo Market of his own
 2    initiative without receiving any communication from
 3    the other defendants.
 4          Meanwhile, and if we can go now in the video
 5    to 9:30 in the video, please.  If you could also
 6    highlight on the other side, Ms. Rossi, beginning at
 7    12:14, Asante Gaines' FaceTime call to Laheem Jones.
 8    Okay.  So while Mr. Jones is purchasing bleach, I
 9    guess we can just -- that's good.  Thank you.
10          (Video played.)
11          MS. KAOUTZANIS:  So while you can see in the
12    screen the surveillance from the store in which
13    Mr. Jones is purchasing bleach and lighter fluid,
14    let's look at what's going on.  Asante Gaines has
15    just watched and confirmed that the shootings
16    occurred.  He's on his way to Naugatuck.  He's trying
17    to make sure that Laheem Jones gets what they need to
18    burn the car.  And at this time, it's also important
19    -- I mean, Marquis Isreal has his "Person of
20    Interest" YouTube video where he refers to how if
21    it's a homy, you got to burn the car.
22          So at this point, the defendants know that
23    they fired 23 shots into a sitting car.  So they're
24    operating as if it could have been a homicide.  So
25    they are mobilizing into action.  Asante Gaines is
```

1    calling Laheem Jones, 12:15.  At 12:16, he's getting

2    anxious.  At 12:16, he texts Laheem Jones, WTF, where

3    are you, are you ready to go, we got to get rid of

4    this car, and then we have the rest of this on video.

5            So Laheem Jones, he puts his purchases in the

6    white Volkswagen that his cousin, Angela Teal, had

7    rented.  And finally, at 12:20, he FaceTimes Asante

8    Gaines, he confirms presumably I have the bleach and

9    lighter fluid and I'm going to go get the gas, which

10   he proceeds to do.  And at 12:23, and we'll see it on

11   the video in a minute, Laheem Jones has purchased --

12   is captured on video purchasing a gas can from a

13   Mobil Gas Station.

14           So I'll get to this later when we present our

15   arguments, but the idea that Mr. Jones burned the car

16   because his friends called him is simply not

17   corroborated by the evidence that is before the

18   Court.  There is no evidence that anyone called him

19   after the shooting which suggests that he was aware

20   that the shooting would occur and was working with

21   the others in this closely coordinated plan.

22           (Video played.)

23       MS. KAOUTZANIS:  So this is Mr. Jones at the

24   gas station.  He's getting the gas can.  Meanwhile,

25   the others are driving up to Naugatuck.  Asante

1   Gaines has already started searching the web to see

2   if there's anything that's broken yet about the

3   courthouse shooting which he does at 12:26.  And at

4   12:25, after he fills up his gas can, Mr. Jones will

5   be captured on video leaving the Mobil Gas Station.

6   He comes back in to pay for the gas.  And then at

7   12:25, the car leaves the gas station.

8          And then you have, continuing on the time

9   line, Asante Gaines is reaching out to Jacquon

10  Benejan.  And at 12:34, Laheem Jones and Asante

11  Gaines begin text messaging regarding the plan to

12  burn the vehicle and that's captured in this snippet

13  on Government Exhibit 34.

14         But I'm also going to ask Ms. Rossi, if you

15  don't mind, to take down the video and if you could

16  please bring up in that split screen Government

17  Exhibit 33.  And this is actually the extraction.  If

18  we can just go to the next page beginning on

19  January 27th.

20         This is actually the text message

21  communication between Laheem Jones and Asante Gaines

22  and they go through where the exits are and then

23  continue to coordinate telling each other where the

24  direction is.

25         And if we could skip ahead, Ms. Rossi, to

1    page 4 of that exhibit, I just want to point to one

2    message.  It's indicative of Jones' role in this,

3    taking charge of the situation.  If you could just

4    blow up the first message on the top of the page.

5            So Laheem Jones tells Asante Gaines:  Send

6    location of the car, I'll do the rest.  Okay.

7            So then if we can just go back and then I'll

8    show some pictures in a minute, but the car is burnt

9    in Naugatuck.  So if we could just go back again.  I

10   know the Court has seen these images, but it's

11   important to go through them again.

12           If we could go back -- I'm not going to play

13   the audio footage that we heard yesterday of the

14   shots being fired, but if we can go to Government

15   Exhibit 3 just to look at some of the photos of what

16   happened on that day.  This is the black Chevy Impala

17   that the victims were in filled with gunshots.

18           Government Exhibit 4, another side shot.  I

19   mean, the close proximity of the shooters' vehicle

20   allowed them to shoot directly inside the car at the

21   four individuals inside.

22           Government Exhibit 5, again, you can see the

23   number with those yellow markers mark the shell

24   casings fired, the number of shell casings fired

25   outside the courthouse.

```
 1              Government Exhibit 6, again, more shell
 2     casings.
 3              And then Government Exhibit 7, and this is
 4     just one of the shots of -- I mean, you can
 5     understand why one of the marshals said she'd never
 6     seen so much blood in her life of what was left after
 7     this traumatic event on the floor of the Bridgeport
 8     state courthouse.
 9              And then if we can go to Government
10     Exhibit 8.  And this, again, is just what the victims
11     experienced inside the car, the blood splatter all
12     over the car as they were shot, basically like
13     sitting ducks sitting in the car outside the
14     courthouse.
15              Government Exhibit 9, again, another picture
16     of all the shots fired on the car.
17              And Government Exhibit 10, this shows, for
18     the people sitting in the back, just where the
19     bullets were coming.
20              And then if we can go on to Government
21     Exhibit 11.  And so this was what Laheem Jones took
22     care of, what he told Asante Gaines he was going to
23     do.  He had his bleach, his lighter fluid, his gas,
24     his medical documents that he used to start the fire,
25     and he burnt the Subaru, which he says in the PSR was
```

1    to keep his friends out of jail.

2           And if we can just go on to Government

3    Exhibit 19 -- sorry, 12, you're right.  Government

4    Exhibit 13, these show the tools that Laheem Jones

5    used to burn the car.

6           Government Exhibit 14, again, attempting to

7    cover up exactly -- attempting to burn the whole car

8    was not as successful as they had hoped, but you can

9    still see the partial burnt nature of the car.

10          Government Exhibit 15, please.

11          Government Exhibit 16, and that's the bleach.

12   On one of the bleach bottles, Laheem Jones' DNA was

13   found, the bottle cap, and this is a picture of the

14   bleach that was purchased from the Hidalgo mini

15   market to confirm it was the same bleach that was

16   found at the scene.

17          And so this courthouse shooting, which

18   happened on January 27, 2020, was not Laheem Jones

19   only criminal activity with the Greene Homes Boyz.

20   He was involved with the group back to 2012, and

21   although he spent seven years in prison, he came out

22   and started all over this again.  And his Facebook

23   messages, which are listed in my sentencing memo and

24   in the PSR, provide some examples of the way that

25   Laheem Jones saw himself, saw the gang, saw their

1   attempts to control the city.

2          So he gets out in March of 2019.  A month

3   later, he's posting, quote:  Never fold, I won't give

4   up on a soul.  So telling other people don't

5   cooperate, don't fold, don't tell on anyone.  On

6   June 19, 2019, he posted:  Ain't no monkeys in the

7   middle, we killing N word that play both sides, end

8   quote.  On October 11, 2019, Mr. Jones posted, quote:

9   Dead opps, all my bodies be head shots, end quote.

10          So these are Facebook messages of someone who

11   is promoting violence, inciting violence, someone

12   who's promoting a gang code of conduct where you

13   don't cooperate, where it's impossible to be in the

14   middle but you must choose a gang where you're from,

15   and he also posts things to other people who aren't

16   as real as he is, I guess for lack of a better word.

17          So on November 3, 2019, he posts on Facebook:

18   If you don't put in work for New Ski, King Cod,

19   Lizzy, Fetti, stop acting like you gang, you a bitch

20   who pretending.  So Mr. Jones is calling out these

21   people who aren't as real as he is who aren't putting

22   in, quote, work for the gang, who aren't committing

23   acts of violence, who aren't doing criminal activity.

24          And additionally in my sentencing memo, I lay

25   out in some detail the messages that show Laheem

```
 1   Jones was using, carrying guns.  Again, and I'll get
 2   into this more in a minute, but this is -- I mean, he
 3   gets out of jail in March, he ends his parole in
 4   January, and throughout this time having just spent
 5   seven years in jail, he's returned exactly to what
 6   got him into trouble in the first place doing exactly
 7   the same things, selling drugs, carrying guns and
 8   promoting violence.
 9            And I just -- I know Your Honor has seen a
10   number of the YouTube videos that this group has put
11   out, but I just want to play at least one of them for
12   the Court and that would be Government Exhibit 28
13   which is "We Da Opps".  This was posted to YouTube on
14   April 30, 2020.
15            (Video played.)
16       MS. KAOUTZANIS:  So what's important here is
17   the refrain of the song.  So I forgot to point out
18   but 11 seconds in the video, and I screen shotted the
19   picture that's in the sentencing memo, Mr. Jones
20   appears masked up with a firearm, but the more
21   important thing, I think, is the refrain of the song,
22   so it's:  Who the opps, fuck that, you the opps, and
23   then Heemdog, Peto, Q, the opps.  Now, Heemdog, the
24   cooperating defendants would have testified, is
25   Laheem Jones.  So he's being called out as part of
```

1  the opps with Q, who is the rapper in this, and Peto,

2  and then also later with Moni, who was Dha'moni

3  Lockhart; Blick, who is Jacquon Benejan; and TD, who

4  is Demetrius Robinson.

5           And then if we keeping watching at 2:05,

6  Laheem Jones will appear again in the video.  It's

7  also worth noting some of the background in the

8  video.  At one point in this video that's filmed in

9  the Greene Homes has "all rats die" written on the

10 walls.

11          So if you can continue playing the video.

12          (Video played.)

13     MS. KAOUTZANIS:  Again, shout out to my

14 brother, Rek, there's a reference to over on the east

15 side leave a stain, do a robbery, do something on the

16 east side.  Again real things, real people, real

17 events.  This is where I pause.  You can see

18 Benejan's face up in the front.

19          You can continue.

20          (Video played.)

21     MS. KAOUTZANIS:  So then at this point,

22 Heemdog run it up -- said run it up so, we're out

23 here running track meets.  So again, it's Heemdog

24 told us this, Heemdog told us let's sell drugs, so

25 we're out here doing this.  So this video, I said, is

1   posted to YouTube on April 30, 2020.  Laheem Jones

2   gets out of jail in approximately a year -- so it

3   doesn't take him that long before he's getting back

4   involved into all this stuff.  And this also is worth

5   noting that this is -- the courthouse shooting occurs

6   in January.

7           They know by this point how severe and they

8   know that Trevon Wright is paralyzed, they know that

9   Khalil Heard almost died, and no remorse three months

10  later, "We Da Opps" and we're going to rap about

11  Glocks, we're going to rap about what we do throwing

12  shots.

13          If you can continue.

14          (Video played.)

15          MS. KAOUTZANIS:  And if we can just play

16  briefly the 4E.  Just briefly, the 4E, "Yp Que," and

17  "Timo" music video.  You don't have to play the whole

18  thing.  This is another one of the music videos

19  filmed in the Greenes.

20          (Video played.)

21          MS. KAOUTZANIS:  Again:  This is for Rek.

22  "All rats die," again on the walls.  You can see all

23  the firearms.  We don't have to play all this.  But

24  if we could bring up -- we know Laheem Jones was

25  there when the video was filmed because of the videos

```
 1   that he sends.
 2          So if we can bring up Government Exhibits 26
 3   and 27.  You can see Marquis Isreal.  And then
 4   Government Exhibit -- there's Laheem Jones right
 5   there.
 6          (Video played.)
 7          MS. KAOUTZANIS:  Can you just pause it?
 8          So that's him right there in the background
 9   with Quoron Washington during the filming of this
10   video.
11          (Video played.)
12          MR. CROSLAND:  What exhibit is that?
13          MS. KAOUTZANIS:  That is Government
14   Exhibit 26 sent on February 25, 2020.
15          There he is again on the side.  And you can
16   see Marquis Isreal, Jacquon Benejan, other members of
17   the gang in the video.  And what is most striking is
18   the number of firearms that these individuals are
19   carrying, waving, holding, brandishing the drums.
20   Again, this video was sent on February 25, 2020.  So
21   we are a month after almost killing, but for the
22   grace of God, four people, and this is the video that
23   Laheem Jones and his friends -- this is what they're
24   doing.
25          (Video played.)
```

1          MS. KAOUTZANIS:  And then finally, in terms

2     of Jones' criminal history activity, there's his drug

3     dealing.  So Mr. Jones has prior drug dealing before

4     he gets out of jail.  He continues doing it when he

5     gets out and that's exhibited -- so first of all,

6     Laheem Jones pled guilty to dealing in crack,

7     Percocet, heroin, and marijuana.  That's exhibited

8     through the Facebook messages in the government's

9     memorandum.  That would have also been proven at

10    trial through the testimony of cooperating

11    defendants.

12          And what's interesting and worth highlighting

13    in the PSR is, again, after the courthouse shooting

14    in March of -- well, beginning in January of 2020 and

15    going into March of 2020, there's controlled buys of

16    Laheem Jones in the Greene Homes housing project

17    where the individual is purchasing crack cocaine from

18    Laheem Jones and those eventually lead to a warrant

19    for -- a state warrant for Laheem Jones' arrest, but

20    on February 20, 2020, as noted in paragraph 99 of the

21    PSR, law enforcement officers -- the informant calls

22    Jones on the telephone in the presence of detectives

23    and after purchasing crack cocaine from Laheem Jones

24    and turning it over to law enforcement, the

25    confidential informant tells law enforcements that

```
 1   Laheem Jones said, quote:  You came at the right
 2   time, I lost mad grams, I didn't add enough baking
 3   soda and I lost, like, 36 grams, it's been crazy,
 4   which suggests not only that Laheem Jones is selling
 5   the drugs but he's mixing them and preparing them for
 6   distribution.
 7         And then with regard to the other factors
 8   that I'd like to highlight for the Court, a lot of
 9   them relate to what has become clear is his attempted
10   minimization of his role.  So I don't know if it's
11   appropriate at this time if Mr. Crosland's witness is
12   here to have that witness and then continue to those
13   arguments.
14         THE COURT:  So we've held off to await the
15   next witness on that and the other issue.
16   Mr. Crosland, do you know if your witness is here?
17         MR. CROSLAND:  I can check because he doesn't
18   have a phone.  So I've been texting but no response.
19   He's here.
20         THE COURT:  All right.  I invite you to come
21   and take the stand and please remain standing while
22   you're sworn.
23         Brantley Roland, sworn.
24         THE CLERK:  Please be seated and state your
25   name for the record spelling your last name and
```

```
 1   giving the town of your employer.

 2            THE WITNESS:  Brantley Roland.

 3            THE COURT:  And the town where you are

 4   employed or where you reside.

 5            THE WITNESS:  I reside at 372 Main Street,

 6   East Haven.  I'm employed by Brantley Investments.

 7            THE COURT:  You may proceed.

 8            MR. CROSLAND:  Thank you, Judge.

 9        DIRECT EXAMINATION OF BRANTLEY ROLAND

10   BY MR. CROSLAND:

11     Q.    Good afternoon, Mr. Brantley.  Mr. Brantley,

12   how old are you today?

13     A.    Excuse me?

14     Q.    How old are you today?

15     A.    How old am I?

16     Q.    Yes.

17     A.    Fifty-four.

18     Q.    And where are you employed again?

19     A.    I didn't hear you, sir.

20     Q.    Where are you employed?

21     A.    I'm the CEO of Brantley Investments, LLC

22   located out of Bridgeport, Connecticut.

23     Q.    And what does Brantley Investments do?

24     A.    What we do is we take on properties that are

25   in distress.  I advise the landlord of what to do
```

 1   with their investments.  I also do the construction

 2   of it just as well.  The whole thing is to find a

 3   proper approach to his investment so he can get the

 4   full return.  I also deal with Section 8 clients.  I

 5   also -- I only do that due to construction to get the

 6   apartment up to par so he can get a good return on

 7   his investment.

 8       Q.    And where did you grow up?

 9       A.    Bridgeport, Connecticut.

10       Q.    Okay.  And do you know a Laheem Jones?

11       A.    Yes, I do.

12       Q.    And do you see him in court today?

13       A.    Yes.

14       Q.    And how do you know Laheem Jones?

15       A.    I like to say he's my cousin, but I always

16   say I'm his uncle.  He's actually my cousin.  We

17   always say that I'm his uncle being that I'm one of

18   the older members of the family.

19       Q.    And where did you grow up in Bridgeport?

20       A.    Numerous projects.  It depends on what year.

21   The Greenes apartments, I resided right down the

22   street from there.  I also grew up, numerous

23   projects, PT Barnum, Father Panic Village, the

24   Terrace as well.

25       Q.    And did you know Mr. Laheem Jones to live in

1    the projects?

2        A.    Yes, I did.

3        Q.    What projects did you know him to live in?

4        A.    The Greenes apartments, I believe.  My

5    recollection is building 5, fifth floor, apartment

6    506 by the elevator, because I used to go visit him

7    there when he resided with his mother, Mycheral.

8        Q.    What's his mother's name?

9        A.    Excuse me?

10       Q.    You said when he resided with his mother?

11       A.    Yes.  Mycheral Walker.

12       Q.    Okay.  Ms. Walker.  And from what period did

13   you recall him leaving at the Greenes?

14       A.    I believe 2012 for seven years, I believe.

15       Q.    And when you grew up in the Greenes, was

16   there gang activity or gangs in the Greenes?

17       A.    There's always been gang activity.  It just

18   took another name.  There was always gang activity

19   there before him, after him.  It's always existed.

20       Q.    Do you know if Laheem Jones started the

21   Greene Homes Boyz?

22       A.    No.  There was already a gang present there

23   before him, numerous gangs, the Brotherhood, the

24   Nation, the Zapatas.  The identity of the Greene

25   Homes Boyz, I believe they had to categorize what

1    part of town, so they gave it the Greenes, the

2    newspapers, the identity, the cops, because the

3    Greenes is where the location of whatever took place

4    at.  So that's the identity.  They didn't know what

5    it was, I believe.

6         Q.    Okay.  And so that identity, if you lived in

7    the Greene Homes and you were caught in another area

8    of town, were you viewed as a Greene Homes Boyz?

9         A.    Absolutely.  If you resided there or if you

10   were even hanging in the vicinity known as Bull's

11   Heads, because it's not only the Greene Homes, it's

12   the Bull's Heads.  It's the whole -- that area took

13   place from -- probably was called the Hollow from

14   James Street to Center Street, just in that area,

15   George Street.  So it covers that area.  The Greene

16   Homes covers probably a half a mile radius.  If you

17   resided in that area, you was known as a Greene's

18   boy.  You wasn't known as anything else.  You could

19   not go to any part of town because if you did, it'll

20   be a problem.

21        Q.    And was Mr. Laheem Jones young when he was

22   living in the Greene Homes?

23        A.    Yes, he was.  A good kid.  Yes, he was.

24   Like, 15, I believe, a little bit under that,

25   12 years old.  Like I said, I used to go and see them

1  when they resided in building 5 all the time, go

2  there and talk to him, give him some mentorship, hope

3  for the best.

4      Q.   Okay.  And is it fair to say Laheem Jones,

5  like others, were involved in the streets?

6      A.   I wouldn't know that.  The only thing I know

7  of him as being, how you doing, uncle, what's going

8  on, we'll talk briefly for the day.  As far as

9  whatever characteristics in the street, I would know

10  nothing about that.

11      Q.   Did you know that he went to jail?

12      A.   Yes, I did.

13      Q.   Okay.  And do you recall what period that

14  was?

15      A.   I know that he did seven years, but at the

16  age of 15, I believe that, and then I seen him when

17  he got out and we spoke briefly, what he -- you know,

18  what would be your motive, how do you get the

19  support, instrumental support or emotional support,

20  from your family and try to conduct that just as well

21  to change his characteristics or due to the

22  environment where he resided at.

23      Q.   And you talked about characteristics.  You

24  are well aware of violence in Bridgeport in the

25  Greene Homes?

```
 1        A.    Yes, I am.   The Greene Homes is where one of
 2   my uncles died.   That was the first day that I ever
 3   seen my grandfather cry, so I remember it well.   I
 4   remember the spot.   I remember the identity.   I
 5   remember the crisis that existed there.
 6        Q.    The violence, you saw your uncle die in the
 7   Greenes, right?
 8        A.    Yes.
 9        Q.    And Mr. Jones was a young boy at that time?
10        A.    Yes, he was.   He was very young, just being
11   born at that age, at that age in time.   He was very
12   young.   He wasn't even -- I want to say -- no.   He
13   wasn't born at that particular time.   He was probably
14   four to five years, six years after that.   That's
15   what I remember.
16        Q.    All right.   And the same time that Mr. Jones
17   was there or around that time, if you recall, being
18   subject to any violence?
19        A.    Was he subject to any violence?
20        Q.    You.
21        A.    Oh, me?
22        Q.    Yeah.
23        A.    Absolutely.   I lived in the Hollow.   This is
24   where we talked about that radius and that area.   I
25   was shot probably -- I was shot three different times
```

```
 1   on two different occasions.  So I've been shot three

 2   times on two different occasions.

 3       Q.   Okay.  And you discussed with me law

 4   enforcement involved and why you were shot once,

 5   right?

 6       A.   Yes.

 7            MS. KAOUTZANIS:  Your Honor, relevance.

 8            THE COURT:  Sustained.

 9            MR. CROSLAND:  Okay.

10            THE COURT:  We're talking about Mr. Jones.

11            MR. CROSLAND:  I was going to connect it up.

12   BY MR. CROSLAND:

13       Q.   Gang violence was a part of -- strike that.

14            Mr. Jones you said you knew pretty much all

15   his life?

16       A.   Yes.

17       Q.   You would know if, in fact, he was the head

18   or founder of a gang, correct?

19       A.   Yes.

20       Q.   And you're aware of the gang violence and the

21   gang memberships loosely throughout the projects,

22   correct?

23       A.   Yes.

24       Q.   And you were shot as a result of gang

25   violence, correct?
```

 1      A.    Yes.

 2      Q.    And can you just explain briefly so I can

 3   understand what you're saying?

 4      A.    Well, when I was shot or --

 5      Q.    Yes.

 6         MS. KAOUTZANIS:  Your Honor, the question as

 7   to why he was shot has nothing to do with Mr. Jones.

 8         THE COURT:  So the question is -- that you

 9   started with, "You would know if, in fact, he was the

10   head or founder of a gang, correct?"  "Yes."  "And

11   you're aware of the violence and gang memberships

12   loosely throughout the projects?"  "Yes."  I think

13   that's -- if you would continue in that line of

14   questioning, we would have relevance.

15         MR. CROSLAND:  Very well.

16   BY MR. CROSLAND:

17      Q.    I'm not sure if you heard the government

18   playing tapes that Mr. Laheem Jones was trying to

19   encourage people not to cooperate with the police.

20   You heard that?

21      A.    I heard in the videos that was being said,

22   yes.

23      Q.    And you heard the government talk about the

24   fact that Mr. Jones' idea is to tell others don't

25   cooperate with the police.  Do you remember that?

1      A.    Yes.  I heard that on the video.

2      Q.    And isn't it true that police gave you a

3   business card and you were shot because of that?

4           MS. KAOUTZANIS:  Your Honor, relevance.

5           THE COURT:  I don't understand the relevance,

6   Mr. Crosland.  We're supposed to be talking about

7   Mr. Jones.

8   BY MR. CROSLAND:

9      Q.    Let's talk about Mr. Jones.  Mr. Jones wasn't

10  immune to any of the same violence that you're

11  talking about, right?

12     A.    Immune as to what?  Can you please give me

13  detail?

14     Q.    Immune like if you're coughing and you're

15  sick and you may have COVID and then you get a

16  vaccine and the vaccine stops you from being sick

17  anymore.  You know immunity, build immunity?

18     A.    Yes.  I know what that means.

19     Q.    So that's what I'm talking about.

20     A.    No.  He's not immune to it.

21     Q.    He was subject to that violence like

22  everybody else, right?

23     A.    Yes, he is.

24     Q.    And he had to do what he had to do to survive

25  in that violent environment like everybody else,

1  right?

2      A.   Absolutely.  It's a dog eat dog world.

3      Q.   And Mr. Jones is still young as he sits here

4  today, right?

5      A.   Yes.

6      Q.   Okay.  And so just a few brief questions just

7  to stay on point.  Mr. Jones, you know him for a long

8  time and there's nothing before you that made him the

9  CEO of any Greene Homes Boyz, right?

10     A.   No.

11     Q.   And the Greene Homes Boyz and other names in

12  Greene Homes projects existed far before he was even

13  born; is that correct?

14     A.   Absolutely, yes.

15     Q.   And the violence that killed your uncle, gang

16  related, correct?

17     A.   Yes.

18     Q.   And Mr. Jones was probably a toddler at that

19  time, right?

20     A.   No.  I don't even believe he was even born at

21  that time.  That's what I'm trying, you know, to

22  recall when he was born, but he wasn't even born at

23  that time.  I believe it was six or seven years after

24  or probably even longer to be exact, but he wasn't

25  around.  Like I said, it was the first time I seen my

```
 1  grandfather cry.

 2      Q.   So to hear the government, you heard -- to

 3  hear the government say that Mr. Jones then became

 4  born and now started a gang in the Greene Homes, do

 5  you agree with that?

 6      A.   No.

 7           MR. CROSLAND:  Nothing further.

 8           THE COURT:  Cross-examination.

 9           MS. KAOUTZANIS:  Thank you, Your Honor.

10       CROSS-EXAMINATION OF ROLAND BRANTLEY

11  BY MS. KAOUTZANIS:

12      Q.   Good afternoon or morning.  So I think you

13  said you're the cousin or uncle, you call yourself

14  the uncle of Mr. Jones?

15      A.   You are correct, yes.

16      Q.   And that you're living in New Haven right

17  now?

18      A.   East Haven.

19      Q.   East Haven?

20      A.   Yeah.

21      Q.   Okay.  And I think you also said that you

22  don't know -- I mean, you're not living in

23  Bridgeport, right?

24      A.   I resided in Bridgeport all my life.  I just

25  moved to East Haven three years ago.
```

1     Q.   So for the past three years or since Laheem

2  Jones has been out of prison most recently, you

3  haven't been living in Bridgeport?

4     A.   No.  My work --

5          MR. CROSLAND:  Objection.

6          THE COURT:  What?

7          MR. CROSLAND:  I said objection, compound.  I

8  heard like three questions in there.

9          MS. KAOUTZANIS:  I can break it apart, Your

10 Honor.

11 BY MS. KAOUTZANIS:

12    Q.   So I said -- I believe you said you moved to

13 East Haven three years ago?

14    A.   Yes.

15    Q.   So you've been living in East Haven since

16 2019?

17    A.   You are correct, yes.

18    Q.   And since Laheem Jones got out of prison in

19 2019 -- do you know if that's right?

20         MR. CROSLAND:  Objection, Your Honor.  Since

21 Laheem Jones got out of prison, is that right, what's

22 the question?

23 BY MS. KAOUTZANIS:

24    Q.   Do you know if Laheem Jones got out of prison

25 in 2019?

```
 1      A.    Yes.

 2      Q.    So you have not been living in Bridgeport

 3   since Laheem Jones got out of prison, right?

 4      A.    My business is located in Bridgeport.  That

 5   gives me -- I have to be in Bridgeport actually every

 6   day where he was -- as far as the Greenes apartments,

 7   I do business with a program called Section 8 where I

 8   turn in rafters or I give -- I just administer

 9   landlords on their behalf.  So the Greenes

10   apartments, I'm there every -- probably four times a

11   week.

12      Q.    Okay.  So you're in the Greenes four times a

13   week, but you're not living there, correct?

14      A.    I don't live there, no.

15      Q.    Okay.  And I thought you said that Laheem

16   Jones' family moved to the Greenes in 2012 and were

17   living there for about seven years.  Did I hear you

18   correctly?

19      A.    I believe so, yes.

20      Q.    Okay.  And I think you also testified that

21   there was always gang activity in the Greenes, it's

22   just taken different names; is that fair to say?

23      A.    Yes.

24      Q.    So there hasn't always been a gang that calls

25   itself the Greene Homes Boyz, right?
```

```
 1        A.    Yes, there has.  Prior to that, the Greene
 2   Boys, the Hollow Boys, those are just the names.  The
 3   Greene Boys was before him.
 4        Q.    Okay.  So there's been different names for
 5   the gang?
 6        A.    Yes.
 7        Q.    Were you a part of the Greenes Boys?
 8        A.    No, I wasn't.
 9        Q.    So do you know exactly when it was founded or
10   the circumstances of it?
11        A.    The only thing I heard was just the name.  I
12   played basketball out there for years during the
13   summer when they had a basketball court.  I spoke to
14   kids that lived in that particular environment.  I'm
15   also a product of my environment.  So the identity of
16   the Greenes apartments would be something I would
17   know.
18        Q.    Okay.  But let me ask you this:  Have you
19   seen rap videos where gang members take credit for
20   being part of the Greene Homes Boyz?
21        A.    I don't watch rap videos.  I'm too old for
22   that.
23        Q.    And have you talked to any individuals who
24   say that they were in the Greene Homes Boyz gang?
25        A.    No.  The only thing I do is when I go to --
```

1    there's a store that's located there.

2        Q.    Junco's?

3        A.    Yes.  I don't know if they're in the gang or

4    not.  When we talk, we talk, we have conversations,

5    business conversations of, you know, how I got

6    started, where I'm at.  They always ask me how much

7    money am I making.  They never -- that's it.  You

8    know, that's what they always want to know.

9        Q.    Okay.  So you haven't talked to -- you

10   haven't had a conversation with any Greene Homes Boyz

11   gang members where they tell you that they're part of

12   the gang?

13       A.    I don't have -- I don't recall them being a

14   gang member.  The only thing that the kids -- I do

15   know them because I resided around them, we speak on

16   occasions.  So I don't know whether they're

17   specifically a gang member.

18       Q.    Okay.  And you aren't privy -- I assume

19   you're not friends with people Laheem Jones' age on

20   Facebook and social media, correct?

21       A.    I don't watch Facebook.

22       Q.    So you don't know any of their communications

23   between each other?

24       A.    No, I don't.

25       Q.    Okay.  And you testified you have not been in

1    the Greenes, at least not 24/7, in the past three

2    years; is that fair to say?

3        A.   I'm in the Greenes apartments five times a

4    week because I do turn in Section 8 vouchers.  That's

5    located at the tail end of the Greenes apartments.

6    If I drive through, we -- when I come, I'll drive

7    through the circle and I'll see who's out there.

8    I'll say hi, what's up, how you guys doing, and I'll

9    turn back around.  It's like in the summertime, we

10   drive through there with our cars to just to see

11   who's out there.  So periodically in the summertime,

12   I'm usually there more often than others.  If I see

13   him or one of the guys, I say, hi, how you doing,

14   what's going on.

15       Q.   Okay.  But fair to say you don't know who was

16   calling themselves Greene Homes Boyz at this time or

17   over the past several years, do you?

18       A.   I don't recall that, no.

19       Q.   And you are not with these individuals at all

20   times with the guys in the Greenes?

21       A.   No.  I work.

22       Q.   Okay.  So your basis for knowledge as to

23   whether Mr. Jones was the founder of the gang is

24   based on what you've seen from your time in the

25   Greenes, I guess, and the fact that he's your family

 1  member; is that fair to say?

 2          MR. CROSLAND:  Objection.  Compound, time in

 3  the Greenes or family member.

 4          THE COURT:  You want to put that in two

 5  questions.

 6          MS. KAOUTZANIS:  I can break it down, Your

 7  Honor.

 8  BY MS. KAOUTZANIS:

 9      Q.   So your basis for any conclusion about

10  Mr. Jones' founding status in the Greene Homes Boyz

11  gang is based first on him being your family member;

12  is that fair to say?

13      A.   I had conversations in the past when he was

14  out there.

15      Q.   With Mr. Jones?

16      A.   With Mr. Jones.  He never informed me that he

17  was head, leader as such, of that type of identity or

18  what you're trying to establish here.  He's never

19  informed me that he is this individual that you guys

20  are speaking of.

21      Q.   Okay.  So Mr. Jones never told you that he

22  was the head of the gang?

23      A.   Absolutely not.

24      Q.   And he presumably did not tell you that he

25  was going -- let me ask it a different way.

1              Did he tell you on January 27, 2020, that he

2     was going to go help others to shoot the courthouse?

3              MR. CROSLAND:  Objection.  Outside the scope

4     of direct, not even relevant to the purpose of this

5     witness.  That's why I didn't go into it.

6              MS. KAOUTZANIS:  Your Honor, I think it gets

7     to the limited nature of what this witness does know

8     about Mr. Jones' criminal activities.

9              MR. CROSLAND:  We can go into that for days,

10    but that's not relevant to this section of the

11    examination.

12             THE COURT:  I'm going to permit the

13    government to ask whether he had any conversation

14    with Mr. Jones with the subject matter of the

15    January 27, 2020, courthouse shootout.

16             MR. CROSLAND:  No objection to that then.

17    BY MS. KAOUTZANIS:

18    Q.    Can you answer the question?

19    A.    Can you repeat the question, please?

20    Q.    If Mr. Jones spoke to you before the shooting

21    at the courthouse about that shooting --

22    A.    I speak to Mr. Jones at that time often,

23    very, very often, not one time.  He's never mentioned

24    that he was going to or whatever was going to happen

25    there, unheard of to me.

1    Q.   And Mr. Jones did not tell you that he was

2  selling drugs?

3    A.   No.

4         MS. KAOUTZANIS:  Okay.  No further questions,

5  Your Honor.

6         REDIRECT EXAMINATION OF ROLAND BRANTLEY

7  BY MR. CROSLAND:

8    Q.   Mr. Brantley, the government consistently

9  asked you about the word "gang."  You heard that?

10    A.   Yes.

11    Q.   Is it your testimony that groups that live in

12  the Greene Homes are seen as the Greene Homes Boyz?

13    A.   Absolutely.

14    Q.   And the media views them that way?

15    A.   Absolutely.  Even I, even I'm from that part

16  of town, they call me the Greenes boys just as well.

17  I mean, anybody that resides in this area, if you're

18  from that area, long term, short term, you're related

19  to that.  That's your identity.

20    Q.   And being identified as being from the

21  Greenes doesn't make you a gang, does it?

22    A.   Absolutely not.  It's just a tag to -- it's

23  just an image.  It's just identification.  It's just

24  like a scar that never goes away.

25    Q.   And so when the government creates these gang

```
 1  databases and puts people in there, because you live
 2  in the Greenes, do you object to that?
 3           MS. KAOUTZANIS:  Your Honor, relevance.
 4           MR. CROSLAND:  I'll withdraw it.
 5  BY MR. CROSLAND:
 6    Q.    You're familiar with these gang databases,
 7  correct?
 8           MS. KAOUTZANIS:  Your Honor, relevance.
 9           MR. CROSLAND:  I'll withdraw it.
10           THE COURT:  Can we finish up with the witness
11  if there's nothing else?
12           MR. CROSLAND:  I'm talking, Judge.  So that
13  means I have more to say.  If you don't mind, can I
14  finish my examination, my cross?
15           THE COURT:  Yeah.  But don't keep repeating
16  the same area and then withdraw the question.
17           MR. CROSLAND:  Okay.  If they object --
18           THE COURT:  I'm interested in getting this
19  done efficiently.
20           MR. CROSLAND:  Thank you.
21           THE COURT:  Thank you.
22  BY MR. CROSLAND:
23    Q.    So when you're from this area, you don't have
24  to sign a treaty or join a gang to be considered a
25  gang, do you?
```

1     A.    Absolutely not.  Unheard of.

2     Q.    And the government was asking you did you

3  know or did you have any knowledge that Mr. Jones was

4  the head of the Greene Homes Boyz.  Do you recall

5  that question?

6     A.    Yes, I do.

7     Q.    And you're in the Greenes a substantial

8  amount of time, aren't you?

9     A.    Absolutely.

10    Q.    So you don't necessarily need Mr. Jones to

11 tell you that he's the head of a gang for you to

12 maybe learn that from other people, do you?

13    A.    No.

14    Q.    And did you learn that from other people when

15 you were in the Greenes all this time?

16    A.    Yes.

17    Q.    And you're an elder, would you say, to these

18 young boys?

19    A.    Absolutely.  And a mentor.

20    Q.    And a mentor.  So it won't be a secret if

21 someone who's like your nephew was the head of this

22 gang, you would hear that, wouldn't you?

23    A.    They would talk to me personally and if there

24 was a situation with him, they would talk to me

25 personally and I would go and talk to him, but I

1   never heard of this, what's going on.

2       Q.   So when the government's asking you did you

3   know everything about him and did you speak to him

4   every single day, do you need to speak to him every

5   day to know he's the head of a gang?

6       A.   Absolutely not.

7           MR. CROSLAND:  Thank you.

8           THE COURT:  Anything further?

9           MS. KAOUTZANIS:  No, Your Honor.

10          THE COURT:  Thank you, Mr. Brantley.

11          THE WITNESS:  Thank you, Your Honor, for

12  being very patient with me.

13          THE COURT:  I'm patient with everyone.

14  Haven't you noticed?

15          All right.  Does the government wish to

16  proceed further at this time or have you said what

17  you have to say?

18          MS. KAOUTZANIS:  Your Honor, I'd like to be

19  heard on the two issues that the Court raised with

20  regards to this hearing and I would like to return to

21  acceptance and the 3553(a) Factors.  So I can do that

22  now or whenever the Court would like.

23          THE COURT:  Would you prefer to go first,

24  Mr. Crosland?

25          MR. CROSLAND:  No, Your Honor.  The

1    government can go first and I just wanted to -- I

2    guess I can do it as part of my presentation, but I

3    wanted to return to Government's Exhibit 26 that was

4    shown on the video during their earlier presentation

5    because there was something that needs to be cleared

6    up because there was, what I view, a

7    misrepresentation based on that exhibit.  So I could

8    either run it into my closing --

9            THE COURT:  Why don't we package it that way.

10           MR. CROSLAND:  Very well, Judge.

11           THE COURT:  Okay.

12           MS. KAOUTZANIS:  Shall I proceed, Your Honor?

13           THE COURT:  You should.

14           MS. KAOUTZANIS:  Okay.  So just to begin with

15   the relevant law here when considering -- as this

16   Court is aware, when considering disputed factual

17   allegations at a sentencing hearing, the standard is

18   a preponderance of the evidence and I would cite the

19   court to *United States v Rizzo*, which is a Second

20   Circuit case from 2003.  Similarly, the Court can

21   rely on hearsay as long as such hearsay evidence is

22   sufficiently reliable, and that I would cite the

23   Court to *United States v Scott*, which is a Second

24   Circuit case from 2015.  And another recent Second

25   Circuit case on point is *United States v Rikaina*

1   {phonetic} from 2020.

2           So with regards to the first disputed issue,

3   Mr. Jones' founder status, with regard to what the

4   government put on as testimony, this Court heard from

5   three separate agents, each of whom testified to

6   their interviews with a separate cooperating witness,

7   and before we get into their testimony, I think it's

8   important to parse out what's actually being disputed

9   here.  So the government has never claimed that

10  Mr. Jones was the head or the CEO of the Greene Homes

11  Boyz gang and I think what's also important to

12  clarify is that the presentence report in paragraph 9

13  states that Mr. Jones was part of the Greene Homes

14  Boyz and a member of the gang since 2012.  So that

15  was not contested.

16          So it does not appear that Mr. Jones contests

17  his membership and association with the Greene Homes

18  Boyz dating back to 2012 and the only disputed issue

19  before the Court is whether or not he founded the

20  group or started the group.  And as to that,

21  yesterday, this Court heard the testimony -- what was

22  relayed from three separate cooperating witnesses,

23  each of whom said -- one was a 150 gang member, one

24  was an East End gang member, and one was a Greene

25  Homes Boyz gang member, and each one of them said

**A - 445**

85

```
 1  that Laheem Jones was a founder of the Greene Homes
 2  Boyz or started the Greene Homes Boyz gang in
 3  approximately 2012 and that he recruited other
 4  members.  And the Court heard their testimony of the
 5  separate things that Laheem Jones did including
 6  recruiting other members, encouraging acts of
 7  violence, et cetera.
 8        The government is not saying that there were
 9  not other gangs in the Greene Homes.  The government
10  is not saying that there was not criminal activity
11  before 2012.  But the testimony that the government
12  would have intended to present at trial through these
13  cooperating witnesses was that in 2012, Laheem Jones
14  helped with other members to found the group that is
15  known as the Greene Homes Boyz gang, as Asante Gaines
16  and others post about on Facebook, as Undrea Kirkland
17  raps about in his rap videos wearing a necklace to
18  that effect, that Mr. Jones was involved in the
19  founding of that group dating back to 2012.
20        And what else does the Court have to rely
21  upon besides the three separate pieces of testimony?
22  There are the Facebook messages that I referred to
23  earlier and there's communications, like the ones
24  that I pointed out, where Laheem Jones tells Asante
25  Gaines, don't worry about it, I'll take care of the
```

```
 1    rest.  And there's also the YouTube videos where
 2    Laheem Jones is referred to in the refrain and things
 3    like Heemdog said do this are referred to.
 4           And what was presented to the contrary?  The
 5    defense called two witnesses.  Neither of them is
 6    Laheem Jones' age.  They are both about 20 years
 7    older than him.  Neither of them is part of the
 8    Greene Homes Boyz gang.  Neither of them was with
 9    Laheem Jones throughout the time in which he was
10    involved in the gang either in the early period
11    before he was incarcerated or when he came out from
12    jail.  Neither of them communicated with Laheem Jones
13    and his friends on Facebook.  Neither of them were
14    involved in the rap video.  I appreciate that they
15    came here today and I appreciate their perspective,
16    but they simply have no basis to say that Laheem
17    Jones that was not a founding member of the group
18    based on what this Court has in front of it and what
19    we heard from their testimony.
20           So I would respectfully submit that the
21    testimony of the cooperating witnesses combined with
22    Laheem Jones' own messages, how he's referred to in
23    songs, his apparent return to a respected status in
24    the group immediately upon his release, enables this
25    Court to find, again, by a preponderance of the
```

1   evidence that he was a founding member of the gang;

2   however, this finding has no impact whatsoever on the

3   guidelines.  And even if this Court were to conclude

4   that on this record there's not enough evidence to

5   determine he was a founder, I would respectfully

6   submit that the amount of years he has spent in the

7   gang, so dating back to 2012 until his arrest in

8   2020, his respected status, his promotion of violence

9   on social media and through YouTube videos, his clear

10  influence with younger gang members, are all relevant

11  considerations and all lay in favor of a longer

12  sentence than some of his co-defendants who do not

13  have that longevity in the group or that status.

14          On the second point, the knowledge of

15  Mr. Jones' shooting.  Before I get into that, I want

16  to make something very clear, there was some

17  suggestion by Mr. Crosland yesterday that there was a

18  private conversation with Mr. Jones or that he

19  entered into the plea agreement and just admitted to

20  various aspects because he had to.  There were no

21  private conversations between government counsel and

22  Mr. Jones.  And to the extent Mr. Crosland wishes to

23  pursue any type of argument to that effect, I would

24  respectfully ask that Mr. Jones and Mr. Crosland both

25  be canvassed on the record to that effect.  Attorney

1    Crosland has been told, and I am sure he conveyed to

2    his client, that you can only plead guilty if you

3    are, in fact, guilty.

4         At the plea proceeding, Mr. Jones was under

5    oath.  He stated he was of clear mind.  The plea

6    agreement was gone over in excruciating detail.

7    Mr. Jones admitted to everything laid out in the plea

8    agreement.  And what did that plea agreement say?  It

9    laid out the elements of the crimes.  Mr. Jones

10   agreed to those elements.  It had a factual

11   stipulation, which I'll get to in a minute, and

12   Mr. Jones acknowledged in written form and on the

13   record that he was entering into the agreement freely

14   and voluntarily because he was guilty.  He further

15   acknowledged that no promises, benefit or any other

16   agreements had been entered into, and I would refer

17   to page 8 of the plea agreement and then again at

18   page 10.

19        He also said as in the factual stipulation

20   that he knew there was a plan to kill Trevon Wright

21   and Jaheim Warren.  Mr. Jones' statements and

22   admissions under oath at a plea hearing are entitled

23   to great weight and I know AUSA Kale yesterday

24   referred the Court to *Blackledge v Allison*, which is

25   a Supreme Court case from 1975 which states that

 1  those solemn declarations in open court carry a

 2  strong presumption of verity and that the subsequent

 3  presentation of conclusory allegations unsupported by

 4  the specifics is subject to summary dismissal as are

 5  contentions that in the face of the record are wholly

 6  incredible.

 7        I would submit to the Court that that is

 8  exactly what you have.  There are conclusory

 9  allegations unsupported by specifics and contentions

10  that fly in face of the record.  Laheem Jones is not

11  moving and does not wish to withdraw his plea of

12  guilty on Counts 1 and 2.  Instead, he's trying to

13  minimize his role and the conduct here, additionally

14  undermining any claim regarding his acceptance of

15  responsibility.

16        And here this Court can rely upon not only

17  Mr. Jones' sworn statements at his plea proceeding

18  under oath, the written plea agreement, the Court can

19  also rely upon following the Second Circuit case

20  *United States v Lloyd* of 2018 to the facts set forth

21  in the PSR and the facts established at an

22  evidentiary hearing, a district court is not obliged

23  to accept at face value every claim a defendant makes

24  and that's even where a defendant disputes an

25  essential element of the offense, the district court

1    may conclude that the defendant's version is unworthy

2    of belief if some circumstances appear on the record

3    to warrant that conclusion.  And for that, I'd cite

4    the Court to *United States v Garcia*, which is a

5    Second Circuit case.

6         Here, as I laid out in detail, it is simply

7    incredible to believe that Laheem Jones did not know

8    that there was a plan to shoot and to kill rival gang

9    members as he previously admitted he was with Asante

10   Gaines up until the point at which Asante Gaines

11   entered the spotter car outside of the courthouse.

12   He was in contact with Asante Gaines on FaceTime up

13   until one minute before -- up until two minutes

14   before the shooting started.  The cell site evidence

15   shows that he was within blocks of the courthouse if

16   not outside the courthouse.  And then again, and

17   perhaps most crucially, is he was in the store

18   purchasing bleach and lighter fluid two minutes after

19   the shooting without any communication from any of

20   the defendants who did the shooting.

21        So by a preponderance of the evidence, what

22   makes sense here, all of this was coincidental or

23   that it was intentional, planned, premeditated, and

24   coordinated.  And this Court based on Mr. Jones'

25   statements, written plea agreement, and facts on the

1   record at plea can certainly find by a preponderance

2   of evidence that Mr. Jones knew exactly what his

3   plan -- his fellow gang members intended to do and

4   quickly mobilized into action to cover up what they

5   did.

6         And then finally, I'd like to conclude with

7   some of the Section 3553 factors that are relevant

8   here.  So with regards to comparing Mr. Jones against

9   the other defendants, it is certainly the case that

10  Mr. Jones was not a shooter.  It is also the case

11  that he was in jail for a portion of the conspiracy.

12  But what are the bad aspects that stand out?  The

13  first one of those is the lack of acceptance of

14  responsibility and the minimization of his role.  You

15  cannot plead guilty and then try to retract and

16  minimize your role.  Here there is overwhelming

17  evidence that Mr. Jones did and knew exactly what he

18  admitted to during his plea hearing and that lack of

19  acceptance of responsibility raises significant

20  concerns about any argument he may have that he has

21  reformed his life or that he's ready to change when

22  he has not yet fully accepted responsibility for what

23  he had pled guilty to.

24        Another thing that stands out about Mr. Jones

25  is his role within the group.  I eluded to this

1   earlier, but he in the unobjected to PSR has been

2   involved in the group since 2012.  That is over a

3   decade.  He enters prison, leaves prison, and goes

4   right back to the group.  Whether it's because of

5   family ties or otherwise, he made the Greene Homes

6   Boyz gang life his life.  He chose to put himself in

7   the middle of violence and drug dealing and he chose

8   to perpetuate that violence and drug dealing.

9          What else stands out about Mr. Jones?

10  Unfortunately, he has a pretty significant criminal

11  history.  He has a criminal history that demonstrates

12  drug dealing and acts of violence, which is the same

13  type of conduct for which he was charged here.  He

14  has two convictions for attempt to commit first

15  degree assault for which he was arrested in 2012,

16  conviction for the sale of illegal drugs, second

17  degree robbery in 2013, a robbery that was committed

18  in the Greene Homes complex, and after all of that,

19  he goes to jail, he serves over seven years in jail,

20  and then he leaves jail and does the same thing

21  again, the same type of criminal activity again.

22          He's discharged from supervised parole five

23  days before the courthouse shooting on January 27,

24  2020.  Mr. Jones was 25 years old at the time of the

25  crime.  He has not been deterred by his prior

1    incarceration and he should have known better.  At

2    this point, there's a need -- beyond the seriousness

3    of the offense, there's a need for deterrence, a need

4    to protect the public, a need to promote respect for

5    the law, and under the theory of incremental

6    punishment, he should get a higher sentence.

7         So I want to conclude by saying that there

8    was some argument in defense counsel's memo about

9    Laheem Jones' desire to change his life and I commend

10   that desire and hope that that actually does happen,

11   but there is no path forward if there is not full

12   acceptance for what happened.  The attitude of

13   pleading guilty and then backtracking on guilt cannot

14   be condoned and Mr. Jones must recognize that he and

15   the Greene Homes Boyz do not run the streets of

16   Bridgeport.  You cannot burn cars to cover up crime.

17   You cannot shoot at opposition gang members or people

18   from the other side of town.  Vigilante justice will

19   not be tolerated and whether or not you pull the

20   trigger, if you plan an act and you help to hide it

21   from authorities, your culpability for that act is

22   just as high as your co-defendants.

23        The path forward when Mr. Jones gets out of

24   jail this time is not to return to the gang.  It is

25   to make good on what he says in the sentencing memo

 1  and to get out of this lifestyle, but at this point,

 2  Your Honor, based on everything I have laid out,

 3  there is a real need for a sentence here that

 4  reflects the seriousness of the offense, provides

 5  deterrence, promotes respect for the law, sends a

 6  message for the community, a sentence that is

 7  commiserate with the sentence of his co-defendants,

 8  and for all those reasons, we respectfully submit

 9  that a sentence as we've asked for in the sentencing

10  memorandum is appropriate.  Thank you.

11      THE COURT:  Thank you.  Mr. Crosland?

12      MR. CROSLAND:  Your Honor, I'm just a little

13  confused, but I do have to use the restroom.  Are we

14  going to go straight into our actual sentencing

15  presentation?

16      THE COURT:  Yes.

17      MR. CROSLAND:  And Mr. Jones has to use the

18  restroom as well.

19      THE COURT:  As soon as Mr. Jones has heard

20  everything that everybody is going to say in the

21  courtroom in relation to his sentencing, I will hear

22  from Mr. Jones.  He can then be in a position to

23  respond to everything that's been said.  Okay?

24      MR. CROSLAND:  Very well, Your Honor.  I

25  guess that will cover what I was going to mention was

1    I guess the government is saying that Mr. Jones

2    should be canvassed, maybe I should be canvassed.

3    Mr. Jones as part of the --

4            THE COURT:  I don't think we're going to do

5    any canvassing.

6            MR. CROSLAND:  Thank you, Judge.

7            THE COURT:  However, since we have a

8    significant amount more to do, what I'd like to do is

9    recess for about 45 minutes.  I have another matter

10   that's scheduled at 1 that I'd like to get through.

11   So why don't we be back at quarter -- at 20 until 2,

12   all right, and then we'll go straight through.

13           MR. CROSLAND:  At 20 to 2, I have permission

14   to set up my --

15           THE COURT:  Sure.

16           (Recess taken.)

17           (Call to Order, 2:06 p.m.)

18           THE COURT:  Mr. Crosland, do you wish to

19   continue?

20           MR. CROSLAND:  Yes, Your Honor.  Thank you,

21   Judge.

22           Your Honor, thank you for allowing me to be

23   heard.  I think what I'm going to do is just address

24   the first part of the two-prong issues that we have

25   which is whether Mr. Laheem Jones was a founder of

1    the GHB and whether he knew there was going to be a

2    courthouse shooting prior to the shooting and then

3    I'll go into my presentation which I've set up on the

4    podium.

5            So with that perception throughout this

6    proceeding so far, there have been people in the

7    galley who've commented, boy, the judge doesn't like

8    you, that means Mr. Jones is going to get a really

9    bad sentence.  My response, we accept our lot in

10   life, as defense attorneys, we aren't always the

11   favorite, we rarely are; however, the judge has

12   nothing personal against me and that's just the way

13   the system works.  Sometimes the prosecutors are a

14   favorite, but I don't think that's the case here.

15           Over lunch, I walked down the street and one

16   of the older lawyers who is a lawyer for the

17   co-defendant in one of these cases said, and I quote:

18   Oh, I heard Judge Arterton's punching you around in

19   there, to which I responded, Not at all.

20           THE COURT:  This is really -- I'm sorry.

21   Mr. Crosland.

22           MR. CROSLAND:  Yes, Your Honor.

23           THE COURT:  I don't think it's appropriate

24   for us to introduce into this hearing other people's

25   views or perceptions who've not been witnesses, who

1    are not parties.  You're not being punched around.

2    You're being held to the rules and there is no lack

3    of respect for you and respect for you as your

4    attorney -- as your client's attorney.

5          MR. CROSLAND:  I appreciate that and that was

6    my sentiment and I'm glad the Court said that because

7    as a younger lawyer in this field, I commented that's

8    not the case here.  So I don't know what they're

9    hearing, but as I stated, I think we've been doing

10   fine and I stated, and I'll state here to Mr. Laheem

11   Jones, I think our system works well when we have

12   advocates on the government's side and the Court's

13   doing their job and I'm doing my job and we have one

14   of the best criminal justice systems in the world

15   because of it.

16         So if people think that when we have vehement

17   arguments that we don't like each other, I commented

18   that that doesn't make sense to me.  We are always

19   going to do this.  Even in the Supreme Court, we have

20   cold benches that don't say anything and we have hot

21   benches that attack you.  And in law school, we

22   wanted the hot bench, not the cold bench, because we

23   didn't know what the cold bench was thinking.

24         So I made sure that that was -- Mr. Laheem

25   Jones knew that.  I even said yesterday, the judge

```
 1   took a walk in a park and waved to us and was just
 2   down to earth.  So I want to dispel that feeling that
 3   anybody has openly right away.
 4         With that, I'll address the evidentiary
 5   hearing directly and then go into my sentencing.  The
 6   question before the Court for the evidentiary part
 7   was, one, whether Mr. Jones was a founder of the gang
 8   called GHB or G$B or Hots.  The answer to that is no.
 9   The government's witnesses never confirmed this and
10   they gave the Court nothing to rely on.  I know they
11   talked about preponderance of the evidence is the
12   burden.  They gave the Court no preponderance of the
13   evidence to show that.  And I rely on the Court to
14   harken back to the people who testified.
15         The agent testified yesterday, several
16   agents, but one of the agents testified yesterday
17   about a quote, unquote, incarcerated person who
18   stated to him that he saw Laheem in a photo.  He
19   didn't say when, where, when the photo was taken, but
20   he said he saw Laheem in that photo and Laheem threw
21   up a sign that's analogous to an A-OK or three
22   fingers with a circle, and I'm doing it now just in
23   recollection, but that's what he said that -- this
24   individual said, he saw Laheem in a photo.  And he
25   stated that the three fingers doesn't mean he's a
```

1   gang leader but presumably a gang member and I

2   questioned him about that, was there anything about

3   these alleged three fingers that said that Mr. Laheem

4   is a founder or gang leader, and he was very clear,

5   he said no, that that's all he knew.

6          So this one time that he -- he also said that

7   this incarcerated individual said they saw him at

8   parties, and I guess at parties, he was with other,

9   what they call, gang members.  I think of them

10  differently, but he said he saw him at parties, but

11  that's not a preponderance of the evidence to show

12  that he's a gang leader or that he's a gang founder,

13  the head of an organization like Elon Musk or anybody

14  else.

15         They also put on another witness to tell you

16  that the cooperator named KJ told them that he was

17  invited by Mr. Jones to the Greenes to sell drugs in

18  around 2011, 2012, somewhere in there.  There was no

19  corroboration to that.  I questioned directly, did

20  you corroborate that.  The same agent testified that

21  when he does cell phones analysis, they always

22  corroborate them, it's very important to take the

23  analysis and then corroborate it against other

24  things.  So I thought, I guess that's a scientific

25  approach, that's a reliable approach.  I said, did

1   you do that when you found this information from

2   people saying that they saw -- from this specific

3   individual Jones, KJ, that he saw Mr. Jones -- excuse

4   me, that he was invited by Mr. Jones in 2011 or 2012

5   to sell drugs.  He said, no, he did not.  So there is

6   no corroboration there to allow the Court to find

7   beyond a preponderance.

8          In fact, Jones was incarcerated in 2011.  I'm

9   not sure if this individual knew that.  So he

10  couldn't have been invited to the Greenes at that

11  point.  Or maybe he was invited even though Mr. Jones

12  was going to be there, we don't know, but that's

13  exactly my point.  There's nothing there to show this

14  beyond a preponderance that that happened, or even if

15  it did happen, there's nothing that says in that

16  statement, come down to Greenes, that means that

17  Mr. Jones is the head of this organization or started

18  an organization.

19         They had an agent also say that Mr. Jones was

20  given a welcome home package, is the way I referred

21  to it.  He didn't say welcome home package, but he

22  said when Mr. Jones came home, this individual,

23  unnamed individual, said that he told the agent that

24  when Mr. Jones came home, he got a gun and he got

25  clothes and that's sort of like the welcome home to

1  members who are from the GHB to show they're always a

2  part of GHB or something like that.

3          I really have to impress upon the Court that,

4  you know, this is a federal court, this is a court

5  within our United States that we rely on, and this

6  type of stuff, this type of evidence put forward is

7  just -- is disappointing and it doesn't show what the

8  government is trying to show, which is that Mr. Jones

9  was the head of this organization.  And I ask for the

10  sanctity of the Court that we not rely on that type

11  of stuff.

12          In fact, what we can rely on is Anthony

13  Marshall testified that he was assigned by probation

14  to Mr. Jones, and when Mr. Jones came home, as a part

15  of his duties, he had to pick Mr. Jones up from the

16  jail, he had to take Mr. Jones to probation to get

17  outfitted with an ankle monitor, a GPS, because he

18  was on house arrest, and he said he did that and then

19  he took him to Waterbury to his aunt's house and

20  that's where Mr. Jones was living at the time.  And

21  that is corroborated because when I made my bail

22  package, the judge -- it was the magistrate in this

23  case early on, when I made -- Magistrate Merriam, I

24  think it was a magistrate at the time, in my bail

25  package, we gave Mr. Jones' aunt's address in

1    Waterbury and Mr. Jones, his aunt was one of the

2    suitors for him in this particular case.  So we know

3    that to be true and that to be corroborated.

4         So when you look at this street talk or these

5    street people who we don't know who they are, we

6    don't know what their motives are, one of them was

7    sent for by the government and he came down to their

8    office and we don't know what that's about, but we

9    know that people who are in jail seeking ways out are

10   going to say whatever they have to say, but that's

11   fine.  The question is whether it was corroborated.

12        We do know that Mr. Jones' aunt lives in

13   Waterbury, she's in the bail package.  And we do know

14   that Anthony Marshall who works with probation was

15   there as a part of -- excuse me, was working with

16   probation to be a mentor to Mr. Jones and was the one

17   who picked him up.  So I ask the Court to find that

18   there's no preponderance of the evidence that

19   Mr. Jones was given some welcome package of a gun and

20   clothes by anyone and that type of stuff we should

21   keep out of federal court.

22        The video, the video that the government

23   showed, talks about -- is a hip hop video.  They were

24   showing a bunch of hip hop videos.  And I will

25   caution the Court and not only cite in a Maryland

**A - 463**

103

```
 1   Supreme Court case, there was a big discussion about
 2   the admission of hip hop videos and their reliability
 3   on these videos.  And I think it's still an ongoing
 4   discussion as to whether, in fact, it's a first
 5   amendment violation, whether, in fact, it's reliable,
 6   et cetera, but I will point out that in 1970, that's
 7   when hip hop began and hip hop began in the Bronx,
 8   and I'm from the Bronx, and the idea was to stop
 9   violence, as strange as that might sound.  The idea
10   was to take it out of the streets and put it as a --
11   so-called put it on wax.  So people in videos and
12   music, they will talk about dissing the other guy or
13   they're better than the other guy, and this was an
14   outlet that transformed into competitiveness, into
15   territoriality of gang life, and took it out of the
16   street and put that territory on wax.
17          Now, I would be the first to admit in Chicago
18   and other places, you have Little Durk and King
19   Vaughan and a bunch of other ones who have now gone
20   from wax, where it's supposed to be, to now
21   perpetuating violence in the streets.  So we don't
22   want that and I don't support that.  But I want to
23   make sure when the government is quoting these videos
24   and also articulating what they think slang is, I
25   will caution them to or advise them to be very clear
```

```
 1   and very open, because I'm from the Bronx, I'm of
 2   this generation, I'm happy to be African-American,
 3   and I know these slangs.
 4           And so with that, if the Court can go to --
 5   excuse me, madam government assistant, I don't know
 6   your name.  Can you go to Exhibit 26?
 7           (Video played.)
 8           MR. CROSLAND:  Okay.  Your Honor, you see
 9   Government's Exhibit 26 and -- can I have one second?
10           So in Government's 26, they're in a studio, a
11   music studio, and there's sound equipment and mixing
12   boards, et cetera, and they have what appears to be
13   guns no different from Arnold Schwarzenegger in "The
14   Terminator" who walks around with that huge, big gun
15   and is shooting people.  Those are props.  Arnold
16   Schwarzenegger doesn't have real guns.  I think the
17   gentleman in one of these movies just shot and killed
18   somebody with a prop that had a live round in it or
19   something, Alec Baldwin.
20           So what we have here is these props in these
21   videos, which they're doing, and not only do we have
22   it but the government spent a lot of time talking
23   about street slang and what street slang means, but
24   they glossed over this and they went straight into
25   calling these guns all real when we know that when
```

1   the seizures happened in this case, they didn't seize

2   all these guns.  There was really no guns seized, but

3   more important, let's get back to -- Your Honor, look

4   on the screen.  It says:  These props, these props,

5   no cap, and what that means is that these are props

6   and we're telling the truth, we're not lying.

7          And I was just looking up when I -- I just

8   looked up on Google, and the government can do the

9   same, what does the slang word "cap" mean, no cap,

10  slash, capping, capping is another word for lie,

11  saying "no cap" means that you aren't lying or if you

12  say someone is capping, then you are saying that

13  they're lying, and that's on Google and you can look

14  it up on Wikipedia.

15         So what I'm saying to the Court is the

16  government just glossed right over their own exhibit

17  where it says, these props, no cap, and they want to

18  tell the Court, as they said today, oh, look at all

19  those guns in this video, look at the guns, it's so

20  alarming, and I think that's a bit disingenuous, and

21  I know that's a fighting word, but that's really what

22  it comes down.

23         And while we're on that -- while we're on

24  that and making argument, the government went into

25  their sentencing memo and they said to the Court,

1    look at our sentencing memo, you're going to see all

2    the pictures that we put in there.  And I'm pretty

3    surprised and pretty hurt that they said that because

4    the whole idea is when we go back to the spirit of

5    this negotiation, the government made it clear to

6    Mr. Jones and to myself and they said they want to

7    canvass.  What they said to us was, you know what,

8    your client should be interested in this offer

9    because if we went to trial, the judge would see all

10   these bad things and you want to avoid that, but what

11   did they do, they put all the bad things, to quote

12   what they call bad things, and color pictures in the

13   video.  So how honest and upfront was that, you know,

14   and that was one of the reasons why we were told you

15   should take this offer.  And so that's number 26.

16        So Judge, I will just go to conclude on that

17   point that there was nothing before the Court to show

18   that Mr. Jones founded any Greene Homes Boyz.  There

19   was credible testimony from Mr. Brantley who

20   testified that if Mr. Jones was the John Gotti of the

21   neighborhood, everybody knows that.  If you're into

22   hip hop, he would be similar to the Damon Dash or the

23   Puff Daddy of the industry, we would know that.  So

24   he didn't have to go to Mr. Jones and say can you

25   show me your CEO card, he would just know that.  And

1   the government wanted to say, well, did you ask him,

2   did he tell you, but Mr. Brantley testified that he

3   would just know that, that's something you'd know.

4           And so I think when you compare

5   Mr. Marshall's testimony and Mr. Brantley's testimony

6   to the agents who are saying some people said, if

7   anything, they cancel out.  But at the most, I would

8   say that we have more credibility here to show that

9   he wasn't -- there's nothing before the Court to say

10  he's the head of this gang.  And I'm not sure if

11  they're just using that for an enhancement somewhere

12  along the line, but I just ask the Court to -- what

13  we did during this to make sure that the Court sees

14  that that's not the case there.

15          And so I'll jump down to the second part,

16  which is whether Mr. Jones knew about the courthouse

17  shooting before it happened.  When it came to that

18  part, the government has their burden, and in

19  addition to all the conjecture that we've seen, the

20  experts testified yesterday about cell phone towers

21  and LTE and the technology of cell phones.  They said

22  that they don't capture FaceTime, but they can tell

23  what type of transmission, was it a FaceTime

24  transmission or a text message, et cetera.

25          Now, the government has an enormous

 1    responsibility and I would assume they take that

 2    responsibility seriously.  So what they're saying is

 3    their whole offer of proof that Mr. Jones knew about

 4    this was that their cell phone technology and

 5    communications shows that Mr. Jones was speaking to

 6    Mr. Gaines earlier or was with Mr. Gaines earlier in

 7    the day, and they talked about some other connections

 8    with Mr. Gaines.  If Mr. Jones was this big CEO

 9    leader of this group, he wouldn't be talking to just

10    Mr. Gaines like this.  He would be talking directly

11    to the shooters and to the organizers.  He might even

12    be there.  But what's most important is we can't fill

13    in the blanks.

14          So what I'm saying to the Court is they're

15    saying how did Mr. Jones know to buy gasoline or how

16    did he know to do this or do that because we don't

17    see it on the cell phone, we don't see any cell phone

18    communications, but the government can't stop there.

19    Anybody could have come over to Mr. Jones or who

20    might have been talking to the other guys and saw

21    Mr. Jones and said, yo, the homies is in big trouble,

22    this is what's going on, and I don't have a car.

23    Mr. Jones happened to have a rental car then, and I

24    talked to Mr. Jones about this.  He had a rental car,

25    so everybody was relying -- you don't have cars like

```
 1   that.  They either have to steal cars or sometimes

 2   you have an honest car.  Mr. Jones had an honest

 3   rental car and that's in the government's evidence

 4   that he had a rental car.

 5        So it's not for the government just to

 6   speculate because there was no phone traffic that

 7   Mr. Jones didn't know or have any communication with

 8   somebody that came over to him and said this is

 9   what's going on.  He's already admitted to that.

10   He's accepted responsibility for that.  But for them

11   now -- now, that's not good enough that he accepted

12   responsibility.  Now, they want to now say, oh, he

13   knew because there was no phone traffic, we didn't

14   see any phone traffic, so how did he know unless

15   something else happened.  Those are all speculative.

16   So I'd ask the Court to consider that.

17        Again, as they mentioned, if this was at

18   trial, what they would have to prove, that wouldn't

19   be good enough.  That would be purely speculative.

20   So with that, I wrap up those two points and if I can

21   just go right into my argument.

22        Thank you, Your Honor.  If it pleases the

23   Court, Your Honor, I have the honor of representing

24   Mr. Jones throughout this process and I can tell you

25   that from the beginning of the process to where we
```

 1  are now, Mr. Jones has matured.  Mr. Jones has

 2  communicated with me honestly and openly about his

 3  journey to where he is now and I could appreciate

 4  that.  Mr. Jones has taken the chance, and he knows,

 5  the jails talk and people talk, and the talk is

 6  sometimes, you know, Attorney Crosland, he's a state

 7  lawyer, he's not a big-time federal lawyer, et

 8  cetera, and he took the chance on me as well as I did

 9  on him and he didn't have funds to fund where I am

10  now and we continue to work together and I'm very

11  proud of the time I've had to work with Mr. Jones.

12       Mr. Jones knows that there's no way out of

13  this situation but to accept responsibility and to be

14  further punished as necessary for the things that

15  he's done.  But in this journey, I've been able to

16  talk to Mr. Jones quite openly and frankly about his

17  whole life in terms of what brought him here and we

18  discussed whether, in fact, things are excuses or

19  justifications for him being here.  But I do know

20  that Mr. Jones agrees that he can't give up hope and

21  that he has to find a way to change his mindset,

22  change his circle, change his environment.

23       As an African-American, I can tell you all

24  through these inner cities, the only thing that we

25  had hope for was, quote, unquote, being sent down

1   south, and the Court might have heard this in all the

2   Court's years on the bench.  Kids were sent down

3   south to get out of the cities to hope for a better

4   life.  My family had me from the Caribbean, so I was

5   sent to the Caribbean.  But that's what we were

6   hoping for and that's what we had to rely on, but

7   sometimes people don't have the money or the

8   resources to send you down south, so you come out of

9   jail and you end up in the same area.

10          The government was talking about over and

11  over how he came out of jail and went right back to

12  the same situation, as though the government is

13  saying this correctional institution should have

14  corrected you and it should have just changed you

15  from who you were, but as we know, there's

16  institutionalizing of individuals who are in jails

17  for a long time and it takes some time to get back to

18  where you need to be.

19          And so I have that hope for Mr. Jones, but

20  the government in their position is like, look at

21  this guy, look at what he's done, look, just out of

22  jail and look at where he's at, but if we're honest

23  with each other, I think we have the benefit of

24  different lives and different environments and we

25  have comfortable environments that we are proud of

 1   and other people don't have that.  That's not to

 2   condone anything, but that's to say that I'm not

 3   going to give up hope.

 4        The great Langston Hughes, an

 5   African-American writer, once said, "Hold fast to

 6   your dreams because if dreams die, life is a

 7   broken-winged bird which cannot fly."  It's so

 8   important that we be strong, fierce advocates for our

 9   clients, their lives and their ability to thrive.

10   It's amazing how many problems that people have and

11   these problems are oftentimes much more difficult

12   than they can handle alone, and helping people in my

13   life just turned me on so tremendously.  I felt, and

14   I always tell people, like Willie Mays when he played

15   center field, why do they pay me to do this, it's so

16   much fun, it's really, really something that you can

17   fall in love with.

18        Driving up to Wyatt all these days, helping

19   Mr. Jones, flying back to my office, other people

20   were not happy because I wasn't there, but I had to

21   talk to tell and make them understand what's going

22   on.  The more you help people, the better you feel

23   about yourself, the better you feel about the world,

24   because people respond so wonderfully to being

25   helped, and that response gives me more and more

```
 1   energy and more love for what I do.  Helping someone

 2   solve one of the most significant problems they've

 3   ever had in their life, it just doesn't get any

 4   better than that for me.  And when you feel that joy

 5   from the other person because this tremendous burden

 6   has just been lifted from them, boy, that gives you

 7   more and more energy and more love for people and

 8   more love for what you're doing.

 9            So what I try to accomplish with my clients

10   is for them to become happier people because they

11   have better insight.  And I can remember Mr. Jones,

12   preparing for today, I went up to Wyatt to see him

13   and he said I had such a headache, and I said, why, I

14   gave you all the documents, everything the Court said

15   you should have.  He goes, that's what gave me the

16   headache, I had the information but I just didn't

17   know what to do with it.  And he said, after speaking

18   with you today, and I get emotional to talk about it,

19   he gave me a hug and said just thank you.  And I

20   don't find nothing special about me except I'm trying

21   to stand in the gap and help people like Mr. Jones

22   and all those who need a voice.  So helping him

23   understand what he was facing gave him some relief.

24            So you have these larger victories that start

25   to populate your life and they have an incredible
```

```
 1   impact on your attitude, and it's not easy for me and

 2   this Court knows that in this journey to justice,

 3   sometimes these things that impact your life -- I was

 4   in a murder trial at the same time I was trying

 5   Mr. Jones' case, and I thank Mr. Jones for

 6   understanding that this is what happens here and

 7   still hang in there with me, and we had a lot of

 8   hearings in between, but as the Court noted after I

 9   left that murder case, that -- I was able to help

10   that gentleman and help that gentleman have voice and

11   I think that was a just situation and I felt good

12   about it, but like doctors, sometimes you lose people

13   on the table, but we have to do our best.  Right.

14        And so you become the dominant force to whom

15   everyone looks to for the truth in a situation when

16   you stay in there and you fight like I've been

17   fighting.  I really care about solving people's

18   problems and I work relentlessly until my client's

19   problems are solved or addressed.

20        Now, like Justice Scalia from the Supreme

21   Court, whenever he had a case, he was a strict

22   textualist, and what he would do is go to the text

23   for everything, and in law school, I would watch

24   Justice Scalia and I started to become like him in

25   that sense.  So I went to the dictionary for
```

1   prosecutor.  A prosecutor is a person, especially a

2   public official, who institutes legal proceedings

3   against someone, prosecutors are fully entitled to

4   bring any number of offenses against a single

5   defendant, the prosecution is the legal party

6   responsible for presenting the case in a criminal

7   trial against an individual accused of breaking the

8   law.  With that great power comes great

9   responsibility.  A prosecutor must administer the law

10  fairly and without prejudice, and even if he or she

11  isn't racist, they must be aware of implicit biases.

12          I just finished a trial before Judge Thompson

13  in Hartford and he gave a jury instruction on

14  implicit bias in the federal court.  Federal courts

15  are giving instructions on jury implicit bias as well

16  as state courts and others.  It's something that we

17  must be aware of.

18          What are the other ethical obligations of

19  prosecutors?  The prosecutor must seek to protect the

20  innocent and convict the guilty.  I understand that.

21  Consider the interest of the victims and witnesses

22  and respect the constitutional and legal rights of

23  all persons including suspects and defendants.  That

24  means the law requires prosecutors to respect the

25  constitutional and legal rights of Mr. Jones at every

1    stage including when they make a sentencing

2    recommendation.

3         Over prosecution, all lives matter.  As an

4    advocate of justice, prosecutors play a unique and

5    powerful role in our justice system, yet too often

6    prosecutors fall prey to a pervasive convict at all

7    costs culture and neglect their ethical duty to

8    protect the innocent and guard the rights of the

9    accused.  Their sentencing memos and arguments call

10   for life imprisonment, life time of enslavement of

11   black and brown kids all too often with no mercy,

12   just lock them up for life regardless of the

13   mitigators as discussed by Dr. Michelle Alexander in

14   her book *The New Jim Crow*, which I've read and many

15   scholars have discussed.

16        Responsibility of prosecutors, prosecutors

17   have the sole responsibility of deciding whether to

18   file charges, what charges to bring, what sentence to

19   seek, what plea bargains to offer, and what evidence

20   to present to a jury during trial.  And as I stated

21   in my argument a second ago, it's a work -- it's a

22   journey here and both the prosecution and the defense

23   are working at this journey all the time and we

24   either end up at trial or we end up with a plea.

25        And one of the things that we discussed, the

1    prosecution made it clear, if we enter this plea, we

2    can resolve some things.  Mr. Jones was there.  Your

3    Honor was in court.  It was the second day of jury

4    selection.  We spoke about this at the table.  And

5    one of the things was, you know, let's do this and

6    you won't have all this other ugliness presented to

7    the Court, and for whatever reason in the sentencing

8    memo, the same things that we were told we would

9    avoid was all in there.  But I ask the Court to

10   understand there's a bigger picture here, which I'll

11   get into my argument, that Mr. Jones is part of that

12   ugliness, he grew up in that ugliness, and I hope

13   that that's not just something the prosecution has

14   used to inflame the Court to sentence Mr. Jones

15   unfairly.

16          These varied and unique duties render

17   prosecutors the most powerful actors in the criminal

18   justice system, hands down, and that's why state

19   court here, in New York, other places I go to, it

20   seems like the prosecution is in and the defense

21   attorneys are always on the outside fighting, the

22   agitator.  I often comment to judges sometimes, it

23   would be nice to say, hey, good morning, Darnell,

24   with that same glee for the prosecutor, but some

25   judges do and some judges don't, but I accept that.

1   I'm the agitator, it seems like.

2          Yet despite their power, prosecutors are

3   rarely held accountable for violating their ethical

4   obligations.  This lack of accountability forces a

5   problematic culture that plagues offices across the

6   country and it results in --

7          MS. KAOUTZANIS:  Your Honor, I'm sorry to

8   interrupt, but what are we doing here?

9          MR. CROSLAND:  Your Honor, I object.  I'm

10  doing my sentencing argument.

11         THE COURT:  You're not addressing the factors

12  of sentencing.  You're in a definitional and

13  metaphysical discussion about prosecutors.  Could we

14  stick with the guidelines, with the factors that bear

15  on Mr. Jones' sentencing, and not with a philosophy

16  of prosecutorial conduct?

17         MR. CROSLAND:  I can skip the prosecutorial

18  conduct, but I'm addressing Mr. Jones' entire life.

19  I'll skip the -- let's go to the GHB housing.

20         We have heard a lot about the GHB housing in

21  this case and in reviewing all the evidence here, we

22  clearly know that the G doesn't stand for Greenwich.

23  It's for the Charles F. Greene housing.  And as

24  articulated in my memo and in memo after memo in this

25  particular case, people highlight how the impact of

1    these kids growing up in these projects have affected

2    them in a huge way, and as a mitigator, as I stated

3    earlier, I'll get into it.

4         The countless number of black boys that grew

5    up in this poverty, violence, negligence, instead of

6    the luxury afforded them in Greenwich are known as

7    the Greene Homes Boys.  As testified to by

8    Mr. Brantley who grew up there, no matter what -- how

9    you try to get around this, if you grew up in that

10   violent neighborhood, poor neighborhood, you were

11   known by that.  You were known by the company you

12   kept, where you came from.

13        Are these housing experiments working

14   according to plan or have they failed?  Let's review.

15   The Court is looking at these individuals separately

16   and looking at and considering their backgrounds,

17   3553(a) Factors, where they came from, what kind of

18   parents they had, what kind of trauma they suffered,

19   where they live.  Well, for young black boys who grow

20   up in these projects, they're neglected like their

21   parents before them.  Their parents before them were

22   -- for the most part were in jail or had felony

23   records.  They too end up in a life of crime and

24   violence.  So it's either working -- excuse me, it's

25   either not working or it's working according to plan.

1          The Tuskegee experiment, we know on July 25,

2    1972, similar to these projects that we are dealing

3    with, case after case coming before the Court from

4    these projects that there was a 40-year experiment on

5    African-American men untreated for syphilis.  Why,

6    because that's the way it was.  Is that fair,

7    absolutely not.  These housing projects, Charles F.

8    Greene, I forget all the names of them, Father Panic

9    Village, et cetera, they destroy black families.  And

10   so I ask again, is it working according to plan?

11          In my sentencing memo, I talk about the

12   importance of structure and how Mr. Jones didn't have

13   that structure and how Mr. Jones at 15 years old was

14   out there in the streets and trying to fend for

15   himself.  When he did his PSR, he spoke to Ms. Lindo

16   and told Ms. Lindo that he had to sleep at friends'

17   houses, but it wasn't like you can have a room,

18   Mr. Jones.  You had to sleep -- he had to sit on the

19   couch and stay there so long until you fell asleep,

20   and then the next morning you would say I apologize

21   and leave, and he would try to fend for himself at

22   that point.  That's what he had to go through.  So I

23   ask is this plan working?  But we do know that these

24   projects, kids are ending up in federal court by the

25   thousands.  They go straight from the way they grew

1   up in the projects straight to federal court.

2          Now, madam prosecutor and her team, I ask do

3   they care about that, have they asked the question

4   about that?  One of my speakers was here yesterday

5   but he couldn't come back today because he couldn't

6   take off time from work, so I added him to the slide.

7          (Video played.)

8          MR. CROSLAND:  This is Project Safe Streets.

9   We heard a lot of talk about the police who works

10  with Project Safe Streets.  We heard Mr. Marshall

11  works with Project Safe Streets.  This individual

12  from Project Safe Streets that says the reason why

13  we're having gun violence, and as a mitigator against

14  -- to Mr. Jones' sentencing argument, that we have

15  gun violence is because of the poverty that exists.

16  If we turn a blind eye to this, then we just don't

17  advance the cause.  And furthermore, with Project

18  Safe Streets, we're talking about the people that

19  these kids hang around and is that a mitigator, and

20  in Project Safe Streets, the question was answered

21  right here.

22          (Video played.)

23          MR. CROSLAND:  Does peer pressure contribute

24  to the gun violence and poor choices, and this is a

25  brother from Project Safe Streets who answered that

```
 1   question.
 2            (Video played.)
 3            MR. CROSLAND:  So that's very important, Your
 4   Honor, because as he stated, the tools that are
 5   needed for these young men to make better decisions
 6   aren't available.  And so again, when you talk about
 7   the 3553(a) Factors and when you talk about this
 8   stuff, I know no other way to address this Court than
 9   to address this Court from who I am and the pain that
10   I've seen and witnessed firsthand, and I know no
11   other way than to address this Court by stating to
12   this Court that when you have somebody like
13   Mr. Marshall who went through the system and who is
14   sitting here, and to me, it seems like the government
15   spoke towards Mr. Marshall with such disdain to the
16   point where he had to say I accept what I went
17   through --
18            THE COURT:  Excuse me.  That's not
19   appropriate commentary in the sentencing hearing.
20            MR. CROSLAND:  I withdraw it.  I'll withdraw
21   that.
22            But Mr. Marshall is working with Safe
23   Streets.  He's working to understand these kids, why
24   these kids think this way, why this kid thinks this
25   way, and how can we avoid these issues.  That's very
```

```
 1   important to me.  And everyone says if you speak
 2   directly to these factors that lead us to the Court
 3   and you mention race, then it's a big problem.  But
 4   at every federal workshop that I've been to, they say
 5   how do you try a race case, how do you try a case,
 6   you understand that race plays a factor in
 7   everything.
 8           And what I'm saying is that these poor black
 9   and brown kids in these areas, I had to read all the
10   memos from the other lawyers in this case, and they
11   cite Harvard articles, New York Times articles, and
12   all they talk about in those articles is the projects
13   and the effects, PTSD, they use the ACEs model, and
14   they talk about Miller v Alabama, et cetera, and how
15   when you grow up, even if you don't know it, you grow
16   up in these environments, you have that thing stuck
17   in you, the violence and the poverty and the neglect,
18   and you've read these articles.
19           So I have to stand and speak the truth just
20   like Martin Luther King did and I have to make the
21   Court understand that as a mitigator, I'm going to
22   continue to say that the government might not be
23   focusing on this and point the finger at me, I don't
24   know what I'm doing, but these are mitigators that
25   this Court needs to understand and that's why I took
```

1   the time to put this together.

2          So the tools that this gentleman talked

3   about, school, education, social things, things that

4   they need to have a better social life, is are we in

5   society looking for those tools or are we looking for

6   other tools.  Better education, no; more jobs, no;

7   social programming, no.

8          So when you want to talk about this case,

9   let's go to the indictment.  Let's go to what

10  Mr. Jones is facing and what he pled to and the

11  things that -- the tools that the government are

12  using.  In fact, you should know that the Greene

13  Homes project was remodeled and they took out the

14  basketball courts.  Even prisoners have gyms and

15  basketball courts, but in the Greenes when they

16  remodeled it, they took away the basketball courts.

17  So what are you expecting to happen?  No outlet.

18          So what are the tools that the government

19  uses instead, they use 18 U.S.C. Sections 1961 to

20  1968, the racketeering influence and corrupt

21  organization act.  That's the tools that we use to

22  address those social issues.  And I started to

23  research this, and Judge John Gleeson, who is

24  formerly of the Southern District, contributed to

25  this study that I'm going to show.  The other tool,

```
 1    before I go there, is the violent crimes in aid of
 2    racketeering, that's in this indictment, 18 U.S.C.
 3    Section 1959.  Now, are these tools used to change
 4    the lives and make things better, no.  They're used
 5    to enhance and put these kids away for life.
 6            Ask yourself, if you don't look at this as a
 7    racial issue, you're never, ever going to get to
 8    where we need to because when people look at this as
 9    a racial issue, they know that drugs proliferate
10    environments, but sometimes in white or suburban
11    environments, it's a health crisis.  In other
12    environments, it's a criminal matter.  We went
13    through years and decades of crack cocaine versus
14    regular cocaine and we destroyed so many families,
15    black families, with this disparity.  Finally, our
16    federal courts spoke up against that and we're doing
17    much better now.  So this is one of the greatest
18    systems in the world but we're not without trouble.
19            And so do we have a problem in society in
20    that regard, yes, we do, and we have to ask
21    ourselves, everybody in this room, everybody
22    involved, would we like to be treated that way, the
23    way these kids are in the Greene Homes, and are those
24    mitigators that they're telling you or is it just
25    another story.  Mr. Laheem Jones is a young boy to me
```

 1    and he's lived a life that's been terrible.

 2          (Video played.)

 3          MS. KAOUTZANIS:  Your Honor, I've been trying

 4    to be patient with this, but this has no -- this is

 5    all aside from what is directly relevant to

 6    Mr. Jones.  There is speculation, theories.  I mean,

 7    I don't know what we're doing at this sentencing.  I

 8    really don't.

 9          THE COURT:  I'm not going to address whether

10    or not at heart and at bottom there are issues of

11    poverty, privation, racism, et cetera.  What I am

12    going to address is the factors that the Court is

13    supposed to take into account both in terms of what

14    Mr. Jones did or has been demonstrated to have done

15    and the other factors and fashion an appropriate

16    sentence.

17          So I really think that the evolving

18    understanding of sociological principles is

19    important.  It, however, does not have the kind of

20    role that helps the Court in fashioning the sentence

21    in this individual case.  So if we could move on

22    Mr. Jones.

23          MR. CROSLAND:  Thank you.  I think the deputy

24    clerk left to get some water because my feed is

25    killed.

1            So Mr. Jones is facing sentencing based on

2    RICO and VCAR, as we just talked about, and it's

3    important for the Court to understand that this RICO

4    charge that Mr. Jones faces, it was designed for

5    complex criminal organizations and now it's applied

6    to Mr. Jones.  And Mr. Jones, as we discussed in this

7    case, there's been groups from housing projects and,

8    quote, unquote, gangs, and as you see, Judge John

9    Gleeson as well as Lucy Lit discussed exactly what

10   we've been talking about in this entire proceeding

11   today, we've been talking about classification of

12   gangs, these databases of gangs, that lead to

13   disproportionately African-Americans being caught up

14   in these prosecutions and I ask the Court to consider

15   that.

16           I have to elevate that thought.  These gang

17   databases, we don't know if you grew up in the

18   Greenes whether you were in a gang, you should be in

19   the database or not, but this is the *Berkeley Journal*

20   *of Criminal Law* who did a deep dive into this and we

21   find that an overrepresentation of black and browns

22   are in these databases and subject to these RICOs and

23   have enhancements.

24           I do believe all that we discussed today is a

25   part of my responsibility and I understand that

1    there's latitudes and different spaces.  It's very

2    important for me to highlight these things and I'll

3    just read from my sentencing memo directly.  Laheem

4    Jones was born August 6, 1994, in Bridgeport.  He had

5    a brother who was shot and killed on June 16, 2021,

6    at the age of 21.  The violent death of his brother

7    happened while this case was still pending.  Madam

8    prosecutor and myself and Mr. Jones, we talked about

9    that.  She explained to him that she knew about that

10   death and the impact.  In fact, we had a brief

11   discussion at counsel's table and Mr. Jones

12   appreciated it.  He even commented that he

13   appreciated the conversation.

14          In addition to his brother being killed, he

15   has a younger sibling, Brooklyn Ortiz who is here, 12

16   years old, and London Ortiz, nine years old, who is

17   here today too missing their pizza party at school.

18   They reside with his mother, Ms. Walker.  Mr. Jones

19   considers himself a father figure to his younger

20   siblings.  He considers his mother his best friend

21   and advised that she has carried the role of both

22   mother and father his whole life.

23          As of this writing, his father's currently

24   locked up in jail for heinous crimes related to

25   children, PSR page 102.  And I touched on this

1   earlier in my presentation about these housing

2   projects and experiments that lead these parents

3   directly to where Mr. Jones' father is, in jail.  And

4   so when madam prosecutor points out, and I appreciate

5   it, that Mr. Jones goes into jail, comes out of jail,

6   and he's back in the same environment, and we missed

7   the mitigation in that and we missed how fortunate we

8   are in our lives and it's up to me to point that out.

9         Mr. Jones was raised in the toughest parts of

10  Bridgeport and his housing situation was unstable in

11  his formative years.  He grew up in the Charles F.

12  Greene housing projects in Bridgeport, but never

13  really had a place to call home in his early youth,

14  PSR 104.  As he got older, he moved around to

15  different houses in Bridgeport.  The PSR -- during

16  the PSR interview, he expressed to the officer how he

17  would sleep from couch to couch.

18        I can write pages and pages about the

19  suffering that Mr. Jones had to endure as they fit

20  into the 3553(a) Factors, but as discussed in the

21  PSR, gangs have been around Bridgeport far before

22  Mr. Jones was born.  Over the past years, local

23  street gangs in Bridgeport, Connecticut joined forces

24  and call lesson to two broad alliances.  These gang

25  alliances are geographically based and centered

1    around public housing projects in the city of

2    Bridgeport.

3          It's important for me to note, as the

4    speakers noted when they were speaking, if you're

5    from the Greene houses and you go across the block or

6    across the street, you're going to be associated and

7    affiliated, and -- just like if you're in jail and

8    you're in cottage one and people in cottage two don't

9    like the people in cottage one, then you're going to

10   be facing that kind of violence.  And so at times,

11   you just join forces with the people in cottage one

12   to protect yourself.  What else are you going to do?

13   And I think the Court should consider this type of

14   rampant existence in this petri dish that we call

15   Bridgeport, we call the projects, we call the urban

16   neighborhoods, whatever you want to call it, that's

17   what happens there.

18         And Mr. Jones to me is a young man who can

19   turn his life around with the proper guidance.  If we

20   put him in jail to a point where he's so

21   institutionalized that there's no coming back, then

22   all we do is continue this experience.  And so the

23   Court can consider that and also consider his role in

24   this particular current offense.

25         The life that Mr. Jones lived, I wouldn't

 1    wish it on my worst enemy.  As the PSR details, his

 2    father is in prison for sexual assault.  According to

 3    the Connecticut Department of Corrections website,

 4    Mr. Coleman, Laheem's father, is currently

 5    incarcerated in Cheshire Correctional.  In 2013,

 6    Laheem's father was convicted of cruelty to persons,

 7    illegal possession of child pornography, sexual

 8    assault of a minor, promoting a minor in obscene

 9    performance, and two counts of risk of injury to a

10    minor involving contact with intimate parts of

11    someone under the age of 16.  More specifically,

12    Mr. Coleman orchestrated a sexual contact between a 9

13    and a 14-year old.

14         If we look over this, and I'm not sure if the

15    government appreciates this in making their

16    recommendations, I haven't heard much talk about

17    this, but this is an extreme mitigator upon which the

18    Court should give some weight to.  Can you imagine if

19    that's the kind of parenting that the father provided

20    for Mr. Jones where he would be, and I mean not to

21    ever bore anybody with this, but I have to say that

22    this is cruel and unusual for a kid to have to live

23    like this and grow up like this and to be so young

24    and have to find his own way.

25         Mr. Jones made a mistake on the day that the

```
 1   courthouse was shot up.  He made a mistake before

 2   that when he went to jail earlier at 15, 16, and he

 3   pretty much had his formative years in jail.

 4         The characteristics of the offense, the

 5   characteristics of offense are detailed in the PSR

 6   between paragraphs 7 through 39.  And having

 7   sentenced more than one co-defendant in this case,

 8   the Court is aware of the characteristics of the

 9   offense.  I would say to the Court that it's very

10   important that the Court find some parity in

11   sentencing, and although there's a lot of talk about

12   we pled to this and we said we did this, it's -- I'll

13   take the blame.  I'll take the blame because my only

14   job was to make sure that I work with Mr. Jones and

15   to try to find a way for him to resolve these matters

16   in a way that he can still make it back home to his

17   family and to his two sisters that are here that are

18   very young.

19         And in working with the madam prosecutor,

20   maybe it was my fault, Mr. Jones points out and he

21   reminded me today specifically, specifically, that

22   madam prosecutor made it clear that you plead to

23   this, you can argue your role at the sentencing

24   hearing.  And Mr. Jones knows this because he was

25   there.  So if he was canvassed, that's exactly what
```

1   he would say.  So in the spirit of negotiation, we

2   ended up pleading to this, and now, again, if I'm

3   ineffective, I'll accept that.

4        It's been no easy road even getting here with

5   the type of the stuff in my life, but I know the

6   spirit of this negotiation was that Mr. Jones was

7   taking responsibility.  They said he should have did

8   it earlier when the cap was 20, but at that time,

9   Mr. Jones had a plea agreement up in the jail and I

10  hadn't been up there because I'm trying a murder

11  case, but then we were able to address that issue.

12       Mr. Jones understands that selling drugs in

13  connection with the others makes him a part of the

14  RICO; however, when you look at the drug quantity, I

15  ask the Court to consider above and beyond just the

16  stipulation and focus on and give some credit to

17  Mr. Jones and his role.

18       Sentencing considerations, Mr. Jones came out

19  of jail, was doing treatment, therapy, still had some

20  ways that he needed to get rid of, and I ask the

21  Court to consider that.  Mr. Jones had used a very

22  limited opportunity at Wyatt to demonstrate his

23  desire to change over the time that he's been

24  detained.  He had completed various programs while he

25  was at Donald W. Wyatt and he had maintained a job

1  there which he's very proud of.  Even one time we

2  came to court and we didn't need to be in court and

3  he said he was missing work and he had to get up

4  early and he normally would be at work at the jail.

5      Among the sentencing considerations that the

6  Court will consider is general and specific

7  deterrence; however, it should be noted that a

8  lengthy prison sentence cannot be justified on a

9  deterrent basis, crime prevention basis, Daniel S.

10  Nagin, "Deterrence in the Twenty-First Century."

11      Mr. Jones stands before the Court convicted

12  of crimes that demonstrate a marked disrespect for

13  the law.  We agree with that 100 percent; however,

14  given the inadequacy of incarceration itself to

15  change individuals or community-based behaviors, the

16  defendant respectfully asserts that deterrence should

17  not play a significant role in fashioning an

18  appropriate sentence in this case.

19      Seriousness of the offense and punishment,

20  Mr. Jones has acknowledged his criminal conduct and

21  the enterprise involved in this case; however, that

22  enterprise is much more complicated than the Greene

23  Homes or the GHB or the moniker of a street gang.

24  Mr. Jones was socially, politically, economically,

25  and familially related to the co-defendants and

1    others in Bridgeport.  He grew up with them and

2    experienced similar traumas and tribulations as they

3    did.  He had to learn to fight for himself and his

4    siblings.  He was tethered to his peers who he turned

5    to for support.  And sometimes the peers who you turn

6    to for support, whether they're older or younger than

7    you, aren't doing the right things, aren't leading

8    you in the right direction, and Mr. Jones accepts the

9    fact that he needs to separate himself from those

10   people and try to find a better life.

11          Vocational and skill building, cognitive

12   behavior skill building is more effective in reducing

13   future and criminal behavior than punishment even

14   among persons of high risk of re-offending.  That was

15   by Patricia Clark, National Institute of Justice.

16   Mr. Jones has expressed a desire to utilize his

17   period of incarceration to better himself and his

18   life upon release.  He wishes to engage in counseling

19   to remain drug free.  He hopes to take advantage of

20   programs to learn to do the best he can in prison.

21   And after his release from prison, he aspires to

22   complete college courses.  Mr. Jones hopes to utilize

23   whatever BOP -- Bureau of Prisons' programming he can

24   to have a remarkable vocational skill, and in the

25   PSR, they highlight several different options that

1   the Court can recommend for Mr. Jones during his time

2   in the BOP.

3          In conclusion, Mr. Jones will be standing

4   before or is standing before this Court today.  He

5   understands the seriousness of the crimes he has

6   committed.  The journey both before his arrest and

7   after has provided teachable moments for Mr. Jones.

8   I have journeyed to Wyatt, Rhode Island to meet with

9   Mr. Jones on many occasions during the pendency of

10  this case.

11         The last time I visited him, he said -- and

12  gave me a huge hug, because, again, he had a headache

13  because he couldn't understand all that was before

14  him.  He said, and I quote, I thank you Darnell, I'm

15  sorry I gave you such a hard time when we first met,

16  it is just hard for me to trust people.  And I think

17  that that was very moving for me.  Because of all the

18  trauma, as we stated, his father's in jail, all the

19  stuff he went through, when I first met Mr. Jones, it

20  wasn't -- we weren't at the same place we are now.

21  It was like he didn't trust me.  He didn't trust who

22  was around him and I had to continue to work with him

23  to gain that trust.

24         And at one of the last meetings we had, he

25  said, thank you Darnell, it was just hard for me to

```
 1   trust people, and I thought that that was very
 2   important to mention.  I was moved then and I'm moved
 3   now as I speak these words.  I too wasn't born with a
 4   silver spoon in my mouth and I could never imagine
 5   how his life was.
 6           Now, I do know that we make no excuses for
 7   the fact that he grew up in the housing projects and
 8   the fact that he had a poor life, and if that means
 9   that he should be a part of this, right, we make no
10   excuses for that.  We see how it happens.  We see how
11   it could happen.  If you grew up around doctors or
12   lawyers or maybe more important people, prosecutors,
13   judges, et cetera, bankers, you become one of those.
14   But we see how if you grow up in this environment,
15   how you could become one of those, a gang member
16   hanging with gang people or bad groups, et cetera.
17   We see that.  We see if you have no money and
18   everyone is selling drugs, how at 15 and 14, you can
19   engage in that.  We see that.
20           And as I stated in my memo, we live in a
21   worldwide pandemic right now and just because we're
22   in this pandemic doesn't mean that we're all going to
23   catch COVID.  Some of us might catch it.  We might
24   not die from it.  But we can't dismiss the fact that
25   to date 3.1 million people have died from COVID and
```

1  we're seeking a vaccine for this.

2      The question is do we have a vaccine for

3  poverty and for these neighborhoods and for these

4  projects that can stop this from happening so these

5  kids aren't before your Court, Your Honor,

6  constantly.  And I can tell you that that's why I

7  applaud Mr. Marshall and the things that he's doing.

8  I can tell you that I work with these groups all the

9  time, the president for the NAACP, working for the

10 homeless shelter.  I was on the board for the

11 methadone clinic when Judge Winslow stepped down.  So

12 I'm out there in the streets working there.

13     So if I'm not the brightest lawyer, that's

14 fine.  I will balance that with the efforts that I'm

15 really doing, truly doing, trying to change lives for

16 people like Mr. Jones and I have hope that he does

17 change.  I have confidence and I know that he will do

18 better.  Mr. Jones understands that if he's sentenced

19 to a substantial period of time in jail, that with

20 the time he has done before, when you look at the

21 math, he has about seven years in free society and

22 he's going to have to figure that out, but he's

23 asking this Court for a second chance, a third

24 chance, to learn from what he's gone through.

25     As such, Mr. Jones respectfully requests that

1   this Court consider a period of incarceration that

2   punishes him and deters him from further criminal

3   activity but also that provides him with service and

4   support so he can make something of his life.

5           Counsel asks this Court to consider affording

6   Mr. Jones with acceptance of responsibility points

7   that we talked about that was primarily delayed

8   because counsel was on trial someplace else and the

9   Court stated on the record that the Court will think

10  about it, and again, I accept responsibility for

11  that.  If I wasn't otherwise detained, Mr. Jones

12  could have pled out earlier.  As the Court will

13  recall, counsel was on a murder case and the Court

14  said they would think about it.  I take the blame for

15  that.

16          The Court did say that it would consider

17  giving him those points as the government at that

18  time stated that they take no position, they leave it

19  up to the Court.  Mr. Jones pleads with the honorable

20  Court to consider a sentence of 60 months

21  incarceration as sufficient but not greater than

22  necessary to serve the means of justice.  And before

23  I just conclude, if it please the Court, I'd like to

24  have Mr. Jones address the Court.

25          THE COURT:  That's fine.  Is there anything

1  further from the government?

2       MS. KAOUTZANIS:  Your Honor, I'd like to

3  respond just briefly, if that's okay.  Do you want me

4  to do that now?

5       THE COURT:  And then we'll hear from

6  Mr. Jones.

7       MR. CROSLAND:  From Mr. Jones and I think the

8  two -- yeah.  I think I'm going to dispense with

9  anybody else speaking, just Mr. Jones.

10       MS. KAOUTZANIS:  Your Honor, just very

11  briefly, I've already argued the two points that were

12  in dispute with regard to the founder status and the

13  knowledge of the shooting.  Your Honor can look back

14  in the transcript and see what the three witnesses

15  testified to including Mr. Jones' role as a founder

16  having started the gang.  That testimony is

17  consistent with the unredacted reports that were

18  provided to defense counsel.

19       There was one mention that Laheem Jones was

20  not -- was incarcerated in 2011.  He was not

21  incarcerated until October of 2012.  I refer the

22  Court to the PSR on that.

23       With regards to the videos, the videos, as

24  Your Honor has seen, the rap videos take real

25  violence, promote it, celebrate it.  They talk about

 1   real people, real events.  It's not just an

 2   expression.  It's not just artistic expression.  It's

 3   promoting a gang, celebrating real violence, and in

 4   the videos where Mr. Jones was present, that's

 5   exactly what was happening.

 6        The idea that the firearms are props is

 7   absurd.  Had we gone to trial, the government would

 8   have called cooperating defendants to testify to that

 9   effect.  Beyond that, there's common sense.  The

10   defendants had real guns.  They used real guns to

11   shoot people.  Jacquon Benejan was found with two

12   guns.  Mr. Crosland is correct that there were not

13   search warrants and extensive seizures in this case,

14   but even Laheem Jones' Facebook messages in which he

15   talks about buying a gun for $650, that's a real gun,

16   not a prop.  And again, this goes to the minimization

17   of Mr. Jones' conduct here.

18        As for the courthouse shooting and his

19   knowledge of it, again, I previously went through the

20   detailed planning, coordination, communication, which

21   I'm not going to go through again, but this is a

22   group, a gang, that was acting from the moment in

23   which Myreke Kenion was killed through coordinated

24   mobilization, premeditation to extract vigilante

25   justice.

```
 1          MR. CROSLAND:  Your Honor, I have to object.
 2   I'm not sure if we're getting two closings or what's
 3   happening, but everything is being repeated again and
 4   I'm not sure --
 5          THE COURT:  I agree.
 6          MS. KAOUTZANIS:  Okay.  I'll move on, Your
 7   Honor.
 8          THE COURT:  If you have points that you want
 9   to make with respect to Mr. Crosland's arguments,
10   fine, but not a redo.  You also mentioned something
11   about reports from the -- about the cooperating
12   witnesses that have been provided to the defense.
13   Were they in the Court's exhibit book?
14          MS. KAOUTZANIS:  No, Your Honor.
15          So I'll just conclude with this, no one, no
16   one is giving up hope for Mr. Jones.  I think
17   everyone in this courtroom hopes whatever sentence he
18   gets, and he will have time, he'll go out and he will
19   change his life and he will stop engaging in this
20   conduct, but the constant minimization of his conduct
21   is quite concerning and this would have been a very
22   different sentence had Laheem Jones admitted as he
23   did in the plea hearing.
24          Mr. Jones was not a victim here.  He took a
25   path that resulted in toxic substances being
```

 1   distributed in the community and a path that

 2   celebrated violence, promoted violence and guns.

 3           MR. CROSLAND:  And I stand back on my

 4   position.  I think this is a second argument and it's

 5   unfair.

 6           THE COURT:  It's finished.

 7           MR. CROSLAND:  Thank you.

 8           THE COURT:  Unless there's some factual

 9   correction you want to make to what Mr. Crosland has

10   said, I think we should finish.

11           MS. KAOUTZANIS:  All right, Your Honor.  I'll

12   conclude with that.  Thank you.

13           THE COURT:  All right.  Mr. Jones, will you

14   come to the podium, please?

15           THE DEFENDANT:  Hello, Your Honor.

16           THE COURT:  Hello.

17           THE DEFENDANT:  First off, I want to thank

18   you for everything you have done with respect to the

19   prosecution, keeping everything fair with the

20   evidence and stuff like that.  Secondly, I want to

21   apologize to the victims and the victims' families;

22   however, I want to individually apologize to the

23   victims, each one; however, I don't know any of them

24   by name.  I've heard their names a couple times in

25   here, but I didn't remember their names.  I remember

**A - 504**

144

```
 1   Tre because Tre is mentioned a thousand times.  So I
 2   don't know his real name, but I want to apologize to
 3   him and his family because, obviously, what my mom
 4   went through, I know personally and watching her go
 5   through something so heinous as losing a child, I
 6   know even though he didn't lose a child, just having
 7   the thought of losing a child is a very, very
 8   difficult experience.  So I want to apologize to
 9   them.
10           I want to apologize to the marshals that had
11   to go through such a traumatic experience, especially
12   with listening and seeing if he closes a door, he
13   might -- he feels uncomfortable thinking it was a
14   gunshot or something like that.  I'm not too sure 100
15   percent on what he was saying, but I want to
16   apologize to them.  I'm very sorry for everything
17   that they have to go through.
18           Thirdly, I want to apologize to the
19   pedestrians that was there, the judges, that they had
20   to witness and hear such a brutal event.  I wasn't
21   there; however, I really sincerely apologize for
22   everything.
23           I really can't express someone else's remorse
24   for something, only my own because I'm my own
25   individual.  I can't apologize for what they have
```

1    done.  I only can apologize for my own -- how would I

2    say, my own thing that I have done within the acts of

3    the experience, whatever had happened -- not whatever

4    would have happened but what has happened.  I only

5    can apologize and take responsibility for what I have

6    done.  I can't take responsibility for what everyone

7    has done, only for what I have done.  I know what I

8    have done.  I know I burned the car and I sincerely

9    apologize for burning the car.  And in all actuality,

10   I want to apologize to the people whose car I had

11   burned, because for obvious reasons, they spent their

12   own hard-earned money buying that car and I burned

13   that car for my own reasons.

14        But secondly, I want to apologize to my mom,

15   my girl, my family.  Having to put them through such

16   an experience, that's just not right at all.  Just

17   bringing them in front of the Court is very wrong all

18   around the board.  I know, like the prosecution said,

19   I did go to jail for a significant amount of time;

20   however, I was 17 when I did go to jail, just to make

21   everything clear.  I was 17 when I did go to jail.

22        There was no program for a 17 year old in an

23   adult facility.  I was in an adult facility for a

24   crime and they made me sit in protective custody,

25   which for two-and-a-half years, I could not leave the

 1   block.  I couldn't go to school.  I couldn't do

 2   anything.  I had to stay in one specific block for

 3   two-and-a-half years until I actually pleaded guilty

 4   and was able to leave and experience different

 5   things.

 6          So for the first two years, I didn't know

 7   anything.  I didn't know no one.  I was around

 8   rapists, child rapists.  I was around everything that

 9   you can think of that's not good that will put you in

10   a protective custody program, but that still doesn't

11   make anything right of coming home and going back to

12   the Greenes, but, however, Your Honor, that's all I

13   know.

14          If I went home today, where can I go that's

15   safe?  There's nowhere.  I don't have no money.  I

16   don't have no family that really has any money that

17   can move us out.  My mom is still in the same

18   predicament from when my brother was alive until now.

19   Ain't nothing changed.  Ain't nothing going to change

20   for us.  It's the same repetitive thing.  It's like

21   you could tell me I should be changing, I should be

22   doing this; however, what outlet are you giving us to

23   change?

24          I cannot -- I'm going to try with the

25   programs I'm taking.  I can go home, but when you're

```
 1   in the world, change requires financial support.
 2   That's something I do not have.  I don't have no work
 3   experience.  I never had a job ever in my life.
 4   Well, when I came home, I tried to have a job but
 5   that was difficult.
 6          So it's -- it's just what they're saying
 7   isn't what it is.  It's what you read isn't what it
 8   is.  It's what I'm living is what it is.  What I go
 9   through every day is what it is.  It's not what
10   they're saying.  It's not what my lawyer is saying.
11   It's not what the prosecution is saying.  It's what
12   I'm going through is what it is.
13          My mom, she tried her best.  I could never
14   take that from her.  Even with the PSR lady, I didn't
15   want to tell them certain things with my mom because
16   I don't want to embarrass her.  She did what she can
17   and that's really it with my mom.  She lost her son.
18   I'm in jail.  I'm broken.  She's broken.  I talked to
19   her about it.  She doesn't -- I can't FaceTime her
20   because she don't want to look at my face because I
21   look just like him.  I sound just like him, so we
22   barely talk.  So it's more than what y'all understand
23   and what y'all are hearing and stuff like that, you
24   know what I mean.  So I'm just trying to figure it
25   out.
```

 1          I know I should have never burned the car;

 2    however, I take full responsibility of what I did;

 3    however, I'm not going to take full responsibility

 4    for what someone else did for their own individual

 5    mistakes.  I can only take responsibility for what I

 6    have done and that's what I do -- I mean, that's what

 7    I'm doing.

 8          The prosecution is telling me that I'm going

 9    back on the plea agreement, what we did; however,

10    when you left the courtroom, we sat there and you

11    asked, Mr. Jones, would you like to have a

12    conversation with them, I said yes, out of the

13    respect that when you was leaving the last time we

14    was -- I'm not sure if we was in this courtroom or

15    the last courtroom, she sat right here and we sat

16    right there.  It was on trial, the second day of jury

17    selection.  You said is it all right if I have a

18    conversation with them.  They came over there.

19          Rahul, Jocelyn came over and talked to me at

20    the table.  We sat there and had a conversation.  She

21    explained certain things, which she didn't make me

22    sign a plea agreement.  She didn't do anything like

23    that; however, she advised me on certain things like

24    when you come to sentencing, you're going to be able

25    to argue certain things.

1          So it ain't like I'm coming here trying to

2   say I didn't have parts -- I didn't do this, I didn't

3   do that.  It's that I'm coming here to fight for

4   myself as my own individual.  I'm not coming here to

5   fight for Asante Gaines, Marquis Isreal, or anyone

6   else.  I'm here to fight for myself and my own life.

7   I have -- I already lost a lot and I'm not trying to

8   lose any more.  People know me for who I once was

9   with my brother, with my mom's two sons.  People

10  don't know who I am now and who I'm becoming.  I'm a

11  different person.  I have a different heart.  I have

12  a different mindset.  I have a different outlook on

13  life.  I have a different view on how death is.  I

14  have a different view on everything that you can

15  think of, because losing my brother and hearing my

16  mom cry is the hardest thing ever.  She don't cry to

17  nobody else, only me.

18          So but with Anthony Marshall and the rest of

19  my family, they do try.  They did try.  They do try.

20  They do everything.  I'm quite sure when I go home,

21  I'm going to have a support system set up for

22  whatever I want to do this go around; however, if

23  this didn't happen and the traumatic experience

24  didn't happen, who knows what I would have had then,

25  you know what I mean.  Things had to happen for other

```
 1   stuff to fall into place.  So now that everything is
 2   falling into place, I'm just kind of begging and
 3   asking the Court to show leniency on certain aspects
 4   of everything.  I'm not saying don't punish me
 5   because I deserve to be punished by my crimes;
 6   however, don't punish me for other individual's
 7   crimes.  Punish me for what I have done, not what
 8   everybody else has done.
 9           I just want to thank you again for being
10   fair, for listening, for calling for the evidentiary
11   hearing because that shows that you want to know as a
12   federal judge what the real evidence is and what is
13   what to actually sentence me to what I'm supposed to
14   be sentenced to.  That's really it.  Thank you.
15           THE COURT:  Thank you.  We'll stand in recess
16   while I consider the arguments and the factors.
17           (Recess taken.)
18           (Call to Order, 4:13 p.m.)
19           THE COURT:  Please be seated, ladies and
20   gentlemen.
21           The following are the findings of fact that
22   the Court makes following the evidentiary hearing on
23   the two disputed material issues of fact.  In
24   summary, number one, the Court concludes that the
25   government did not prove by a preponderance of the
```

1   evidence that Mr. Jones was the founder of GHB.  He

2   may well have played a key role in the drug

3   trafficking and violence against rivals, even though

4   there was no formal structure to the enterprise, but

5   the cooperating witness' information relaid through

6   the law enforcement witnesses was unclear as to time

7   frames and circumstances in many instances, although

8   it has been proved that Mr. Jones was a long-time,

9   active participant, one of the originals, more

10   experienced than newer members well before he was

11   incarcerated in October of 2012 and after his release

12   in 2019.

13       The government did prove by a preponderance

14   of the evidence that around January 27, 2020,

15   Mr. Jones agreed with his fellow GHB and O.N.E.

16   members that they would retaliate against rival gang

17   members by killing Trevon Wright and Jaheim Warren

18   and others with them as they left the state Superior

19   Court.  Mr. Jones was not a shooter, but the night

20   before the courthouse shooting, he was looking for a

21   gun following the knowledge of Mr. Kenion's murder.

22       The government's evidence with respect to the

23   timing of his calls, the location of his phone, his

24   FaceTime and other communications with GHB members,

25   primarily Gaines, up to just before the attack at the

```
 1   courthouse and his immediate departure to purchase
 2   the lighter fluid, bleach, and gas to burn the car
 3   that they had shot -- that his fellow members had
 4   shot from is so much more than just sheer
 5   coincidence.  It demonstrates his knowledge and his
 6   participation in covering up and obstructing justice
 7   by covering up the car and the evidence it would
 8   contain incriminating his fellow gang members.  It is
 9   absolutely in contradiction to his assertion that he
10   did not know of a plan to retaliate.  And therefore,
11   the Court concludes he wrongfully denied relevant
12   conduct to which he had pled guilty and will not get
13   acceptance of responsibility.
14        The second reason is he pled guilty after two
15   days of jury selection having had the essence of the
16   plea agreement as early as October 2021 and declining
17   to accept it and to proceed to trial; therefore, the
18   guideline is the 360 months and that provides no
19   particular anchor for the Court to decide what is the
20   appropriate sentence considering the goals of 3553.
21        The nature and circumstances of Mr. Jones'
22   offense, this was his fourth conviction, include his
23   involvement five days after his parole expired while
24   he was still on state probation, the continued drug
25   dealing, and the admonishment to other members that
```

```
 1   they needed to work, that is do violent things, deal
 2   the drugs to be in the gang, plus the reality that
 3   Mr. Jones, this was a continuation of his criminal
 4   activity from his early teens, but he was 25 at the
 5   time of this criminal activity.  In that conspiracy
 6   which Mr. Jones pled guilty to, he is responsible for
 7   all the acts in furtherance of the attempted murder
 8   of these four and must take that responsibility and
 9   will be sentenced for that.
10        A great deal has been said about the impact
11   of poverty, race, childhood trauma, and instability,
12   which is without doubt a continual plaguing problem
13   whose solution is not an overnight fix.  But the
14   record reflects no efforts by Mr. Jones to try to
15   pull himself out in any way.  Even his words today
16   suggest that he still doesn't know how.  The result
17   of the ongoing violence and lawlessness of the GHB
18   and its activities and the defendant's participation
19   early and then immediately after his discharge from
20   prison in 2019 provided the fuel that kept the cycle
21   of violence, death, and grief going.  There has been
22   no dispute that the offense was of the most serious
23   variety.
24        The additional history and characteristics of
25   Mr. Jones, he has no high school degree.  He has no
```

```
1    GED.  He has no appreciable work experience.  He's 27
2    now.  He had a prior eight-year sentence.  His father
3    is in prison.  His mother has suffered from substance
4    abuse problems and both served time themselves.  He
5    knows firsthand of the consequences of gun violence
6    having lost seven friends and having been shot
7    himself.
8          Mr. Brantley and Mr. Marshall Thompson gave
9    optimistic portraits.  The Court wishes that those
10   pictures that they have of Mr. Jones was accurate or
11   complete.  It appears that that is not the case.
12   Recognizing childhood trauma and instability as
13   explaining conduct, it doesn't excuse it, and
14   particularly can't excuse it continuing well into
15   adulthood, although certainly it is hoped that
16   therapy and commitment can and will overcome the
17   impact.
18          The Court always looks for signs of
19   turnaround, signs of the beginnings of
20   rehabilitation.  It appears Mr. Jones picked up right
21   where he left off when he was released from
22   incarceration which is compounded by the fact that he
23   minimizes to the Court the degree and nature of his
24   role in this offense and thus casts a shadow on
25   prospects for a lawful life.
```

```
 1            Much has been said about the relationship
 2    between deterrence and length of sentence.  The
 3    sentence has to reflect the seriousness of the
 4    offense, it has to promote respect for law, it has to
 5    be just punishment, and it has to be a sentence that
 6    will afford adequate deterrence to Mr. Jones where an
 7    eight-year sentence didn't and to others who might
 8    consider the gloriousness portrayed in those videos
 9    of gang life replete with guns as ever at your side.
10    A sentence that will provide adequate deterrence is
11    one that's long enough that he can take advantage, if
12    he will, of the Bureau of Prisons' programs, and if
13    he doesn't, it at least incapacitates lawlessness for
14    a significant period of time and thus protects the
15    public from further crimes.
16            Sentences and circumstances like this are
17    anything but easy.  Underlying is still a sense of
18    hope for the person being sentenced, but one which is
19    not myopic on what the criminal activity was, how
20    much the drug distribution and the gun violence
21    caused grief and misery to others.  Having considered
22    all of the factors that bear on tailoring an
23    appropriate sentence, the Court is prepared to impose
24    sentence and will ask Mr. Jones to stand.
25            Mr. Jones, you are remanded to the custody of
```

```
 1   the Attorney General of the United States for a

 2   period of 100 months on Count 1, 90 months on

 3   Count 2, to be served consecutively, for a total

 4   effective sentence of 190 months.  Thereafter, you

 5   will be on supervised release for three years on each

 6   count concurrently.  There are mandatory conditions

 7   of supervised release which you are responsible for

 8   in addition to the standard conditions which you will

 9   get a copy of when you are -- begin your supervised

10   release.

11           Mandatory conditions, you must not commit

12   another federal, state or local crime.  You must not

13   unlawfully possess a controlled substance.  You must

14   refrain from any unlawful use of a controlled

15   substance and submit to one drug test within 15 days

16   of release from imprisonment and at least two

17   periodic drug tests thereafter.

18           Restitution is not an issue.  I understand

19   that none of the victims are seeking restitution.

20   You must cooperate in the collection of a DNA sample

21   directed by the Bureau of Prisons or probation.

22           There are a number of special conditions of

23   supervised release that you are obligated to follow.

24   You must not communicate or otherwise interact with

25   any known member of GHB or O.N.E. without first
```

```
 1    obtaining permission from the probation officer.  You
 2    must participate in an educational or vocational
 3    services program following the rules and regulations
 4    and that may include high school equivalency, job
 5    readiness, and skills development.  You must have no
 6    contact direct or indirect with the victims or any of
 7    their family members by any means including in
 8    person, telephone, mail, fax, text messages, e-mail,
 9    chat, IM, Facebook, internet, other social media, or
10    any form of electronic communication.
11          You must participate in a program that
12    probation recommends for mental health treatment
13    following the rules and regulations of that program.
14    Your probation officer will supervise your
15    participation in that program, and to the extent you
16    are financially able, you must pay all or a portion
17    of the costs associated with that treatment.
18          You must submit your person, your residence,
19    your office, or your vehicle to search by the
20    probation officer based on the reasonable suspicion
21    of the presence of contraband or evidence of a
22    violation of a condition of supervised release.  If
23    you refuse to or fail to submit to a search, that may
24    be grounds for revoking your supervised release.  You
25    must inform other residents of your premises that
```

1    they, the premises, may be subjected to search

2    pursuant to this condition.

3         You must participate in a program that's

4    recommended by the probation office for substance

5    abuse treatment and testing, and you must, to the

6    extent you are financially able, pay all or a part of

7    those costs.  The mental health treatment requirement

8    is in part to respond to Mr. Jones' report of a prior

9    PTSD diagnosis.  The drug treatment is responsive to

10   Mr. Jones' report of a history of marijuana and

11   Percocet use.  And the educational and vocational

12   services component is to aid Mr. Jones with obtaining

13   a GED and skills that are needed for lawful

14   employment as a step to re-entry into society as a

15   law-abiding person.

16        The Court waives any fine due to Mr. Jones'

17   inability to pay but imposes a special assessment of

18   $200 as required under 18 United States Code 3013.

19        Mr. Crosland, when will that be paid?

20        MR. CROSLAND:  I haven't looked into it.

21   Would you like me to look into it?

22        THE COURT:  I'm going to have it payable by

23   the Bureau of Prisons inmate Financial Responsibility

24   Program.

25        Mr. Jones, I advise you that you have the

1    right to appeal this sentence.  Any notice of appeal

2    has to be filed in 14 days from the entry of

3    judgment.  If you cannot afford the cost of the

4    appeal, the clerk will prepare and file on your

5    behalf your notice of appeal.  If you cannot afford

6    an attorney for your appeal, the Court will appoint

7    one for you at no cost to you.  I had previously

8    advised you that that was a right you were entitled

9    to pretrial.

10          You have asked me about any assistance with

11   paying your current attorney's fees.  I have no

12   capacity to do that, only with counsel who were

13   appointed by the Court and are paid by the Court.

14          I note in your plea agreement you waived your

15   right to appeal a sentence that was 360 months or

16   less, which this is.  That does not waive your right

17   to appeal fundamental flaws with the process

18   including unconstitutional ineffective assistance of

19   counsel.  The presentence report contains in

20   paragraphs 151 to 155 a variety of programs that

21   exist in facilities of the Bureau of Prisons and they

22   certainly are recommended for Mr. Jones to seek out

23   and apply for.

24          Are there any other recommendations to the

25   Bureau of Prisons, Mr. Crosland?

```
 1          MR. CROSLAND:  Only I would inquire as to

 2   whether, in fact, due to his family's financial

 3   condition, whether he can be housed somewhere in this

 4   northeast region, and also whether, in fact, he

 5   qualifies for RDAP due to the fact that he has

 6   articulated drug issues.

 7          THE COURT:  I will recommend that he be

 8   permitted to participate in the RDAP program.  The

 9   Court's recommendation gives you at least some -- I

10   don't know if it's priority, but it will be useful to

11   you if you seek out and apply to the RDAP program.  I

12   will recommend that he -- that Mr. Jones be

13   designated to a facility in the northeast to

14   facilitate family visitation.

15          Anything further?

16          MR. CROSLAND:  No.  Thank you, Your Honor.

17          THE COURT:  I look to the government for a

18   motion to dismiss the remaining portion of Count 2

19   and Count 4.

20          MS. KAOUTZANIS:  Your Honor, I so move in the

21   underlying indictment.

22          THE COURT:  Apparently, the correction to the

23   defendant's sentencing memorandum which has been

24   filed as an amended sentencing memorandum has an

25   accompanying motion to make that correction, docket
```

1   number 496.  That's granted.

2          Is there anything that the Court has

3   misstated, overlooked that still needs to be

4   addressed, or otherwise is a part of our proceedings?

5          MS. KAOUTZANIS:  No, Your Honor.  Thank you.

6          MR. CROSLAND:  No, Your Honor.  Thank you.

7          THE COURT:  From probation?

8          MS. LAUREN HARTE:  No, Judge, thank you.

9          THE COURT:  We have completed our sentencing

10  hearing.  I hope this is the turnaround, Mr. Jones.

11  You do have qualities that you are not -- you have

12  not nourished.  If you nourish them, you can be a

13  happy, productive person.  I wish you luck on that.

14  We stand in recess.

15          (Proceedings adjourned, 4:41 p.m.)

16

17                C E R T I F I C A T E

18

19   RE:   UNITED STATES OF AMERICA v. LAHEEM JONES
                 No. 3:20-cr-00126-JBA-5

20

21          I hereby certify that the within and

22  foregoing is a true and accurate transcript taken in

23  the aforementioned matter to the best of my skill and

24  ability.

25

```
 1                    /s/ Corinne T. Thomas

 2            CORINNE T. THOMAS, RPR
               Official Court Reporter
 3          United States District Court
                 141 Church Street
 4          New Haven, Connecticut 06510
                  (203) 809-0848
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# UNITED STATES DISTRICT COURT
## District of Connecticut

### JUDGMENT IN A CRIMINAL CASE

UNITED STATES OF AMERICA

Case No.: 3:20-cr-00126-JBA-5

USM No.: 04311-509

V.

Rahul Kale and Jocelyn Courtney Kaoutzanis,
Assistant U.S. Attorneys

LAHEEM JONES

Darnell Crosland, Defendant's Attorney

The defendant pled guilty to Count 1 and 2 of the Superseding Indictment.

Accordingly, the defendant is adjudicated guilty of the following offense:

| Title & Section | Nature of Offense | Offense Concluded | Count |
|---|---|---|---|
| Title 18, United States Code, §1962(d) | Racketeering Conspiracy | August 2020 | 1 |
| Title 18, United States Code, §1959(a)(5) | VCAR Attempted Murder / Aiding and Abetting | August 2020 | 2 (Divisible Portion) |

The following sentence is a variance from the U.S. Sentencing Guidelines and is imposed pursuant to the Sentencing Reform Act of 1984.

**IMPRISONMENT**
The Defendant is ordered to be committed to the custody of the Attorney General of the United States to be imprisoned for a period of 100 months as to Count 1 and a period of 90 months as to Count 2, to be served consecutively for a total effective sentence of 190 months.

**SUPERVISED RELEASE**
Upon release from imprisonment, the Defendant shall be on Supervised Release for a term of 3 years as to each count, to be served concurrently.

The Mandatory and Standard Conditions of Supervised Release as attached are imposed. In addition, the following Special Conditions are imposed:

1. You must not communicate, or otherwise interact, with any known or suspected member of any gang, including GHB or O.N.E., without first obtaining the permission of the United States Probation Office.

2. You must participate in an educational and/or vocational services program and follow the rules and regulations of that program. Such programs may include, but are not limited to, high school equivalency preparation, job readiness training, and skills development.

3. You must have no contact, direct or indirect, with the victims or any of their family members by any means, including in person or by telephone, mail, facsimile, text messaging, email, chat rooms, instant messaging, over the Internet, through Facebook or other social media, or through any other form of electronic communication.

4. You must participate in a mental health treatment program recommended by the United States Probation Office. You must follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program. You must pay all or a portion of costs associated with treatment based on your ability to pay as recommended and approved by the United States Probation Office.

5. You must submit your person, residence, office, or vehicle to a search, conducted by a United States Probation Officer, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; you must inform any other residents that the premises may be subject to searches pursuant to this condition.

6. You must participate in a substance abuse treatment program recommended and approved by the Probation Office substance abuse treatment and testing. You must follow the rules and regulations of that program. The probation officer will supervise your participation in the program. You must pay all or a portion of costs associated with treatment based on your ability to pay.

**CRIMINAL MONETARY PENALTIES**

The defendant must pay the total criminal monetary penalties under the schedule of payments as follows:

| | |
|---|---|
| **Special Assessment:** | $200.00 to be paid to the Clerk of the Court via the Bureau of Prisons' Financial Responsibility Program |
| **Fine:** | Waived |
| **Restitution:** | **NA** |

It is further ordered that the defendant will notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this Judgment are paid.

The following Counts have been dismissed:  Counts 1 and 3 of the Indictment; Count 4 and the remaining portion of Count 2 of the Superseding Indictment.

**JUDICIAL RECOMMENDATION TO THE BUREAU OF PRISONS**

The Court recommends that the Defendant be designated to a facility in the Northeast U.S. to facilitate family visitation. The Court further recommends that the Defendant be permitted to participate in the RDAP Program.

Date of Imposition of Sentence:  April 7, 2022

/s/ Judge Janet Bond Arterton

Janet Bond Arterton, United States District Judge

Date: _April 28, 2022_

### CONDITIONS OF SUPERVISED RELEASE

**In addition to the Standard Conditions listed below, the following indicated (■) Mandatory Conditions are imposed:**

### MANDATORY CONDITIONS

(1) You shall not commit another federal, state or local crime.

(2) You shall not unlawfully possess a controlled substance.

(3) You shall refrain from any unlawful use of a controlled substance.  You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

(4) ☐ You must make restitution in accordance with 18 U.S.C.§§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*

(5) ■ You must cooperate in the collection of DNA as directed by the Bureau of Prisons or probation officer. *(check if applicable)*

(6) ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

(7) ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

### STANDARD CONDITIONS

As part of your Supervised Release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

(1)   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

(2)   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

(3)   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

(4)   You must answer truthfully the questions asked by your probation officer.

(5)   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

(6)  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

(7)  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so.  If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

(8)  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

(9)  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

(10)  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

(11)  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

(12)  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

(13)  You must follow the instructions of the probation officer related to the conditions of supervision.

Upon a finding of a violation of Supervised Release/Probation, I understand that the court may (1) revoke supervision <u>and impose a term of imprisonment</u>, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed) _____          _____
                Defendant                                                  Date

             _____          _____
                U.S. Probation Officer/Designated Witness          Date

**RETURN**

I have executed this judgment as follows:

Defendant delivered on _____ to _____ a
_____, with a certified copy of this judgment.

                                _____
                                  Lawrence Bobnick
                            Acting United States Marshal

By     _____

                                 Deputy Marshal

JUN 27 2022 PM 2:42
FILED-USDC-CT-New_Haven

# Notice of Appeal

U.S. Vs. Laheem Jones                Case No: 3:20 CR 126 (JBA)

I the defendant, pro se, hereby informs
this court of my intentions to appeal the sentence
issued by the New Haven District of the Second
Circuit on April 7, 2022. Please accept this notice of
appeal in accordance with the standards set by
Hanes vs. Kerner.

Laheem Jones 04311-509
pro se

PROVIDENCE RI   028

24 JUN 2022   PM 5   L

To: Court Office Clerk
141, Church St
New Haven, CT 06510

Ladeana Jones #04311504
950 High St
Centralfalls, RI, 02863

06510-203064